Private

# Exhibit 15

Toyin Falola <toyinfalola@austin.utexas.edu>

Fri 10/19/2018 6:25 AM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>

📎 3 attachments (223 KB)
PHOTO-2018-10-18-12-28-36[4].jpg; PHOTO-2018-10-18-12-28-36[5].jpg; PHOTO-2018-10-18-12-28-36[6].jpg;

Dear Al:
I wanted to call you yesterday but I was dealing with the excitement around the addition to the family—Simone Sade, photos attached.

Here is my personal advice, which I am making to remove yourself from the center of all the unnecessary attacks (I was expecting disagreements but not at this sustained level of anger) is to say that you are just dealing with compilation of facts and records and let Jackie deals with its interpretations, using the EC or another committee.

I have served on various peace missions, and you cannot drive change if established and privileged vested interests are not ready for it. One has to seek other instruments.

**This is a private note**, but you don't want to give yourself emotional agonies that can be transferred to the Head of Department who is well paid.

**See my message as private**. As you can tell, I keep to myself, which is why I am super productive, although I am not rewarded for it.

Best
TF

Toyin Falola
Department of History
The University of Texas at Austin
104 Inner Campus Drive
Austin, TX 78712-0220
USA
512 475 7224
512 475 7222 (fax)
http://sites.utexas.edu/yoruba-studies-review/
http://www.toyinfalola.com
http://www.utexas.edu/conferences/africa
http://groups.google.com/group/yorubaaffairs
http://groups.google.com/group/USAAfricaDialogue

can we meet soon?

# Exhibit 16

Alberto A. Martinez

Mon 2/4/2019 5:21 PM

Sent Items

To:Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>;

hi Lina and Martha,

I write as Chair of the Equity Committee and Minority Liaison, since Lina is our department's Ombuds and Martha used to be. I'm hoping the three of us can meet soon so that I may get your advice on a difficult situation.

Basically, last semester after the Eq Committee presented our draft Report on Salaries, Jackie called a meeting of the Executive Committee in which she asked them to "disband" the Eq. C. However, the Executive Committee objected and decided not to do that, but that we should be allowed to proceed doing our work.

However, Jackie soon told me that she wanted to create subcommittees of the Eq C so that more faculty could participate. I thought that was fine, but she didn't tell me how members of the subcommittees would be selected and didn't seem to like my suggestion that we just ask everyone in the department who'd like to join. She asked me a few times which members of the Eq C wanted to be in the subcommittees and last Tuesday I sent her the names of which subcommittees we each had chosen. The very next day, Madeline emailed that Jackie appointed her chair of the subcommittee on Promotions. I was annoyed that Jackie did that without consulting me or the Equity Committee, but I try to be flexible so I emailed Jackie saying it's fine, but that I do want to be chair of the subcommittee on Governance. She emailed me the next day, saying she asked Jeremi to chair that subcommittee and that he accepted. This top-down way of doing things is exasperating and inappropriate, and it's the kind of problem that led to the creation of the Eq. Committee in the first place. I explained in an email to Jackie why this is procedurally wrong; I've copied it below.

So, I'm hoping to get your advice in person — to discuss my options. Option 1: keep all faculty that Jackie appointed to the subcommittees. Option 2: we don't, because she did it without even consulting the Eq C.  Maybe Madeline and Jeremi can well be members of the committees but I seriously worry that Jeremi might be counterproductive as chair because he's the only faculty member in the department who has told me at length that there are no significant inequities in governance in our department (e.g., he said that anyone who doesn't get elected into the EC doesn't have the trust of the department, that some people can't be trusted in certain roles, that people don't trust me in particular because I'm "an antagonistic person," that those who think they're underpaid are not, that if anyone wants more than they have "they just have to play the game," etc.) I appreciate Jeremi's honesty, but chairs of subcommittees are usually appointed by the choice of committees themselves.

I'm exasperated by all this, and there's more, but we can talk about it.
Can we meet maybe tomorrow Tuesday at noon? Or at some time on Wednesday?

Thanks,
Al

Exhibit 17

**Equity Committee Meeting**
February 6, 2019
                            **Problems for Discussion**

After we presented the draft Report on Salaries, ==Jackie asked the Exec. C. (EC) to disband the Eq. Comm. The EC disagreed and re-asserted that we must be allowed to do our job.==

Jackie decided that Susan DS is a subcommittee of the Eq. Com. But this was beyond our original scope: We were appointed to analyze equity issues in salaries, governance, promotions.

Jackie decided that our Eq. C. should have two more subcommittees: Promotions and Governance. She asked us to choose in which subcommittees we want to be.

Once we chose, she unilaterally appointed Madeline to be chair of Promotions subc., without consulting us.

When I found out Jackie had done that, I wrote her that I want to be chair of the Gov. Sub. But the next day, she told me that she appointed Jeremi, and that he accepted, again, without consulting us, as a *fait accompli*, as already decided before those affected hear about it.

==I emailed Jackie that she proceeded inappropriately, by not consulting us.== I explained that subcommittees can have external members but they can or should be chaired by members of the parent committee. And, subcommittees must report only to the parent committee.

Jackie then reiterated her previous statements. And she ignored my complaints about how she proceeded improperly, without consultation and disregarding our autonomy, and about how the subcommittees must report only to the Equity Committee.


**Some Options for Discussion:**

1) Revoke all members and chairs of the Governance and Promotions subcommittees, since they were appointed without consultation, and invite everyone in the Dept. to join, including those individuals. Appoint as chairs only members of the Eq. C.

2) Retain all members and chairs of the subcommittees, but under the condition that they agree to follow the standard rules of order, and, in particular, that they will report only to the Eq. Committee, and submit drafts of reports to be edited by the Eq. C.

3) Retain some members and chairs of subcommittees, under the same condition above, and invite other members openly, any faculty.

4) Discharge the Subcommittee on Curriculum and Scheduling, that is, give SDS independence in a separate committee, since that area was not one of our original charges.

Jeremi might be counterproductive as chair because he's the only faculty member in the department who has told me at length that there are no significant inequities in governance in our department (e.g., he said that anyone who doesn't get elected into the EC doesn't have the trust of the department, that some people can't be trusted in certain roles, that people don't trust me in particular because I'm "an antagonistic person," that those who think they're underpaid are not, that if anyone wants more than they have "they just have to play the game," etc.) I appreciate Jeremi's honesty, but chairs of subcommittees are usually appointed by the choice of committees themselves.

Huaiyin 13 years at UT never in EC
Emilio  13 years until EC
Juliet 0 times in past 15 years
Falola 1 time in 15 years

Matysik 6 years
Bsumek 8 years
Joan 5 yrs
Philippa 5 yrs
David Crew 6 years

appoint individuals who don't want to serve, appoint some who have already served too much, not appoint others who do want to serve

Alberto A. Martinez
Mon 2/4, 5:21 PM
hi Lina and Martha,

I write as Chair of the Equity Committee and Minority Liaison, sinceLina is our department's Ombuds and Martha used to be. I'm hoping the three of us can meet soon so that I may get your advice on a difficult situation.

Basically, last semester after the Eq Committee presented our draft Report on Salaries, Jackie called a meeting of the Executive Committee in which she asked them to "disband" the Eq. C. However, the Executive Committee objected and decided not to do that, but that we should be allowed to proceed doing our work.

However, Jackie soon told me that she wanted to create subcommittees of the Eq C so that more faculty could participate. I thought that was fine, but she didn't tell me how members of the subcommittees would be selected and didn't seem to like my suggestion that we just ask everyone in the department who'd like to join. She asked me a few times which members of the Eq C wanted to be in the subcommittees and last Tuesday I sent her the names of which

Re: New Equity Committee in place: Your charge

Exhibit 18

Alberto A. Martinez

Fri 5/11/2018 4:33 PM

Sent Items

To: Zamora, Emilio <e.zamora@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>;

Cc: Jones, Jacqueline <jjones@austin.utexas.edu>;


Dear Emilio, Joan, Juliet, Leonard, Mark, Megan, Peniel,

welcome to our new committee -- I'm glad to have you on board. I forward to you, below, the first email I sent to this committee, less than a week ago.

As you may know, in April Jackie kindly called for a "robust online discussion on departmental governance issues." It led to a series of frank emails in which some faculty members, including myself, raised concerns about apparent inequities and about how we might well improve our governance to solve them.

I thank and value Jackie's trust in appointing me to chair this new committee. Near the end of our Faculty Meeting, on May 2, she said we'd look at the three areas in the Agenda: governance, merit increase guidelines, and nurturing of junior faculty. Still, she also notes that our charge is broad, so we may well focus it.

My aim is to help increase equity in our department, and to that end we will prepare a Report with recommendations. It'll be based on historical data, faculty input, and your thoughtful analysis. I certainly agree with Jackie's suggestion that we should "develop positive recommendations related to departmental structures and policies that will ensure an equitable distribution of resources and influence among various groups and all individuals."

Bear in mind that this won't be a diffuse or protracted process. We should work for equity and inclusiveness now, promptly, not years from now.

So, please tell us what specific problems you'd like us to address and work on. My previous email, below, includes good suggestions from our colleagues.

With best wishes,
Al

Chair,
Committee on Equity



Subject: Committee on Equity
Sat 5/5/2018 8:07 AM
To: Raby, Megan; Zamora, Emilio; Stoff, Michael B; Neuberger, Joan H

# New Equity Committee in place: Your charge

## Jones, Jacqueline

Fri 5/11/2018 1:42 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>;

Cc: Tully, Alan <tully@austin.utexas.edu>;

Dear Al, Emilio, Joan, Megan, Peniel, Mark, Leonard, and Juliet,

Thank you for agreeing to serve on the department's New Equity Committee, which Al is chairing. I have included everyone on this committee who wished to be part of it; but at 8 people, it's probably big enough now. I'll tell other colleagues who want to join that it is now closed (though I assume you welcome input from interested parties generally).

A couple of things: Please cc me on all your email correspondence, so that I can serve as a resource when needed.

As of now, the committee's charge is broad and vague. How can we narrow and focus it? I'll leave it to you to make suggestions. I know that certain colleagues not on the committee have a keen interest in related issues (the nurturing of junior faculty, for example), and perhaps you want to identify those issues that can be handled by another group, or by the department as a whole. I don't want you to think that you have to tackle every problem. My chief suggestion is that, looking to the future, you develop positive recommendations related to departmental structures and policies that will ensure an equitable distribution of resources and influence among various groups and all individuals.

In any case I think it will be best that you decide on your charge before going much further; I'm happy to weigh in if you want me to, but Al will moderate the discussion.

Again, thank you for agreeing to serve.

Cheers,
Jackie

# Exhibit 19

On Nov 30, 2018, at 10:44 AM, Jones, Jacqueline <jjones@austin.utexas.edu> wrote:

Hi Megan,

   Jack Davis told me he had dinner with you at UF! I hope you enjoyed your visit! Jack is a great guy (did he tell you he was my first grad student at Brandeis?) and will be our Littlefield Lecturer in 2020. I hate to keep bothering you, but I am checking in about the Climate Survey. What is the division of labor on the Equity Committee related to this? Al asked me to put out a call to our colleagues for questions, but I have had no responses yet.

   I am hoping we can keep things pretty simple: For example, What suggestions do you have for strengthening or changing the governance structures of the department, especially the EC? And What suggestions do you have for improving the tenure and promotion process in the department?

   In all honesty I have not heard a lot of grumbling about either one of these, but that is what the survey is for I suppose, to solicit opinions that folks have but have not verbalized or otherwise communicated to the department.

   Once again, I feel badly writing just to you, but do not know whether or not you have a committee, or whether or not others on the Equity Committee are actively involved in this project with you.

Jackie

Re: checking in

Exhibit 20

## Jones, Jacqueline

Fri 11/30/2018 10:18 AM

To: Raby, Megan <meganraby@austin.utexas.edu>;

Cc: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Thanks Megan. Either I didn't get the drafts or I missed them— would you mind resending? Thank you.
Jackie

Get Outlook for iOS

---

**From:** Raby, Megan
**Sent:** Friday, November 30, 2018 11:16:08 AM
**To:** Jones, Jacqueline
**Cc:** Alberto A. Martinez
**Subject:** Re: checking in

Hi Jackie,

The committee is on track with the climate survey. Yes we're actively working on it as a whole—with additional feedback from emails, conversations, my meeting with Indrani and Martha, etc. I thought you were on the last email exchange, before Thanksgiving, when some drafts were circulated, but perhaps I am wrong? I think we will need 1-2 more meetings for the committee to come to consensus about the questions. (Al, I've cc'ed you: can the Equity Committee meet next week and/or during finals to finalize the questions?) I've learned how to use Qualtrix, so over the break I'll use it create the survey itself using the questions we decide on. I'll make sure you continue to be Cc'ed on future correspondence. I'm in agreement re: relative simplicity—that is exactly what has taken some time to craft. I think we're almost there.

Yes, I had a great dinner with Jack and was planning to pass along my greeting to you from him! You beat me to it!  I'm so thrilled he'll be here as Littlefield Lecturer. And I had a great time at UF—it is nice to have such a positive response to my research from both historians and ecologists.

Best,
Megan

Megan Raby
Assistant Professor
Department of History
University of Texas at Austin

www.meganraby.com
New book: **American Tropics: The Caribbean Roots of Biodiversity Science**

On Nov 30, 2018, at 10:44 AM, Jones, Jacqueline <jjones@austin.utexas.edu> wrote:

Hi Megan,
    Jack Davis told me he had dinner with you at UF!  I hope you enjoyed your visit!  Jack is a great guy (did he tell you he was my first grad student at Brandeis?) and will be our Littlefield Lecturer in 2020.
    I hate to keep bothering you, but I am checking in about the Climate Survey.  What is the division of labor on the Equity Committee related to this?  Al asked me to put out a call to our colleagues for questions, but I have had no responses yet.
    I am hoping we can keep things pretty simple: For example, What suggestions do you have for strengthening or changing the governance structures of the department, especially the EC?  And What suggestions do you have for improving the tenure and promotion process in the department?

Important

Exhibit 21

## Raby, Megan

Mon 12/10/2018 10:41 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Hi Al,

I am **so sorry** to do this, but I have just told Jackie that I must resign from further involvement in a climate survey. Jackie has contacted me with objections about the survey, and I feel that I am stuck in an untenable position, forced to mediate between her and the committee.

Let me figure out how to turn over the Qualtrics draft to you. I won't go to the meeting tomorrow. If it is OK with you, I'll rejoin the equity committee if/when we move on from the survey to other items. Let me explain this in person if you are around today. I'm very sorry—this must be unexpected and inconvenient.

Thanks for understanding, and for being a good friend,
Megan


Megan Raby
Assistant Professor
Department of History
University of Texas at Austin

www.meganraby.com
New book: American Tropics: The Caribbean Roots of Biodiversity Science

# Re: Important

Alberto A. Martinez

Mon 12/10/2018 11:32 AM

Sent Items

To: Raby, Megan <meganraby@austin.utexas.edu>;

==hi Megan,==

==wow, this is surprising and rough.==
You can well send me her objections, if that's ok, and it's too bad, as I thought the Survey was going very well, and my impression this weekend was that the version online is looking good even though most of the material isn't in there yet. ==Had I imagined that she might complain about draft 2.0 before it's not even finished I would have insisted that I do it this weekend, rather than you.==

==Note also that Jackie could better have sent any concerns to all of us, rather that just you, but oh well.==

In any case, ok, you can step away from the CS, and I'll complete it, with everyone's input, including Jackie's.

And of course, I do want you to continue in our committee for the promotion and governance issues.

I'm not on campus yet, but might be a bit later -- I'm not sure yet, but I'll call you on your cell phone today.

And thank you for all your good work!!

Al

---

**From:** Raby, Megan
**Sent:** Monday, December 10, 2018 10:41:36 AM
**To:** Alberto A. Martinez
**Subject:** Important

Hi Al,

I am **so sorry** to do this, but I have just told Jackie that I must resign from further involvement in a climate survey. Jackie has contacted me with objections about the survey, and I feel that I am stuck in an untenable position, forced to mediate between her and the committee.

Let me figure out how to turn over the Qualtrics draft to you. I won't go to the meeting tomorrow. If it is OK with you, I'll rejoin the equity committee if/when we move on from the survey to other items. Let me explain this in person if you are around today. I'm very sorry—this must be unexpected and inconvenient.

Thanks for understanding, and for being a good friend,
Megan

Megan Raby
Assistant Professor
Department of History
University of Texas at Austin

Re: Salary Guidelines: Voting Results

Exhibit 22

Brower, Benjamin C

Mon 12/17/2018 9:38 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Dear Al, A well deserved vote of confidence for the committee's hard and thoughtful work.  Thanks again for your efforts.  Best, Ben

Benjamin Claude Brower
Associate Professor

History Department
University of Texas at Austin
104 Inner Campus Dr. Stop B7000
Austin TX 78712-0220
USA
tel. +1 512-475-6813
benbrower@utexas.edu
webpage: http://www.utexas.edu/cola/depts/history/faculty/bcb936
Office: Garrison Hall GAR 3.204

On Dec 16, 2018, at 11:26 PM, Alberto A. Martinez <almartinez@austin.utexas.edu> wrote:

hi everyone,

as you know, the Committee on Equity developed 23 proposals, in consultation with faculty members and Jackie Jones, with the aim of improving our Salary Guidelines, especially in the interest of equity issues such as compression. We invited the 60 tenured and tenure-track History faculty to vote (not including lecturers, Affiliated Faculty, or Emeriti), that is, everyone who is directly affected by our Salary Guidelines. Jackie Llado received 41 ballots, which is a pretty good turnout (68%).

On Wednesday Jackie Llado and I tallied the ballots in Jackie Jones' office while she too was there.
Results:  the faculty vote approved all 23 proposals for improving the Salary Guidelines.

The two proposals with most votes in favor received 38 votes each and are #16 (about the 60% for equity raises) and #22 (about being informed about itemized reasons for raises received). The proposal with fewest votes had 26 votes and was Proposal #9 (about editing a journal special issue). Again, all proposals did pass. To me, it's especially gratifying that we did choose to grant greater priority to Equity Raises than what was stated in past Guidelines; it's a kind gesture of solidarity for our colleagues.

I've attached the tally of vote counts: Yes, No, Abstain. Jackie Llado has all the ballots and voting list.

Thank you for participating -- and for your suggestions during the process.
Also, I warmly thank Jackie Jones, Jackie Llado, and the members of the Committee for their good work: Joan, Emilio, Megan, Juliet, Mark, Peniel.


Al Martinez

Chair,
Committee on Equity

---

**From:** Alberto A. Martinez
**Sent:** Monday, December 10, 2018 1:29 AM
**To:** Abzug, Robert H; Berry, Daina R; Bodian, Marion E; Brands, H W; Brower, Benjamin C; Brown, Jonathan C; Bsumek, Erika M; Buenger, Walter L; Butler, Matthew J; Canizares, Jorge Canizares-Esguerra; Chatterjee, Indrani; Coffin, Judith G; Crew, David F; Deans-Smith, Susan; Del Castillo, Lina M; Di-Capua, Yoav; Toyin Falola; Farmer, Ashley; George Forgie; Frazier, Alison K; Frens-String, Joshua; Garfield, Seth W; Burnett, Virginia Garrard; Laurie Green; Guha, Sumit; Hardwick, Julie; Hsu, Madeline Y; Hunt, Bruce

# Exhibit 23

**Office for Inclusion and Equity**

---

| | |
|---|---|
| **From:** | noreply@utexas.edu |
| **Sent:** | Monday, January 14, 2019 12:28 PM |
| **To:** | equity@utexas.edu |
| **Subject:** | Office of Institutional Equity Data Intake Form |

**Categories:** ██████████

---

**Recipient Data:**
**Time Finished:** 2019-01-14 12:27:52 CST
**IP:** 128.83.117.25
**ResponseID:** R_2wjeWXzNLMEpVVt
**Link to View Results:** <u>Click Here</u>
**URL to View Results:**
https://proxy.qualtrics.com/proxy/?url=https%3A%2F%2Futexas.qualtrics.com%2FCP%2FReport.php%3FSID%3DSV_8iAZSunZGgcGC4l%26R%3DR_2wjeWXzNLMEpVVt&token=sRJPXnp%2Bxiz4w11rzj%2BVmMtC3B6jMK8f5XXHzkPCefo%3D

---

**Response Summary:**

NAME:
 Jacqueline Jones

HOME ADDRESS:
 ████████████████████

PHONE:
 ████████████████████

EMAIL:
 ██████████████

UT DEPARTMENT:
 History

UT EID:
 ████████

I am a:
 UT Employee

Have you been to this office previously?
 Yes

1

If "yes", date of visit:
   No apppointment-- I have apassed along a Title IX complaint

Please briefly describe why you are visiting the Office for Inclusion and Equity:
   As Chair of the History Department, I was contacted by ███████████████
██████ this morning.███ told me that █████████████████████ had informed ██ that
a current faculty member of the department had engaged in inappropriate conduct with graduate students in the
past, and was dating a graduate student now.██████ said ████████████ were concerned about the
well-being of the graduate student(s).███ email address is ████████████

NAME:
   Alberto Martinez

JOB TITLE:
   Professor

DEPARTMENT:
   History Department

Earliest:
   ??

Latest:
   currently dating a graduate student

Continuing Harm:

BASIS OF HARM:
   Sexual Misconduct

EMPLOYMENT or ACADEMIC HARM: (If Applicable)

INITIALS:
   JJ

DATE:
   January 14, 2019

RE: subcommittees

Exhibit 24

Jones, Jacqueline

Thu 1/31/2019 10:47 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Hi Al,
Thank you for your message.  I wanted you to know that I have asked Jeremi to chair the subcommittee on Governance, and he has agreed.
Since you are the chair of the Equity Committee, I do not think it would be appropriate for you also to chair this subcommittee.  I am chair of the department, but in virtually all cases I leave chairing departmental committees to others.  Of course as a member of the committee, you'll play a major part in shaping its work.
I think we have a good core of people on the committee—you, Mark, Peniel, Juliet, and Emilio.  I'll be asking a couple of other people to serve as well.
I'll let you know when the committee is complete.  Thanks so much.
Best,
Jackie

**From:** Alberto A. Martinez <almartinez@austin.utexas.edu>
**Sent:** Wednesday, January 30, 2019 7:56 PM
**To:** Jones, Jacqueline <jjones@austin.utexas.edu>
**Subject:** subcommittees

hi Jackie,
Madeline sent me a group email saying that she'll serve as chair of the subcommittee on Promotions, which is fine with me. Still, I'm just writing to say that I do want to serve as chair of the subcommittee on Governance. Or, let me know if you were thinking of appointing someone else. I assume that Susan will lead the subcommittee on Curriculum and Scheduling, as you had mentioned.

Madeline reached out to Abena, Lina, and Yoav to join the subcommittee, which sounds good to me too.

Thanks,

Al

subcommittees

# Exhibit 27

Alberto A. Martinez

Sat 2/9/2019 5:14 PM

Sent Items

To: Jones, Jacqueline <jjones@austin.utexas.edu>;

Cc: Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>;

hi Jackie,

the Equity Committee met to discuss how to proceed with regard to the subcommittees. We agreed that since you already appointed Madeline and Jeremi to chair the subcommittees on Promotions and Governance none of us wants to chair those committees now, and we expect to work well with them. We do agree that both of them and the other new members you appointed can contribute valuable expertise and good will to work on these areas. Still, most of us felt disappointed and uncomfortable that you just didn't consult us.

Still, we do want to keep working on these issues so we wish to make a few requests. We want to meet soon with Madeline, Jeremi, and Susan to give them an overview of our work and findings to date, since we've been discussing these issues for eight months. Also, we think that the three of them should well be members of the Equity Committee, in order to have a good working relationship. Finally, we'd like to invite all the faculty to see if others want to join the subcommittees, to be open and inclusive.

Best,

Al, Mark, Megan, Juliet, Emilio, Peniel

Re: equity

# Exhibit 28

Suri, Jeremi
Mon 4/22/2019 8:40 AM
**To:** Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>
**Cc:** Alberto A. Martinez <almartinez@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Joseph,
Peniel E <Peniel.Joseph@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Lawrence, Mark A
<malawrence@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; Neuburger, Mary C
<burgerm@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>;
Jones, Jacqueline <jjones@austin.utexas.edu>

Dear Jorge,

Thanks for your message. Our governance subcommittee has worked very hard to promote the
values that underlie your message: transparency, representativeness, equity, diversity, efficacy, and
access. They will be front-and-center in our report to the department. Our subcommittee's
proposed reform will seek to implement these values more fully. Our subcommittee is currently
working on a draft report which will explain this in detail, but I am happy to meet with you to
discuss details, explain our work, and hear your suggestions. I will be in Berlin and Dresden to
deliver a keynote and conduct research most of this week. Would you like to meet early next week?

I personally value your suggestions, but I hope you will avoid combative accusations that are
based, as below, on very partial information. I will happily share the details of our subcommittee
efforts, our goals, our proposal, and our values. We can all work together in good faith and agree
on the most important things, I believe.

As I suggested, please let me know when you would like to meet early next week for a collegial
discussion about our subcommittee's work. Please feel free to invite anyone else you wish. I am
cc'ing our entire subcommittee — you only copied a partial list of the subcommittee.

Thanks again.

Yours,
Jeremi


On Apr 22, 2019, at 4:45 AM, Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu> wrote:

> Dear Colleagues
> I am concerned about the new alternative of  Committee on Committees (or Nominations)
> along with triads of applicants for every position (one of whom will be chosen by the chair)
> as a solution to departmental inequities in governance. The solution appears as extremely
> cumbersome instead of the straightforward system of rotation. How we'll guarantee that the
> nominating committee and the chair won't simply select candidates from the same pool of
> individuals who are not now considered "reliable"?  Example: Alberto had never been chair
> of anything until last April. Alberto temporarily became the chair of the equity committee .He
> directed reforms on equity merit pay and the climate survey and gathered data. Suddenly,
> the equity committee was dissolved into subcommittees and power devolved to the same
> pool of people, the grownups, who have been running things in the department.  Clearly,
> Alberto cannot be trusted with positions of leadership. Would he ever be chosen out any
> triad presented to Jackie to be, say, director of the IHS or Graduate Director?  The new
> proposed solution will most likely make things worse as those not chosen will feel even more
> disenfranchised. Or they simply don't ever apply not to be humiliated. How do make sure
> that those  of us who want to occupy positions of leadership in the department but who are
> considered by the "grownups"  illegible or incapable won't be, again, left out?  We embarked

a year ago on a pattern of analysis and reform. Let's make sure we offer realistic alternatives of inclusion and equity.
Best
Jorge


Jorge Cañizares-Esguerra
Alice Drysdale Sheffield Professor of History
University of Texas-Austin
https://utexas.academia.edu/JorgeCanizaresEsguerra

Re: the way forward this spring

Exhibit 29

Alberto A. Martinez

Mon 2/18/2019 12:42 AM

Sent Items

To: Jones, Jacqueline <jjones@austin.utexas.edu>;

Cc: Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan
  <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>;
  Suri, Jeremi <suri@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Deans-Smith, Susan
  <sdsmith@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>;

Hi Jackie,

thank you for writing;
and to Susan, Madeline, and Jeremi — welcome to the Equity Committee.

Thank you for sending these draft statements of the subcommittees' charges, Jackie. I do have a some suggestions.

Looking at our initial emails last May and the agenda from the very first meeting of the Equity Committee, I want to echo some of that language. Our objective was to review equity broadly, to better include "minorities, gender, and any colleagues who feel disenfranchised," in order "to ensure an equitable distribution of resources and influence among various groups and all individuals."  So how about this:

**Governance:**
This subcommittee is tasked with reviewing our department's structures of governance-- including the Executive Committee, committee assignments, and administrative positions (such as Associate Chair, Graduate Adviser, and Assessment Director)-- to make recommendations to ensure an equitable distribution of resources and influence among various groups and all individuals. This subcommittee will work to ensure that our governance is inclusive (especially in terms of diversity and gender), efficient, transparent, and responsive to the needs of faculty and students.

[original draft] Governance:
This subcommittee is tasked with reviewing the department's structures of governance-- including the Executive Committee, standing committee assignments, and administrative positions (such as Associate Chair, Graduate Adviser, and Assessment Director)—and with making recommendations as needed to insure that those structures are efficient, transparent, inclusive, and responsive to the needs of the department.

Next, regarding promotions, the draft seems to emphasize promotion to full professor ("special attention") whereas originally when the Equity Committee was created the main focus was promotion to tenure. To be sure, multiple colleagues didn't get tenure in our department, and also, several others have been Associates for a while, so I suggest editing the wording in order to work on both areas equally. Also, I think we should prioritize helping faculty in the promotions processes. So how about this:

**Promotions:**

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent (understanding that the University and the College impose rules and guidelines that also govern our procedures). This subcommittee will analyze both promotion to full professor and promotion to tenure (including the Third Year Review, peer observations of classes, mentoring, etc.), to help faculty advance in rank.

[original draft] <u>Promotions:</u>
This subcommittee is tasked with reviewing the department's promotion policies to insure that they are fair, transparent, and comprehensive (understanding that the University and the College impose certain rules and guidelines that must govern our own procedures). Members should pay special attention to procedures related to promotion to full professor, but also policies that affect junior faculty--including the Third Year Review, peer observations of classes, and mentoring—as means of preparing those faculty for the tenure review.


Finally, about Scheduling and Curriculum, I think the draft is fine, except that we should well add a robust discussion about how the new requirements for the History major may affect enrollments in terms of diversity. Basically, I share Abena's serious concern that by eliminating the old requirement of 2 courses in AAME&LAH, while adding the new requirement of 2 pre-1800 courses, our department risks funneling more students to white faculty (especially in European history) and reducing enrollments in African History courses in particular. I worry that a net effect might be: teaching less ethnocultural diversity to some of our majors and inadvertently luring fewer students into AAME. Hence I suggest adding one goal/sentence, at the end:

**Scheduling and Curriculum:**
This subcommittee is tasked with ensuring the fair and transparent participation of faculty members in assessment assignments and in the distribution of teaching assignments (especially required courses for History undergraduate majors and graduate students) as well as continuing to ensure that MWF/TTh schedules are rotated among the faculty in an equitable way. This subcommittee will also discuss how the new requirements in the History major can affect enrollments in geographic area courses in order to elucidate how to counter any inadvertent effects on teaching diversity.

[original draft]  <u>Scheduling and Curriculum:</u>
This subcommittee is tasked with insuring the fair and transparent participation of faculty members in assessment assignments and in the distribution of teaching assignments (especially required courses for History undergraduate majors and graduate students) as well as continuing to insure that MWF/TTh schedules are rotated among the faculty in an equitable way.


Finally, the dates for the open meetings and final reports seem fine to me.

Thank you all --

Al

---

**From:** Jones, Jacqueline
**Sent:** Sunday, February 17, 2019 1:12:50 PM
**To:** Alberto A. Martinez
**Cc:** Joseph, Peniel E; Lawrence, Mark A; Raby, Megan; Walker, Juliet E K; Zamora, Emilio; Suri, Jeremi; Hsu, Madeline Y; Deans-Smith, Susan; Flores, Arturo R; Llado, Jacquelin
**Subject:** RE: the way forward this spring

Dear Members of the Equity Committee:

Re: Clarification on no change to original charge of Curriculum and Scheduling Committee

Exhibit 30

Alberto A. Martinez

Mon 2/18/2019 2:39 PM

Sent Items

To: Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>;

Cc: Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>;

📎 1 attachments (43 KB)

Equity Agenda 1.pdf;

hi Jackie,

thank you for writing.

The exact phrase I used last night: "ensure an equitable distribution of resources and influence among various groups and all individuals" was the main charge verbatim that you fairly gave to our Equity Committee on May 11, 2018 in the initial email you wrote to us (me, Joan, Emilio, Leonard, Megan, Peniel, Mark, Juliet; and cc'd to Alan). I've pasted it below. Naturally, I agreed right then and quoted this same phrase verbatim in an email to the committee later that same day, which I cc'd to you, and also in the printed Agenda of the very first meeting of the Equity Committee on May 22, which I also emailed to you and the committee on May 29, and attached here.

Since we had all agreed on this charge, I think it is still part of our goal. Obviously it doesn't imply a necessarily equal distribution of resources among everyone, but equity: inclusion in governance, access to leadership, opportunities, resources, etc.

But you now ask: "Who are these various groups?"
As you originally wrote, there are indeed various groups in our department. Certainly there are differences by rank, areas of expertise, friendships, etc., but more specifically I'm referring also to minorities. The original Public Statement on Governance circulated by Hispanic faculty in our department was precisely that we felt excluded for years from our department's governance for various reasons that we listed.

Such experiences and sentiments affect other faculty individuals too, for example, in 15 years (fall 2003 to spring 2018) some individuals such as Bill Brands and Erika had been in the Executive Committee 7 or 8 years, whereas others, such as Juliet, Emilio, Huaiyin, had been in the EC exactly 0 years. Similar things happen with departmental resources, such as organizing conferences or holding fellowships at the IHS. For example, my friend Erika has been an IHS Fellow 3 times whereas some others have never had an IHS fellowship. Or we can consider it by "groups," whereas 13 white colleagues have held 2 or more IHS fellowships, no minorities have been fellows twice, not yet, and some minorities have never had an IHS fellowship even once, such as Juliet, Toyin, Leonard, Lina, Indrani. I experienced this point personally when I first applied for an IHS fellowship, with a research topic that perfectly matched that year's topic, but instead my friend Mark Metzler received his 2nd IHS fellowship. He told me it was

because "they sort of owe it to me, because I've done lot for them; but don't worry, I'm sure you'll get it next year."

As for the word "influence," which again, I just quoted from your email about our Committee's main charge last May, I basically mean that individuals or groups who have been disenfranchised from our governance have lacked the influence in steering our department, contributing to promotions decisions, feeling included, etc.

You write: "The general concerns that you are expressing here are, I think, implicit in the charge."  Still, I prefer much prefer my explicit version, echoing your words from May, just because it includes and highlights these words: "equitable," "influence," "groups and all individuals," "inclusive," "diversity and gender," and "faculty," whereas your revised version deletes all of them.

I prefer my draft because it makes explicit issues of equity, but you're welcome to send the version you prefer -- at least you see those issues as implicit.

I see that you've added the word "democratic," which always sounds good, but is part of the issue at stake, I think: Does unconscious bias step in when we vote? Does majority rule overlook the participation of some minorities and individuals? I like democracy, but there are other ways also to assign positions and opportunities, such as rotation and volunteering.

Btw, I spoke with Martha Newman and Lina recently and Martha emphasized and insisted that really a department is not a democracy but a "consultative dictatorship," which I disagree with.

As for your revised charge for the Promotions Subcommittee, it looks good to me.

Next, about Scheduling and Curriculum, you write:  "your revised charge presupposes all sorts of things we do not know to be true."

I wrote:  "Eliminating the old requirement of 2 courses in AAME & LAH"
You say that it wasn't eliminated.
But it appears exactly as I described it in the 2016-18 Course Catalog:
"6 hours African, Asian, Latin American or Middle Eastern history"
which is, as I wrote: "2 courses in AAME & LAH"

You write that it was replaced with this requirement:
"students must take at least 3 and could take all 4 geographical range requirements in AAME & LAH."
This is incorrect, I think: the new requirement is instead that students must take 3 courses in these areas: Africa, Asia, Europe, Latin America, Middle East, Transnational"
https://liberalarts.utexas.edu/history/undergraduate/degree-info.php
which adds Europe and Transnational to what used to be AAME&LAH.

Let me illustrate the difference with an example: Previously there were 6 course requirements in the major (aside from in-residence and upper division). To complete 30 credits (10 courses), a student might take, for example, 2 US History + 2 EUR + 2 e.g. African History courses (to fulfill the Requirement of 2 in AAME&LAH), + 1 Required 350L (e.g., in African History) + 3 HIS courses (e.g., in African History). In this scenario, a student could complete a 30 credit major including 6 courses in African History.

However, in the new major, this same student (seeking to maximize African history courses), would take 2 US History + 3 African History (among the required geographic areas) + 1 TLAH + 1 capstone, + 2 Pre-1800 (unlikely that the student finds two that are Afr) + 1 History elective, say, in Afr. History. Thus it's unlikely that this student can pull off 6 courses in Afr. History with the new requirements whereas it's far more plausible to take 1 or 2 courses in pre-1800 in EUR history. Thus, since most pre 1800 courses

are in EUR history (in addition to US courses), the net effect is to pull more students to those EUR courses.

Last night, before I wrote, I looked at the HIS list of spring courses:
https://liberalarts.utexas.edu/history/courses/index.php
I counted at least 13 courses in EUR that seem to be mostly pre-1800 (including cross-listings from other departments offered as HIS). Meanwhile, I only saw 2 courses by Cynthia and Jorge pre-1800, + 1 course by Indrani is partly pre-1800, and 2 courses by Abena and Toyin have 1/4th or less pre-1800 material (I don't know if 1/4th counts as pre-1800).

The lack of pre-1800 AAME&LAH courses is clear.

As you write, the old requirement of taking two courses in EUR was "eliminated," but then again, this requirement was, or as you say, replaced with EUR being among the geographic areas that can fulfill a geographic requirement, and also, many pre-1800 courses are in EUR.

Still, as you write, some students might well complete the new major without any EUR courses. But will it happen? Or will more students enroll in courses taught by EUR professors? We'll see.

I was at the Department meeting many months ago when Abena tried to present to our department the numerical data that she had painstakingly complied with Jerry Larson about pre-1800 courses. She told me after the meeting that Julie abruptly did not allow her to present that data, and I saw that Abena therefore felt exasperated and disenfranchised. Later Julie or Nancy Sutherland sent everyone a cursory email saying that there was no potential problem with enrollments if we do the pre-1800 requirement, but giving no numerical data.

I'm sure and I trust that Julie, Nancy, and several colleagues have worked earnestly to conscientiously try to improve the History major. Personally, I haven't had the time to engage these conversations much, so hopefully indeed there are no inadvertent problems in enrollments or diversity in teaching. However, I'm just not so sure, and thus last night I suggested that this be part of the Sch. & Curriculum discussions. But again, these are just my honest opinions, and you and Susan are welcome to set the charge of the committee as you see fit, without this.

Finally, regarding the Proposal for Evaluating the History Major, I had already given you my feedback in person when we met in your office on Jan. 25 with Art Flores. That was one of the items you had sent me to discuss that day. According to my notes, what I said right then was that on the whole the document looks good to me, but that my only substantive suggestion was, verbatim, that tracking demographic data about our students is valuable but that instead of only doing so by year "it would be good to track what percentage of minorities take intro courses (for the major) and what percentage of minorities are in the capstone. In other words, are we losing or gaining buy-in from minority students? I've received some anecdotal info about the former, in the History Honors program." You then replied that the History Honors program is going very well and that the info about minorities over time can be tracked from the Dean's office data.

Also, I see that the version you sent now is a bit different from the version you sent me in January. The new version seems fine too, and I'm glad that it includes questions about whether students have any suggestions for improving the major.

Sincerely,

Al


From: Jones, Jacqueline

# RE: the way forward this spring

Exhibit 31

Jones, Jacqueline

Mon 2/18/2019 10:20 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Cc: Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>;

📎 2 attachments (81 KB)

EC LIST 2011-2018.pdf; PROPOSAL FOR EVALUATING THE HISTORY MAJOR revised.docx;

Hi Al and Committee members:

Some comments on the charges and proposed changes:

Your suggestions for revised charge, Governance:
This subcommittee is tasked with reviewing our department's structures of governance-- including the Executive Committee, committee assignments, and administrative positions (such as Associate Chair, Graduate Adviser, and Assessment Director)-- to make recommendations to ensure an equitable distribution of resources and influence among various groups and all individuals. This subcommittee will work to ensure that our governance is inclusive (especially in terms of diversity and gender), efficient, transparent, and responsive to the needs of faculty and students.

My comments:
"equitable distribution of resources and influence among various groups and individuals":  I believe this wording is vague and unnecessary.  Who are these "various groups"?  Are you suggesting we define colleagues by sexual preference, marital status, religion, age, immigrant status?  We do not define our department or mission that way.  And what is "influence"?  The general concerns that you are expressing here are, I think, implicit in the charge.
Your revisions presuppose that the EC is not already diverse in terms of minority faculty and women.  Please see the attached document, which lists all EC members over the last 7-8 years.

Revised charge, Governance:
This subcommittee is tasked with reviewing the department's structures of governance-- including the Executive Committee, standing committee assignments, and administrative positions (such as Associate Chair, Graduate Adviser, and Assessment Director)—and with making recommendations as needed to insure that those structures are efficient, democratic, transparent, inclusive, and responsive to the needs of the department and our students.

Please note that you and all other members of the subcommittee are free to express any and all concerns during deliberations. A charge is best when it is succinct and when it does not make unwarranted assumptions about the issue under review.

Revised charge, Promotions:

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent (understanding that the University and the College impose rules and guidelines that also govern our procedures). This subcommittee will analyze policies and procedures related to both promotion to full professor and promotion to associate professor with tenure. Factors to be considered (but are not limited to) the Third Year Review, peer observations of classes, mentoring, and service obligations, with the goal of helping faculty to advance in rank.

Finally, about Scheduling and Curriculum, You write, "I think the draft is fine, except that we should well add a robust discussion about how the new requirements for the History major may affect enrollments in terms of diversity. Basically, I share Abena's serious concern that by eliminating the old requirement of 2 courses in AAME&LAH, while adding the new requirement of 2 pre-1800 courses, our department risks funneling more students to white faculty (especially in European history) and reducing enrollments in African History courses in particular. I worry that a net effect might be: teaching less ethnocultural diversity to some of our majors and inadvertently luring fewer students into AAME. Hence I suggest adding one goal/sentence, at the end:"

**Scheduling and Curriculum:**

This subcommittee is tasked with ensuring the fair and transparent participation of faculty members in assessment assignments and in the distribution of teaching assignments (especially required courses for History undergraduate majors and graduate students) as well as continuing to ensure that MWF/TTh schedules are rotated among the faculty in an equitable way. This subcommittee will also discuss how the new requirements in the History major can affect enrollments in geographic area courses in order to elucidate how to counter any inadvertent effects on teaching diversity.

[original draft]   Scheduling and Curriculum:

This subcommittee is tasked with insuring the fair and transparent participation of faculty members in assessment assignments and in the distribution of teaching assignments (especially required courses for History undergraduate majors and graduate students) as well as continuing to insure that MWF/TTh schedules are rotated among the faculty in an equitable way.

Please note that there seems to be a great deal of misinformation floating around about the new major. First, see the attached draft proposal from the committee tasked with developing metrics to assess the new major. Over the last few weeks I have twice asked for Equity Committee input, but received replies from only two individuals. Again, your revised charge presupposes all sorts of things we do not know to be true. It will take some time to gather the statistics and feedback from both faculty and students before we can address these concerns with any certainty.

More generally on this issue:

Your revisions contain errors: "Eliminating the old requirement of 2 courses in AAME & LAH" - that requirement has **not** been eliminated, rather it has been replaced by an expanded requirement for geographical diversity that means students **must take** at least 3 and could take all 4 geographical range requirements in AAME & LAH. What **has been eliminated** is the old requirement of 2 courses in European history.

The old requirement was 2-2-2  that is, 2 courses in US, 2 in Europe and 2 in any other; the new one is at least two course in US (one in residence) plus four courses out of five geographic areas - Africa, Asia, Europe, Latin American, Middle East or transnational.  Students can fulfill the new requirement without any European history and many no doubt will.

By the way, this information is readily accessible:

https://liberalarts.utexas.edu/history/undergraduate/degree-info.php

Adding the new requirement of 2 pre-1800 courses:  This was done because almost everyone agrees History is a discipline about chronological depth and this requirement is common in recently redesigned majors nationwide.   How is that working in practice --- is it "funneling more students to white faculty in European history"?  According to those keeping track of these things, No, it isn't.  We have almost no pre-1800 courses on the schedule in the Eur area for next year as we only have three pre1800 faculty, all of whom have various load reductions and other teaching responsibilities.  Apparently there are plenty of pre-1800 courses scheduled in other areas.

Please note that the new major represents the extensive consultation and collaboration of our department colleagues and the collective wisdom of members of the AHA, including Univ of OK professor Anne Hyde, who has led the Tuning Project that has shaped new configurations of majors nationwide in the last decade plus.  We'll make changes as we go forward no doubt, as that's what good curriculum practice looks like. Along those lines, please offer comments on the attached proposal to assess the major, which recommends the collection of both anecdotal and statistical data.

In sum, I am confident that the three subcommittees, plus the committee to assess the new major, will address forthrightly any and all concerns of your committee and of the department as a whole. I think it is time to begin those conversations.

Best,
Jackie

Re: good seeing you !

Exhibit 32

Chatterjee, Indrani

Thu 2/21/2019 1:11 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Al, I seriously cannot fathom how you have the energy to keep going. Thanks for sharing the entire correspondence- and re Mark Metzler I had the identical experience. He TOLD me not to apply to the IHS - and I figured he was major favorite of the department and so I kept out. The next year Sumit marched into the same IHS fellowship. And I never even tried!
Let us go and hang out next Thursday evening- Trudy is good. I love their food. This weekend I am in Pittsburgh giving a talk. And I have to shut the phone now on flight.
Big 🤗 .

Indrani Chatterjee,
Professor of History

http://www.utexas.edu/cola/depts/history/faculty/ic2396#home

---

**From:** Alberto A. Martinez
**Sent:** Thursday, February 21, 2019 4:38:07 PM
**To:** Chatterjee, Indrani
**Subject:** good seeing you !

hi Indrani,

we live in different hallways, and probably different class schedules too, so it was good running into u yesterday! Anyhow, here's a sample of the kind of behind the scenes wrangling that I do around here; see the emails below. It's exasperating, but I'm making progress despite the needless constant interventions.

Btw, I might do a happy hour tomorrow, maybe at 5-ish, if so I'll send the place. Maybe Trudy's or Julio's...

Al

Jones, Jacqueline
Thu 2/14/2019 8:01 AM
Alberto A. Martinez
Joseph, Peniel E; Lawrence, Mark A;
Raby, Megan; Walker, Juliet E K;
Zamora, Emilio; Suri, Jeremi;
Hsu, Madeline Y; Deans-Smith, Susan;
Flores, Arturo R; Llado, Jacquelin
Inbox

Dear Members of the Equity Committee:

From: Alberto A. Martinez
To:  Jones, Jacqueline; Joseph, Peniel E;
Lawrence, Mark A; Raby, Megan;
Walker, Juliet E K; Zamora, Emilio
Flores, Arturo R; Llado, Jacquelin
Download  Save to OneDrive - The University of Texas at Austin

 hi everyone,

the Climate Survey is finished. I've taken account of all your feedback and tried to incorporate nearly all
your suggestions as well as Jackie's. Once I have the final approval of members of the Equity
Committee, we will distribute it to the department. I expect we can do this within a week. Here it is:


Note: our drafts used to have some fill-in-the-bubble matrices (known as Likert) but in the end I had no
choice but to change it to an uglier choose-the-rectangle system (known as Profile) because Qualtrics
kept complaining that using any Likert-answer-matrix "Does Not Meet Web Accessibility Standards":
won't display in all devices, and Qualtrics would not issue a sharable link using that format.

I also attach a pdf evaluation produced by the Qualtrics system, so you may see the kinds of restrictions
that the system tracks. This survey has a rating of "Good" because it's mobile-optimized, its display logic
functions properly, very few questions have conjunctions, it allows people with disabilities to participate,
etc. The minor defects are that the predicted duration is 13.6 minutes (rather than an ideal 7), and there
are multiple matrix questions and text entry boxes (instead of just three, which is absurdly low for our
purposes).

Please let me know if you approve it.

Next we have to discuss the issue of subcommittees. Jackie, I'm surprised and disappointed that you
didn't let me chair the Governance Subcommittee. When you requested subcommittees you said it'd be
"to open it up" to more faculty in the dept. I'm all for inclusion, so it sounded good to me to invite others
to contribute, but I would've preferred to have the invitation be announced and extended to everyone in
the department as I said. Personally, I didn't think it was "inappropriate" for me to chair the
Subcommittee on Governance, since that's one of the three tasks for which the Equity Committee was
created, and it didn't occur to me that you'd appoint anyone to chair our subcommittees without
consulting me or the committee. I thought members of the Eq. Committee could chair its subcommittees,
since normally subcommittees do just consist of members of a committee, though they may pull in
consultants and others too.

In any case, I do expect and require that the subcommittees will follow the standard rules of order, and in
particular, that they won't issue any reports to the department, to you, or to the Executive Committee, but
that they will serve and report to the Equity Committee. As explained in Robert's Rules of Order, "A
committee that is a subset of a larger committee is called a subcommittee. Committees that have a large
workload may form subcommittees to further divide the work. Subcommittees report to the parent
committee and not to the general assembly."

I respectfully agree with you that as department Chair you generally shouldn't chair other committees,
yet I feel that by appointing the chairs of all our subcommittees and by choosing all the additional
members without consulting us you are really infringing on the autonomy of our committee. I'm flexible,
so I accepted it when you decided that Susan's work on Curriculum and Scheduling was a subcommittee
of the Equity Committee. Similarly, when you requested that we create other subcommittees, I said fine.

And so forth, yet the Equity Committee really needs to participate in deciding the composition of its own subcommittees, instead of it being done in this top-down manner.

To that end, I will meet with the Equity Committee to discuss how to proceed. I do agree of course that the subcommittee on Governance "should consider the responses to the Climate Survey and consult with members of the department generally (who would be encouraged to contact the committee through email or in person or anonymously) to pinpoint policies and structures related to departmental governance that could be improved in some way." Still, the Equity Committee should now discuss and decide how to proceed.

Sincerely,

Al

DEPARTMENT OF HISTORY
The University of Texas at Austin

128 Inner Campus Drive · B7000 · Austin, Texas 78712-1739 · 512 471 3261 · FAX 512 475 7222

Exhibit 34

MEMO Feb. 25, 2019.

①

I met w. JJ. Flores was there, taking notes. weird.
JJ shows me a printout of a ⊤, my email, asks me "Do you
see anything wrong with this?" I say no, not at all. She asks
"Why are you saying that Julie is racist towards Abena?" (!) But
that's not what I wrote at all! just wrote that A felt disenfran-
chised when Hardwick didn't let her present data to the dept. !
I say I would've written the same thing if it had been about Joshua
Frens-String." But Jones takes H's side, says what I wrote implies
that H is racist, asks me How do you know that's what happened?
because I was there — I saw that Abena had handouts and she told
me, upset, that JH didn't let her distribute it to faculty. Jones
defends JH, says "Julie has done a lot of work for our Department"
shouldn't be criticized. says my emails are not private, that "some people"
have them, are "talking about reporting you to H.R." (Who? JH? over
what??) Says if I'm going to name someone I should include that
person in the email. or not put that in. Says my email was
"hurtful and divisive" — but I explained I was just noting Abena
as an example of someone who felt excluded, disenf. from
our governance (because she has been) I said it's a big Dept. so
sometimes indiv. might be offended, as I myself was offended
by Jones meddling in Eq. C, or Abena was offended by Julie.

(Doesn't it (Does that not matter? What about our feelings?)
But J brought up HR again. (Over what? that I defend a black woman?) So I say she or anyone are perfectly welcome to report me to HR or send them any of my emails because I really haven't done anything wrong. And I know emails are public, I tell her they can all go on the cover of any newspaper. Jackie says I shouldn't write names in emails, only maybe allude to incidents indirectly, generally. Said some Eq. C. members said names in some meetings (Who? Said what? gives no evidence of course; absurd) Asked if I asked Julie for her own account. No, my point is JJ had denied or sort of denied that any individuals are disenfranchised, not true, so I gave an example. Had I said I'm attentive to (whomever is out of the loop, like J. Brown, he's white but I argued his salary was way too low, said it in the Eq. C. and in emails + JJ. He agreed, didn't even know it.

Jones asked for an apology - For what?? Asked me to mediate ∴ Abena and Julie, so I said she should do it, she's the chair. "You think I should meet with them?" she says. "Certainly, Yes."

I brought up the new major, said I talked w. Susan Somers, who told me they had no clear data on enrollments, on how the new major affected them. but that maybe not affecting enrollments in African History or LAH because students fulfill a pre-1800 req with US AP courses. But SS admitted that the new major



**DEPARTMENT OF HISTORY**
The University of Texas at Austin

128 Inner Campus Drive · B7000 · Austin, Texas 78712-1739 · 512 471 3261 · FAX 512 475 7222



doesn't allow as many courses in one area as before. I insist that faculty should discuss this but I won't have it. J switches again to censorship of names in emails, saying privacy, I said not a private incident, and that I certainly DO already spend plenty of effort "biting my tongue." So what about her? I explain that it was wrong and shocking of her to appoint subcommittee chairs without even consulting the Eq.C. or me. She gets tense, but I say it was disappointing, and that I had already been appointed for that. Told her it shows a lack of trust, totally unwarranted.

She goes back to email issue, names, that I should be like Art Flores. (and so I'm thinking, what about all the problems staff have with Art?!?) Bite my tongue. I reiterate, did nothing wrong, no confidential info, nothing false, etc. I tell her about dept rumors, people badmouthed behind their back, like Sally Clarke, that some said she was "crazy," but I was in a committee once with her and she was totally fair and straightforward forthright and rational, especially on not bending any rules. They did the same to J. Walker, as if she were "crazy," when she isn't. I say I don't like this culture of whispers.

Ending, Jackie says "by the way" I can't use the title John E Green Regents Professorship, that I'm only a "Fellow of the" title, that there's a difference, honorary. I thought



I was given the title with the research funds, I say
Brian Levack had it for years and he told me he
heard it they gave it to me, and that I should
ask for more money because they were giving me less then
him, that the Dean keeps some of it. I tell Jackie
that's fine.

Strangest meeting in my time at UT.
exasperating, absurd.

AM.

request

# Exhibit 35

### Jones, Jacqueline

Sun 3/10/2019 1:41 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Hsu, Madeline Y
   <myhsu@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>;

Dear Al, Susan, Madeline, and Jeremi,
Some of the email correspondence surrounding our Equity initiatives this semester contain pointed references to individual colleagues (coincidentally, mostly women) in a way that apparently seeks to embarrass or denigrate them.  Often these colleagues are not even on the email thread in question, giving them no opportunity to weigh in on the topic or set the record straight. However, in some cases they do learn about these comments second-hand. I have heard from a couple of these colleagues, and they are understandably upset.
I think we can all agree that it is possible to make larger points about departmental policies and procedures without naming individual colleagues in the process. The Equity initiative is meant to bring us together as a department, not divide us. I would like to request that, should this problem persist, you encourage correspondents within your own (sub)committee to make their arguments without referencing specific colleagues.
Finally, this request does not apply to *my* name, as of course suggestions for the Chair are always welcome, as long as they are based on accurate information and proposed in a spirit of cooperation and collegiality.
Jackie

confirmation/summary of meeting

Exhibit 36

Jones, Jacqueline

Wed 3/20/2019 7:08 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Cc: Flores, Arturo R <arturo.flores@austin.utexas.edu>;

Dear Al,
This is to note that you and I met on the afternoon of Monday, Feb. 25. (Art was there and took notes.)  I discussed what I felt were inappropriate references to specific colleagues in some of the emails you have sent as Chair of the Equity Committee.  Disparaging colleagues in emails to the committee list-serv is divisive and inappropriate, especially when at least some of the claims are misleading or false.  Certainly we can discuss departmental policy and procedures without denigrating individuals.
Too, I would like to take this opportunity to ask you to refrain from forwarding emails I send you to members of the History department staff; I always cc them on any correspondence I want to share with them.
Best,
Jackie

Re: confirmation/summary of meeting

Exhibit 37

Alberto A. Martinez

Thu 3/21/2019 12:46 AM

Sent Items

To: Jones, Jacqueline <jjones@austin.utexas.edu>;

Cc: Flores, Arturo R <arturo.flores@austin.utexas.edu>;

Bcc: Alberto Martinez <almartinez1905@gmail.com>; wagonmail@yahoo.com <wagonmail@yahoo.com>; wendigo00979@yahoo.com
<wendigo00979@yahoo.com>; francesyrivera@yahoo.com <francesyrivera@yahoo.com>;

Hi Jackie,

I received your brief summary of our meeting on Feb. 25th.
However, your account is much too incomplete and doesn't fairly capture my statements. For example, I
did not denigrate anyone. Therefore, I here send you my own memo of our meeting:

As requested, I came to your office and saw that Art Flores was there too. I noticed that he had a small
yellow notepad and was taking notes on pencil; this seemed odd because he's not usually in your office
when we've met before.

After our greetings, you showed me a printout of one paragraph from a group email I wrote on February
18th in which I mentioned that Abena felt bad that Julie didn't let her present certain data to the
department. This is the paragraph:

"I was at the Department meeting many months ago when Abena tried to present to our department the
numerical data that she had painstakingly compiled with Jerry Larson about pre-1800 courses. She told
me after the meeting that Julie abruptly did not allow her to present that data, and I saw that Abena
therefore felt exasperated and disenfranchised. Later Julie or Nancy Sutherland sent everyone a cursory
email saying that there was no potential problem with enrollments if we do the pre-1800 requirement, but
giving no numerical data."

You asked me if I saw anything improper in that paragraph; so I read it and said no, there's nothing
wrong there. But then you asked me: "Why did you say that Julie is racist toward Abena?" I replied that
that's not what my sentence says or what I wrote. But you said that it implies it. And I replied that I would
have written the same thing if it had happened to a white man, like Joshua Frens-String instead of
Abena. I said that my point was that although faculty present at a meeting had voted in favor of changes
to our History major, faculty had not been able to listen to the data that Abena had painstakingly
compiled with Jerry Larson, because Julie didn't let her distribute the handouts. You asked me how do I
know that's what really happened, and I replied "Because I was there," at the faculty meeting and right
then Abena showed me the handouts that she had prepared and told me that Julie didn't let her
distribute them at the meeting. So I saw that Abena was upset and frustrated, and I felt sorry that her
input just wasn't heard in our faculty meeting. At the time, Abena was still an Assistant Professor
whereas Julie was a full Professor, so naturally I was concerned about the importance of empowering
and entrusting our junior faculty to have their input heard in our department governance.

Still, you replied by defending Julie and said that "she has done a lot of work for our department" and
therefore should not be criticized. You asked me if I realized that there might be another account of what
happened. I said sure, such as Julie's account, but that I was just stating what I knew, what I saw. You

then said that university emails are not private, and that hence "some people" had forwarded my group email to others who, you said, were upset by what I had written and that "they're talking about reporting you [me] to H.R." That seemed weird to me. But you said that it was an unfair critique of Julie because I hadn't included her in the email and said that I could have instead brought it up in some other way. You also said that my email was "hurtful and divisive," about which I disagreed because it wasn't a critique of Julie but an example of how Abena felt excluded and disenfranchised from our department governance. I also explained that certainly in a department as big as ours (60+ faculty) sometimes individuals might feel offended by what others say, whether it's Abena offended by Julie, or Julie offended by my email, or me offended by you (especially by how you've intervened in the Equity Committee that I chair). I said that by mentioning an incident in which Abena felt upset and disenfranchised I was precisely responding to something that felt "hurtful and divisive" to her.

You brought up Human Resources again, and I said that it's perfectly fine if anyone who griped to you or you yourself want to show my email to Human Resources especially because there's nothing wrong or unfair in my email, because I'm just standing up for a colleague who felt disenfranchised, and also because my email can well be printed on the cover of any newspaper, just as we are well-informed about our university email accounts.

You said that emails should better not include names of persons who are not copied in the correspondence. This was news to me, and I've never heard of any department or UT unit requiring that no names be mentioned in emails unless any mentioned persons are copied. You asked me if I can agree that I should not have stated Julie's and Abena's names in my email. I replied that it's sometimes possible to allude to incidents without stating names but that it's also common to use names, since otherwise it may be unclear what one is actually saying. (For example, I know that you've said or written things about me and other faculty without sending us copies of such emails, or telling us about such conversations.)

Still, you also said that you've heard that in some meetings of the Equity Committee some members of the committee have actually mentioned names of other faculty in a critical way. Since you did not give any specific example, I tried to think of one, to see what such a comment might refer to, but you said that it wasn't necessary to bring up any example now.

You asked me if I had asked Julie Hardwick for her own account of the incident. I said no, but that I'm well available to talk to both of them, as Chair of the Equity Committee. I had mentioned this incident in my group email to illustrate how sometimes input from individual faculty isn't taken into account. In the previous email to me and the committee, you had seemed to deny that any "groups" or "individuals" in our department feel disenfranchised, so I was therefore giving specific examples of how some individuals who are minorities are indeed disenfranchised to some extent. And I said that I also do the same for individuals who are white and disenfranchised, as I did when I pointed out that Jonathan Brown was the most underpaid professor in our department.

Still, you asked whether I wanted to apologize for what I wrote, but I replied that I can't apologize because I did nothing wrong, but only mentioned a problem, among others, as someone concerned about issues of equity and inclusion, as Chair of the Equity Committee. You then asked why didn't I try to just resolve the matter directly between Abena and Julie, and I replied that you're welcome to do that, since I was just bringing up this problem as an example of a junior faculty member, Abena, feeling disenfranchised.

You asked me if I don't think that this incident was already resolved, and I replied that obviously it was not resolved. You asked me whether I think that You should meet with Julie and Abena together, and I said: "Certainly, yes." (Accordingly, I wrote to Abena that same day to let her know that you might therefore ask to meet with her and Julie.)

As you know, Abena was very worried that the new requirements in the History major (especially the requirement of 6 credits in pre 1800s courses) might reduce enrollments in certain geographical areas that have fewer pre-1800 courses, such as in her area, African History; in favor of courses in European History, which have many pre-1800 offerings. I agreed, as do multiple other faculty members. Hence my group email to the Equity Committee raised this issue, since you had asked us to provide suggestions for possible charges for the Equity Committee's subcommittee on Curriculum and Scheduling, among others; so my suggestion was that that subcommittee could well include --a discussion-- of how the new major may affect enrollments in certain areas such as African history.

But you disagreed and excluded my suggestion that there be any such discussion in the subcommittee. Hence in our meeting with Art, you didn't want to discuss the technicalities of how the new major might affect enrollments. I then said that I had already spoken about this with our new Academic Advising Coordinator, Susan Somers, and that she kindly confirmed to me that the department just doesn't have compiled statistics of how enrollments were usually distributed among courses or how they will now be, with the new major, but that the very limited data so far shows that the requirement of two pre-1800 courses doesn't seem to be reducing enrollments in courses such as AAME and Latin American History, mainly because many History majors are fulfilling one of their pre-1800 requirements with an advanced placement course in US History. Still, Susan said that the new major indeed doesn't let students potentially specialize with as many courses as before in a single geographical area, such as African history, because there is one more requirement than previously, but she added that maybe few students previously took so many courses in any one geographical area anyhow.

But I said that we can well "bracket aside" the issue of whether the new requirements will affect any enrollments. And I said that even if it's true that no enrollments will be affected, that still I think it could be fruitful to have a constructive open discussion about this issue, since it has been brought up by faculty such as Abena, Indrani, Tracie, myself, and others. So, you said that we could indeed set aside the question of the new major but that still, the point of the present meeting is for me to realize that certain sensitive issues need not arise in emails, especially if one is mentioning the names of persons who are not copied in the correspondence. I noted that certainly one should not write emails that reveal confidential information, but that the email in question was just a description of a minor incident, and that already I do spend plenty of time in the department knowing when to "bite my tongue" about not saying things that may be embarrassing to some colleagues. This meant that, like other faculty, I certainly do my part in terms of not writing certain things about our colleagues.

Also, I then said that I was shocked and very upset when you decided to appoint the chairs of every subcommittee of my committee without even consulting me or the members of the committee. Since the Equity Committee was created mainly to deal with questions of Diversity and Inclusion in our department governance, and since you and the department faculty selected and approved me to chair the Equity Committee in an open faculty meeting, it was very disappointing to me that months later you appointed someone else to chair the discussions on governance. It shows an unwarranted lack of trust. Still, as I said, I can shrug it off since I do want to continue being part of the present process of improving equity in our department governance.

(On May 2, 2018, as a minority, after 13 years in our department, it was very significant for me to finally be appointed Chair of one of the more than fifteen standing or ad hoc committees that annually exist in our department. Other faculty get appointed to chair committees multiple times, year after year, and therefore, my Hispanic colleagues and I pointed out on May 2, 2018 that we were frustrated that we were never or nearly never appointed to chair committees.)

Again, you returned to the issue of using individuals' names in emails. You suggested that I might well emulate the managerial approach of Art Flores, sitting right there, who sometimes criticizes things done by staff without actually naming them in group emails. He too briefly said something to that effect. So I bit my tongue and I said that, to be fair, there are different managerial styles, and that I believe in

forthright honesty and transparency, so long as confidential or personal information is not being revealed, of course.

I explained that one of the problems in our department is an unfortunate habit whereby some individuals are badmouthed behind their back in conversations and innuendos. I gave the example of a former faculty member who I had been told was "crazy," but who I didn't personally know. Then finally I was once in a hiring committee that included her and I was surprised to see that she was actually, really, the one person there who was most focused on following proper procedures; it was impressive to see. Thus I frankly state my concerns rather than whispering about colleagues.

At the end of our meeting you raised a separate issue from the topics above. You said that sometimes I've written "John E. Green Regents Professorship" under my name as a title, but that actually when I was allocated research funds from that Professorship, I had not been awarded the Professorship title per se, but that I instead was really just "a Fellow" of the Professorship. I replied that I didn't realize there was a difference, and that the former holder of the title, Brian Levack, had even congratulated me for having received it, so I thought you had appointed me to the title not just the research funds. I quoted also that Brian had asked me how much funds I was allotted, so I replied $7500, and he then commented that that was very low, that apparently the Dean had held back some funds because Brian used to receive much more, and that I should therefore request more. Anyhow, you then clarified at our meeting that any honorary Professorship is awarded through a process and that I was only a fellow of those funds. I asked if anyone else is presently a fellow of the same Professorship too, and you said no, and I said that certainly I was glad to have a title, I thought, but that if the title was not awarded to me I can well write instead "Fellow of the John E. Green Regents Professorship."

That was the end of our meeting, I then thanked you both for meeting with me.

To end this long email, I have to frankly ask and advise you, as the Minority Liaison Officer of our Department, to please spend more effort on extending trust to individuals such as myself, and to please encourage, welcome, and incorporate more individual faculty input in our governance. This is a concern that other faculty have repeatedly voiced, as Abena herself stressfully and critically requested in our recent department meeting on governance.

As I've said before, in writing, I do disagree with one of our colleagues who frankly claimed that our department is "a consultative dictatorship," and advised me to accept that.

Sincerely,

Al

---

**From:** Jones, Jacqueline
**Sent:** Wednesday, March 20, 2019 7:08 AM
**To:** Alberto A. Martinez
**Cc:** Flores, Arturo R
**Subject:** confirmation/summary of meeting

Dear Al,
This is to note that you and I met on the afternoon of Monday, Feb. 25. (Art was there and took notes.)  I discussed what I felt were inappropriate references to specific colleagues in some of the emails you have sent as Chair of the Equity Committee.  Disparaging colleagues in emails to the committee list-serv



Exhibit 38

hi ▮ still in PR, I'll try to call today, but I'm not worried, Jorge said that apparently JJ wants to claim that I did something "inappropriate" which is absurd. I think she's annoyed at the Eq. Committee or me, since she sent me an unwarranted email days ago saying I was "disparaging" profs which is false.

03/24/2019, 10:31 AM

Well I want to talk to you about it because i have no interest in getting wrapped up in this

03/24/2019, 10:34 AM

Exhibit 39

Handbook of Operating Procedures 3-1022

# Protection from Retaliation for Suspected Misconduct Reporting (Whistleblower)

**Effective September 30, 2015**

Executive Sponsor: Vice President for Diversity and Policy Owner: Associate Vice President, Diversity Community Engagement                              and Community Engagement

## I. Policy Statement

The University of Texas at Austin ("University") is committed to the ethical stewardship of University resources in compliance with laws and the rules, policies, and procedures of The University of Texas System ("UT System") and the University. To this end, it is the policy of the University to:

- foster a University environment that promotes employees, students, and other University community members to report suspected misconduct of a material nature taking place at the University.

- prohibit retribution or retaliation against any individual who, in good faith, reports such concerns or participates in an investigation pertaining to these reports.

Links to University policies related to misconduct in research and academic misconduct may be found in Sec. X below.

## II. Reason for Policy

To set forth responsibilities and steps for good faith reporting of material violations of law or University policies in the employment setting and to aid in the protection of individuals from retaliation for such reporting.

## III. Scope & Audience

This policy applies to reports of misconduct in the employment setting and applies to University employees, students, affiliates, and visitors.

## IV. Definitions (specific to this policy)

**Misconduct:**
An individual's action that is unlawful or unethical including but not limited to: illegal or fraudulent activity; financial misstatements, accounting or auditing irregularities; conflicts of interest or commitment; violation of laws, regulations, rules, or policies. Examples of misconduct may be found in the Office for Inclusion and Equity's Procedure and Practice Guide (http://www.utexas.edu/equity/policies/procedure-and-practice-guide).

**Retaliation:**
Any action that adversely affects the employment or institutional status of an individual who, in good faith, advances a report of misconduct to University officials or participates in an investigation of such report.

**University Community Member:**
Refers to any University employee, student, affiliate, or an individual external to the University who conducts business with the University.

**University Policy:**

This collectively refers to The University of Texas System ("UT System") Board of Regents' *Rules and Regulations* (http://www.utsystem.edu/board-of-regents/rules), UT System policies (http://www.utsystem.edu/board-of-regents/policy-library), as well as the University's own policies.

**Whistleblower:**
An individual who raises a concern about suspected violation of law or University policy.

## V. Website (for policy)

https://policies.utexas.edu/policies/hop/3-1022

## VI. Contacts

| CONTACT | DETAILS | WEB |
|---|---|---|
| Office for Inclusion and Equity | **Phone:** 512-471-1849 | **Website:** http://www.utexas.edu/equity (http://www.utexas.edu/equity) **Email:** equity@austin.utexas.edu (mailto:equity@austin.utexas.edu) |
| University Compliance Services Hotline | **Phone:** English:1-877-507-7321 Español:1-800-216-1288 | **Website:** http://utexas.edu/hotline (http://utexas.edu/hotline) **Email:** compliance@austin.utexas.edu (mailto:compliance@austin.utexas.edu) |

## VII. Responsibilities & Procedures

A. **General Overview**

1. The University expects its employees to perform their duties and responsibilities in accordance with applicable laws and to follow University policies and procedures.

2. The University provides mechanisms to assist individuals in coming forward to report misconduct without fear of reprisal or retaliation.

3. Any individual who retaliates against a University employee or student because of a good faith report of actual or suspected misconduct is subject to disciplinary action by the University, up to and including dismissal.

4. The Procedure and Practice Guide (http://www.utexas.edu/equity/policies/procedure-and-practice-guide) provides information regarding reporting avenues, individual and supervisory responsibilities, and other details clarifying the implementation of this policy.

B. **Whistleblower Reporting**

1. A University community member who in good faith suspects or has knowledge of a material violation of law or University policy has a professional obligation and is expected to report suspected violations. A University community member who reports in good faith actual or suspected violations of law or University policy will be protected from retaliation.

   a. Reports may cover suspected or actual misconduct, regardless of whether the individual is personally involved in the matter.

b. The individual should make such report as soon as reasonably possible, preferably within ninety (90) days from the time he or she becomes aware of the suspected misconduct.

c. An individual may amend his or her report upon learning of new information relevant to the report.

2. Reporting guidelines specific to a particular issue may be found in the Procedure and Practice Guide (http://www.utexas.edu/equity/policies/procedure-and-practice-guide). Reports to the University, however, may be directed through any of these channels:

a. employee's supervisor/manager, dean/director, or Human Resources contact

b. the Office for Inclusion and Equity via
   - (512) 471-1849

   - email: equity@austin.utexas.edu (mailto:equity@austin.utexas.edu)

   - www.utexas.edu/equity (http://www.utexas.edu/equity)

c. University Compliance Services Hotline (available 24 hours a day, 365 days per year) via
   - Phone:  English 1-877-507-7321 or Español 1-800-216-1288

   - Email: hotline@compliance.utexas.edu (mailto:hotline@compliance.utexas.edu)

   - Web: utexas.edu/hotline (http://utexas.edu/hotline)

The supervisor/manager, dean, director, or other University official receiving such report must assure the report is further brought to the attention of the University designee handling such reports. Refer to the Procedure and Practice Guide. (http://www.utexas.edu/equity/policies/procedure-and-practice-guide)

3. Reports made through the University Compliance Services Hotline (https://utexas.edu/hotline) may be submitted anonymously and will be routed to appropriate University officials for investigation.

4. Reports made in accordance with this policy may not be construed as having made a report to a law enforcement authority.

5. Processing of such report will follow procedural steps outlined in the Procedure and Practice Guide. (http://www.utexas.edu/equity/policies/procedure-and-practice-guide)

6. An individual who has a question about the propriety of any practice under University policies should seek guidance from his or her supervisor/manager or the University official who has responsibility for overseeing compliance with the particular policy.

7. Examples of violations of University policies and illegal behavior may be found in the Procedure and Practice Guide. (http://www.utexas.edu/equity/policies/procedure-and-practice-guide)

8. The individual who suspects a violation has occurred should not accuse or confront the individual directly or attempt to investigate the matter personally.

C. **Retaliation Reporting**

1. An employee who comes forward in good faith to report actual or suspected misconduct in violation of federal or state law or regulations or University policy will not be subject to retaliation, reprisal, or disciplinary action by the University. This protection does not extend to self-reported violations.

2. An employee or other University community member must not take any disciplinary or retaliatory action against any individual for good faith reporting, or causing to be reported suspected misconduct, or for assisting in an authorized investigation associated with the report.

3. Any employee or other University community member who believes he or she is experiencing retaliatory action by another individual as a result of any of the following activities is strongly encouraged to report this to the Office for Inclusion and Equity at http://www.utexas.edu/equity (http://www.utexas.edu/equity) or by calling 512-471-1849:

   - Good faith reporting of misconduct of another individual reported to a person designated by the University to receive such disclosure.

   - Participation in an investigation involving misconduct of another person.

   - Filing a complaint alleging prohibited discrimination or harassment with the Office for Inclusion and Equity.

4. Procedures for filing a complaint may be found in the Practice and Procedure Guide. (http://www.utexas.edu/equity/policies/procedure-and-practice-guide)

5. Further resources and information for addressing concerns of retaliation in the workplace or academic environment may be obtained by contacting the Office for Inclusion and Equity or visiting its website (http://www.utexas.edu/equity).

   D. **False Information**

   Related to this policy, an employee will be subject to disciplinary action, up to and including dismissal, for any of these actions:

   - making a false report of retaliation, actual misconduct, or suspected misconduct.

   - knowingly providing false answers or information in response to an ongoing investigation.

# VIII. Forms & Tools
**Office for Inclusion and Equity Procedure and Practice Guide**
(http://www.utexas.edu/equity/policies/procedure-and-practice-guide)

# IX. Frequently Asked Questions
None

# X. Related Information
**University Compliance Services Reporting Hotline** (https://utexas.edu/hotline)

UT System Policy **UTS131** (http://www.utsystem.edu/board-of-regents/policy-library/policies/uts131-protection-retaliation-reporting-suspect-wrongdoing) - Protection from Retaliation for Reporting Suspected Wrongdoing

**HOP 3-1021** (http://www.policies.utexas.edu/policies/suspected-dishonest-or-fraudulent-activities) - Suspected Dishonest or Fraudulent Activities

**HOP 7-1230** (http://www.policies.utexas.edu/policies/misconduct-science-and-other-scholarly-activities) – Misconduct in Science and Other Scholarly Activities

Applicable state and federal laws: Titles VI and VII of the Civil Rights Act of 1964, as amended; Age Discrimination in Employment Act of 1967; Age Discrimination Act of 1975; Americans with Disabilities Act of 1990; Americans with Disabilities Amendment Act of 2008; Equal Pay Act of 1963; Veterans Readjustment Act of 1974; Executive Order of 11246; Sections 503 and 504 of the Rehabilitation Act of 1973; Title IX of the Education Amendments of 1972; Texas Labor Code; Chapter 21

## *XI. History*

Last review date: September 30, 2015
    Editorial changes made February 18, 2016

Next scheduled review date: October 2017

**Office for Inclusion and Equity - Please Contact**

# Exhibit 40

## Eagle Bull, Galen <galen.eaglebull@austin.utexas.edu>

Fri 5/17/2019 7:42 AM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>

Professor Martinez:

My name is Galen Eagle Bull, and I am an Associate Director in the Office for Inclusion and Equity (OIE). We received an anonymous concern regarding your relationship with a female graduate student, and I would like to discuss that with you. This is not a formal investigation.

Please contact me at the number below to arrange a time to come to OIE and discuss the matter in-person. I will do my best to accommodate your schedule.

Thank you in advance for your cooperation. I look forward to hearing from you.


Galen Eagle Bull, JD
Associate Director
Office for Inclusion and Equity
The University of Texas at Austin
512-471-1849

*It is the policy of The University of Texas at Austin ("University") to provide an educational and working environment that provides equal opportunity to all members of the University community. In accordance with federal and state law, the University prohibits unlawful discrimination, including harassment, on the basis of race, color, religion, national origin, sex, pregnancy, age, disability, citizenship, veteran status and genetic information. The University also prohibits discrimination on the basis of, sexual orientation, gender identity, and gender expression.*

# Exhibit 41

**Re: Office for Inclusion and Equity - Please Contact**

## Alberto A. Martinez <almartinez@austin.utexas.edu>

Sat 5/18/2019 11:43 AM

**To:** Eagle Bull, Galen <galen.eaglebull@austin.utexas.edu>; katie@sergilaw.com <katie@sergilaw.com>
**Bcc:** Alberto Martinez <almartinez1905@gmail.com>; wagonmail@yahoo.com <wagonmail@yahoo.com>

Dear Mr. Galen Eagle Bull,

thank you for writing. However, I'm not in Austin right now; I flew to Puerto Rico on Thursday and will return on June 5th. (I'm the primary caretaker for my mother, who is disabled in Puerto Rico.) If it works, we can meet on the afternoon of Friday June 7 or Monday June 10.

By the way, I've been waiting to hear from someone for weeks. In March a colleague told me that I was being "investigated" about an alleged "inappropriate relationship" with ███████████ I had no relationship and no inappropriate relationship with her. Last June she frankly asked me ███████████████████████████████████ and told her anyhow that it was impossible. She told me right then that she had "a boyfriend" anyhow (who actually was not quite that). Still, we became friends by working in the same coffee shops. And, I set boundaries such as not inviting her to any restaurants, rejecting all invitations to go to her house, not telling her where I live, and not even accepting her friend request on facebook. Even though she agreed that we'd just be friends, I later eventually got the impression that she liked me again so I told her that "I'm worried that you're crushing on me," but she categorically denied it, and repeatedly showed me photos of the guys she was dating and meeting, to reassure me. Finally on October 18 she texted me frustrated saying that "I fell in love with you" and I replied that I just didn't know that at all since she had denied having any crush on me. She replied that she hadn't told me that because she couldn't admit it and still be friends so she had acted to "play it cool" especially by dating other people because I had rejected her. She then explained that she would not talk to me anymore, because, she wrote, when one person likes another but it's not reciprocal then the two should not speak. Regardless, she did reach out to me subsequently several times.

Since someone first told me in March that there was some sort of ongoing investigation about me, I asked for advice and a colleague told me to just wait for OIE or some other office to contact me ███████████ told me in March that she had to meet with the Chair of my department, and she told me that the Chair Jackie Jones told her that an anonymous complaint against me was submitted last semester, even though ███████████ has no such claims or complaints against me. By now, six months or more have passed and therefore in the meantime several faculty members have either been interviewed or have heard some version of the story that I'm being investigated for an "inappropriate relationship," which is exasperating for me, because (A) I had no such relationship, and (B) I'm waiting for when is the right time for me to respond to such false rumors publicly.

I understand that your job presently might well be to investigate only the present allegation, but for the record, I've been at UT 15 years, and suddenly in March I've had to tolerate a series of false allegations against me: (1) that I said or wrote disparaging and denigrating things about female faculty in my department (totally false), (2) that I had some sort of inappropriate relationship with a graduate student (totally false), and (3) that I said false and divisive things about Jewish faculty (totally false).

Therefore, in order to defend myself against a pattern of smears and false allegations, I had to retain a lawyer. We met with Donna Reddix recently to discuss allegation (3) above. And as I explained to Ms. Reddix and UT's lawyer Chris, I am upset that allegations based on no facts

have gained currency in my department and feel like retaliation. The Chair of my department has been involved in gifting credence to all of these allegations without consulting me at all, and I worry that she is retaliating because she disliked the findings of the Equity Committee that I chair in the department. (We found substantive inequities in salaries, and lack of inclusion of minorities and especially Hispanic faculty in positions of departmental governance during all 15 years reviewed; and moreover, I stood up for an African American female professor who was disrespected—and who is now being accused too.)

Since you write that the concern about a graduate student "is not a formal investigation," I don't know yet whether I'll bring my lawyer. But I've cc'd her to discuss it and I've written the present email without consulting her or anyone. I understand that if I bring a lawyer to our meeting you may have to bring a UT lawyer too, so if I will indeed bring a lawyer I will let you know in advance.

Lastly, I respectfully understand that it's your job to investigate allegations, and I look forward to assisting you in the process. Let me know if we can meet on June 7 or 10.

Sincerely,

Dr. Alberto A. Martínez
Professor, Department of History


University of Texas at Austin
128 Inner Campus Dr., Stop B7000
Austin, TX  78712-0220
tel. 512-517-2755, fax 512-475-7222
almartinez@austin.utexas.edu
http://liberalarts.utexas.edu/history/faculty/aam829
http://www.martinezwritings.com/m/About.html
http://liberalarts.utexas.edu/hps/
http://sites.utexas.edu/puertorico/

---

**From:** Eagle Bull, Galen
**Sent:** Friday, May 17, 2019 5:42:54 AM
**To:** Alberto A. Martinez
**Subject:** Office for Inclusion and Equity - Please Contact

Professor Martinez:

My name is Galen Eagle Bull, and I am an Associate Director in the Office for Inclusion and Equity (OIE). We received an anonymous concern regarding your relationship with a female graduate student, and I would like to discuss that with you. This is not a formal investigation.

Please contact me at the number below to arrange a time to come to OIE and discuss the matter in-person. I will do my best to accommodate your schedule.

Thank you in advance for your cooperation. I look forward to hearing from you.


Galen Eagle Bull, JD

Exhibit 42



**DIVISION OF DIVERSITY & COMMUNITY ENGAGEMENT**
Office for Inclusion and Equity

*100 West Dean Keeton Street, SSB, 3.212 • Austin, Texas 78712-1541 • 512-471-1849*
*FAX 512-512-471-8180 • www.equity.utexas.edu • oie@austin.utexas.edu*

## PRIVATE & CONFIDENTIAL

August 20, 2019

To:        Alberto Martinez, PhD
           Department of History

From:      Galen Eagle Bull, J.D., Associate Director
           Office for Inclusion and Equity ("OIE")

RE:        Closure Memorandum

In January of this year, OIE received an anonymous third-party report that you were dating a current graduate student in violation of the University's Consensual Relationship policy. The graduate student was subsequently identified ▮▮▮▮▮▮▮▮▮▮▮. OIE conducted an extensive due diligence inquiry into the allegation, speaking with ▮▮▮▮▮▮▮▮ and select faculty within the Department of History. OIE determined that the evidence did not substantiate a policy violation.

You met with OIE on June 6, 2019. You reiterated that you never dated ▮▮▮▮▮▮▮▮ never had a physical relationship with her, or anything beyond a friendship. You said that you were not on ▮▮▮▮▮ dissertation committee, and that you never supervised her or evaluated her work in any way. You added that you never read one chapter of her dissertation.

You said that in June 2018, you received a ▮▮▮▮▮▮▮▮ text message. It was a ▮▮▮▮▮▮▮▮▮▮ text message saying that she was, "Pre-emptively hitting on," you, that it led to a discussion between the two of you about your friendship, and that it was not a dating relationship. Afterward, you said that you received a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ text message, ▮▮▮▮▮▮▮▮▮" You said you ▮▮▮▮▮▮▮▮ to anyone.

Based on the information you provided and information from other sources, OIE will take no further action and considers this matter closed. OIE reserves the right to re-open this complaint should additional information arise.



DIVISION OF DIVERSITY & COMMUNITY ENGAGEMENT   Exhibit 43
Office for Inclusion and Equity

*100 West Dean Keeton Street, SSB, 3.212 • Austin, Texas 78712-1541*
*PHONE 512-471-1849 • FAX 512-471-8180*
*www.equity.utexas.edu • oie@austin.utexas.edu*

**<u>PRIVATE & CONFIDENTIAL</u>**

April 22, 2019

To:          Alberto Martinez, PhD
             Professor
             Department of History

From:        Donna Davis Reddix, JD
             Associate Director
             Office for Inclusion and Equity

CC:          Janet Dukerich, PhD
             Senior Vice Provost for Faculty Affairs and Professor
             Office of the Executive Vice President and Provost

             Carmen L. Shockley
             Assistant Vice President for Faculty Affairs
             Office of the Executive Vice President and Provost

             Randy L. Diehl, PhD
             Dean, College of Liberal Arts and Professor

RE:          Notice of Race and Religious Discrimination Complaint & Investigation

_____

        The University of Texas at Austin has empowered the Office for Inclusion and Equity
(OIE) to investigate and resolve concerns of discrimination, harassment (including sexual
harassment) on the bases of race, color, religion, national origin, age, disability, citizenship,
veteran status, sexual orientation, gender identity or gender expression, and genetic information,
as well as allegations involving sexual misconduct, inappropriate consensual relationships, and
retaliation. [1]

---

[1] *Applicable OIE policies can be found at https://equity.utexas.edu/policies/*

This memo is notification that OIE has received an official complaint against you by Jacqueline Jones, PhD, Professor and Chair of the Department of History.  The allegation(s) against you are as follows:

1. Allegation #1: You have charged that the Complainant shows favoritism towards other Jewish colleagues through departmental appointments of administrative influence and power.
2. Allegation #2: Your statements have caused a toxic environment in the Department of History between Jewish and non-Jewish colleagues.

**Statement of Allegations**

1. On April 2, 2019, the Complainant initiated a formal investigation against you alleging race discrimination.
2. The Complainant alleges that you have stated within the Department of History that she only promotes Jewish colleagues to senior leadership roles.

Pursuant to University Policy, you are provided an opportunity to submit a written response to the allegations presented within ten (10) working days. The ten day period commences the day after the date of this letter.  If you chose to submit a written response, please submit the response to OIE. Upon conclusion of the investigation, you will receive a report on the investigation along with any findings.

To ensure the integrity of the investigation, we ask that you maintain confidentiality and not discuss the allegations with any individual who does not have a legitimate need to know. Additionally, you must retain and preserve all records, including but not limited to documents and electronic communications that may be relevant to the subject of this notice.

As a reminder, University policy strictly prohibits retaliation towards any person who has brought a complaint or participated in an investigation. OIE appreciates your cooperation in this process. If you have any questions regarding University policies and/or OIE's process, please do not hesitate to contact OIE.

Re: Notice of Investigation

Exhibit 44

Alberto A. Martinez

Tue 4/23/2019 9:58 AM

Sent Items

To: Reddix, Donna D <Donna.Reddix@austin.utexas.edu>;

Bcc: Alberto Martinez <almartinez1905@gmail.com>; wendigo00979@yahoo.com <wendigo00979@yahoo.com>;

📎  1 attachments (8 MB)

Equity emails.pdf;

Dear Donna Davis Reddix,

thank you for duly writing.
I'm stunned to read these allegations, which are completely false, and also absurd and nonsensical. I certainly do Not believe these claims that have been ascribed to me, and I've said no such things in person or in writing. Either someone has lied to Prof. Jones, or she herself is misrepresenting me.

This is especially exasperating to me, since in the past few weeks I've already patiently endured a series of other arbitrary and false allegations about me. First (1), Prof. Jones told me that some faculty were thinking of "reporting me to Human Resources," which was absurd. Next, (2) I received emails from Prof. Jones, falsely stating that I had "disparaged" or "denigrated" certain female faculty in emails, which is false, and which I immediately denied in meticulous detail. Then, (3) I also heard from several colleagues that there is some sort of ongoing investigation about me about an anonymous allegation of an "inappropriate relationship" or something like that with a graduate student, which likewise is completely false. And now, (4) I receive this official notice about an investigation about Jewish faculty. It's incredible.

Yet I've said no such things at all, so I want to know who has initiated such smears about me. I do understand and fully respect that OIE must fairly and professionally investigate this matter and I'll gladly cooperate in any ways that I can. This is certainly an offensive allegation that deserves close attention, even though it's false. I am entirely interested in investigating this allegation. Alarmingly, this claim and the series of incidents I list above, and others, jointly show a pattern that feels like retaliation against me. But why?

On April 2018, the tenured Hispanic professors (myself and two others) in our History department publicly raised the problem that we were effectively if inadvertently marginalized and excluded from our History department's governance for many years. This complaint led to the creation of an "Equity Committee" of which I am the Chair. My committee and I have painstakingly worked on important and delicate issues of equity and diversity for a year. I've consistently expressed myself professionally and respectfully. Still, the inordinately defensive, paranoid, and accusatory ways in which Prof. Jones has recently acted, make me think that she worries about the direction of my committee or imagines that I might speak ill of her.

To promptly help you with your investigation, I have spent many hours today and yesterday gathering various emails that should clearly convey to you two things: that the allegations about me are false and absurd, and that I have been subjected to an unwarranted treatment. I've highlighted multiple passages to bring to your attention. I have multiple other emails, do let me know if you need more. In the Equity

Committee, and as Minority Liaison Officer, and as a minority myself, my concern all throughout has been about how to be more inclusive in our faculty governance (as all my emails plainly show), not to invent absurd reasons as to why others have been included.

You ask when we may meet; how about Friday May 3 at 1:00pm?
Or, if you prefer sooner, how about Thursday May 2 at 3:45pm?
I'd like to bring a lawyer to our meeting, since I too want to formally investigate these allegations, not just defend myself, so I have to find one soon.

Sincerely,

Dr. Alberto A. Martínez
Professor, Department of History

University of Texas at Austin
128 Inner Campus Dr., Stop B7000
Austin, TX  78712-0220
tel. 512-517-2755, fax 512-475-7222
almartinez@austin.utexas.edu
http://liberalarts.utexas.edu/history/faculty/aam829
http://www.martinezwritings.com/m/About.html
http://liberalarts.utexas.edu/hps/
http://sites.utexas.edu/puertorico/

---

**From:** Reddix, Donna D
**Sent:** Monday, April 22, 2019 10:49:10 AM
**To:** Alberto A. Martinez
**Subject:** Notice of Investigation

Dear Professor Martinez,

My name is Donna Davis Reddix, and I am an Associate Director for the Office for Inclusion and Equity (OIE). The University of Texas at Austin has empowered OIE to investigate and resolve certain allegations, including claims of discrimination, harassment, and retaliation.  A matter has been brought to our attention that I need to discuss with you.  We are currently investigating a race and religious discrimination allegation made against you by Dr. Jacqueline Jones, Professor and Chair of the Department of History.

Attached is the official Notice of Investigation memorandum, which contains a more detailed account of the allegations against you.   As with all investigations, we caution against discussing the nature of the investigation or disseminating information discovered during the course of the process to anyone.  We would also like to send a reminder not to engage in any action that can be reasonably interpreted as retaliation against anyone who participated in or who you believe may have participated in this investigation.

Please contact our office or respond via email to schedule a meeting to discuss the allegations.  This meeting will provide you with an opportunity to respond to the allegations. Pursuant to University policy, you have the right to

be accompanied by an advisor in any meetings with OIE.  Please provide me with days when you are available for a meeting. I will do my best to accommodate your scheduling needs.

OIE can be reached at 512.471.1849. Additional information about OIE and its services is available at https://www.equity.utexas.edu.

Thank you in advance for your time and attention to this matter.

Best regards,

**Donna Davis Reddix, JD**
Associate Director, Office for Inclusion and Equity
The University of Texas at Austin
T:  512-471-1849
F:  512-471-8180
www.equity.utexas.edu
(Pronouns: she/her/hers)



It is the policy of The University of Texas at Austin ("University") to provide an educational and working environment that provides equal opportunity to all members of the University community. In accordance with federal and state law, the University prohibits unlawful discrimination, including harassment, on the basis of race, color, religion, national origin, sex, pregnancy, age, disability, citizenship, veteran status and genetic information. The University also prohibits discrimination on the basis of sexual orientation, gender identity, and gender expression.

RE: Notice of Investigation

# Exhibit 45

Reddix, Donna D <Donna.Reddix@austin.utexas.edu>

Fri 5/3/2019 3:12 PM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>
**Cc:** katie@sergilaw.com <katie@sergilaw.com>

Professor Martinez,

The alleged statement was provided by an anonymous third party on or about March 27, 2019, who claims you have charged openly that Professor Jacqueline Jones shows favoritism towards Jewish colleagues, and appoints them to positions of administrative influence in the Department of History.

We will discuss the allegations in greater detail during our meeting on Monday.  I look forward to meeting you.

Best regards,

**Donna Davis Reddix, JD**
Associate Director, Office for Inclusion and Equity
The University of Texas at Austin
T:  512-471-1849
F:  512-471-8180
www.equity.utexas.edu
(Pronouns: she/her/hers)



*It is the policy of The University of Texas at Austin ("University") to provide an educational and working environment that provides equal opportunity to all members of the University community. In accordance with federal and state law, the University prohibits unlawful discrimination, including harassment, on the basis of race, color, religion, national origin, sex, pregnancy, age, disability, citizenship, veteran status and genetic information. The University also prohibits discrimination on the basis of sexual orientation, gender identity, and gender expression.*

---

**From:** Alberto A. Martinez <almartinez@austin.utexas.edu>
**Sent:** Thursday, May 2, 2019 9:44 AM
**To:** Reddix, Donna D <Donna.Reddix@austin.utexas.edu>
**Cc:** katie@sergilaw.com
**Subject:** Re: Notice of Investigation

Dear Ms. Reddix,

to assist our meeting on Monday, I have a request: can you please email me any alleged facts on which the allegations by Dr. Jones are based?  My lawyer pointed out that according to OIE's Procedure and Practice Guide (p. 16, item D.2.), the OIE should provide "the facts surrounding the allegations."

In particular, I'm wondering what Dr. Jones specifically meant by claiming that I've said things "within the Department." Simply put, exactly (1) who claims that I said (2) what to (3) whom, (4)

where, and (5) when?

Also, please let me know if you have any questions or need any additional information from me based on your review of the email correspondence that I sent you.

Thank you,

Alberto Martinez

---

**From:** Reddix, Donna D
**Sent:** Tuesday, April 30, 2019 8:28:37 AM
**To:** Alberto A. Martinez
**Subject:** RE: Notice of Investigation

Great.  Thank you for confirming.

**Donna Davis Reddix, JD**
Associate Director, Office for Inclusion and Equity
The University of Texas at Austin
T:  512-471-1849
F:  512-471-8180
www.equity.utexas.edu
(Pronouns: she/her/hers)



*It is the policy of The University of Texas at Austin ("University") to provide an educational and working environment that provides equal opportunity to all members of the University community. In accordance with federal and state law, the University prohibits unlawful discrimination, including harassment, on the basis of race, color, religion, national origin, sex, pregnancy, age, disability, citizenship, veteran status and genetic information. The University also prohibits discrimination on the basis of sexual orientation, gender identity, and gender expression.*

**From:** Alberto A. Martinez <almartinez@austin.utexas.edu>
**Sent:** Monday, April 29, 2019 7:02 PM
**To:** Reddix, Donna D <Donna.Reddix@austin.utexas.edu>
**Subject:** Re: Notice of Investigation

hi Ms. Reddix,

good, let's meet on Monday May 6 at 2:30pm in SSB Suite 3.212; my lawyer too confirmed that that time works.

Thank you, see you then,

Alberto Martinez



DIVISION OF DIVERSITY & COMMUNITY ENGAGEMENT  **Exhibit 46**
Office for Inclusion and Equity

*100 West Dean Keeton Street, SSB, 3.212 • Austin, Texas 78712-1541*
*PHONE 512-471-1849 • FAX 512-471-8180 • www.equity.utexas.edu • oie@austin.utexas.edu*

**PRIVATE & CONFIDENTIAL**

September 12, 2019

TO:             Maurie McInnis, PhD
                Executive Vice President and Provost

FROM:           Donna Davis Reddix, JD
                Associate Director
                Office for Inclusion and Equity

RE:             Formal Investigation Report
                Jacqueline Jones, PhD, Department Chair & Professor, History (Complainant)
                Alberto Martinez, PhD, Professor, History (Respondent)

CC:             Janet Dukerich, PhD
                Vice Provost for Advocacy and Dispute Resolution
                Office of the Executive Vice President and Provost

                Carmen L. Shockley
                Assistant Vice President for Faculty Affairs
                Office of the Executive Vice President and Provost

                Michelle George
                Assistant Director
                Faculty Affairs

**Introduction:**

On March 27, 2019, the Office for Inclusion and Equity ("OIE") received a complaint reporting allegations of race and religious discrimination against Alberto Martinez, PhD, Professor, Department of History, College of Liberal Arts ("Respondent"). The Complainant is Jacqueline Jones, PhD, Department Chair & Professor, Department of History, College of Liberal Arts ("Complainant") who claims Respondent made alleged anti-Semitic statements to a graduate student that she shows favoritism towards Jewish colleagues, and appoints them to positions of administrative influence and power in the department because of their race and/or religion.

The allegations were based on information that could implicate the University's Nondiscrimination Policy (HOP 3-3020).[1]

Based on the evidence obtained during its investigation, as set forth below, there is INSUFFICIENT EVIDENCE to find the Respondent in violation of the University's HOP 3-3020 policy.

**Background:**

Complainant and Respondent are both tenured faculty members of the Department of History. Complainant serves as the Department Chair and states that a graduate student shared with her comments allegedly made by Respondent during a casual conversation. Specifically, that Respondent stated Complainant only promotes and appoints faculty colleagues who are Jewish. The graduate student has requested anonymity and OIE obliges this request.

**Allegations:**

In accordance with University policy, the OIE conducted an investigation to examine the following allegations submitted by Complainant:

1. Respondent made an anti-Semitic statement that Complainant shows favoritism towards other Jewish colleagues through departmental appointments of administrative influence and power.

2. The alleged statement has caused a toxic environment in the Department of History between Jewish and non-Jewish colleagues.

**Methodology:**

In addition to Respondent and Complainant, OIE contacted and interviewed both the anonymous graduate student ("Graduate Student"), and three current faculty members representing various social identities, including race and gender.  The witnesses will not be individually identified in this investigation report to protect their privacy and confidentiality.

In its due diligence to conduct a thorough investigation, OIE notified Respondent and provided him with an opportunity to submit a written response to the allegations.  Respondent submitted email correspondence and documents for review. Subsequently, OIE met with Respondent and his advisor Katie Frank, Attorney at Law, Sergi & Associates, P.C., Attorneys at Law ("Advisor") on May 6, 2019, to discuss the claims and provide an opportunity for a broader

---

[1] HOP 3-3020 can be viewed here: https://policies.utexas.edu/policies/nondiscrimination-policy

discussion. Attorney Chris Hutto from the University's Office of Legal Affairs was also present for Respondent's interview.

The allegations were analyzed under the University's Nondiscrimination Policy (HOP 3-3020). Specifically, the provisions pertaining to nondiscrimination[2] were examined. OIE's preponderance of the evidence standard reviews all evidence, including witness credibility, to determine whether it is more likely than not that the conduct occurred as alleged. If the conduct did occur as alleged, then an analysis is completed to determine whether the conduct violated University policy.

To establish a nondiscrimination violation, the investigation must find that the Respondent more likely than not engaged in 1) behavior or conduct; 2) directed at a specific individual or group of identifiable individuals; 3) that subjects the individual or group to treatment; 4) that adversely affects their employment or education; 5) because of their race or religion. This may include as provided by HOP 3-3020, verbal conduct that is not necessary to an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea.

In determining whether conduct was discriminatory, the OIE seeks written guidance from various agencies and departments, including the Equal Employment Opportunity Commission (EEOC).  Accordingly, a "reasonable person" standard is applied to the basic determination of whether or not challenged conduct is discriminatory.[3]

**<u>Investigation:</u>**

OIE initially met with Complainant on April 2, 2019 to discuss the allegations. Complainant claims Graduate Student shared that Respondent made the alleged anti-Semitic statements during a private casual conversation in Respondent's office.  No further parties were in attendance or participated in the alleged discussion.  According to Complainant, Respondent's alleged comments have caused tension and discourse within the Department of History between Jewish and Non-Jewish faculty in that many believe Complainant considers race and/or religion in her administrator leadership appointment decisions.

Respondent and Graduate Student were the only individuals present when the alleged statements were made.  However, Complainant states that gossip within the Department about Respondent's alleged statement has caused tension among the faculty.

---

[2] OIE is tasked with determining whether a violation of University policy (ies) has occurred. OIE bases its determinations on the preponderance of the evidence, which refers to the deliberative process that OIE uses to determine which evidence in the case produces the stronger impression, has the greater weight, and is the more convincing.  An OIE determination that University policy (ies) was violated does not imply that a violation of state and/or federal law occurred.

[3] U.S. Equal Employment Opportunity Commission Enforcement Guidance, Number N-915-050.

Complainant states that Graduate Student claims Respondent asked, "Did you know that Jackie Jones is Jewish?" and showed her a list of faculty salaries while going through the names designating those that belonged to Jewish faculty. Complainant states that she was also told that Respondent made statements to Graduate Student that she is "Head of the Jewish Kabbalah" and there was a conspiracy against non-Jewish faculty in the Department of History.

OIE met with Graduate Student on April 12, 2019, and they asserted that Complainant spoke with them about comments Respondent allegedly made about her. Graduate Student stated that Respondent told them "Did you know that Jackie Jones was Jewish?" in the context of being concerned about the number of Jewish leaders that currently hold senior leadership roles within the Department of History. Graduate Student asserts they explained Respondent's concern was in his capacity as the Equity Committee Chairperson, and that he showed them salaries of other faculty as an illustration that Complainant is biased and favors Jewish faculty. Graduate Student states that it is their understanding that the Equity Committee created a report that disclosed salary disparities to the Department of History faculty.

OIE met with Respondent and his Advisor to discuss the allegations further. Respondent asserts that he never made the alleged statements, and offers that he does not know which colleagues are Jewish, Baptist, or any other religion. Additionally, Respondent asserts that he identifies as an Agnostic, and is not Anti-Semitic.

As the Chairperson of the Equity Committee, Respondent states that he never looks directly for a pattern based on ethnicity. However, through his research he found a lack of Hispanic leadership within his department over a number of years. The Equity Committee reviewed information regarding the fifteen standing committees, statement on governance, promotion to tenure, and salary. The Equity Committee reviewed a 10-15 year period and asked, "Is the Department of History being equitable in promotion?"

The Equity Committee asked if the Department of History could institute a rotation that would allow more depth in the selection process and diversity of leaders. Respondent states that he never personally mentioned Complainant specifically in any of the deliberations regarding equity, and the Equity Committee did not offer individual critiques of Complainant. Respondent views the racial and ethnic disparities in leadership as part of a pattern that reflects systemic racism.

According to Respondent, the Equity Committee requested equitable salaries, but instead Complainant is obstructing the process, disrupting the narrative, and retaliating against the group who are attempting to increase leadership diversity with the Department of History.

OIE interviewed three current Department of History faculty. The following accounts were offered by each witness.

- Witness 1 claims that they never heard Respondent say anything anti-Semitic or derogatory when referring to inequalities within the Department of History leadership. According to this witness, Respondent reviewed the collected data and shared the inequities with Complainant.  Respondent has been critical of Complainant's refusal to implement a process that would increase equality, and has often referenced unconscious bias as the basis of misunderstanding by Complainant.

- Witness 2 states that some Hispanic faculty have complained about the lack of inclusion in the appointment process, lower salaries, and that others in the department are selected repeatedly for leadership positions. According to this witness, Complainant has favorites within the faculty that represent various racial groups, including white and black.

  Witness 2 asserts that they reviewed the department's leadership roster and it appeared to be a large group of Jewish and older/senior staff who make more than the average salary within the department.  According to Witness 2, it is not clear whether all the Department's leaders are Jewish.  However, in this witness' opinion, Complainant is in a position to help and promote "her own" which this witness defines as the Department favorites.

  Witness 2 claims that they have never heard Respondent say anything against Complainant, and views his work on the Equity Committee as a request for Latinos to be treated with the same respect as White colleagues.

- Witness 3 asserts that the Equity Committee used tabular data over a 15 year period, and discovered disparities with the faculty salaries. Witness 3 offers that they never heard Respondent or anyone on the Committee make a derogatory statement about the Complainant's appointments being based upon ethnic or religious backgrounds. According to this witness, Complainant saw the momentum growing to support a salary equity review and adjustment, and she allegedly appointed Committee members to subcommittees which took away their power to effectuate change. Witness 3 states that the subcommittees then reported to faculty, not the Committee who initiated the discussion.

**<u>Findings:</u>**

OIE interviewed three faculty witnesses identified by the parties, representing different races and genders who have interacted directly with Respondent.  None of the witnesses indicated that they experienced individually or witnessed inappropriate comments by Respondent regarding Complainant.  Each witness responded that Respondent reported on Department of History faculty salary disparities in his capacity as the Equity Committee Chairperson, but none heard anti-Semitic or derogatory comments towards Complainant or Jewish faculty.  Further, OIE interviewed Graduate Student who also shared that Respondent's alleged comments were made within his capacity as the Committee's Chairperson.

Although Respondent admits identifying salary inequities and advocating for equal appointments of Hispanic men on faculty, he denies making Anti-Semitic comments about Complainant.

Based upon the evidence obtained and witness interviews, OIE does not find that Respondent more likely than not engaged in the alleged behavior.  OIE examined the credibility of each witness and was unable to find supporting information or documentation that supported Complainant's allegations of race or religious discrimination by Respondent.

While OIE does not discount the purported experience of Complainant, OIE was unable to independently corroborate Complainant's allegations.  The facts do not support a finding that Respondent exhibited behavior or conduct directed towards Complainant or Jewish individuals that subjects them to treatment or adversely affects their employment or education because of race or religion.  The standard of proof has not been satisfied.

**<u>Conclusion:</u>**

OIE finds that there is INSUFFICIENT EVIDENCE that Respondent violated the University's Nondiscrimination policy. Therefore, the allegations herein are unsubstantiated. OIE will take no further action and considers this matter closed. OIE reserves the right to re-open this complaint should we receive additional information.

Cc: Jones, Jacqueline; Flores, Arturo R
Sent Items


Alberto A. Martinez
hi Joan, Emilio, Megan, Michael,

thank you for kindly agreeing to serve on our Committee on Equity.

As Jackie said near the end of our meeting, we'll look at three main areas of concern listed in Wednesday's Agenda: Department governance, Merit increase guidelines, and nurturing of junior faculty. In agreement with Emilio, we'll create "a Report, and a plan of action to help fix inequities," and to "review equity broadly to include not just Hispanics, but other minorities, gender, and any colleagues who feel disenfranchised." In agreement with Jeremi we'll base our report on a careful collection of facts, and in agreement with Martha, Megan, and Jackie we'll also carry out some sort of Climate Survey, in order to solicit, listen, and respond to how faculty feel in our department.

I fly to Puerto Rico today until the 19th, and I understand that Michael is on leave during the summer. Still, we will begin the process of collecting data presently. So, if you have any relevant information please do share it. For example: old lists of membership in committees for the past 15 years, and as Alan fairly suggests, "a year-by-year roster on hirings, potential hirings, resignations, terminations, leaves and information as to who is up for promotion and promotion and tenure."

Finally, any suggestions are welcome.

Many thanks again,
Al


Chair,
Committee on Equity



Professor, Department of History
Director, Certificate Program in History & Philosophy of Science
John E. Green Regents Professorship in History

University of Texas at Austin
128 Inner Campus Dr., Stop B7000
Austin, TX  78712-0220
tel. 512-517-2755, fax 512-475-7222
almartinez@austin.utexas.edu
http://liberalarts.utexas.edu/history/faculty/aam829
http://www.martinezwritings.com/m/About.html
http://liberalarts.utexas.edu/hps/

---

**From:** Jones, Jacqueline
**Sent:** Friday, May 11, 2018 1:42:18 PM
**To:** Alberto A. Martinez; Zamora, Emilio; Neuberger, Joan H; Raby, Megan; Joseph, Peniel E; Lawrence, Mark A; Moore, Leonard N; Walker, Juliet E K

# Climate Survey: full results

Alberto A. Martinez

Tue 2/26/2019 11:15 AM

Sent Items

To: Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Joseph, Peniel E
<Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan
<meganraby@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora,
Emilio <e.zamora@austin.utexas.edu>;

Cc: Jones, Jacqueline <jjones@austin.utexas.edu>;

📎 1 attachments (2 MB)

Climate Report Feb 25.pdf;

Dear members of the ==Equity Committee,==

attached are the complete results of ==our Climate Survey,== which ended yesterday.
I've read all the replies and I think th==at on the whole the== respondents expressed themselves
constructively, almost entirely respectfully, and aired opinions and concerns frankly. I think all of the few
instances in which individuals are actually named are positive, which is good.

In the interest of full transparency, generating reflection and conversations, and not being the only ones
in possession of this information, I certainly think that these results should be available to our entire
department. And also, so that anyone can fairly confirm that their input is actually here. However, rather
than distribute it to everyone in an unsolicited email, I propose to send a copy of the report to Jackie
Llado, as I told Jackie and Art yesterday, and that we let the faculty know that the full Report is available
to them, and that if they wish to read it please ask Jackie Llado to email them a copy.

Alternately, if any of you think that there's a particular answer that for some reason should first be
censured please let me know. For one, I'm pleased that this Survey was not used as a means to insult or
berate anyone, despite individual critiques which can well be expected in an anonymous survey of this
nature.

The Survey was submitted to 67 faculty, including lecturers, and it was started (the individualized links
were clicked) by 54. However, actual answers are fewer, that is, I think no question has more than 46
respondents. It was possible to skip questions without answering them, so I don't know if more than 46
persons (out of 54) replied to some questions. Still, looking at one must-answer-to-proceed question #
Q28, "What is your position?" 46 persons answered so ==it's fair to say that 46 faculty completed the
survey, that is, 46/67 = 69% turnout, which is good for a== survey this long.

Thank you, let me know your thoughts --

And thanks again to Jackie and all who worked on this survey.

Best wishes,

Al

Survey and subcommittees

## Alberto A. Martinez <almartinez@austin.utexas.edu>

Mon 2/4/2019 1:25 AM

**To:** Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>
**Cc:** Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>

📎 1 attachments (716 KB)
Survey Review.pdf;

hi everyone,

the Climate Survey is finished. I've taken account of all your feedback and tried to incorporate nearly all your suggestions as well as Jackie's. Once I have the final approval of members of the Equity Committee, we will distribute it to the department. I expect we can do this within a week. Here it is:
https://utexas.ca1.qualtrics.com/jfe/preview/SV_2bKPcvl92bvxKHb?Q_SurveyVersionID=current&Q_CHL=preview

Note: our drafts used to have some fill-in-the-bubble matrices (known as Likert) but in the end I had no choice but to change it to an uglier choose-the-rectangle system (known as Profile) because Qualtrics kept complaining that using any Likert-answer-matrix "Does Not Meet Web Accessibility Standards": won't display in all devices, and Qualtrics would not issue a sharable link using that format.

I also attach a pdf evaluation produced by the Qualtrics system, so you may see the kinds of restrictions that the system tracks. This survey has a rating of "Good" because it's mobile-optimized, its display logic functions properly, very few questions have conjunctions, it allows people with disabilities to participate, etc. The minor defects are that the predicted duration is 13.6 minutes (rather than an ideal 7), and there are multiple matrix questions and text entry boxes (instead of just three, which is absurdly low for our purposes).

Please let me know if you approve it.

Next we have to discuss the issue of subcommittees. Jackie, I'm surprised and disappointed that you didn't let me chair the Governance Subcommittee. When you requested subcommittees you said it'd be "to open it up" to more faculty in the dept. I'm all for inclusion, so it sounded good to me to invite others to contribute, but I would've preferred to have the invitation be announced and extended to everyone in the department as I said. Personally, I didn't think it would be "inappropriate" for me to chair the Subcommittee on Governance, since that's one of the three tasks for which the Equity Committee was created, and it didn't occur to me that you'd appoint anyone to chair our subcommittees without consulting me or the committee. I thought members of the Eq. Committee could chair its subcommittees, since normally subcommittees do just consist of members of a committee, though they may pull in consultants and others too.

In any case, I do expect and require that the subcommittees will follow the standard rules of order, and in particular, that they won't issue any reports to the department, to you, or to the Executive Committee, but that they will serve and report to the Equity Committee. As explained in Robert's Rules of Order, "A committee that is a subset of a larger committee is called a

==subcommittee. Committees that have a large workload may form subcommittees to further divide the work. Subcommittees report to the parent committee and not to the general assembly."==

I respectfully agree with you that as department Chair you generally shouldn't chair other committees, yet I feel that ==by appointing the chairs of all our subcommittees and by choosing all the additional members without consulting us you are really infringing on the autonomy of our committee.== I'm flexible, so I accepted it when you decided that Susan's work on Curriculum and Scheduling was a subcommittee of the Equity Committee. Similarly, when you requested that we create other subcommittees, I said fine. And so forth, yet the Equity Committee really needs to participate in deciding the composition of its own subcommittees, instead of it being done in this top-down manner.

To that end, I will meet with the Equity Committee to discuss how to proceed. I do agree of course that the subcommittee on Governance "should consider the responses to the Climate Survey and consult with members of the department generally (who would be encouraged to contact the committee through email or in person or anonymously) to pinpoint policies and structures related to departmental governance that could be improved in some way." Still, the Equity Committee should now discuss and decide how to proceed.

Sincerely,

Al


Jones 1 of 2
subcommittee
From: Jones, Jacqueline
Fri 2/1, 1:04 PM
To:  Alberto A. Martinez; Flores, Arturo R; Llado, Jacquelin
Inbox

Hi Al,
    The Governance subcommittee as now constituted consists of a diverse group representing all four area groups. In addition to Equity Committee members,  I wanted on it some folks who had been members of the department for many decades (Toyin), who had chaired other departments (Mary), and who knew something about theories of governmental structure(s) (Jeremi).
    I would like to draw up a specific charge for this subcommittee.  Please send me your thoughts.  I think it should consider the responses to the Climate Survey and consult with members of the department generally (who would be encouraged to contact the committee through email or in person or anonymously) to pinpoint policies and structures related to departmental governance that could be improved in some way.
    Let me know what you think.
Jackie

Jeremi, Chair
Al*
Juliet*
Peniel*
Emilio*
Mark*
Ann

# RE: Table of Associate to Full promotions?

Exhibit 47

## Hsu, Madeline Y

Fri 4/19/2019 12:59 PM

To: Raby, Megan <meganraby@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>;

Cc: Alberto A. Martinez <almartinez@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>;

📎 1 attachments (29 KB)

Evaluation section.docx;

Hi everyone,

Attached is my draft of the evaluation section.  Please note that the first two pages provide a general introduction for our subcommittee's work.  Can you take a look and let me know if you feel comfortable with the statements I have made about our findings and recommendations?

Best regards, Madeline

---

**From:** Raby, Megan <meganraby@austin.utexas.edu>
**Sent:** Friday, April 19, 2019 12:48 PM
**To:** Brower, Benjamin C <benbrower@utexas.edu>
**Cc:** Hsu, Madeline Y <myhsu@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>
**Subject:** Re: Table of Associate to Full promotions?

Yes, please, I think it would be really valuable to hear his experiences.

Megan Raby
Assistant Professor
Department of History
University of Texas at Austin

www.meganraby.com
New book: American Tropics: The Caribbean Roots of Biodiversity Science

On Apr 19, 2019, at 12:46 PM, Brower, Benjamin C <benbrower@utexas.edu> wrote:

Hello all, I just had a coffee with James and he said he'd be willing to share his experiences with Lina and Megan, writing the Assistant part of the report.  I add this because I remember that we had discussed the availability of "exit interviews"

Best, Ben

Benjamin Claude Brower
Associate Professor

**Department of History, Equity Committee, Promotions Procedures Subcommittee Report**

**Subcommittee members**: Madeline Hsu (chair), Ben Brower, Lina Del Castillo, Yoav Di-Capua, Al Martinez, Megan Raby

**Subcommittee charge:**

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent, with the caveat that the University and the College impose rules and guidelines that also govern departmental procedures. This subcommittee will analyze policies and procedures related to both promotion to full professor and promotion to associate professor with tenure. Factors to be considered (but are not limited to) the Third Year Review, peer observations of classes, mentoring, and service obligations, with the goal of helping faculty to advance in rank.

We have made our deliberations recognizing that equity may be defined and therefore evaluated in various ways. The impetus for starting the Equity Committee stemmed from observations of inequality of outcomes between History faculty in areas such as salaries, graduate students admitted, endowed chairs, research funds, teaching awards, major service appointments, teaching schedules and loads, promotions rates and successes, election to the EC, and many other resources, markers of status, and departmental support. Trying to evaluate equity issues directs attention as to why inequality of outcomes have been produced. Are such differential outcomes related to inequality of access? Are there measures that the department can undertake and wishes to undertake to address these inequities? This subcommittee deliberated with the understanding that the department can primarily seek to accomplish equality of access to information, opportunities, and support but cannot guarantee equality of outcomes because of the complexity of factors attending individual faculty trajectories.

**General Findings:**

Overall, in the 27 cases of promotion processed by the History Department 2009-2019, this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender. 21 of the 27 cases were successful; all 12 cases of promotion from associate to full went through while only 9 of 15 cases of assistants seeking promotion and tenure went through. Of the promoted faculty, 10 of 21 were women and 11 of 21 were persons of color. The 6 faculty failing to receive

promotion and tenure, span the spectrum in terms of race, ethnicity, and gender. Some of these candidates received positive or evenly split votes in the department, only to be turned down at the College and Presidential levels. Please see the appendix at the end of this report for the full listing of these 27 cases.

Although this subcommittee did not find discernible patters of inequity in promotions outcomes, we did find considerable inconsistency and variation in individual trajectories to promotion that should be addressed by changes in departmental policy and practices. We also call attention to recent major changes in University policy which impose a limit of 12 years during which associate professors must seek promotion to full or face conversion to a 3-3 teaching load. In a book field such as history, for which the primary requirement for promotion is a major project requiring years of work, this recent policy change has abruptly pulled the rug from under many colleagues who have been highly productive in many major areas of academic activity, including major leadership positions and institution building projects, whose publication output has ebbed as a consequence. The narrow framing of academic work considered for promotion to full based on publications and research fails to acknowledged the breadth of important work that is required to operate a university of the first rank. We discuss these findings and our recommended actions in the following sections concerning promotion from assistant to associate, promotion from associate to full, and evaluation processes.

**Department of History, Equity Committee, Promotions Procedures Subcommittee Report**

**Subcommittee members**: Madeline Hsu (chair), Ben Brower, Lina ~~dD~~el Castillo, Yoav Di-Capua, Al~~berto~~ Mart~~íi~~nez, Megan Raby

# Exhibit 48

**Subcommittee charge:**

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent, with the caveat that the University and the College impose rules and guidelines that also govern departmental procedures. This subcommittee will analyze policies and procedures related to both promotion to full professor and promotion to associate professor with tenure. Factors to be considered (but are not limited to) the Third Year Review, peer observations of classes, mentoring, and service obligations, with the goal of helping faculty to advance in rank.

We have made our deliberations recognizing that equity may be defined and therefore evaluated in various ways.  The impetus for starting the Equity Committee stemmed from observations of inequality of outcomes between History faculty in areas such as salaries, graduate students admitted, endowed chairs, research funds, teaching awards, major service appointments, teaching schedules and loads, promotions rates and successes, election to the EC, and many other resources, markers of status, and departmental support.  Trying to evaluate equity issues directs attention as to why inequality of outcomes have been produced.  Are such differential outcomes related to inequality of access?  Are there measures that the department can undertake and wishes to undertake to address these inequities?  This subcommittee deliberated with the understanding that the department can primarily seek to accomplish equality of access to information, opportunities, and support but cannot guarantee equality of outcomes because of the complexity of factors attending individual faculty trajectories.

**General Findings:**

Since 2009 there have been 21 Assistant Professors who either earned tenure or departed without it. From 2009 until 2019 the History Department submitted 20 applications for tenure, and 11 of those have been successful: 55%. (Two Assistants were each denied tenure twice). Thus, ten Assistant Professors departed without tenure (7 were denied tenure, plus 3 resigned). Among these ten

departures, 50% were minorities and 60% were women. The three Assistants who resigned did not expect to receive tenure in our department.

The 7 faculty who failed to receive tenure, span the spectrum in terms of race, ethnicity, and gender.  Some of these candidates received positive or evenly split votes in the department, only to be turned down at the College and Presidential levels. A few candidates received mostly negative votes in the EC.

In the area of promotions to full professors, the Department submitted 14 cases to COLA from 2009 until 2019. There were 13 promotions to full Professor, and only 1 denial (a Hispanic professor who was subsequently promoted, making the thirteen promotions).

Adding together all the applications for promotions (to tenure or full professor) submitted to COLA in 2009-19, we find that there were 34 cases (including 3 men who each applied twice), and altogether, 24 cases (70%) were successful. Please see the appendix at the end of this report for the full listing of these 34 cases.

This subcommittee does not find patters of inequity in promotions outcomes, if we do not consider faculty who resigned before going up for tenure. However, if we do consider the latter, it seems unfortunate that our department lost 10 assistant professors in 10 years, mostly women and including 50% minorities.

Original:

Overall, in the 28 cases of promotion processed by the History Department 2009-2019, this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender. 21 of the 28 cases were successful; all 12 cases of promotion from associate to full went through while only 9 of 16 cases of assistants seeking promotion and tenure went through.  Of the promoted faculty, 10 of 21 were women and 11 of 21 were persons of color.  The 7 faculty failing to receive promotion and tenure, span the spectrum in terms of race, ethnicity, and gender.  Some of these candidates received positive or evenly split votes in the department, only to be turned down at the College and Presidential levels.  Please see the appendix at the end of this report for the full listing of these 27 cases.

Although this subcommittee did not find discernible patters of inequity in promotions outcomes,

In addition, we did find considerable inconsistency and variation in individual trajectories to promotion that should be addressed by changes in departmental policy and practices. We also call attention to recent major changes in University policy which impose a limit of 12 years during which associate professors must seek promotion to full or face conversion to a 3-3 teaching load.  In a book field such as history, for which the primary requirement for promotion is a major ~~project~~ monograph requiring years of work, this recent policy change has abruptly pulled the rug from under many colleagues who have been highly productive in many major areas of academic activity, including major leadership positions and institution building projects, whose publication output has ~~ebbed~~ varied as a consequence.  The narrow framing of academic work considered for promotion to full based on publications and research fails to acknowledged the breadth of important work that is required to operate a university of the first rank.  We discuss these findings and our recommended actions in the following sections concerning promotion from assistant to associate, promotion from associate to full, and evaluation processes.

## INTERIM EQUITY REPORT OF THE CHALLENGES
## OF PROMOTION TO FULL PROFESSOR

Many of the equity problems that present themselves in the promotion and tenure of Assistant Professors apply to the promotions of Associate.  However, Associates face some unique issues and this Report will focus on these.

From 2009 until 2019, there have been at least a dozen faculty who are or were Associates for 15 years or more. Since there are roughly sixty T-TT faculty in our department in a given year, then 15/60 = 25% of our faculty are or were Associates for 15 years or more. If Assistant professors are excluded from the denominator, then the percentage is higher.

Overall, including promotions to full that have not been yet completed, the average time from first year as an Associate at UT until first year as full Professor is:  more than 14 years. Or, if we exclude from the calculation those who haven't yet been promoted, then the average time from 1st year as Associate at UT until first year as full Professor is:  9 years. The quickest time to full professor has been 3 years.

The History Department currently has 21 Associate Professors, nearly 1/3 of our faculty, who will go through the process of promotion to Full Professors in the coming years.  Academic careers follow many separatevarious paths, and within this group there is considerable variation in terms of time in position rank and, most critically, in terms of the overall professional profile and contribution to the our UT campus. By and large, this cohort could may be divided into two different groups. The first is comprised of Associate Professors who will start the promotion process to Full Professor no later than twelve years after their last promotion to the rank of Associate Professor. The second group consists of colleagues who have been in the position of Associate Professors for more than twelve years. With the mandate of equity in mind, this report is mostly concerned with what the department can do in order to guarantee produce a successful and fair process to for this second group.

Why is this is an equity issue?

As faculty memberswe already know, in the last few years both COLA and now also the Provost's Office, have introduced significant changes with regard to the necessary requirements for promotion to Full Professors. Many of theseSuch changes are significant and some might constitute an actual contractual change. Although we are still in the process of trying to fully understand the

~~specific nature of~~ these changes and receive an updated set of standards (especially from the Provost~~'s~~ Office and the Presidential Committee), it is clear that colleagues who have been in rank for more than twelve years ~~have become extremely vulnerable~~will be affected. At the heart of this vulnerability is the administrators' suspicion that such professors have "disengaged" from their work. ~~Even the most critical assessment of our colleagues does not reveal any~~ In actuality, however, our Associate Professors have not ~~who has~~ disengaged in our Department. Instead, we find colleagues who have made a variety of contributions, ~~and experience shows that these will~~ yet we worry that they might not be measured equally. In particular, service does not seem to carry much weight at the COLA level and beyond, even when such service is truly exceptional, making long-lasting contributions to our ~~the UT~~ campus, the academic field, and communities. Thus, the extraordinary contributions of faculty members risk being overlooked, even if they consume massive amounts of scholars' time. Associate Professors have~~who~~ directed programs, chaired other departments, units and schools and/or contributed in significant ways to campus life and to ~~the~~ develop~~ing~~~~ment of~~ teaching pedagogy. ~~, risks being overlooked, even as it consumes massive amounts of a scholar's time. Concomitantly,~~Therefore, the goal of this report is to ~~suggest~~ propose ways in which the History Department can ensure that it highlights these scholars' achievements and ensure that their promotion file correctly and accurately states their contribution.

**Publication rate and publication impact**

**Recommendations:**

A. Retrieving Institutional Memory via a revamped Service Report: How to account for and ensure the recognition of *extraordinary service*? We propose to significantly substantiate the process by which the EC's sub-committee on Service approaches preparing its report. By and large, the research profile and trajectory of each candidate attracts the most attention, and this is justified ~~in as much~~inasmuch as research is a primary consideration for promotion at all levels. However, such outsized attention to research ~~risks overshadowing~~obscures other elements in a candidate's file, including the service of Associate Professors who have been in rank more than twelve years. Simply put, the Service report normally gets very little attention. The data which is required to compose it is retrieved simply from the candidate's service report and department's data. These sources are likely to fall short of accounting for extraordinary service and do not fully explain the work of colleagues who ran programs, departments, centers and academic units. Just as outside letters help unpack a candidate's research profile, highlighting contributions that might not easily reveal themselves to the uninformed eye, so too a more informed and dynamic analysis of service can reveal contributions that might otherwise go unseen. To begin to close this gap and properly account for service achievements, we propose that in the relevant cases the sub-committee

on Service would actively interview members of the department and colleagues in other pertinent departments, as well as people who have worked with a candidate in ~~extra muros~~extramural service (including community service). It should also entertain the possibility of interviewing the candidate and anyone else that the candidate ~~would wish~~wishes to include in this process. [GD Service is only given so much weight in promotions considerations, and will not exceed that weight. Even if evidence is added and more service documented, it still will not be weighted more.  GD/AK did support idea of trying to get new Dean to give greater emphasis, but do not think it will happen at the Tower level.]

B.   Teaching: In some cases,  similar process is also relevant in the case of teaching and unique contributions to the development and dissemination of pedagogy.

C.   Ad-Hoc Representation: Buttressing the effort of reconstructing institutional memory, we propose that the candidate for promotion would nominate one individual that can best advocate for their case and have witnessed ~~first-hand~~firsthand and over many years, the ~~accumulative~~ cumulative impact of their labor (including teaching and leadership). This nominee would become part of the overall EC's evaluation process and would have full voting rights.

D.   Candidates with "split appointment": Colleagues who have "split appointments" are also vulnerable to the same process by which a sound institutional memory of their labor might be lost or misunderstood.

E.   A Political Effort: While the Department is very limited in terms of its ability to influence promotion criteria on the level of COLA and beyond, we recommend that the Chair would bring the situation of the second category of Associate Professors to the attention of the new dean. In particular, we are concerned about the application of  indices such as "publication rate" (it is rumored that the Provost's O~~o~~ffice is considering such new evaluation tools).

**Section: Evaluation Procedures**

**Faculty Input:**  Please note that some suggestions made by faculty conflicted with University policy or were not congruent with actual departmental practices.  These contradictions will be noted in comments in brackets.

-There was a general consensus that the CIS teaching evaluations are incapable of providing useful or insightful measures of teaching success and that they discriminate on the basis of gender, race and ethnicity, and age. [Jackie Llado: "There were some inaccuracies in terms of procedure and policy that were discussed during the open meeting. For example, one of the suggestions is focusing on the Teaching Portfolio to offset biases in CIS scores and student written comments. The Teaching Portfolio is not sent to the President's Committee as it's a COLA specific requirement [University requirement but doesn't get sent up to Tower AK]. Discrepancy in CIS scores and comments are explained in both the Chair's letter and the Scholarship Committee's letter on teaching. They can also be addressed in the candidate's Teaching Statement."

Jackie Jones: "CIS scores: In my Chair's letter I always address CIS scores that I think are unfair or unwarranted.  At times that means that I provide additional information related to a particular course—the challenges of teaching it, reasons why some students might have given less than favorable scores—and other times I consider where there might be a discrepancy between the peer observations (usually glowing) and the CIS scores (which might be ambiguous).  I also encourage candidates when they are writing their teaching philosophy statement to be candid about the challenges they face in the classroom, or have faced in a particular class.  Both the Dean's P&T Committee and the President's Committee are looking for evidence that the candidate has engaged in a measure of self-reflection when it comes to teaching; at times that means explaining (not explaining away) less than stellar CIS scores, in a specific class, or a specific section of the class, or overall.  // My point here is that no candidate for promotion is (or should be) at the total mercy of a particular number or score, as there are several places in the file where contextual evidence can be introduced. //In my letter I always include boilerplate language about the fact that we are a book discipline and so we do not consider citations as a measure of a colleague's work or prominence in the field.  (The social sciences and sciences use this metric.)  If your committee wanted to craft some language about the inherent unreliability of CIS scores, I would be glad to include that in any letter I write, though that might be a bit problematic for someone who has very  high scores across the board." ]

-Perhaps the most popular suggestion was that votes on promotion should extend beyond the EC to the entire department in order for more faculty to have input into the process and for greater transparency.  Without violating privacy requirements, files should be made available to the entire department and all faculty exert due diligence to cast informed votes.  Several colleagues also suggested that the department take votes by the EC and by the department and that both be sent up to the College and Tower for consideration.  [Several colleagues objected that the Department had used department wide voting under the Budget Council structure, and that participation had been low.  As nonvotes will be held against candidates, opening up voting in this way seems detrimental to faculty.  Jackie Llado:  "The EC vote was also discussed in the meeting. This is a University rule and the vote breakdown is included as the first page of the promotion dossier, including number of abstentions and illegible members (assistant profs cannot vote and associates cannot vote on promotions to full prof). I don't think that we can have the entire department vote on promotion cases because the University guidelines state that the department's governing body must vote on promotion. We also have to consider issues of privacy with regards to giving access to the full dossier to all faculty."]

-Some faculty advocated that membership on the EC should rotate more so that more faculty have opportunity to vote on promotion cases.  [This matter falls more under the brief of the Governance subcommittee.]

-Indrani Chatterjeei: Experience from other institution – in between device. All department members who were interested in a case have access to work and to the external letters. Kept in file with chair. Interest in voting and promotion and package go and sign names. A record we were reading. For that to be fruitful: we need a discussion on privacy. Also think about letters and read them how prior to vote. The whole intellectual thrust might not be intelligible, but at least sense for how experts talk about it. That could be a way of sharing information and gathering opinion and consensus. [Jackie Jones:  "…all members of the department have an opportunity to speak to the scholarship, teaching, and service of candidates up for promotion.  That meeting usually takes place very early in the fall semester, because departmental decisions are due in the Dean's office by September 15. Not many colleagues take advantage of that opportunity it seems to me; I'm not sure why that is the case.."]

-Several faculty [Erika Bsumek, Emilio ZamorraZamora, Martha NeumanNewman] urged that advocacy for faculty be strengthened by opening up membership on the Research Committee to interested friends of the faculty and/or colleagues with close areas of expertise.  [Madeline specified

that professional evaluations of colleagues should be handled on the basis of expertise, not friendships, which introduce inequitable considerations of popularity and personal networks into what should be workplace procedures.]   This sounds odd. I don't recall Erika, Martha, or Emilio saying that friends should be in the EC to vote. E.g., Emilio wasn't a friend of Anne, John, or Neil, his point was that he's an expert in Mexican American history and yet he was never involved in writing scholarship reports or voting.

-Faculty noted lack of clarity about how key terms such as "trajectory" and "time to tenure" are evaluated.

-Faculty noted that some colleagues with books on the table were denied promotion because their major publication was deemed "not important."  There should be greater clarity and standardization of how quality of publications are determined.

-From the Climate Survey: "Don't have mentors that write negative letters about their own candidates. I've seen this happen in our department at least twice. Please make the best case, not the worst. Please apply rules equally: if a year is "off the clock" write down what that means; e.g., it can't be used against the candidate at all. PLEASE let expert outside peer reviewers be used (it's not their fault if they're not in a peer university). PLEASE let experts be used who live in foreign countries. PLEASE change the system so that all tenured and full professors vote in all tenure cases."


**Recommendations:**

As noted in the other two sections, faculty should receive uniform information regarding processes and standards for promotion that is as updated as possible.  This information should be applied consistently in evaluation processes so that faculty will have a clear understanding of how each item will be weighed.  Of particular note are the following items:

-Evaluations of quality of scholarship are very uneven, and can be detrimental for faculty whose expertise is more specialized.  This committee recommends that the department ensure that the Research Committee includes colleagues with the closest fit in terms of expertise.  Furthermore, we recommend that the EC honor the evaluations made by external letter writers who are recruited because they are leading scholars in the faculty's research specialization, rather than setting them aside if members of the EC, who do have the ~~same levels of~~comparable expertise in the same area, disagree.

-How years ~~from~~ since the PhD to promotion will be weighed in terms of expected productivity varies from faculty to faculty.  There should be greater transparency and a consistent standard of

how years ~~from~~ in rank~~PhD~~ will be evaluated.  Factors complicating this include faculty who arrive from other positions, clock stoppages for fellowships, family leave, and illness.

-Outside letters be solicited from leading experts in the faculty's field of expertise, and that greater leeway be provided so that scholars from non-peer institutions, but who are leading experts, be included among outside reviewers.  If there is a strong mix of letters, at least one could be from a leading scholar from a nonpeer institution, with additional explanation of their centrality for that subfield.

Alberto Martínez's summary of promotions since 2009:

Since 2009 there have been 21 Assistant Professors who either earned tenure or departed without it. From 2009 until 2019 the Department has submitted 20 applications for tenure, and 11 of those have been successful.

11 Assistant Professors (out of 21) were promoted to tenure:

2019    (10) Lina del Castillo, (11) Megan Raby

2017    (9) Abena Osseo-Asare

2016    (8) Tatjana Lichtenstein

2012    (7) Ben Brower

2010    (6) Yoav di Capua

2009    (1) Tiffany Gill, (2) Frank Guridy, (3) Huaiyin Li, (4) Alberto Martinez, (5) Karl Miller

(Li had tenure at Missouri, but was hired as an Assistant at UT in 2006 and was promoted to Associate in 2009)

10 Assistant Professors departed without tenure:

2019    James Vaughn                    denied tenure

2017    Ruramisai Charumbira          denied tenure

2014    Anne Martinez                 denied tenure

2013    John McKiernan-Gonzalez       denied tenure twice: 2012 and 2013

2011    Susan Boettcher               denied tenure

2011    Carolyn Eastman               denied tenure

2011    Roger Hart                    denied tenure twice: 2010 and 2011

2011    Abigail Lustig                resigned, expected not to get tenure

2009    Kim Alidio                    resigned, expected not to get tenure

2009    James Wilson                  resigned, expected not to get tenure

7 individuals were denied tenure; in 9 tenure denials, plus 3 resignations.

10 departures total without tenure (60% women), including 5 minorities (50%).


Promotions to full professors: 14 cases

13 Promotions to full Professor, and 1 denial (who was subsequently promoted)


2019    (14) Yoav Di-Capua

2018    (13) Daina Berry

2017    (12) Cynthia Talbot

2016    (11) Madeline Hsu

2015    (10) Alberto Martinez

2014    (8) Seth Garfield, and (9) Denise Spellberg

2013    (7) Mary Neuburger

2010    (4) Neil Foley, (5) Virginia Garrard, and (6) Leonard Moore

2009    (1) Julie Hardwick, and (2) Huaiyin Li    -- (3) Neil Foley was denied promotion


Jackie Jones summary of promotions since 2009-10:

To Full: Daina Berry (US), Yoav Di-Capua (AAME); Al Martinez (EUR); Cynthia Talbot (AAME); Madeline Hsu (US/AAME); Virginia Garrard (LAS); Leonard Moore (US); Neil Foley (US); Huaiyin Li (AAME); Mary Neuburger (EUR); Mark Metzler (AAME); Seth Garfield (LAS).

[No one who came up for full was denied promotion.] Neil Foley, denied 2009

To Associate: Karl Miller (US); Frank Guridy (LAS); Tiffany Gill (US); Yoav Di-Capua (AAME); Tatjana Lichtenstein (EUR); Abena Osseo-Asare (AAME); Megan Raby (EUR); Lina Del Castillo (LAS); Ben Brower (AAME/EUR).

Denied promotion to Associate: James Vaughn (EUR), Ruramisai Charumbira (AAME), Carolyn Eastman (US), John McKiernan-Gonzalez (US), Roger Hart (AAME), Anne Martinez (US), *Susan Boettcher (EUR)

*Not in Jackie Jones' summary, added by Bruce Hunt

Promotions to Full Professor compiled by Al Martinez:

| Faculty | First year at UT as Associate | First year as a Full | Years to promotion |
|---|---|---|---|
| George Forgie US | 1980 | | 39+ |
| Michael Stoff  US | 1986 | | 33+ |
| Bob Olwell  US | 1999 | | 30+ |
| Neil Kamil   US | 2000 | | 29+ |
| Susan Deans-Smith LAS | 1991 | | 28+ |
| Bruce Hunt  ST | 1992 | | 27+ |
| Charters Wynn  EUR | 1995 | | 24+ |
| Martha Newman  EUR | 1996 | | 23+ |
| Judy Coffin  EUR | 1997 | | 22+ |
| Alison Frazier  EUR | 2004 | | 15+ |
| Mark Lawrence  US | 2006? | | ~13? |
| Laurie Green  US | 2008 | | 11+ |
| Matthew Butler  LAS | 2008 | | 11+ |
| Erika Bsumek  US | 2009 | | 10+ |
| Tracie Matysik  EUR | 2009 | | 10+ |
| Ben Brower  AAME | 2012 | | 7+ |
| T. Lichtenstein  EUR | 2016 | | 3+ |
| A. Osseo-Asare   AAME | 2017 | | 2+ |
| Aaron O'Connell  US | 2017 | | 2+ |
| *Promotions to full professor, which have been completed* | | | |
| Denise Spellberg   AAME | 1996 | 2014 | 18 |
| Cynthia Talbot  AAME | 2001 | 2017 | 16 |
| Neil Foley   US | 1997 (denied 2009) | 2010 | 13 |
| Joan Neuberger  EUR | 1994 | 2007 | 13 |
| David Crew  EUR | 1987 | 1998 | 11 |
| Jonathan Brown  LAS | 1983 | 1993 | 10 |
| Seth Garfield  LAS | 2004 | 2014 | 10 |
| Madeline Hsu   AAME/US | 2006 | 2016 | 10 |
| Yoav Di-Capua  AAME | 2010 | 2019 | 10 |
| Julie Hardwick  EUR | 2001 | 2009 | 8 |
| Mary Neuburger  EUR | 2006 | 2013 | 7 |
| Daina Berry  US | 2012 | 2019 | 7 |
| Bob Abzug  US | 1984 | 1990 | 6 |
| Alberto Martinez  ST | 2010 | 2015 | 5 |
| Virginia Garrard  LAS | 2006 | 2010 | 4 |
| Huaiyin Li    AAME | 2009 | 2012 | 3 |
| Leonard Moore   US | 2007 | 2010 | 3 |

**Rates of promotion from assistant to associate by category compiled by Madeline Hsu:**

| Category | No. seeking promotion | No. receiving promotion | Rate of promotion and tenure |
|---|---|---|---|
| Total | 18 | 11 | 61% |
| Faculty of color | 9 | 6 | 66% |
| White, male | 5 | 3 | 60% |
| Male | 9 | 6 | 60% |
| Of color, male | 4 | 3 | 75% |
| Female | 9 | 5 | 56% |
| White, female | 4 | 2 | 50% |
| Of color, female | 5 | 3 | 60% |

-This table includes faculty since 2009 who were put up for tenure. HIS rates of promoting and tenuring assistant professors is significantly lower than university wide levels, which average over 80% of faculty seeking promotion. https://provost.utexas.edu/promotion-tenure-data/ten-year/ HIS's rate of promoting full professors (100%) exceeds university averages of about 95%.

-18 faculty sought promotion and tenure, of which 11 were successful: Lina del Castillo, Megan Raby, Abena Osseo-Asare, Tatjana Lichtenstein, Ben Brower, Yoav di Capua, Tiffany Gill, Frank Guridy, Huaiyin Li, Alberto Martinez, Karl Miller.

7 were turned down: James Vaughn, Ruramisai Charumbira, Anne Martinez, John McKiernan-Gonzalez, Susan Boettcher, Carolyn Eastman, Roger Hart.

Re: Reschedule portion of Promotions report to May 8?

Exhibit 49

## Del Castillo, Lina M <delcastillo@austin.utexas.edu>

Sat 4/27/2019 3:31 PM

**To:** Raby, Megan <meganraby@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>
**Cc:** Brower, Benjamin C <benbrower@utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>

🖇 1 attachments (70 KB)
P&Treport_04_27 Lina additions.docx;

Dear All,
I did notice a few things missing from the version Megan sent. Madeline, please use this as our final version for the final report.

I can understand the frustration that comes from dealing with these issues over email (face to face is much better -- but this would require another meeting, aaak!)

I nevertheless do want to address a few points Madeline brought up. I especially want to clarify why I consider including information about ALL the people we hired for a tenure track position (including those who resigned prior to undergoing the process) matters as a question of equity. (This might be a bit long, but please bear with me).

First of all, I do appreciate how seriously we are all taking this issue; it is a sensitive one.

Madeline, you are right; I do not have the memory of what happened in the resignation cases. I did not have direct experiences with the people involved. From my point of view, my lack of knowledge about these cases is a reflection of the lack of institutional historical memory suffered by us as a department.

==Madeline, it is concerning to me that you do not agree that we should include statistical information on all the people hired as assistant professors.==

I am still not entirely clear on the reason why you do not think this is an equity issue. Are you familiar with the concept of PhD to Tenure Track pipeline (and leaks thereof?) I found a few articles from STEM, where most of this kind of research has been done:
https://www.nationalpostdoc.org/m/custom_page.asp?page=postdocket_04185m
https://www.jstor.org/stable/41328583?seq=1#metadata_info_tab_contents

Political Science also at least one study focused on Latinos and Latinas in particular:
http://web.apsanet.org/cswp/wp-content/uploads/sites/4/2017/01/leaky-pipeline.pdf

---

## web.apsanet.org

Title: Diagnosing the Leaky Pipeline: Continuing Barriers to the Retention of Latinas and Latinos in Political Science Created Date: 20170124185125Z

web.apsanet.org

**Re: Quick recap of May 1 meeting**                    Exhibit 50

Raby, Megan <meganraby@austin.utexas.edu>
Tue 5/7/2019 12:07 PM

**To:** Hsu, Madeline Y <myhsu@austin.utexas.edu>
**Cc:** Alberto A. Martinez <almartinez@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>

Dear Madeline,

I'm disappointed that the version of the report that this subcommittee last saw is not the version that actually went out to the department. I was satisfied enough with the final version you sent to us where you noted "A majority of subcommittee members found it important to include the information that this rate falls to only 52%...," whereas "the dissenting subcommittee member" disagreed. The version you sent to the department without first showing us is not accurate in stating "Several subcommittee members" rather than the majority. Although you note that the report reflects a range of views, it should accurately report this range. I respectfully request that you correct this statement.

Thank you for agreeing to correct the tenure case success percent to 61%. I request that you also accept the other corrections to data (such as the inverted counts of minorities and women) and name spellings that Al has taken the time to make.

I also strongly request that you remove the citation of Ted Gordon who clearly does not agree with this characterization of his position. To dismiss it by saying he's not familiar with the specific cases is not relevant to his 1st point ("The 52% is certainly pertinent to discussions of the retention of diverse faculty members") and not tenable in relation to his 2nd point ("It is directly pertinent to the tenure rate if there is evidence that the three left because they were counseled out or otherwise were made to believe that they would not be promoted if they had stayed and gone up"). You have repeatly stated the latter was indeed the case with the individual cases you were familiar with. Please note, as I have stated from the beginning, this has *nothing* to do with us making a claim that any of these individuals indeed should have have gone up or should have been promoted—I have *never* argued that. What I and others on this subcommittee have been arguing is that this is data directly pertinent to the overall hiring-to-tenure-case trajectory examined by the subcommittee, and hence should be accurately stated in the introduction of this subcommittee's report. You suggest that instead of correcting these statements in the introduction, we should write a separate section on the resigned Assistants, but, first, this would not address these specific objections, and second, such a section is not possible given that we do not have necessary data (having not conducted exit surveys, as we discuss in the report).

I don't think it is correct that that this subcommittee "did not agree on many fundamental issues"— the matter of tenure and retention rates is the only fundamental issue we've been disagreeing about. In fact, I hope that none of this overshadows the fact that the subcommittee has been in complete agreement about the actual recommendations put forth in the report.

Thank you,
Megan

Megan Raby
Assistant Professor
Department of History
University of Texas at Austin

www.meganraby.com
New book: *American Tropics: The Caribbean Roots of Biodiversity Science*

On May 7, 2019, at 11:00 AM, Hsu, Madeline Y <myhsu@austin.utexas.edu> wrote:

Dear Al,

As noted in the chair's introduction, this subcommittee did not agree on many fundamental issues.  Nonetheless, the report as drafted reflects the range of views as well as those holding them.  Hence my decision to attribute primary authorship to each of the sections.

I will change the percentage from 66 to 61 but will not change other aspects of my chair's introduction.  Based on Ted's own decisions with faculty associated with AADS, I am surprised by his evaluation of the history department's history, but assume that it stems from his lack of knowledge of the situations.

If you and others wish to write up a section regarding the assistants who did not go up for tenure, please do so and it can be included in the report.

Best regards, Madeline

**From:** "Alberto A. Martinez" <almartinez@austin.utexas.edu>
**Date:** Tuesday, May 7, 2019 at 10:49 AM
**To:** Madeline Hsu <myhsu@austin.utexas.edu>, "Del Castillo, Lina M" <delcastillo@austin.utexas.edu>, "Raby, Megan" <meganraby@austin.utexas.edu>, "Di-Capua, Yoav" <ydi@austin.utexas.edu>, "Brower, Benjamin C" <benbrower@utexas.edu>
**Cc:** Jacqueline Jones <jjones@austin.utexas.edu>
**Subject:** Re: Quick recap of May 1 meeting

hi Madeline,

in your email you say again that our department's rate of promoting assistants who apply for tenure is 66%; please note again that it's actually 61% as I said in last week's meeting, and as your table at the end of your draft clearly shows. When revising, also please include the corrections I emailed on April 28th and again on the 29th, which as I wrote, include "three names were misspelled, some faculty counts are wrong, the counts of minorities and women were mistaken (inverted), as was a count of individual promotions, a few acronyms were undefined, three percentages were wrong," etc.  I attach it again as a pdf.

As for the other major significant figure, the 52% of assistants overall who were promoted (excluding 48% in resignations and tenure denials), you chose to move it to a footnote whereas we first had it in the main text. Please move it back to the main text since the info in that footnote is just inaccurate. As you fairly wrote in our original version "A majority of subcommittee members found it important to include the information that this rate falls to only 52% if all assistant professors who were hired and did not receive promotion are considered," whereas "the dissenting subcommittee member," yourself, disagreed. The footnote that you later added, however, without showing it to us before sending it to the department, pluralized: "dissenting subcommittee members," and downsized the actual majority to just "Several subcommittee members."

Regarding the other point you made, that the information about 52% "is noted but not included in the main report because Vice-Provost for Diversity, Edmund T. Gordon categorizes cases where faculty have not produced monographs as not involving issues of equity or diversity as individual faculty are responsible for meeting stipulated workplace standards,"
I ask that you please remove it because again it just isn't correct. It didn't make sense to me so I emailed Ted and asked him whether you consulted him about this and whether he agreed that the information should be excluded.

He replied, below, that he actually didn't say this, especially in the present context, and that "The 52% is certainly pertinent to discussions of the retention of diverse faculty members. It is directly pertinent to the tenure rate if there is evidence that the three left because they were counseled out or otherwise were made to believe that they would not be promoted if they had stayed and gone up."

Thus, for example, in the case of James Wilson, he was making good progress on his book manuscript, finished all chapters, but had had a bad Third Year Review, and a non-functional relationship with his mentor which made him conclude that he wouldn't get tenure here, so he left. Abigail too believed that she wouldn't be promoted if she stayed and went up, and Kim believed it so much that she stayed until the end but did not apply for promotion, having no book in hand, whereas others, such as Susan Boettcher, did apply for tenure, though having no book in hand or in production, no full manuscript. I also remember that Kim told me that if she had known that she'd get an extra year at UT by applying for promotion but being denied, she would have applied.

I certainly don't think our report should get into the specifics of any one case. The main point is just that the majority of members in our committee do agree that the 52% is an important aspect of the data that should be included in the main text of the report, not excluded in a footnote. So, please stet this.

Thanks,
Al


Alberto A. Martinez
To:  Gordon, Edmund T
Sent Items
Yesterday, 9:21 AM


hi Ted,

I hope you're very well; thank you for taking the time to kindly help our University provide a fair retention offer for Prof. Paul Bonin-Rodriguez, in Theatre and Dance -- I'm super glad that it enabled him to remain at UT.

On another topic, I have a quick question. In my History Department I'm in a subcommittee that analyzes our faculty promotions. We're finishing a Report, and there's a question of whether we can discuss in it the low rate with which Assistants in our department have managed to earn tenure. From 2009-2019, we had 11/21 = 52% of our Assistants get tenure, while the 10 who didn't consist of 7 who were

meeting last week                                                    Exhibit 51

Alberto A. Martinez

Sun 5/5/2019 10:31 PM

Sent Items

To: Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>;

hi Lina and Megan,

welcome back.  I meant to write and now I saw Madeline's email.
In the meeting last week, Susan presented and discussed info about the Curriculum and Scheduling subcommittee. Afterward, Madeline spoke and then we had a few faculty voice comments or questions. Near the end, I spoke and explained the following:

(1) some of the numerical data in the draft is mistaken/not final -- and as an example I noted that whereas p.1 and the last page of the report state that our promotion rate is 61% (11/18) the top of p.2 wrongly states 66% and compares it to 85%, a mistake that Madeline repeats below.

(2) I explained that if I were a 1st year Assistant Professor I'd like to know what are the chances that I will eventually be tenured, and to that end, therefore we should also count how many of our Assistant Professors left without tenure, including James Wilson, Kim Alidio, and Abigail Lustig. And so, I said that when we do that we find a troubling fact that only 52% of our Assistants were tenured while the rest left without it, and I said that our department should confront this fact.

(3) I also noted that it's concerning that HALF (5/10) of the faculty that left without tenure were minorities, given that roughly only 25% of all our faculty are minorities.

(4) Finally, I explained that there's a significant issue of gender that needs attention, which is that in all three categories: women, white women, and women of color, our female faculty have received tenure at a lower rates than males in our department, ranging at a greatest difference between 75% tenure rate for men of color and 50% of tenure rate for white women, as evinced in Madeline's table at the end. (I should've also said that the highest rate of tenure for our female faculty, 60%, is the Lowest for our male faculty 60%, again, in Madeline's table.)

Best,
Al

─────────────────────────────────────────

**From:** Hsu, Madeline Y
**Sent:** Sunday, May 5, 2019 5:01 PM
**To:** Del Castillo, Lina M; Raby, Megan
**Cc:** Di-Capua, Yoav; Brower, Benjamin C; Alberto A. Martinez; Jones, Jacqueline
**Subject:** Quick recap of May 1 meeting

Hi Megan and Lina,

So that you have some orientation for your discussion of the Promotions Procedures Subcommittee section on promotions for assistants to associate professors on May 8, I am sending you the summary of the general points and recommendations I presented on May 1.


1)      The subcommittee did not find patterns of inequity based on gender, race or ethnicity.  This is summarized in the tables at the end of the report.

2)      The subcommittee and faculty at large have differing views on many issues, including how to define equity.  We thought it important to include the range of opinions and views in fulfilment of the reporting aspects of our charge.

3)      History department rates of promoting and tenuring assistant professors is significantly lower than university rates (66% v. 85%)

4)      We anticipate a serious crisis with regard to associate professors seeking promotion to full, in light of the recent policy change and the 2018-2019 spate of turn-downs at the Tower level.

5)      I was not going to recommend a vote on any items, but that the Department should assign a senior faculty or a committee to be responsible for developing and enacting policies and practices in response to points 2 and 3.  The report contains many recommendations intended to facilitate these priorities which such a promotions czar or committee could act upon.


Jackie has allotted 15 minutes for your discussion, and the other 45 minutes to the governance subcommittee, which has not yet presented its findings.


Best regards, Madeline

RE: Reschedule portion of Promotions report to May 8?Exhibit 52

## Hsu, Madeline Y

Mon 4/29/2019 5:31 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>;

Cc: Brower, Benjamin C <benbrower@utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>;


Hi everybody,

I will have limited email access until I return home later tonight and will send out the report draft then to meet the Tuesday deadline.

My work laptop does not track the changes made by Al's computer so I will not be using his version as it is not possible to check it before tomorrow.

In light of our concerted disputes regarding categorizing the resignations of 3 assistant professors as equity issues, I have decided to follow Vice Provost of Diversity Ted Gordon's categorical definition that faculty failing to publish a book in a book field in preparation for tenure are not equity or diversity cases.

The dispute is included in the report as a footnote.

Best regards, Madeline

---

**From:** Alberto A. Martinez <almartinez@austin.utexas.edu>
**Sent:** Monday, April 29, 2019 12:05 AM
**To:** Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>
**Cc:** Brower, Benjamin C <benbrower@utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>
**Subject:** Re: Reschedule portion of Promotions report to May 8?

hi all,

apologies for not replying more often this weekend, I was at a very time-consuming conference at Caltech.

Still, I've spent all day today on proofreading the latest version that Madeline sent. I have not added the edits that Lina sent this afternoon, so please add them.

Still, I've made multiple suggested edits and a few corrections; please consider them carefully -- attached.

Also, here are some comments:

The draft mentions "departmental bylaws" – I don't recall if I've ever seen them. If anyone has them, can you please email them to me?

**Department of History, Equity Committee, Promotions Procedures Subcommittee Report**

**Subcommittee members**: Madeline Hsu (chair), Ben Brower, Lina Del Castillo, Yoav Di-Capua, Al Martinez, Megan Raby

**Subcommittee charge:**

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent, with the caveat that the University and the College impose rules and guidelines that also govern departmental procedures. This subcommittee will analyze policies and procedures related to both promotion to full professor and promotion to associate professor with tenure. Factors to be considered (but are not limited to) the Third Year Review, peer observations of classes, mentoring, and service obligations, with the goal of helping faculty to advance in rank.

　　We have made our deliberations recognizing that equity may be defined and therefore evaluated in various ways.  The impetus for starting the Equity Committee stemmed from observations of inequality of outcomes between History faculty in areas such as salaries, graduate students admitted, endowed chairs, research funds, teaching awards, major service appointments, teaching schedules and loads, promotions rates and successes, election to the EC, and many other resources, markers of status, and departmental support.  Trying to evaluate equity issues directs attention as to why inequality of outcomes have been produced.  Are such differential outcomes related to inequality of access?  Are there measures that the department can undertake and wishes to undertake to address these inequities?  This subcommittee deliberated with the understanding that the department can primarily seek to accomplish equality of access to information, opportunities, and support but cannot guarantee equality of outcomes because of the complexity of factors attending individual faculty trajectories.

**General Findings:**

Overall, in the 28 cases of promotion processed by the History Department 2009-2019, this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender. 21 of the 28 cases were successful; all 12 cases of promotion from associate to full went through (100%) while only 11 of 18 cases of assistants seeking promotion and tenure went through (61%). Of the promoted faculty, 10 of 21 were women and 11 of 21 were persons of color.  The 7 faculty failing to receive promotion and tenure span the spectrum in terms of race, ethnicity, and gender. Some of these candidates received positive or evenly split votes in the department, only to be turned down at the College and Presidential levels.  Please see the appendix at the end of this report for the full listing of these 28 cases.

　　When compared to University-wide rates of promotions for the past ten years (see https://provost.utexas.edu/promotion-tenure-data/ten-year/), the HIS rates differ.  HIS is more successful in promotions from associate to full at 100% compared to the University average of

about 95%.  For promotions from assistant to associate with tenure, however, HIS averages about 66% compared to the University rate of about 85%.[1]

Although this subcommittee did not find discernible patters of inequity in promotions outcomes, we did find considerable inconsistency and variation in individual trajectories to promotion that should be addressed by changes in departmental policy and practices. As a book field, which requires long-term development of the key project, any changes in policy are inevitably inequitable as several years are needed to adjust to new requirements.  For example, we call attention to recent major changes in University policy which impose a limit of 12 years during which associate professors must seek promotion to full or face conversion from a 3-3 teaching load.  This policy change has abruptly pulled the rug from under many colleagues who have been highly productive in many major areas of academic activity, including major leadership positions and institution building projects, whose publication output has slowed as a consequence.  The narrow framing of academic work considered for promotion to full based on publications and research fails to acknowledged the breadth of important work that is required to operate a university of the first rank.  We discuss these findings, faculty input, and our recommended actions in the following sections concerning promotion from assistant to associate, promotion from associate to full, and evaluation processes.

Each section reports relevant information gathered from the climate survey, email and other communications from faculty, our meetings within the subcommittee and with the faculty at large, supplemental secondary materials, and consultation with staff such as Jackie Llado, Gail Davis, and Ann Kelble.  We have sought to include the range of perspectives and projections.  Please note that in at least two instances, statements made by some faculty have been directly contradicted by other faculty but that these cannot be presented here to avoid breaches of confidentiality.

The reports are followed by recommendations for future action by the department.  Many departmental colleagues have participated sincerely and earnestly, reflecting their deep commitments to this department.

---

[1]  Several subcommittee members thought it important to note that this rate falls to only 52% if all assistant professors who were hired and did not receive promotion are considered.  Inclusion of this information was disputed by dissenting subcommittee members, who questioned its relevance based on institutional memory of the cases.  This information is noted but not included in the main report because Vice-Provost for Diversity, Edmund T. Gordon categorizes cases where faculty have not produced monographs as not involving issues of equity or diversity as individual faculty are responsible for meeting stipulated workplace standards.

quick question                                                            Exhibit 53

Alberto A. Martinez <almartinez@austin.utexas.edu>

Mon 5/6/2019 11:21 AM

**To:** Gordon, Edmund T <etgordon@austin.utexas.edu>

hi Ted,

I hope you're very well; thank you for taking the time to kindly help our University provide a fair retention offer for Prof. Paul Bonin-Rodriguez, in Theatre and Dance -- I'm super glad that it enabled him to remain at UT.

On another topic, I have a quick question. In my History Department I'm in a subcommittee that analyzes our faculty promotions. We're finishing a Report, and there's a question of whether we can discuss in it the low rate with which Assistants in our department have managed to earn tenure. From 2009-2019, we had 11/21 = 52% of our Assistants get tenure, while the 10 who didn't consist of 7 who were denied tenure, plus 3 who departed before the tenure application because they expected not to get tenure.

Five members in our committee think this information is significant, alongside the rate of 11/17 = 61% of applicants to tenure became tenured.

However, the one other member, our subcommittee chair, Madeline Hsu, prefers to exclude discussion of the 52%, and therefore, in the draft Report she includes your name in a footnote:

"Several subcommittee members thought it important to note that this rate falls to only 52% if all assistant professors who were hired and did not receive promotion are considered. Inclusion of this information was disputed by dissenting subcommittee members, who questioned its relevance based on institutional memory of the cases. This information is noted but not included in the main report because Vice-Provost for Diversity, Edmund T. Gordon categorizes cases where faculty have not produced monographs as not involving issues of equity or diversity as individual faculty are responsible for meeting stipulated workplace standards."

My question is:
For clarity, do you actually agree that such information should be excluded from our report, or is Madeline invoking your name without having actually asked you?

Thanks,

Al Martinez

## Re: quick question

Exhibit 54

## Gordon, Edmund T <etgordon@austin.utexas.edu>

Mon 5/6/2019 1:45 PM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>

Al

Thanks for letting me know about this. I do not remember ever saying anything like this. Certainly not in the context she places it. Where does she claim to have gotten it from? She has not talked to me about this issue as far as I can recall.

The 52% is certainly pertinent to discussions of the retention of diverse faculty members. It is directly pertinent to the tenure rate if there is evidence that the three left because they were counseled out or otherwise were made to believe that they would not be promoted if they had stayed and gone up.

Ted

---

**From:** "Alberto A. Martinez" <almartinez@austin.utexas.edu>
**Date:** Monday, May 6, 2019 at 11:21 AM
**To:** "Gordon, Edmund T" <etgordon@austin.utexas.edu>
**Subject:** quick question

hi Ted,

I hope you're very well; thank you for taking the time to kindly help our University provide a fair retention offer for Prof. Paul Bonin-Rodriguez, in Theatre and Dance -- I'm super glad that it enabled him to remain at UT.

On another topic, I have a quick question. In my History Department I'm in a subcommittee that analyzes our faculty promotions. We're finishing a Report, and there's a question of whether we can discuss in it the low rate with which Assistants in our department have managed to earn tenure. From 2009-2019, we had 11/21 = 52% of our Assistants get tenure, while the 10 who didn't consist of 7 who were denied tenure, plus 3 who departed before the tenure application because they expected not to get tenure.

Five members in our committee think this information is significant, alongside the rate of 11/17 = 61% of applicants to tenure became tenured.

However, the one other member, our subcommittee chair, Madeline Hsu, prefers to exclude discussion of the 52%, and therefore, in the draft Report she includes your name in a footnote:

"Several subcommittee members thought it important to note that this rate falls to only 52% if all assistant professors who were hired and did not receive promotion are considered.

the report

# Exhibit 55

Alberto A. Martinez

Sun 5/12/2019 11:57 PM

Sent Items

To: Raby, Megan <meganraby@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>;

hey you two,

for the record, earlier today I did read the report that Madeline sent, but once I saw that she still strangely refused to fix the wrong numerical data in her section, such as the line about "Of the promoted faculty, 10 of 21 were women and 11 of 21 were persons of color," I decided that I can't keep arguing over this. I asked her directly 3 times by email to fix it and Megan firmly asked her too. It's so bizarre that I actually spent a while again today trying to figure out if there's any way in which Madeline's count is right, and I couldn't find any. Once again, I count:
24 promotions overall (including 3 individuals who were promoted twice), 12 cases of promoted minorities (10 individuals who are minorities, and two were promoted twice). Thus, 24 - 3 = 21 individuals were promoted (including 12 women, and 10 minorities).

I wonder if Madeline counted Cynthia Talbot as a minority, since the university lists her as "two or more ethnicities," which could account for the 11 persons of color (whereas I don't count whites among persons of color), but still, the 10 women is plainly wrong, since the 12 are:
(12) Lina, (11) Megan, (10) Abena, (9) Tatjana, (8) Tiffany, (7) Daina, (6) Cynthia, (5) Madeline, (4) Denise, (3) Mary, (2) Ginny, (1) Julie.

I included that count way back in April 26 & 27, etc., so it was Madeline's choice not to read it. Anyhow, someday I'll ask her, one-on-one, why she refused to read my accounting or revise hers. It's awfully absurd and exasperating, even offensive. It's almost as if it begs for a public rebuke, but I won't do any such thing, and think we should just shrug it off, since it's important to in some ways "be the bigger person."

Still, it's alarming the degree to which one finds that the humanities is a non-mathematical culture. Abena has remarked on this too. There's some civility missing too. Anyhow, in light of such errors, naturally I just couldn't write anything such as "I approve" of what Madeline did, since I don't.

Anyhow, your section is good --- so thank you for working on it, despite the strange opposition that we've seen.

I'll be at the department meeting --

Best,
Al

**Department of History, Equity Committee, Promotions Procedures Subcommittee Report**

**Subcommittee members**: Madeline Hsu (chair), Ben Brower, Lina Del Castillo, Yoav Di-Capua, Al Martinez, Megan Raby

**Exhibit 56**

### Chair's Introduction

**Subcommittee charge:**

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent, with the caveat that the University and the College impose rules and guidelines that also govern departmental procedures. This subcommittee will analyze policies and procedures related to both promotion to full professor and promotion to associate professor with tenure. Factors to be considered (but are not limited to) the Third Year Review, peer observations of classes, mentoring, and service obligations, with the goal of helping faculty to advance in rank.

We have made our deliberations recognizing that equity may be defined and therefore evaluated in various ways. The impetus for starting the Equity Committee stemmed from observations of inequality of outcomes between History faculty in areas such as salaries, graduate students admitted, endowed chairs, research funds, teaching awards, major service appointments, teaching schedules and loads, promotions rates and successes, election to the EC, and many other resources, markers of status, and departmental support. Trying to evaluate equity issues directs attention as to why inequality of outcomes have been produced. Are such differential outcomes related to inequality of access? Are there measures that the department can undertake and wishes to undertake to address these inequities? This subcommittee deliberated with the understanding that the department can primarily seek to accomplish equality of access to information, opportunities, and support but cannot guarantee equality of outcomes because of the complexity of factors attending individual faculty trajectories.

**General Findings:**

Overall, in the 28 cases of promotion processed by the History Department 2009-2019, this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender. 21 of the 28 cases were successful; all 12 cases of promotion from associate to full went through (100%) while only 11 of 18 cases of assistants seeking promotion and tenure went through (61%). Of the promoted faculty, 10 of 21 were women and 11 of 21 were persons of color. The 7 faculty failing to receive promotion and tenure span the spectrum in terms of race, ethnicity, and gender. Some of these candidates received positive or evenly split votes in the department, only to be turned down at the College and Presidential levels. Please see the appendix at the end of this report for the full listing of these 28 cases.

When compared to University-wide rates of promotions for the past ten years (see https://provost.utexas.edu/promotion-tenure-data/ten-year/), the HIS rates differ. HIS is more successful in promotions from associate to full at 100% compared to the University average of

about 95%.  For promotions from assistant to associate with tenure, however, HIS averages only about 61% compared to the University rate of about 85%.[1]

Although this subcommittee did not find discernible patterns of inequity in promotions outcomes, we did find considerable inconsistency and variation in individual trajectories to promotion that should be addressed by changes in departmental policy and practices. As a book field, which requires long-term development of the key project, any changes in policy are inevitably inequitable as several years are needed to adjust to new requirements.  For example, we call attention to recent major changes in University policy which impose a limit of 12 years during which associate professors must seek promotion to full or face conversion to a 3-3 teaching load.  This policy change has abruptly pulled the rug from under many colleagues who have been highly productive in many major areas of academic activity, including major leadership positions and institution building projects, whose publication output has slowed as a consequence.  The narrow framing of academic work considered for promotion to full based on publications and research fails to acknowledged the breadth of important work that is required to operate a university of the first rank.  We discuss these findings, faculty input, and our recommended actions in the following sections concerning promotion from assistant to associate, promotion from associate to full, and evaluation processes.

Each section reports relevant information gathered from the climate survey, email and other communications from faculty, our meetings within the subcommittee and with the faculty at large, supplemental secondary materials, and consultation with staff such as Jackie Llado, Gail Davis, and Ann Kelble.  We have sought to include the range of perspectives and projections.  On a number of issues, this subcommittee failed to come to agreement, hence the acknowledgement of primary authorship of different sections and tracking of data.

The reports are followed by recommendations for future action by the department.  Many departmental colleagues have participated sincerely and earnestly, reflecting their deep commitments to this department.

---

[1] Several subcommittee members thought it important to note that this rate falls to only 52% if all assistant professors who were hired and did not receive promotion are considered.  Inclusion of this information was disputed by dissenting subcommittee members, who questioned its relevance based on institutional memory of the cases

# INTERIM EQUITY REPORT ON PROMOTION FROM ASSISTANT TO ASSOCIATE PROFESSOR

**Primary authors:** Lina del Castillo and Megan Raby

# Exhibit 57

Over the past decade, the History Department's rate of successful tenure cases (61%, 11 out of 18 cases) has been significantly below the rate of the university as a whole (81%-85%).[2] Furthermore, 3 assistant Professors resigned before applying for tenure, making the percentage of assistants tenured out of the total hired 52% (11 out of 21 hires).[3] Among these overall departures without tenure, 50% were minorities and 60% were women. While this data on its own is not sufficient to conclude that there has been a lack of equity in the tenure process, it strongly suggests a need to consider what roadblocks may exist in the overall trajectory of junior faculty, from hiring to the tenure case.[4] It is also relevant that, of the 11 assistant professors who were promoted to Associate in the past 10 years, at least 3 were 'advanced' assistants in that they either already had a book published when they were hired, or had given up tenure at their original institution in order to come work at UT without tenure. The distinction between advanced and junior assistant professors is important when considering the kind of challenges junior assistants face versus those of their more advanced colleagues and it matters when it comes time to effectively mentor the diverse pool of assistants.

An assistant professor's success in promotion and tenure depends on the candidate's own efforts and abilities, in combination with the clarity and transparency of the criteria and procedures for promotion at the department level and above, the resources made available in support of research and teaching, mentorship, and department climate and inclusivity. While the department cannot expect to tenure one hundred percent of assistant professors hired, it is in the department's interest to do its utmost to put adequately prepared candidates up for tenure. This is not only in service of achieving a balance of ranks in the department—given the very low current number of junior faculty and low prospects of administrative approval to hire a significant number of faculty at the assistant level in the near future. It is also in service of equity.

Equitable outcomes depend on assistant professors receiving equitable access to information and consistent support from the time of hire through to completion of the tenure case. The department already supports assistant professors in many ways, such as having a mentorship process, opportunities for fellowships, and annual one-on-one meetings with the department chair. However, faculty input strongly suggests that a variety of roadblocks to equitable access to information and support have cropped up over the years, including inconsistencies in mentorship, delays or inconsistencies in the articulation of expectations, teaching duties, and provision of leave. There are many ways—some of them quite simple and straightforward—that we can do better.

---

[2] https://provost.utexas.edu/promotion-tenure-data/ten-year/
[3] See Appendix: "Alberto Martinez's summary of promotions since 2009."
[4] Thus the authors of this section of the report would like to append to the subcommittee chair's statement that "this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender" the qualification that the data we currently have is ambiguous.

# Exhibit 58

2003-2020
Executive Committee members, and Budget Council members (pre-2005)

*Draft, please send me any corrections: almartinez@austin.utexas.edu*

| | years in the EC or the BC | Total years | in 16 years incl. 2019-20 |
|---|---|---|---|
| Tully | years as Dept. Chair 2003-04, 2004-05, 2005-06, 2006-07, 2007-08, 2008-09, 2009-10, 2010-11, 2011-12, 2012-13 | 10 | 10 |
| Jones | 2009-10, 2010-11, + years as Dept. Chair: 2013-14, 2014-15, 2015-16, 2016-17, 2017-18, 2018-19, 2019-20 | 9 | 9 |
| Bsumek | 2007-08, 2011-12, 2012-13, 2016-17, 2017-18, BUT Bsumek's CV also says 2004-08, 2008-09, 2010-11 | 8? | 8 ? |
| Brands | 2006-07, 2007-08, 2008-09, 2009-10, 2010-11, 2015-16, 2016-17, | 7 | 7 |
| Matysik | 2005-06, 2009-10, 2010-11, spring 2014, 2015-16, 2018-19, 2019-20 | 6.5 | 6.5 |
| Levack | 2005-06, 2007-08, 2008-09, 2009-10, 2011-12, 2012-13 + years as Dept. Chair 1988-89, 1989-90, 1990-91, 1991-92, 1993-94, 1999-00, 2000-01 | 13 + prev. yrs.? | 6 |
| Crew | 2005-06, 2006-07, 2008-09, 2009-10, 2013-14, 2014-15, | 6 + prev. yrs.? | 6 |
| Joan Neuberger | 2008-09, 2009-10, 2012-13, 2013-14, 2018-19, 2019-20 | 6 + prev. yrs.? | 6 |
| Levine | 2010-11, 2011-12, 2015-16, 2016-17, 2018-19, 2019-20 | 6 | 6 |
| Lawrence | 2003-04, 2008-09, 2009-10, 2012-13, 2013-14, | 6 | 5 |
| Abzug | 2005-06, 2006-07, 2007-08, 2014-15, 2015-16, | 5 + prev. yrs.? | 5 |
| Metzler | 2005-06, 2007-08, 2008-09, 2014-15, 2015-16. | 5 + ? | 5 |
| Talbot | 2006-07, 2009-10, 2010-11, 2017-18, 2018-19, | 5 + prev. yrs.? | 5 |
| Di-Capua | 2008-09, 2011-12, 2014-15, 2015-16, 2019-20 | 5 | 5 |
| Berry | 2012-13, 2013-14, 2016-17, 2018-19, 2019-20 | 5 | 5 |
| Brower | 2010-11, 2012-13, 2013-14, 2018-19, 2019-20 | 5 | 5 |
| Hunt | 2009-10, 2010-11, 2016-17, 2017-18, | 8 | 4 |
| Kamil | 2006-07, 2007-08, 2014-15, 2015-16, | 4 + prev. yrs.? | 4 |
| Garrard (Burnett) | 2010-11, 2011-12, 2012-13, 2013-14, | 4 | 4 |
| Deans-Smith | 2007-08, 2008-09, 2014-15, 2015-16, | 4 + prev. yrs.? | 4 |
| Bodian | 2010-11, 2012-13, 2013-14, 2015-16, | 4 | 4 |
| Suri | 2012-13, 2013-14, 2016-17, 2017-18, | 4 | 4 |
| Lichtenstein | 2010-11, 2013-14, 2016-17, 2017-18, | 4 | 4 |
| Hardwick | 2005-06, 2006-07, 2007-08, 2019-20 | 4 + prev. yrs.? | 4 |
| Minault | 2005-06, 2007-08, 2008-09. | 3 + prev. yrs.? | 3 |
| Oshinsky | 2005-06, 2006-07, 2007-08. | 3 | 3 |
| Twinam | 2006-07, 2008-09, 2009-10, | 3 | 3 |
| Vaughn | 2012-13, 2014-15, 2015-16. | 3 | 3 |
| Butler | 2013-14, 2016-17, 2017-18, 2019-20 | 3 | 3 |
| Chatterjee | 2014-15, 2017-18, 2018-19, | 3 | 3 |
| Raby | 2014-15, 2016-17, 2018-19, | 3 | 3 |

| | | | |
|---|---|---|---|
| Cañizares-Esguerra | 2006-07, 2007-08*, 2011-12, 2012-13,<br>* doesn't appear in cv, he says he wasn't in EC then | 3 | 3 |
| Charumbira | 2009-10, 2011-12, 2013-14. | 3 | 3 |
| Garfield | 2005-06, 2018-19, 2019-20 | 3 | 3 |
| Wynn | 2003-04, 2014-15, 2015-16, | 3 + 2 prev. yrs. | 3 |
| Frazier | fall 2004, 2007-08, 2008-09, | 8.5 | 2.5 |
| Guridy | fall 2006, 2010-11, 2011-12. | 2.5 | 2.5 |
| Del Castillo | 2012-13, fall 2015, 2017-18, | 2.5 | 2.5 |
| Newman | 2003-04, 2019-20 | 2 + prev. yrs? | 2 |
| Stoff | 2005-06, 2006-07, 2018-19 (withdrew), | 2 + prev. yrs.? | 2 |
| Brown | 2016-17, 2017-18, | 2 + prev. yrs.? | 2 |
| Mary Neuburger | 2013-14, 2014-15, | 2 + prev. yrs.? | 2 |
| Olwell | 2008-09, 2009-10, | 2 + prev. yrs.? | 2 |
| Spellberg | 2005-06, 2006-07, | 2 | 2 |
| Gill | 2006-07, 2011-12. | 2 | 2 |
| Guha | 2014-15, 2015-16, | 2 | 2 |
| Hsu | 2016-17, 2017-18, | 2 | 2 |
| Joseph | 2016-17, 2017-18, | 2 | 2 |
| Anne Martínez | 2008-09, 2011-12. | 2 | 2 |
| Al Martínez | 2010-11, 2011-12, | 2 | 2 |
| Moore | 2010-11, 2011-12, | 2 | 2 |
| Osseo-Asare | 2017-18, 2018-19, | 2 | 2 |
| Zamora | 2018-19, 2019-20 | 2 | 2 |
| O'Connell | 2018-19, 2019-20 | 2 | 2 |
| Karl Miller | spring 2007, 2013-14. | 1.5 | 1.5 |
| Forgie | 2003-04, | 6 + prev. yrs.? | 1 |
| Coffin | 2012-13, | 1 + prev. yrs.? | 1 |
| Sidbury | 2005-06. | 1 + prev. yrs.? | 1 |
| Frens-String | 2017-18, 2018-19, | 1 + next yr. | 1 |
| Falola | 2005-06, at UT Austin since 1991 | 1 + prev. yrs.? | 1 |
| Foley | 2011-12 only.     23 years at UT | 1 | 1 |
| Farmer | 2019-20, | 1 | 1 |
| Mckiernan-González | 2009-10. | 1 | 1 |
| Vong | 2016-17, | 1 | 1 |
| Wilson | 2007-08. | 1 | 1 |
| Louis | at UT Austin since 1970 | 0 + prev. yrs.? | 0 |
| Walker | at UT Austin since 2002 | 0 | 0 |
| Green | at UT Austin since 2001 | 0 + prev. yr.? | 0? |
| Li | at UT Austin since 2006 | 0 | 0 |
| Mintz | at UT Austin since 2012 | 0 | 0 |

**Budget Council**

When there was a Budget Council, instead of an EC, all full Professors were automatically in the BC. There were also some Associate Professors (and sometimes some Assistants): Frazier fall 2004, Deans-Smith 1984-85, 1988-89, 1991-92, 2000, 2001-05, Forgie 1977-78, 80-81, 89-90, 2001-04, Hunt 86-87, 87-88, 92-93, 2000-01, Lawrence 2000-01, 2003-04, Newman 1989-90, 97-98, 2000-01, Walker 2002-03, Wynn 1991-92, 2000-01, 2003-04. Note: I don't have the BC sheet for 2004-05, so the limited data I include for that year is from faculty CVs. Still, it raises the issue of: who to count? Were all full professors in the BC? Or was it an "Extended Budget Council"? E.g., Frazier's CV shows membership in the BC in Fall 2004; Wynn's CV lists membership in the BC 2003-04.

Exhibit 59

**DRAFT -- TENTATIVE**
**Governance Subcommittee, UT Department of History**
**Report to the Department**

<u>Membership</u>: Falola; Joseph; Lawrence; Martínez; Neuburger, M.; Suri (chair); Twinam; Walker; Zamora.

<u>Committee Charge</u>: This subcommittee is tasked with reviewing the department's structures of governance-- including the Executive Committee, standing committee assignments, and administrative positions (such as Associate Chair, Graduate Adviser, and Assessment Director)—and with making recommendations as needed to ensure that those structures are efficient, democratic, transparent, inclusive, and responsive to the needs of the department and our students.

<u>Committee Meetings</u>: 8 March, 5 April, 19 April 2019.

<u>Narrative</u>: Our committee divided our deliberations into three categories related to the governance of the UT history department: Principles of Governance, Structures of Governance, and Procedures of Governance. We sequentially discussed each topic, with the purpose of suggesting practical steps that would improve overall department governance. Our discussions resulted in a clearer articulation of governing principles and a proposed reform, detailed below. These are first steps, designed to improve governance. They are not presented as "solutions," but possible first steps, designed to promote equity within governance structures and procedures.

<u>Principles of Governance</u>: Our committee believes that these principles must be emphasized and followed in all areas of department governance.

Transparency
Access
Representativeness
Equity
Diversity
Efficacy
Honesty
Citizenship
Trust
Credibility

We presume that there is a strong consensus on these principles within the department. There is room for improvement, however, in the implementation of these principles in our daily allocation of resources and duties. In particular, increased openness and accountability for decision-making, as well as broader participation, will allow for more confidence that such

principles are honored in governance appointments, structures, and procedures. This observation guides our proposed reform.

**Proposed Reform: Committee on Governance and Service (COGS)**

Goal: To increase transparency, representativeness, equity, and diversity in appointments to department committees and other positions of department responsibility.

Rationale: Many members of the department have expressed concerns about the allocation of resources and duties across the department. As the department has grown more complex, the department chair has made many of the necessary appointments. To assist the chair in making appointments that match with our principles, many members of the department would like to see a representative advisory body created to assist the chair on appointments, and engage our faculty in these decisions.

Responsibilities:
1. Track individual faculty departmental service to serve as a guideline for committee and position appointments.
2. Nominate colleagues for appointment to department committees and other positions of department responsibility with attention to equity and diversity.
3. Encourage wider department participation in committees and positions of responsibility.
4. Encourage more regular rotation of responsibilities, with continued attention to merit and efficacy.
5. Inform members of the department about these decisions, and thus build trust in the process.
6. Help the chair to fulfill his/her responsibilities in a timely and collegial manner.

Evaluation:
This proposed reform is a pilot. We recommend that the department implement COGS for three years and then evaluate if it, in combination with other possible reforms, serves the principles and responsibilities articulated above. We expect this new structure and its procedures to be adjusted by the department over time to improve our adherence to our principles and responsibilities.

**How will the Committee on Governance and Service (COGS) work?**

Membership: Each year our tenured and tenure-track faculty will elect three faculty members (one from each rank) to serve one-year terms. The elected full professor will serve as the COGS chair/facilitator. Faculty serving on the Executive Committee cannot serve on COGS. After service on COGS, a faculty member cannot serve again for four years. (Possible exceptions will be made for assistant professors, because presently they are fewer.)

The goal here is to create wide and frequent rotation, including new individuals each year to ensure that the department chair receives suggestions from different parts of the department, discouraging entrenched interests. The work of COGS will be advisory, and annual rotation will promote representativeness and shared burdens, the primary goals of this proposed reform.

Activities:

1. With departmental staff support, COGS will send an annual Qualtrics survey to department faculty, asking them to indicate their personal preferences for service in various available committee positions and other positions of departmental responsibility.
    a. The survey will also ask for information on faculty service outside the department, in order to document and take into consideration extensive responsibilities elsewhere on campus, and in the wider historical profession.
2. With department staff support, COGS will also maintain and update a historical listing (an updated Excel spreadsheet) of who has served in various positions during past years, with attention to possible unconscious biases in appointments.
3. Members of COGS will talk with members of the department, especially those less involved in service, encouraging them to consider participation in service roles.
4. After reviewing the above materials, COGS will send nominations to the chair for each open committee position or position of responsibility in the department. The expectation is that the chair will carefully consider each of these nominations, although final appointment power resides with the chair.
5. Upon request, COGS will share its nominations with members of the department, to ensure transparency.
6. We expect COGS to be in frequent communication with the chair, offering collegial advice and consultation on appointments.
7. We hope all members of the department will see COGS as an important avenue for participation in decision-making.

Exhibit 60

COLLECTIVE NOMINATION OF PROFESSOR ALBERTO A. MARTÍNEZ TO THE 2019 CIVITATIS AWARD

Civitatis Award
Faculty Council Executive Committee
c/o Secretary of the General Faculty
WMB 2.102, F9500

Dear Members of the Selection Committee and President Fenves

We, the one hundred-and-thirty-eight (138) undersigned, senior vice chancellors, vice-presidents, vice provosts, associate provosts, deans, associate deans, chairs, directors, professors and students in over forty (40) departments, centers and schools, collectively nominate Professor Alberto A. Martínez for the 2019 *Civitatis Award*. We assert that Professor Martínez is a member of this institution whose "dedicated and meritorious service to the University" goes "above and beyond the regular expectations of teaching, research, and service." Professor Martínez is one of a handful of Puerto Ricans silently working on campus whose long years of labor on behalf of this institution deserve recognition. Since 1997, only one Hispanic has received this award.

Professor Alberto A. Martínez is a distinguished full professor in the History Department. Professor Martínez is also a devoted instructor, capable of enrapturing student audiences. His innovative courses on "Race, Science and Racism" and "History of Money and Corruption" have not just affected students but are also generating reflections on student admission policies and in the administrative life of this institution. Professor Martínez has dedicated more than a decade to identifying and solving inequities on campus. His knack for numbers and his capacious and inquisitive mind have shed a bright light on structural problems at UT Austin that demand our collective attention, particularly the Puerto Rican diaspora and the status of minorities on campus.

Before coming to UT Austin, Professor Martínez held a series of prestigious competitive fellowships at top institutions: M.I.T, Harvard, Boston University, Caltech, and The Smithsonian.

Professor Martínez has published five peer-reviewed scholarly books with top university presses: Princeton University Press, University of Pittsburgh Press, Johns Hopkins University Press, and Reaktion Books (UK) / University of Chicago Press. His latest publication on Giordano Bruno and Galileo is a profound, innovative study that revisits and challenges our well-known historiographies on the Inquisition trials of these two early-modern Italian cosmographers. It singlehandedly transforms our understandings of the Pythagorean-Lucretian-Epicurean Renaissance. It was recently reviewed as "quite possibly the most

important book of the year for the history of astronomy." His areas of expertise range from Albert Einstein to historical myths in sciences and mathematics. His books have received abundant scholarly praise, ranging from "laudable," to "painstakingly detailed," to "fascinating," to "an absolute *tour de force*." Two of his books have been national bestsellers in Mathematics, according to YPB Library Services.

He has published meticulous articles in various journals, from *American Journal of Physics*, to *The American Mathematical Monthly*, to *Archive for History of Exact Sciences*. Some of his writings have been translated into German, Japanese, Turkish, Spanish, and Italian. His ideas have been featured in *Scientific American*, and the Big Picture Science program of SETI (The Search for Extraterrestrial Intelligence Institute). This summer he was an invited expert in the Peabody Award winning investigative show Radiolab. In 2017, he gave the Annual Public Lecture for the Mathematics Department of Cornell University. He has been an invited speaker on history of astronomy and Catholicism at the University of Notre Dame. He has given invited talks about Einstein in Switzerland, France, the Netherlands, Puerto Rico, and Tenerife.

The *Civitatis Award* rewards service to the University. It is impressive, therefore, to see the breadth of Professor Martínez's public contributions to this institution.

At UT Austin, Professor Martínez contributes to the UTeach Natural Sciences program (praised by President Obama), and therefore the course he designed for math and science majors, "Perspectives on Science and Math," has been replicated in 45 universities nationwide. He gave the Keynote address, to the Annual Conference of Texas STEM Teachers in 2014. He was also featured in episodes of the Corporation for Public Broadcasting television series "Essential Science for Teachers: Physical Sciences," in 2003-04.

He mentored the Phi Alpha Theta History Honor Society at UT Austin for years, and he also mentored the League of United Latin American Citizens student group.

He teaches a course on "Race, Science and Racism." In 2018 he publicly complained that UT Austin has far too few African American students and he contended that "UT Austin should enroll more students who are economically disadvantaged." One year later, UT's Board of Regents created a $160 Million endowment to help disadvantaged students enroll in UT, to cover their tuition and fees. Likewise, Professor Martínez has contributed to various ongoing initiatives to help UT advance to become a Hispanic Serving Institution, meeting with other Hispanic faculty and officials from UT's Office of Admissions.

In the aftermath of Hurricane María, which devastated Puerto Rico, Professor Martínez went to the island multiple times to help in recovery efforts, and in Austin he carried out several initiatives: He publicly asked President Fenves for assistance for Puerto Ricans, he sought out and pulled together dozens of Puerto Ricans on campus, he created a coalition of Puerto Rican faculty for the first time at UT Austin, and created the website for it. Furthermore, Professor Martínez analyzed mortality rates caused by the hurricane, and he pointed out statistical

2

errors in the studies published by the government of Puerto Rico and Harvard University, as well as George Washington University. His critical analysis of mortality was featured on national news.

Professor Martínez has also been featured analyzing Puerto Rico's hurricane and economic crises on national television multiple times, in the TV program Full Measure, interviewed by the five-time Emmy Award winning investigative journalist, Sharyl Attkisson.

Professor Martínez also teaches an innovative course on "History of Money and Corruption." Accordingly, he has also pursued this topic in local and national venues. In particular, he has also worked to expose corruption in Puerto Rico at a national level. For example, in 2018 Professor Martínez accused Puerto Rico's Secretary of Education of corruption in government contracts, in the prominent Washington D.C. newspaper, *The Hill*. One year later, the Secretary of Education was arrested by the FBI, for corruption in government contracts.

At UT Austin too Professor Martínez has had the courage to publicly voice much needed critiques. He especially opposed the plan to eliminate and displace our staff. In late 2013, UT administrators announced their plan to establish "Shared Services" at UT Austin: to eliminate the jobs of 500 staff members plus remove another 300 staff out of UT Austin to a distant building, probably at the Pickle campus, to carry out duties for our departments at-a-distance. They said departments would work better with 800 fewer local and dedicated staff. They said UT would "save" $30 million a year. Yet Professor Martínez respectfully showed that such claims were numerically false, in Faculty Council, in campus events, in the *Austin American-Statesman*, *The Daily Texan*, and *The Austin Chronicle*. Professor Martínez found out that the plan was concocted by individuals associated with the firm Accenture, in *a conflict of interests*, which he exposed in Faculty Council and in *The Daily Texan*. Months later, the UT System's Audit Office confirmed that UT Austin did violate conflict of interest policies when it hired Accenture.

Professor Martínez criticized Shared Services in Faculty Council, the Graduate Student Assembly, the Texas State Employees Union, in petitions, in multiple student protests, and in newspapers. Gradually, administrators admitted that earnings projections were wrong, they decided staff would not be housed in a building outside UT, they decided to try a pilot program of Shared Services (instead of implementing it all at once). In Feb. 2015, the chief advocate of Shared Services, Kevin Hegarty, stepped down as Chief Financial Officer of UT Austin. The new CFO, Darrell Bazzell, arrived in April 2016. After just four months, the new CFO eliminated the centralized Shared Services, because, it "has not produced the savings and efficiencies initially anticipated when it was launched in 2014."

Moreover in 2013, Professor Martínez was the only faculty member to publicly object to the purchase and implementation of the immensely expensive administrative application Workday, in Faculty Council, and in *The Daily Texan*. Subsequently, the transition to Workday has caused

enormous expenses and difficulties, especially for UT's staff, yet Martínez had fairly anticipated that it should not be implemented.

In 2019, Professor Martínez has contributed to the Library Task Force to support our system of libraries. And in 2018, in *The Texas Tribune*, Professor Martínez rightly defended Academic Freedom against claims made by the Texas State Attorney General, who had formally denied that such a right belongs to professors. Presently, Martínez serves in UT's Committee and Counsel on Academic Freedom and Responsibility.

Yet Professor Martínez's most important and significant contribution is the advancement of Hispanic students and faculty on campus. He has spearheaded much-needed reform in his department and university to address issues of inclusion and fairness. Professor Martínez led for one year a new Equity Committee in the History Department that introduced policy reforms on the evaluation of merit salary raises and governance inequities. More important, Professor Martínez is the chair of the Independent Equity Committee of eight (8) distinguished Hispanic full professors in five (5) departments. Under the leadership of Professor Martínez, this committee has spent sixteenth months compiling a study akin in scope to the UT's Gender Equity Report. Without the tireless labors of Professor Martínez this recently completed study, the Hispanic Equity Report, would have never happened.

The significance of this report cannot be overestimated. It took hundreds of hours of Professor Martínez's painstaking research. It demonstrates in chilling numerical detail the subordinate status of Hispanic faculty throughout and the urgency to action to address inequities. Professor Martínez pored over University budgets and administrative paperwork held at the Perry-Castañeda Library, the Briscoe Center, and elsewhere. For the first time in the history of UT Austin and probably the history of all higher education in the State of Texas, Professor Martínez established reliable statistics on Hispanic faculty. The study includes staggering data on Hispanics on such diverse yet significant variables as numbers and distribution across departments, schools, and colleges; salary gaps in rank and gender; retention and tenure rates; gender inequities; ratios of teaching awards; access to campus-wide governance through elections and appointments; access to professorships and endowed chairs; share in positions of higher administration; correlations between merit and publications for 27% of all senior Hispanic Faculty and several departments on campus. This is a herculean task, a labor of care and devotion to the betterment of this institution. Professor Martínez has been a leader, tirelessly sharing data with the Vice Provost for Diversity, the Council for Racial and Ethnic Equity and Diversity, other local groups, and the in the pursuit of diversity and inclusion on campus.

The overall career of Professor Martínez clearly demonstrates that he has done "dedicated and meritorious service to the University, beyond the regular expectations of teaching, research, and service." Professor Martinez's fifteen-year trajectory on campus is one of distinction and courage

4

Cordially

On behalf of the Independent Equity Committee:

1. Prof. Jorge Cañizares-Esguerra. Alice Drysdale Sheffield Professor of History-UT-Austin. Distinguished Professor. Facultad Latinoamericana de Ciencias Sociales (FLACSO). Distinguished Luverhulme Visiting Professor-I.A.S of University of London. Nancy-Lyman-Roelker-Mentorship Awardee. American Historical Association

2. Prof. Francisco Gonzalez-Lima, George I. Sanchez Centennial Professor in Psychology, Psychiatry, Pharmacology & Toxicology. Director of the Texas Consortium in Behavioral Neuroscience. Distinguished Texas Scientist and Academic Director, Texas Academy of Science. Alexander von Humboldt Research Fellow, Germany

3. Prof. Gloria González-López, Professor of Sociology and Center for Women's and Gender Studies.

4. Prof. Martha Menchaca, Professor of Anthropology, Latin American Studies, Women and Gender Studies, and Mexican American & Latina/o Studies

5. Prof. John Morán González, Frank Dobie Regents Professor in American and English Literature

6. Prof. Fred Valdez, Jr. Professor of Anthropology; Director, Center for Archaeological and Tropical Studies

7. Prof. Emilio Zamora. Professor of History. Fellow of the George W. Littlefield Professorship in American History; and Fellow and President of the Texas State Historical Association

On behalf of diverse faculty university-administrators:

8. Prof. Sacha Kopp. Senior Vice Chancellor for Academic Affairs, University of Nebraska Omaha, former Dean of the College of Arts and Sciences, Stony Brook University; former Associate Dean for Undergraduate Education of the College of Natural Sciences, and Professor of Physics at the University of Texas at Austin

9. Prof. Leonard N. Moore, Vice President of the Division of Diversity and Community Engagement George Littlefield Professor of American History.

10. Prof. Ted Gordon. Vice Provost for Diversity. Office of the Executive Vice President and Provost. Associate Professor in African and African Diaspora Studies Department.

11. Prof. James A. Wilson, Jr., Associate Provost for Academic Affairs and Director of Faculty Innovation and Enhancement (FIE) at Prairie View A&M University; 2019-2020 American Council on Education (ACE) Fellow at Rice University; (Former Assistant Professor—UT History Department)

12. Prof. Luis Zayas. Dean. Steve Hicks School of Social Work. Professor of Social Work and the Del Medical School.

13. Prof. Anthony J. Petrosino. Associate Dean for Research and Outreach. Simmons School of Education & Human Development. SMU. Former Associate Professor of STEM Education. College of Education (retired). UT-Austin

14. Prof. Richard Reddick. Associate Dean for Equity, Community Engagement, and Outreach, College of Education. Coordinator, Program in Higher Education Leadership. Assistant Director, Plan II Honors Program, College of Liberal Arts. Associate Professor of Higher Education Leadership and African and African Diaspora Studies

15. Prof. Mia Carter, Associate Dean. College of Liberal Arts. Associate Professor of English, University Distinguished Teaching Professor.

16. Prof. William E Forbath Associate Dean for Research. Law School. Lloyd M. Bentsen Chair in Law

17. Miguel V. Wasielewski. Executive Director of Admissions. UT-Austin.

18. Dr. Suchitra V. Gururaj, Assistant Vice President for Community and Economic Engagement, Division of Diversity and Community Engagement

19. Prof. Karma R. Chávez, Chair and Associate professor, Department of Mexican American and Latina/o Studies

20. Prof. Jossianna Arroyo.. Chair Department of Spanish and Portuguese. Professor Spanish Language and Literature and the Department of African and African Diaspora Studies

21. Prof. Luis Urrieta, Jr., Associate Chair, Department of Curriculum & Instruction . Director of Student Programs, LLILAS-Benson. *Suzanne B. and John L. Adams Professor of Education*

22. Prof Virginia Garrard, Director LLILAS Benson Latin American Studies and Collections & Professor of History

23. Prof. Kevin Cokley, Ph.D. Director, Institute for Urban Policy Research & Analysis (IUPRA). *University and UT System Distinguished Teaching Professor.* Oscar and Anne Mauzy Regents Professorship for Educational Research and Development. Professor of Educational Psychology and African and African Diaspora Studies

24. Prof. Luis E. Cárcamo-Huechante, Director of the Program in Native American and Indigenous Studies (NAIS); Associate Professor at the Department of Spanish and Portuguese.

25. Prof. Lourdes J Rodríguez. Director, Community-Driven Initiatives. Associate Professor Department of Population Health

26. Prof. Huaiyin Li. Director, Center for East Asian Studies Professor of History

27. Prof. Thomas Jesus Garza. Director, Texas Language Center. Associate Professor of Slavic and Eurasian Studies UT Regents' and University Distinguished Teaching

28. Prof. Minkah Makalani Director, John L. Warfield Center for African and African American Studies | Associate Professor, African and African Diaspora Studies

29. Prof. Ricardo Ainslie. Director, Mexico Center at LLILAS-Benson University of Texas at Austin. M.K. Hage Centennial Professor in Education

30. Prof. Arthur B Markman. Executive Director of the IC2 Institute, and Founding Director of the Program in the Human Dimensions of Organizations Annabel Irion Worsham Centennial Professor, Psychology

31. Prof. Deborah Parra-Medina, Director of the Latino Research Institute, and Professor, Mexican American and Latina/o Studies

32. Prof. Douglas Biow. Director, Center for European Studies Director, France-UT Institute Superior Oil Company-Linward Shivers Centennial Professor

33. Prof. Lorraine Pangle Co-Director, Thomas Jefferson Center for the Study of Core Texts and Ideas Professor of Government

34. Prof. Benjamin Ibarra Sevilla. Program Director Master's Advanced Studies. Program Coordinator Masters of Science in Historic Preservation. Associate Professor of Architecture.

35. Prof. Michael Marder. Codirector of UTeach. Professor of Physics.

36. Prof. Wenhong Chen. Co-director, Media and Entertainment Industries Program | Moody College of Communication. Associate Professor of Media Studies and Sociology.

37. Dr. Kimberly Hughes, Director, UTeach Institute, University of Texas at Austin.

38. Dr. Paige Schilt. Director, Sanger Learning Center, School of Undergraduate Studies

39. Prof. Rebecca McInroy, Senior Host / Producer, KUT Radio

On behalf of general faculty:

40. Prof. Mark G. Raizen. Sid W. Richardson Foundation Regents Chair in Physics #2. Professor of Physics, Center for Nonlinear Dynamics Professor of Medicine, Dell Pediatric Research Institute

41. Prof. William Beckner. Paul V. Montgomery Centennial Memorial Professor in Mathematics

42. Prof. Toyin Falola. Jacob and Frances Sanger Mossiker Chair in the Humanities #2. Distinguished Teaching Professor. Department of History.

43. Prof. Henry William Brands Jr. Jack S. Blanton Sr. Chair in History at the University of Texas at Austin

44. Prof. Thomas L. Pangle Joe R. Long Endowed Chair in Democratic Studies. Department of Government

45. Prof. Neil Foley. Robert and Nancy Dedman Chair in History. Southern Methodist University. Former Associate Dean and Professor. UT.

46. Prof. Fernando Luiz Lara. Potter Rose Professorship in Urban Planning. School of Architecture

47. Prof. Juliet E. K. Walker. Professor of History and African and African Diaspora Studies. Fellow of George W. Littlefield Professorship in American History. Founder Director Center Black Business History, Entrepreneurship, Technology

48. Prof. Walter L. Buenger. Chief Historian, Texas State Historical Association Summerlee Foundation Chair in Texas History and Barbara Stuart Centennial Professor in Texas History Department of History.

8

49. Prof. Jeremi Suri. Mack Brown Distinguished Chair for Leadership in Global Affairs. Professor of History and Lindon Johnson School of Public Affairs.

50. Prof, Andrea C Gore, rofessor and Vacek Chair of Pharmacology; Division of Pharmacology and Toxicology, College of Pharmacy; Institute for Neuroscience; Institute for Cellular and Molecular Biology, and Department of Psychology

51. Prof. Peniel E. Joseph. Barbara Jordan Chair in Ethics and Political Values and Founding Director Center for the Study of Race and Democracy, LBJ School of Public Affairs. Professor of History.

52. Prof. Tom Palaima. Robert M. Armstrong Centennial Professor of Classics

53. Prof. Lisa L. Moore. Archibald A. Hill Professor in American and English Literature. Professor of Women's and Gender Studies. Director, LGBTQ Studies Program

54. Prof. Linda Dalrymple Henderson, David Bruton, Jr. Centennial Professor in Art History, University Distinguished Teaching Professor, Dept. of Art and Art History

55. Prof. Allan Tully Professor; Eugene C. Barker Centennial Professorship in American History

56. Prof. Jonathan C. Brown. Professor of History.

57. Prof. Robert Oppenheim, Professor of Asian Studies and Anthropology

58. Prof. Richard Fitzpatrick. Professor of Physics.

59. Prof. Joan Neuberger. Professor of History.

60. Prof. Robin Moore. Professor of Ethnomusicology, Butler School of Music

61. Prof. Cory F. Juhl.   Professor, Philosophy, Associate Chair, Philosophy

62. Prof. Jacqueline L. Angel, Professor of Sociology and Public Affairs. Sociology and LBJ School.

63. Prof. Paul B Woodruff.   Professor, Philosophy; Distinguished Teaching Professor

64. Prof. Daniel Bonevac Professor of Philosophy and Human Dimensions of Organizations

65. Prof. Angela Valenzuela, Professor, School of Education.

9

66. Prof. Cynthia Talbot. Professor of History

67. Prof. Richard Matzner. Professor of Physics

68. Prof. David Prindle. Professor of Government

69. Prof. Yoav Di-Capua. Professor of History.

70. Prof. Indrani Chatterjee. Professor of History and Asian Studies.

71. Prof. Juan Dominguez. Associate Professor of Psychology and Pharmacology. Fellow of the Alma Idell Carlson Chair.

72. Prof. Benjamin C. Brower. Associate Professor of History.

73. Prof. Alison K. Frazier Associate Professor of History & Religious Studies. Graduate Advisor, History.

74. Prof. Sam C. Vong. Assistant Professor of History. Curator of Asian Pacific American History, Smithsonian Institution

75. Prof. Abena Dove Osseo-Asare, Associate Professor of History

76. Prof. J. Brent Crosson. Assistant Professor, Religious Studies

77. Prof. Cesar A. Salgado. Associate Professor of Spanish and Portuguese

78. Prof. Megan Raby. Associate Professor of History.

79. Prof. Carlos E. Ramos-Scharrón. Associate Professor, Department of Geography & the Environment and LLILAS-Benson

80. Prof. Laurie Green. Associate Professor of History.

81. Prof. Katherine Dunlop. Associate Professor, Philosophy

82. Prof. C.J. Alvarez. Assistant Professor, Mexican American and Latina/o Studies

83. Dr. Megan Seaholm, Senior Lecturer. Department of History

84. Dr. Erik Dempsey, Assistant Director, Thomas Jefferson Center Lecturer, Department of Government and Thomas Jefferson Center;.

85. Dr. Rachel Ozzane. Lecturer. Department of History.

86. Prof. Lina del Castillo. Associate Professor of History.

87. Prof. Leticia Marteleto. Associate Professor of Sociology, Department of Sociology, Population Research Center.

88. Prof. Judith Coffin. Associate Professor of History.

89. Arturo De Lozanne, Ph.D. Associate Professor. Department of Molecular Biosciences. Provost's Teaching Fellow. University Distinguished Teaching Professor

90. Prof. Flavio Azevedo. Associate Professor. Department of Curriculum and Instruction.

91. Prof. Enrique Rodríguez-Alegría. Professor of Anthropology.

92. Prof. Paul Bonin Rodriguez. Associate Professor Department of Theatre and Dance.

93. Prof. Tracie Matysik. Associate Professor of History.

94. Prof Adam Clulow. Associate Professor of History.

95. Prof. Erika M. Bsumek. Associate Professor of History. Provost's Teaching Fellow

96. Prof. Joshua Frens-String. Assistant Professor of History.

97. Prof. Lorraine Leu, Associate Professor, LLILAS & Department of Spanish & Portuguese.

98. Prof. Steven Mintz. Professor of History.

99. Prof. Manuel Ramirez. Professor of Pyschology.

100. Prof. George Forgie. Associate Professor of History.

101. Prof. Snehal Shingavi, Associate Professor, English, and South Asia Institute, and Center for Asian American Studies

102. Prof. Alexander P. D. Mourelatos.  Professor Emeritus of Philosophy and Classics

103. Prof. Lesley Dean-Jones.  Associate Professor, Department of Classics.

104. Prof. Jennifer V Ebbeler.  Associate Professor, Department of Classics

105. Dr. Joshua Roebke Author, Instructor, and Researcher
Institute for Historical Studies & College of Natural Sciences

106. Dr. Jeffrey C. Leon.   Lecturer, Philosophy

107. Dr. Dana L. Cloud.   Independent Scholar. Former Professor, Department of Communication and Rhetorical Studies Syracuse University.  Former Associate Professor, Department of Communication  Studies, UT Austin


On behalf of former students and current students

108. Dr Kristie Patricia Flannery. Killam Postdoctoral Fellow, University of British Columbia. Former University of Texas at Austin  Writing Fellow (2017-2018), and Department of History  graduate student (2011-2019).

109. Prof. Cameron Strang.  Assistant Professor of History. University of Nevada-Reno. Alumnus UT-History.

110. Prof. Ben Breen. Assistant Professor of History. US Santa Cruz. Alumnus  UT-History (Professor Martinez's TA)

111. Prof. Paul Conrad. Assistant Professor of History. UT Arlington. Alumnus  UT-History.

112. Prof. Francis Goicovich. Associate Professor of History. Universidad  de Chile. Alumnus UT-History

113. Prof. Brad Dixon, Assistant Professor of History, University  of Memphis. Former IHS Fellow (2018-2019) and Department of History  graduate student (2013-2018).

114. Prof. Chloe Ireton, Lecturer in Iberian History  and the History  of the Iberian World 1500-1800, (Alumni of History graduate program, The University of Texas at Austin,  2011-2018)

115. Dr. Adrian Masters, German Research Foundation Fellow at the University of Tübingen, former UT Austin Institute for Historical Studies Fellow (2018-2019), UT University Writing Fellow (2017-2018), and Department of History graduate student (2011-2018)

116. Dr. Ran Segev. Postdoctoral Fellow. Minerva Humanities Center. Tel Aviv University History Department. UT-Austin. 2008- 2015

117. Dr. Dolph Briscoe IV, Lecturer of History at Texas A&M University-San Antonio. History Department UT 2014.

118. Dr. Angela Smith. Adjunct Professor St Edwards University. Alumnus History Department UT. Ph.D 2014.

119. Prof. Greg Cushman. Associate Professor of International Environmental History at University of Kansas. Alumnus History Department UT (Ph.D 2003).

120. Nicolás Alejandro González Quintero, Ph.D Candidate at the History Department at UT Austin; UT University Writing Fellow (2019-2020).

121. Diana Heredia-López, Graduate Student, Department of History

122. Stormie Koerner, currently a graduate student at the UT iSchool; BA in history and classics from UT Austin.

123. Sophia Grace Donnelly: graduated, December 2014 BA in Liberal Arts with Honors, History Major.

124. Alexander Chaparro-Silva. Graduate Student, Department of History

125. Gary Dunbar. Graduate Student, Department of History

126. Ernesto Mercado. Graduate Student. Department of History.

127. Stormie Koerner, currently a graduate student at the UT iSchool; BA in history and classics from UT Austin

128. Maria Aina Ongcheap, Undergraduate, BSA Neuroscience and BA History (History of Science)

129. Lauren Peña. Graduate Student and Assistant Instructor. Department of Spanish and Portuguese.

130. Gabriel J Rodriguez-Rivera. Scientist in Residence. Environmental Science Institute. Department of Chemical Engineering.

131. Allegra Geller.  M.S. University of Texas at Austin, Information Studies; B.A. 2013 History and European Studies; Phi Beta Kappa

132. Michelle Morar. BS Biology 2009, M. Ed 2019. U-T Austin.

133. Edgardo Irizarry Arroyo.  Graduate Student. School of Design and Creative Technologies

134. Maxwell Anderson, J.D. Candidate at UT Law.

135. Bethany Skeen. BA. University of Texas-Austin.

136. Doreen Balbuena BA International Relations & Global Studies, 2013

Additional signatures
137. Prof. Liliana M. Garces, Associate Professor of Education, College of Education

138. Prof. Shaleiah Fox. Director External Relations Texas Development. Black Studies at UT Austin.

**about my case**

# Exhibit 61

## Alberto A. Martinez <almartinez@austin.utexas.edu>

Thu 10/24/2019 5:50 PM

**To:** Gordon, Edmund T <etgordon@austin.utexas.edu>
**Bcc:** Alberto Martinez <almartinez1905@gmail.com>

📎 2 attachments (11 MB)

190927 Alberto Martinez Retaliation Complaint and Exhibits - full size.pdf; 190928 signed employment-discrimination-complaint-twc MARTINEZ.pdf;

Dear Ted,

I look forward to our group meeting with the Provost next week. Still, when we last met I was stunned to hear that when you kindly signed Jorge's letter nominating me for an award, persons actually wrote and called you to say negative rumors about me, whatever they said. I've lived in the US for 27 years without winning any award, so it makes no big difference if I don't win one again. Still, it's not right that anyone should spread false rumors about me, because really I've done nothing wrong.

So, to reassure you that any such claims about me are grossly false, I here send you the formal complaint that my lawyers filed in the EEOC and Texas Workforce Commission last month, in regard to such allegations. Since you handle faculty and diversity issues, you should see it. It's 18 pages, the rest are exhibits.

Now of course, our meeting won't be about this, but in your office we mentioned how difficult it is to confront inequities "on the ground" that is, within departments. My case illustrates why we strongly hope that some structural institutional changes might be implemented in order to improve inclusion of minorities in faculty governance within departments.

Many thanks,
Alberto

EEOC Form 161 (11/16)

**Exhibit 62**

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To:    **Alberto Martinez**
       **409 E. 38th St. #203**
       **Austin, TX 78705**
       amartinez21905@gmail.com

From:    **San Antonio Field Office**
         **5410 Fredericksburg Rd**
         **Suite 200**
         **San Antonio, TX 78229**

|  | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* |  |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 36A-2020-00045 | **Roy Roscoe,**<br>**EEOC, Federal Investigator** | **(210) 640-7562** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| | |
|---|---|
| [ ] | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
| [ ] | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| [ ] | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| [ ] | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| [X] | The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes.  This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge. |
| [ ] | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| [ ] | Other *(briefly state)* |

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

*Jose Colon-Franqui* ~~Digitally signed by Jose Colon-Franqui
DN: cn=Jose Colon-Franqui, o=EEOC, ou=Equal Employment
Opportunity Commission, email=jose.colon-franqui@eeoc.gov, c=US
Date: 2020.08.27 08:44:32 -05'00'~~ FOR                8/27/2020

Enclosures(s)

**Travis G. Hicks,**
**Director**

*(Date Mailed)*

cc:    **UNIVERISTY OF TEXAS AT AUSTIN**
       *Galen Eagle Bull*
       *Deputy Associate Vice President*
       **100 West Dean Keeton Street, SSB 3.212**
       **Austin, TX 78712**

**Katie Frank**
**DAVID K. SERGI & ASSOCIATES**
**PO BOX 887**
**329 S. Guadalupe**
**San Marcos, TX 78667**

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS    --    **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to
consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell
him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely
manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as
indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of
your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the
charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include
any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters
alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in
some cases can be brought where relevant employment records are kept, where the employment would have
been, or where the respondent has its main office. If you have simple questions, you usually can get answers from
the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint
or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS    --    **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice *and* within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION    --    **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# Exhibit 63

## Differences in Salary by Race & Gender

controlling for Field & Experience (2009-2018)

**Campus-wide, Full Professors**



horizontal line =  White (non-Hispanic)