UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ALBERTO MARTINEZ, | § | |
|     Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO.: |
| | § | |
| | § |     1:20-cv-1175-LY |
| | § | |
| UNIVERSITY OF TEXAS AT AUSTIN, | § | |
|     Defendant. | § | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT & JURY DEMAND

Plaintiff, Alberto Martinez, files this, his First Amended Complaint and Jury Demand against Defendant, University of Texas at Austin ("UT"), and would respectfully show the Court as follows:

## I.   INTRODUCTION

1. This is an employment discrimination and retaliation case. More specifically, this case concerns Dr. Alberto Martinez's analysis of disparities in compensation and promotions among employees of UT's History Department and the various interventions that deterred his efforts to complete such internal reports.

2. On April 19 and May 2, 2018, Martinez notified his supervisor, Jacqueline Jones ("Jones"), and coworkers that there was "discrimination" and "marginalization" of Hispanic employees in the Department of History. Consequently, he was appointed Chair of a new Committee on Equity, which was tasked to review governance, salaries, and promotions in the department. It was the first time in the

130-year history of the department that a Hispanic person had been appointed to lead a committee addressing such areas.

3.  Months later, on October 15, 2018, Martinez distributed a draft report titled: "Report: Equity in Salaries and Raises." It reviewed data showing that there were indeed disparities of pay and lack of promotions to positions of leadership within the department, with compensation, especially for Hispanic and Black employees.

4.  On October 19, 2018, at the start of a meeting of the Department's Executive Committee ("EC"), Jones told one member of the EC: "We're going to disband the Equity Committee." However, that member immediately told two others, and they deterred any such effort to disband Martinez's Equity Committee. Subsequently, Jones created subcommittees of Martinez's committee and she appointed the Chairs of these subcommittees without consulting him. Jones assigned his duties to those new Chairs. Jones wrote the goals of each subcommittee, rejecting Martinez's input. Jones disregarded Martinez's request that subcommittees report to his committee, not to her or to the department. Jones stopped meeting with Martinez and instead met with the new Chairs. Jones ignored the objections Martinez sent to the subcommittee reports. Moreover, Jones made a series of written, false allegations against Martinez: Jones accused him of "denigrating" women coworkers; Jones accused him of creating a "divisive" and "toxic" work environment; Jones accused him of making "anti-Semitic" statements; Jones accused him of discriminating on the basis of race and religion; and Jones accused him of a pattern of harmful sexual misconduct.

5.  All those allegations were entirely false.

6.  Jones reported Martinez to UT's Office of Inclusion and Equity ("OIE"), which proceeded to investigate Martinez. Eight months later, after "extensive" inquiries and interviews, the two OIE Investigators found: no evidence of wrongdoing, no violations of laws, no violations of university policies, and that Jones's allegations were unsubstantiated. Instead, witnesses explained to OIE that Jones manifested favoritism, that she refused to increase equality, and that she deterred Martinez's committee from effecting change.

7.  Based on Jones' intention to disband the Equity Committee, her subsequent reassignment of his committee duties to two other individuals, and the proximity in time of her various false allegations against Martinez, it is clear that Jones' actions constitute retaliation against him for engaging in a protected activity. While Jones made multiple false allegations against Martinez, she also retaliated by undermining and obstructing Martinez from completing his planned Reports on Salaries, Promotions, and Governance.

## II.     PARTIES

7.  Plaintiff Alberto Martinez is an individual who resides in Travis County, Texas, and was during all relevant times employed by UT.

8.  Defendant, UT, is a state university located within the Western District of Texas. Defendant may be served through its President, Jay Hartzell.

## III.     JURISDICTION AND VENUE

9.  This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the claims arise out of questions of federal constitutional law under the 14th Amendment as well as 42 U.S.C. § 2000e et seq. and 20 U.S.C. §§ 1681 et seq.

10. The declaratory and injunctive relief sought in this matter is authorized by 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Federal Rules of Civil Procedure 57 and 65.

11. This Court has personal jurisdiction over all the parties in this lawsuit because each party listed in the lawsuit resides in Texas.

12. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendant is a public university of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

13. This Court is an appropriate venue because the actions giving rise to this lawsuit occurred within the Western District of Texas.

## IV.   FACTS

**A. Professor Alberto Martinez has been teaching for 20 years, he has taught at the University of Texas at Austin, College of Liberal Arts, for 15 years, since 2005, and he is an internationally recognized scholar on history of science.**

14. Professor Martinez is employed as a full Professor in UT's Department of History, since 2015, where he previously worked as Associate Professor, Assistant Professor, and Lecturer.

15. Martinez has been a Research Fellow at top academic institutions, including M.I.T., Harvard University, the California Institute of Technology, Boston University, and the Smithsonian.

16. Martinez is an internationally recognized scholar: he has been invited to give talks in countries such as Switzerland, France, the Netherlands, and Tenerife. His books have been translated into Japanese and Turkish, and have been reviewed

and praised in academic journals and periodicals in the United States, Great Britain, Germany, Spain, Italy, China, and Malaysia. *See* Exhibit 1

17. In the past 30 years, Martinez achieved the 3rd fastest promotion from the rank of Associate Professor to the higher rank of full Professor, in his Department.

18. Among the more than 180 employees who have taught in the Department of History since 2005, Martinez is the 12th who has taught most courses since 2005, that is, 54 courses.

19. Martinez was underpaid, as evidenced, e.g., by a November 30, 2017, email from Jones to her superior, Dean Randy Diehl, in which Jones listed Martinez as one of the individuals with "highly compressed salaries." *See* Exhibit 2. Therefore, Jones recommended Martinez for a Faculty Investment Initiative raise, along with 20 other individuals. The Dean and the Provost then chose to award Martinez three forthcoming annual raises of $12,500 each. These raises were aimed at the Top 10% faculty, as noted in the University of Texas System Operating Budget Summaries for Fiscal Year 2016, p. 17: "to provide recurring salary support for the upper decile of senior faculty as identified by deans." *See* Exhibit 3.

20. Martinez has an outstanding record of scholarly publications. In her email to Dean Diehl, Jones listed Martinez as one of "the most productive members of the department." *See* Exhibit 2.

21. Martínez had also been appointed by Jones to be fellow of the John E. Green Regents Professorship (research funds) in 2017-18. By May 2018, as noted in his "Report on Salaries," Martinez had more scholarly publications than 49 of the 63 faculty in the department. *See* Exhibit 4, pp.14-15.

22. He also earned high teaching evaluations and, in the summer of 2018, Jones offered to nominate him for the President's Associates teaching award (although later she did not).

23. Until 2019, Martinez was an employee in good standing at UT, having never been reprimanded, disciplined, or investigated for any reason, or in any previous university. His most recent evaluation, for 2017-18, stated: "Exceeds Expectations." *See* Exhibit 5.

**B.   In Spring 2018, Professor Martinez discovered that his compensation and job opportunities were not comparable to those of multiple coworkers.**

24. Martinez was being paid far less than multiple coworkers who had fewer scholarly publications, fewer years at UT, lower rank, or who had taught fewer courses.

25. Martinez further realized that Hispanic employees like himself had never been appointed to any departmental positions of leadership that entail raises: Department Chair, Associate Chair, Graduate Advisor, Director of the Institute, Editor of Not Even Past, Director of Assessment, Director of the Honors Program.

26. Martinez's earliest email correspondence referencing discrimination was sent on April 19, 2018 to all faculty in UT's History Department, including his supervisor, Jones. In that email, Martinez noted that "there are longstanding problems in our department governance. . . . there is a kind of discrimination that is 'the unwitting creation of unquestioned everyday choices.'" *See* Exhibit 6.

27. Martinez and two Hispanic coworkers, namely Jorge Cañizares-Esguerra and Emilio Zamora, wrote a "Public Statement on Governance," shared with other employees and their supervisor, Jones, on May 2, 2018, which respectfully

complained about "disparities," "marginalization," "inequities," and being "excluded." It stated points such as: "In the past fourteen years, we have not had the opportunity to serve in key positions such as Chair, Associate Chair, Director of the IHS, Chair of the Salaries Committee, Graduate Advisor, or Director of Graduate Studies," or as chair of multiple other committees. *See* Exhibit 7.

28. As a result of the above-described communications (specifically, Martinez's complaints of discriminatory work conditions), the History Department faculty agreed to create a new "Committee on Equity," and thus, in the full faculty meeting held on May 2, 2018, Jones appointed Martinez to be Chair of the new Committee. *See* Exhibit 8.

29. In relation to his April 19, 2018 email, Martinez received public and personal emails by nine History faculty who presently complained about: "racism," "discrimination," "exclusion," "ethnic marginalization," "disenfranchisement," "disrespect," "hostile working environment," "unconscious bias," and "inequities," in UT's History Department. *See* Exhibit 9 (excerpts). For example, Professor Martha Newman wrote: "it is important for us to recognize the pattern and the perceptions that you, Emilio, and Jorge are articulating. Racial and ethnic marginalization have been a problem in the department for a very long time..." *See* Exhibit 10 (full emails).

**C. In Fall 2018, Professor Martinez confirmed that his compensation and job opportunities were not comparable to those of multiple coworkers.**

30. On October 15, 2018, Martinez completed an extensive "draft" report titled: "Report: Equity in Salaries and Raises," and distributed it to his coworkers and supervisor. *See* Exhibit 4. It painstakingly listed and analyzed 4,037 data points

showing that there were indeed disparities of pay and lack of promotions to positions of leadership within the department, with compensation, especially for Hispanic and Black employees. The findings of this draft Report are further outlined below.

31. Martinez argued that certain faculty within the Department are "underpaid," including ten employees who had progressed in rank in good time. Martinez stated that: "In the interest of equity in diversity, it is necessary to point out that 7 of these 10 faculty members are minorities, including 3 Hispanics, 2 African or African American, 2 Asian or Asian & other." *See* Exhibit 4, p.17. Martinez described their relatively low salaries as "inequities." The four most "underpaid" faculty were either Hispanic (Emilio Zamora, Martinez) or experts on Latin American History (Jonathan Brown, Matthew Butler). For example, Professor Emilio Zamora then earned less than 20 faculty in the same Department who had fewer scholarly publications and awards than him, including six faculty of lower rank.

32. Given the age of Professor Zamora and two "underpaid" others (Juliet Walker, Jonathan Brown), Martinez also wrote that "Our Department should work to undermine any semblance of *ageism*..." *See* Exhibit 4, p.19.

33. Martinez reviewed 15 years of data to identify which employees lacked opportunities to serve in nine compensated positions and he complained: "It's apparent that no minorities (Black, Hispanic, Asian, Foreign) have served in the categories of service compensated by the Department, at least in the period reviewed," that is, 2003-2018. *See* Exhibit 4, p.8.

**D. Following Martinez's draft Report on Salaries of October 15, 2018, his supervisor Jones initiated a series of retaliatory actions against Martinez.**

34. Martinez's draft Report was promptly and overtly appreciated by at least 31 faculty members within UT's History Department, including: five Asians, five Black faculty, all five Hispanics, and 16 White faculty. For example, they praised it as "an enormous piece of work," "Herculean," "important," "fascinating," and "illuminating." *See* Exhibit 11.

35. In contradistinction, only five (5) faculty, all White (and mostly in positions of authority, including the Department Chair Jacqueline Jones), made very critical claims about the Report, aimed directly at Martinez. For example, on October 17, 2018, Julie Hardwick complained about "errors," "murkiness,"  "a chaotic mess," "The report is offensive," "mean spirited [in] nature," and "mind blowing," "It shows an utter lack of respect," "literally fantasies," "women who the report represents as not doing research work because they are too busy doing shit work for the department for which they are overpaid," and "I suggest you withdraw this report and re-present it..." *See* Exhibit 12. Martinez respectfully replied to and corrected each of the mischaracterizations by Hardwick.  *See* Exhibit 13.

36. On Oct. 17, 2018, Jones too sent comments and critiques to Martinez's committee; Jones critiqued UT administrators: "The Tower seems bent on mocking the whole notion" of equity, and she asked "Does the [History] Department systematically discriminate against groups of people?" *See* Exhibit 14. Jones claimed that there were negative implications or insinuations in the Report: "this section seems to denigrate the industrial-strength administrative work that some of our colleagues do," and that it "suggests that this kind of work

is a boondoggle. Not true!" She added: "I would like this section excised or radically reworked. I do object to the implication that those who perform labor-intensive service in the department are somehow grossly overpaid." Yet the report stated no such things. Jones also complained about a chart by misconstruing that it "presents individuals as the sum of their salary (a number) and their publications (another number)," and that "I have expressed my dismay with this chart."

37. By October 18-19, 2018, one Black colleague, Toyin Falola, advised Martinez, "to remove yourself from the center of all the unnecessary attacks (I was expecting disagreements but not at this sustained level of anger)." *See* Exhibit 15.

38. On October 19, 2018, at the start of a meeting of the Department's Executive Committee, Jones told one member: "We're going to disband the Equity Committee." However, that member, Megan Raby, immediately told two others, Abena Osseo-Asare and Indrani Chatterjee, and they deterred any such effort to disband Martinez's Equity Committee.

39. . Upon learning of Jones' intention with the Executive Committee, Martinez was shocked and offended. Nevertheless, Martinez persisted . Martinez later complained in writing about the fact that Jones proposed to disband the Equity Committee in an email to the History "Faculty Ombuds" Lina del Castillo and Martha Newman, on February 4, 2019. *See* Exhibit 16. Martinez also raised the complaint in the Agenda for the Equity Committee on February 6, 2019, which included two members of the Executive Committee, Emilio Zamora and Megan Raby. *See* Exhibit 17.

40. From the start of the Equity Committee, Jones asked for copies of all email correspondence. *See* Exhibit 18.  Jones did not request copies of all emails of other committees. Still, members occasionally did not cc Jones, mainly when merely coordinating to schedule Committee meetings. In November 2018, Martinez realized that Jones received some information about the Committee from a member, Joan Neuberger, because Martinez was at the faculty photocopier when Jones printed an emailed draft document sent by Neuberger. However, Neuberger quit the Equity Committee later that same month on November 29, 2018.

41. The next day, November 30, 2018, Jones emailed another committee member, Megan Raby: "I hate to keep bothering you, but I am checking in about the Climate Survey. What is the division of labor on the Equity Committee related to this? . . . Once again, I feel badly writing just to you, but do not know whether or not you have a committee, or whether or not others on the Equity Committee are actively involved in this project with you." *See* Exhibit 19. Raby subsequently replied: "The committee is on track with the climate survey." *See* Exhibit 20. Yet Jones sent further inquisitive emails to Raby, plus phone calls, which placed Raby under tremendous stress. Therefore, on December 10, 2018, Raby wrote to Martinez: "I am **so sorry** to do this, but I have just told Jackie [Jones] that I must resign from further involvement in a climate survey. Jackie has contacted me with objections about the survey, and I feel that I am stuck in an untenable position, forced to mediate between her and the committee." *See* Exhibit 21.. Martinez then carried out the task Raby had led: creating the Climate Survey.

42. By November 11, 2018, Jones requested the creation of subcommittees to divide the labors of the Equity Committee. Neither Martinez nor any member of the Equity Committee asked for subcommittees. However, Martinez accepted Jones' request for the subcommittees, though worrying that this might dilute his agency. Jones asked Martinez and the other members to choose in which subcommittees each would serve. Martinez asked that everyone be invited to join. Instead, in January 2019, Jones alone chose new members for each subcommittee without inviting everyone in the Department. Also, Jones unilaterally selected the Chairs of each subcommittee, without consulting Martinez or members of the Equity Committee, and, without selecting Martinez or members of the Equity Committee as chairs of the subcommittees.

43. Despite the critiques and interventions by Jones, Martinez effectively carried out multiple initiatives: collecting 15 years of department data; drafting the "Report: Equity in Salaries and Raises" 20 pages with over a thousand data points; creating 23 proposals to revise Salary Guidelines, all of which were strongly approved by faculty vote on December 15, 2018 (Professor Benjamin Brower replied, e.g.: "A well-deserved vote of confidence for the committee's hard and thoughtful work." *See* Exhibit 22.); creation of an online Climate Survey with 69% faculty completion rate; and, creating a report on Climate Survey Data, 83 pages long.

44. On January 14, 2019, Jones took a third materially adverse action against Martinez by filing a report with UT's Office of Inclusion and Equity ("OIE"), claiming that Martinez "engaged in inappropriate conduct with graduate students in the past, and was dating a graduate student now," and that he caused "Harm,"

by "Sexual Misconduct." These claims were false. Despite the gravity of these false allegations, Martinez was not informed by OIE until four months later, on May 17, 2019.  *See* Exhibit 23.

45. In late January 2019, Jones took a fourth materially adverse action against Martinez by effectively transferring him to less prestigious or desirable work. He was Chair of the Equity Committee, but Jones reappointed duties that were fully within Martinez's purview to individuals who she unilaterally selected and who were not members of his Committee. *See* Exhibit 24.

46. When his Committee was created in May 2018, Martinez was charged with working on three areas: "Department governance [equity in governance], Merit increase guidelines [equity in salaries or raises], and nurturing of junior faculty [equity in promotions]." *See* Exhibit 25. Nine months later, in February 2019, when Martinez learned that Jones had appointed the Chair of the Equity Subcommittee on Promotions, he emailed Jones and requested to serve as Chair of the Subcommittee on Governance. Martinez and the Committee members had been working on analyzing equity for nine months, yet Jones chose a new person to chair the subcommittee: one who had not attended any of the four open faculty meetings that had been hosted by the Equity Committee.

47. As an alleged justification for her actions, on January 31, 2019, Jones wrote to Martinez: "Since you are the chair of the Equity Committee, I do not think it would be appropriate for you also to chair this subcommittee. I am chair of the department, but in virtually all cases I leave chairing departmental committees to others." *See* Exhibit 24.  Jones' explanation was demonstrably false, as Jones in

fact had appointed herself to be Chair of committees at least 15 times: Chair of the Executive Committee (2014-19), Chair of the Committee on Evaluating the History Major (2018-19), Chair of the Littlefield Lecture Committee (2016-17, 2017-18, 2018-19), Chair of the Department Endowment Review Committee (2018-19), Chair of the Special Committee on FII Hires (2016-17, 2017-18), Chair of the Committee on FII Two Raises (2017), and Chair of the Special Committee on the TSHA Chief Historian Search (2015-16, 2016-17).

48. On February 4, 2019, Martinez complained to Jones: "I'm surprised and disappointed that you didn't let me chair the Governance Subcommittee. When you requested subcommittees you said it'd be 'to open it up' to more faculty in the dept. I'm all for inclusion, so it sounded good to me to invite others to contribute, but I would've preferred to have the invitation be announced and extended to everyone in the department as I said. Personally, I didn't think it would be 'inappropriate' for me to chair the Subcommittee on Governance, since that's one of the three tasks for which the Equity Committee was created, and it didn't occur to me that you'd appoint anyone to chair our subcommittees without consulting me or the committee. I thought members of the Eq. Committee could chair its subcommittees, since normally subcommittees do just consist of members of a committee, though they may pull in consultants and others too [see Robert's Rules of Order]. . . .  I respectfully agree with you that as department Chair you generally shouldn't chair other committees, yet I feel that by appointing the chairs of all our subcommittees and by choosing all the additional members without consulting us you are really infringing on the autonomy of our committee.

I'm flexible, so I accepted it when you decided that Susan [Deans-Smith]'s work on Curriculum and Scheduling was a subcommittee of the Equity Committee. Similarly, when you requested that we create other subcommittees, I said fine. And so forth, yet the Equity Committee really needs to participate in deciding the composition of its own subcommittees, instead of it being done in this top-down manner. To that end, I will meet with the Equity Committee to discuss how to proceed." *See* Exhibit 26.

49. On the same day, Martinez wrote to the Department's "Faculty Ombuds," Linda del Castillo and the former Ombuds, Martha Newman, asking to meet with them. Martinez explained: "I was annoyed that Jackie [Jones] did that without consulting me or the Equity Committee, but I try to be flexible so I emailed Jackie [Jones] saying it's fine, but that I do want to be chair of the subcommittee on Governance. She emailed me the next day, saying she asked Jeremi [Suri] to chair that subcommittee and that he accepted. This top-down way of doing things is exasperating and inappropriate, and it's the kind of problem that led to the creation of the Eq. Committee in the first place. I explained in an email to Jackie why this is procedurally wrong; . . .   I seriously worry that Jeremi might be counterproductive as chair because he's the only faculty member in the department who has told me at length that there are no significant inequities in governance in our department (e.g., he said that anyone who doesn't get elected into the EC doesn't have the trust of the department, that some people can't be trusted in certain roles, that people don't trust me in particular because I'm 'an antagonistic person,' that those who think they're underpaid are not, that if

anyone wants more than they have 'they just have to play the game,' etc.) I appreciate Jeremi's honesty, but chairs of subcommittees are usually appointed by the choice of committees themselves." *See* Exhibit 16.

50. On February 6, 2019, Martinez met with the Equity Committee and summarized the problem in the Agenda: "I emailed Jackie [Jones] that she proceeded inappropriately, by not consulting us. I explained that subcommittees can have external members but they can or should be chaired by members of the parent committee. And, subcommittees must report only to the parent committee. Jackie then reiterated her previous statements. And she ignored my complaints about how she proceeded improperly, without consultation and disregarding our autonomy, and about how the subcommittees must report only to the Equity Committee." *See* Exhibit 17.

51. Jones' intervention dissuaded all members of the Equity Committee, including Martinez, from wanting to now serve as Chairs of the Subcommittees, in order to not oppose Jones. On February 9, 2019, Martinez and the five members of the Equity Committee sent a jointly written email to Jones, including this critique: "We agreed that since you already appointed Madeline [Hsu] and Jeremi [Suri] to chair the subcommittees on Promotions and Governance none of us wants to chair those committees now, and we expect to work well with them. We do agree that both of them and the other new members you appointed can contribute valuable expertise and good will to work on these areas. Still, most of us felt disappointed and uncomfortable that you just didn't consult us." *See* Exhibit 27.

52. On April 22, 2019, Professor Jorge Cañizares-Esguerra wrote a complaint to Jeremi Suri, Jones, and the eight members of the Equity Subcommittee on Government, and in support of Martinez: "Alberto had never been chair of anything until last April. Alberto temporarily became the chair of the equity committee. He directed reforms on equity merit pay and the climate survey and gathered data. Suddenly, the equity committee was dissolved into subcommittees and power devolved to the same pool of people, the grownups [sarcasm], who have been running things in the department.  Clearly, Alberto cannot be trusted [sarcasm] with positions of leadership. Would he ever be chosen out [of] any triad presented to Jackie to be, say, director of the IHS or Graduate Director?  The new proposed solution will most likely make things worse as those not chosen will feel even more disenfranchised. Or they simply don't ever apply not to be humiliated. How do [we] make sure that those of us who want to occupy positions of leadership in the department but who are considered by the 'grownups' illegible [sic: ineligible] or incapable won't be, again, left out?  We embarked a year ago on a pattern of analysis and reform. Let's make sure we offer realistic alternatives of inclusion and equity." *See* Exhibit 28. Professor Suri replied that he could discuss the matter in person. Jones did not reply.

53. Also in February 2019, Jones set the goals of each Subcommittee within the Equity Committee and rejected Martinez's input. After unilaterally appointing the Chairs of the subcommittees, without consulting Martinez, Jones herself then drafted the goals of each subcommittee. In an email of February 14, 2019, Jones requested feedback from Martinez and others. Martinez was the only one to

propose feedback, in an email of February 18, 2019; for the Subcommittee on Governance, Martinez wrote: "to ensure an equitable distribution of resources and influence among various groups and all individuals. This subcommittee will work to ensure that our governance is inclusive (especially in terms of diversity and gender), efficient, transparent, and responsive to the needs of faculty and students." *See* Exhibit 29. Yet Jones immediately rejected Martinez's changes in an email of February 18, 2019, and she claimed that such concerns were already "implicit." Martinez replied: "I much prefer my explicit version, echoing your words from May [2018], just because it includes and highlights these words: 'equitable,' 'influence,' 'groups and all individuals,' 'inclusive,' 'diversity and gender,' and 'faculty,' whereas your revised version deletes all of them." *See* Exhibit 30.

54. Similarly, in his first email of February 18, 2019, for the charge of the Subcommittee on Curriculum and Scheduling, Martinez proposed to add just one sentence: "This subcommittee will also discuss how the new requirements in the History major can affect enrollments in geographic area courses in order to elucidate how to counter any inadvertent effects on teaching diversity." *See* Exhibit 29. Again, Jones entirely rejected Martinez's proposed revision. *See* Exhibit 31.

55. Martinez was Chair of the Equity Committee, yet Jones wrote the goals of its subcommittees. Martinez was frustrated that Jones asked for feedback but rejected his fair suggestions. As a result, on February 18, 2019, Martinez wrote a second detailed email to Jones (and copied members of the Equity Committee) in defense

of his proposed additions: "I spoke with Martha Newman [former Ombuds for the Department] and Lina [present Ombuds] recently and Martha emphasized and insisted that really a department is not a democracy but a consultative dictatorship,' which I disagree with." *See* Exhibit 30.  Jones did not reply to this point.

56. Jones asked what Martinez meant by "groups." Martinez replied that groups may consist of rank, expertise, friendship, and the like, but that "more specifically[,] I'm referring also to minorities. The original Public Statement on Governance circulated by Hispanic faculty in our department [on May 2, 2018] was precisely that we felt excluded for years from our department's governance for various reasons that we listed. Such experiences and sentiments affect other faculty individuals too, for example, in 15 years (fall 2003 to spring 2018) some individuals such as Bill Brands [race: White] and Erika [White] had been in the Executive Committee 7 or 8 years, whereas others, such as Juliet [Black], Emilio [Hispanic], Huaiyin [Chinese], had been in the EC exactly 0 years. Similar things happen with departmental resources, such as organizing conferences or holding fellowships at the IHS [Institute for Historical Studies]. For example, my friend Erika has been an IHS Fellow 3 times whereas some others have never had an IHS fellowship. Or we can consider it by 'groups,' whereas 13 white colleagues have held 2 or more IHS fellowships, no minorities have been fellows twice, not yet, and some minorities have never had an IHS fellowship even once, such as Juliet [Black], Toyin [Black], Leonard [Black], Lina [Hispanic], Indrani [Indian]. I experienced this point personally [Hispanic] when I first applied for an IHS

fellowship, with a research topic that perfectly matched that year's topic, but instead my friend Mark Metzler [White] received his 2nd IHS fellowship. He told me it was because 'they sort of owe it to me, because I've done a lot for them; but don't worry, I'm sure you'll get it next year.'" *See* Exhibit 30.

57. Frustrated, Martinez emailed colleagues for advice. Professor Indrani Chatterjee replied on February 21, 2019: "Al, I seriously cannot fathom how you have the energy to keep going. Thanks for sharing the entire correspondence – and re Mark Metzler I had the identical experience. He TOLD me not to apply to the IHS – and I figured he was major favorite of the department and so I kept out." *See* Exhibit 32.

58. Jones disregarded Martinez's request that Subcommittee Chairs should only report to the Equity Committee. *See* February 4, 2019 Email to Jones, Exhibit 26: "I do expect and require that the subcommittees will follow the standard rules of order, and in particular, that they won't issue any reports to the department, to you, or to the Executive Committee, but that they will serve and report to the Equity Committee. As explained in Robert's Rules of Order, 'A committee that is a subset of a larger committee is called a subcommittee. Committees that have a large workload may form subcommittees to further divide the work. Subcommittees report to the parent committee and not to the general assembly.'" [Art. 9 Sec. 52]. Instead, Jones (a) did not reply to Martinez's request, (b) Jones repeatedly met with the Chairs of the Subcommittees, and (c) Jones scheduled Subcommittees' presentations to the Department without consulting Martinez. Jones' conduct deterred Martinez's protected activity.

59. On February 25, 2019, Jones gave Martinez a verbal reprimand in a meeting on false grounds, and warned him about being potentially reported to Human Resources for his conduct. Jones scheduled Martinez to meet with her. Without alerting Martinez, Jones also included her Administrative Manager, Arturo Flores, to take notes of the meeting. Jones showed Martinez a printout of one paragraph from his group email of February 18, 2019: "I was at the Department meeting many months ago when Abena [Osseo-Asare] tried to present to our department the numerical data that she had painstakingly compiled with Jerry Larson about pre-1800 courses. She told me after the meeting that Julie [Hardwick] abruptly did not allow her to present that data, and I saw that Abena therefore felt exasperated and disenfranchised. Later Julie or Nancy Sutherland sent everyone a cursory email saying that there was no potential problem with enrollments if we do the pre-1800 requirement, but giving no numerical data." *See* Exhibit 30. Jones then asked Martinez why he had written "that Julie is racist toward Abena?" Martinez was surprised by Jones' mischaracterization  and replied that his email made no such claim, but instead plainly described what happened. Jones warned Martinez that "certain faculty are considering reporting you to Human Resources." Martinez again clarified that what he wrote was fair and that he was merely standing up for Professor Abena Osseo-Asare, who at the time of that interaction was an Assistant Professor without tenure whereas Hardwick was a full professor. Jones insisted that Martinez "should not" criticize Hardwick, and that he should not use names when writing emails. Jones then repeated the claim about reporting Martinez to Human Resources. Martinez advised Jones that she or

anyone was welcome to report him because he did nothing wrong and because all of his email correspondence was fair. *See* Exhibit 33.

60. On March 10, 2019, Jones again claimed that Martinez had been "denigrating" women: "Some of the email correspondence surrounding our Equity initiatives this semester contain pointed references to individual colleagues (coincidentally, mostly women) in a way that apparently seeks to embarrass or denigrate them." *See* Exhibit 34.  In that email, Jones required that Martinez and others no longer name individuals in emails. Since Jones had (1) recently reprimanded Martinez about what he wrote in one sentence about Hardwick, (2) this was the third time Jones used the same word "denigrate," and (3) Jones that same day told Martinez not to specify names in emails, it was clear that Jones was again criticizing him.

61. On March 20, 2019, Jones emailed Martinez a written reprimand, about their meeting a month prior. Jones wrote: "This is to note that you and I met on the afternoon of Monday, Feb. 25. (Art [Flores] was there and took notes.) I discussed what I felt were inappropriate references to specific colleagues in some of the emails you have sent as Chair of the Equity Committee. Disparaging colleagues in emails to the committee list-serv is divisive and inappropriate, especially when at least some of the claims are misleading or false. Certainly we can discuss departmental policy and procedures without denigrating individuals." *See* Exhibit 35.

62. That evening, Martinez replied to Jones: "your account is much too incomplete and doesn't fairly capture my statements. For example, I did not denigrate anyone." Martinez provided Jones a typewritten version of his memo

summarizing the February 25th meeting and added: "I was shocked and very upset when you decided to appoint the chairs of every subcommittee of my committee without even consulting me or the members of the committee. Since the Equity Committee was created mainly to deal with questions of Diversity and Inclusion in our department governance, and since you and the department faculty selected and approved me to chair the Equity Committee in an open faculty meeting, it was very disappointing to me that months later you appointed someone else to chair the discussions on governance. It shows an unwarranted lack of trust." Martinez concluded: "To end this long email, I have to frankly ask and advise you, as the Minority Liaison Officer [Martinez] to our Department, to please spend more effort on extending trust to individuals such as myself, and to please encourage, welcome, and incorporate more individual faculty input in our governance. This is a concern that other faculty have repeatedly voiced, as Abena herself stressfully and critically requested in our recent department meeting on governance." *See* Exhibit 36.

63. In March 2019, Martinez discovered that Jones was personally investigating whether Martinez had an inappropriate relationship with a graduate student. Having heard a rumor, Prof. Jorge Cañizares-Esguerra met with the Graduate Program Administrator, Marilyn Lehman, on March 22, 2019, to ask about this rumor that Martinez was being investigated for an inappropriate relationship. Cañizares-Esguerra informed Martinez that Lehman told him that Jones herself filed the complaint "because of Title IX." Yet, there was never an inappropriate relationship between Martinez and any graduate student. Yet the graduate student

herself informed Martinez by phone on March 25, 2019 at 8:45 p.m. that she was summoned to meet with Jones the next day. Martinez told the graduate student by text message and by phone that this was retaliation by Jones: "apparently JJ [Jones] wants to claim that I did something 'inappropriate' which is absurd. I think she's annoyed at the Eq. Committee or me, since she sent me an unwarranted email saying I was 'disparaging' profs which is false." *See* Exhibit 37. On March 27, 2019, Jones interrogated her as to whether Martinez had done anything inappropriate with her. The graduate student denied any such thing, and afterward called Martinez to tell him about Jones' questions. *See* Exhibit 38 (UT's Handbook of Operating Procedures 3-1022: "The individual who suspects a violation has occurred should not accuse or confront the individual directly or attempt to investigate the matter personally.").

64. Rumors regarding an ongoing Title IX investigation against Martinez continued for weeks, while Martinez waited to be interviewed. Two months later, on May 17, 2019, an investigator with the University's Office for Inclusion and Equity ("OIE") finally emailed Martinez stating that an anonymous complaint was made against him regarding the allegation of a "relationship with a female graduate student." *See* Exhibit 39 at p. 3-4. Martinez replied that there was no such relationship and that this allegation was retaliation by Jones. *See* Exhibit 40. When interviewed by OIE (with counsel) regarding the anonymous complaint, Martinez learned that this claim of a "violation of the University's Consensual Relationship policy" had been made in January 2019. Seven months later, on August 20, 2019, the OIE investigator finally delivered the results of "an

extensive" inquiry, which exonerated Martinez from the allegations, finding that "the evidence did not substantiate a policy violation." *See* Exhibit 41.

65. Unfortunately for Dr. Martinez, Jones' retaliatory conduct continued. On April 22, 2019, Martinez received email correspondence from another OIE investigator, providing him official "Notice of [a Formal] Investigation." *See* Exhibit 42. In this case, Jones accused Martinez of stating that Jones only gave promotions in the History Department to Jewish faculty members, and that such statements have caused a "toxic environment" and sowed division between Jewish and non-Jewish faculty. *See* Exhibit 42. This, too, was entirely false. Martinez replied the next day, denying such allegations as entirely false, stating that Jones' allegations were "retaliation" for his work in the Equity Committee, and he submitted 169 pages of highlighted emails to OIE as evidence that Jones was enacting retaliation. *See* Exhibit 43.

66. Prima facie, the allegation was absurd, because (a) "Martinez" is a Jewish Hispanic last name, (b) Martinez is one of the only faculty who teaches an entire course on a Jewish person, Albert Einstein, eight times since 2005, (c) Martinez has taught two courses on "Scientists and Religion in History," including Judaism, (d) Martinez has taught about the Holocaust in sixteen additional courses since 2006, and (e) none of Martinez's hundreds of students or coworkers ever claimed that he said anything against Jewish people.

67. Martinez then sought counsel and asked OIE to inform him of the facts underlying the investigation, in accord with OIE policy, that is: Who claimed that Martinez said what to whom, where, and when? However, the OIE investigator

only replied "The alleged statement was provided by an anonymous third party on or about March 27, 2019." *See* Exhibit 44. OIE's reply did not state the alleged "facts" to which university policy entitled Martinez: to whom did Martinez allegedly say such things, where, and when?

68. Martinez and counsel met with the OIE investigator on May 6, and Martinez again denied all such allegations, and reiterated his statement that these smears were retaliation by Jones for his work on equity.

69. It took eight months, since Jones' allegation, until finally, on September 19, 2019 Martinez received the OIE Formal Investigation Report. *See* Exhibit 45. It states that on March 27, 2019 Jones made (1) "allegations of race and religious discrimination against Alberto Martinez," claiming that that Martinez (2) "made alleged anti-Semitic statements" to a graduate student that she [Jones] shows (3) "favoritism towards Jewish colleagues, and appoints them to positions of administrative influence and power in the department because of their race and/or religion." Jones further alleged that Martinez told the student that Jones (4) "only promotes and appoints faculty colleagues who are Jewish." Jones further claimed that the alleged statement (5) "caused a toxic environment in the Department of History between Jewish and non-Jewish colleagues." Jones claimed that the graduate student told her that Martinez said that (6) Jones is Jewish, that (7) she is "Head of the Jewish Kabbalah," and that there was (8) "a conspiracy against non-Jewish faculty." Martinez denies all of these allegations as false, absurd, and offensive.

70. OIE interviewed the anonymous graduate student. However, that interview does not echo most of the allegations enumerated above. Instead, that person alleged to OIE that Martinez asked "Did you know that Jackie Jones was Jewish?" while discussing leadership and salary disparities of History Department faculty employees, allegedly to suggest that Jones was biased and favored Jewish faculty. Again Martinez denies these allegations as absurd. OIE formally interviewed three History faculty members as witnesses. None of them claimed that Martinez said anything at all about Jewish faculty. None of them claimed that there was a pattern of Jewish faculty in positions of leadership. None of them claimed that Martinez created divisions between Jewish and non-Jewish faculty. None of them claimed that Martinez created a toxic environment. Instead, all three witnesses explained that the Equity Committee found disparities in salaries. Witness 1 referred to Jones's "refusal to implement a process that would increase equality." Witness 2 claimed that Jones has "favorites" in the faculty, "including white and black." Witness 2 claimed that Jones "is in a position to help 'her own' which the witness defines as the Department favorites." Witness 3 claimed that Jones appointed Subcommittees "which took away their [Equity Committee] power to effectuate change." *See* Exhibit 45.

71. OIE ultimately concluded as follows: "None of the witnesses indicated that they experienced individually or witnessed inappropriate comments by Respondent [Martinez] regarding Complainant [Jones]," and that "none heard anti-Semitic or derogatory comments towards Complainant or Jewish faculty." The evidence did not corroborate the allegations. To the contrary, the faculty witnesses asserted that

Jones manifested favoritism in departmental appointments and that she undermined Martinez's efforts to implement equity. *See* Exhibit 45.

72. Throughout the course of these absurd investigations Martinez repeatedly advised OIE investigators that he believed Jones's allegations were retaliation against him for engaging in protected activity through his work in the Equity Committee.

73. By April 2019, Martinez was very disturbed that Jones was actively making consecutive, false allegations against him: (1) On February 25, 2019, Jones claimed that Martinez wrote that another faculty member, Hardwick, was "racist" toward another, Osseo-Asare; (2) On March 10, 2019, Jones claimed that Martinez generated disparaging and denigrating things about female faculty; (3) On March 20, 2019, Jones claimed Martinez wrote disparaging, false, and denigrating things about faculty; (4) On March 27, 2019, Jones personally investigated whether Martinez had an inappropriate relationship with a graduate student; and then (5) On April 2, 2019, Jones filed a complaint with OIE alleging that Martinez made divisive anti-Semitic claims. Jones made these five false allegations in a span of five weeks.

74. Martinez was a faculty member in good standing in UT's History Department. His most recent evaluation, for 2017-18, stated: "Exceeds Expectations." The Dean and the Provost awarded him a Faculty Investment Initiative raise in Fall 2018. Among 63 faculty members in the History Department, Martinez was the 14th most productive in scholarly publications. In April 2018, Martinez was honored to be elected by university faculty to be a member of Faculty Council and he was elected to serve three years on UT's Committee of Counsel on Academic

Freedom and Responsibility. He also earned high teaching evaluations and, in the summer of 2018, Jones offered to nominate him for the President's Associates teaching award (although later she did not).

75. In 2017-18, Jones had appointed Martinez as fellow of the John E. Green Regents Professorship (research funds) in 2017-18. In May 2019, without explanation, Jones chose not to renew Martinez's appointment, and instead awarded that Professorship to Julie Hardwick, who had a lower scholarly productivity than Martinez or Zamora, and coincidentally, was the only faculty member who had written that Martinez's draft Report of October 15, 2018 "creates further murkiness," "exacerbates equity issues," "is offensive," "is a chaotic mess," "mean spirited," "shows an utter lack of respect," and "suggest[ed] you [Martinez] withdraw this report."). *See* Exhibit 12. Martinez felt targeted and marginalized and, therefore, he did not finish his revision of the draft "Report: Equity in Salaries and Raises" of October 15, 2018. The draft had identified substantive inequities in salaries and lack of inclusion and equal opportunities of certain employees, especially minorities, in the Department throughout a 15-year period. Martinez and the seven members of the Equity Committee carried out this review not to blame or accuse anyone, yet Jones' actions obstructed and deterred the completion of this report.

76. Since Jones did not reply to Martinez's request that the Subcommittees should report directly to the Equity Committee, not to Jones or the Department, Martinez felt disenfranchised and marginalized, as Jones then also did not invite Martinez to her meetings with the Subcommittee Chairs, did not consult him to schedule

the subcommittee reports, did not send him any direct emails, and no longer asked to meet with him individually.

77. At the same time, Martinez also felt targeted and offended because Jones made false accusations against him: about disparaging faculty, about dividing Jewish faculty from non-Jewish faculty, and because Jones herself investigated whether Martinez had an inappropriate relationship with a graduate student. Naturally, Martinez felt frustrated, stressed, confused, smeared, and disregarded. Jones' actions discouraged and dissuaded Martinez from completing his Report on Salaries along with needed reforms of inclusion in the History Department's leadership.

78. Additionally, Jones impeded Martinez from heading the analysis of issues of equity in the Department's promotions. *See* Exhibit 24. In May 2018, Jones appointed Martinez to lead this process in 2018-19. Yet, in January 2019, Jones unilaterally appointed Professor Madeline Hsu to be Chair of the Equity Subcommittee on Promotions. The following summary explains how Hsu subsequently obstructed Martinez by repeatedly ignoring his input.

79. On April 19, 2019, Hsu wrote, "Overall, in the 27 cases of promotion processed by the History Department 2009-2019, this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender." *See* Exhibit 46. However, Martinez proposed that this sentence be deleted because the evidence was not so clear when all cases of promotions are taken into account. For example, from 2009-19, promotions for Hispanics were only 3/7, or 43%.

Similarly, Martinez was concerned that women received tenure at lower rates than men:

> *2009-2019 : Individuals promoted to tenure in the History Department. Women received fewer promotions than men, in all groups:*

| 66% of men | | 60% of White men | | 75% Men of color |
|---|---|---|---|---|
| 56% of women | | 50% of White women | | 60% women of color |

Unlike Hsu, Martinez would have written that it is problematic that rates of promotion among women were all lower, and rates of promotion among Hispanics were unacceptably low. Unlike Hsu, Martinez would have also stated that the only rejection of a promotion to full professor was a Hispanic professor in 2009 (Neil Foley); Martinez wrote it, but Hsu omitted it. *See* Exhibit 47. In Martinez's opinion, such omissions hid the raw numbers from further scrutiny and undermined the purpose of the Equity Committee in this regard.

80. Likewise committee members complained that Hsu excluded data about some employees; for example, on April 27, 2019, Lina del Castillo wrote: "Madeline, it is concerning to me that you do not agree that we should include statistical information on all the people hired as assistant professors." *See* Exhibit 48.

81. On April 30, 2019, the History Department (Hsu via Llado to faculty, April 30, 2019), circulated a draft Report to 60 faculty members. Yet this version by Hsu differed significantly from what the members of the subcommittee (including Martinez) had approved; *see* Exhibit 49, Raby to Hsu et al., May 7, 2019: "Madeline, I'm disappointed that the version of the report that this subcommittee last saw is not the version that actually went out to the department." Hsu also

failed to include the corrections submitted by Martinez on April 28, 2019 (as a

Word doc) and again on April 29, 2019 (as a pdf).

82. At a faculty meeting on May 1, 2019, Martinez voiced corrections to Hsu's draft

Report, e.g., that it incorrectly highlighted 66% instead of 61% as the tenure rate

for applicants to tenure. (The Department's tenure rate of 61% was far below the

total University tenure rate of 83%.) More importantly, Martinez emphasized "a

troubling fact that only 52% of our Assistants were tenured while the rest left

without it, and I said that our department should confront this fact." *See* Exhibit

50, Martinez to Raby and del Castillo, May 6, 2019.

83. Furthermore, on May 6, 2019, Jones via Flores circulated the same draft Report to

59 faculty members, again, without any of the corrections conveyed by Martinez

on April 28, April 29, or May 1, 2019. Hsu removed the fact that, in the History

Department, only 52% of all Assistant Professors gained tenure, by demoting it to

a footnote, justified by a false pretext: "This information is noted but not included

in the main report because Vice-Provost for Diversity, Edmund T. Gordon,

categorizes cases where faculty have not produced monographs as not involving

issues of equity or diversity as individual faculty are responsible for meeting

stipulated workplace standards." *See* Exhibit 51. Contrary to Hsu's interpolation,

all subcommittee members had agreed that this data was important and should be

included in the report. Therefore, Martinez contacted the Vice Provost for

Diversity directly on May 6, 2019. Martinez wrote: "For clarity, do you actually

agree that such information should be excluded from our report, or is Madeline

[Hsu] invoking your name without having actually asked you?" *See* Exhibit 52.

Vice Provost Dr. Gordon replied: "I do not remember ever saying anything like this. Certainly not in the context she places it. Where does she claim to have gotten it from? She has not talked to me about this issue as far as I can recall. The 52% is certainly pertinent to discussions of the retention of diverse faculty members. It is directly pertinent to the tenure rate if there is evidence that the three left because they were counseled out or otherwise were made to believe that they would not be promoted if they had stayed and gone up." *See* Exhibit 53.

84. On May 7, 2019, Raby complained to Hsu: "I request that you also accept the other corrections to data (such as the inverted counts of minorities and women) and name spellings that Al [Martinez] has taken the time to make. I also strongly request that you remove the citation of Ted Gordon who clearly does not agree with this characterization of his position." *See* Exhibit 49. On May 11, 2019, Hsu shared her final draft of the Report, where, again and without explanation, Hsu refused to use accurate numerical data provided repeatedly by Martinez. Therefore, Martinez did not approve what Hsu wrote. *See* Exhibit 54, email, Martinez to Raby and Del Castillo, May 12, 2019: "I did read the report that Madeline sent, but once I saw that she still strangely refused to fix the wrong numerical data in her section, such as the line about 'Of the promoted faculty, 10 of 21 were women and 11 of 21 were persons of color,' I decided that I can't keep arguing over this. I asked her directly 3 times by email to fix it and Megan firmly asked her too. It's so bizarre that I actually spent a while again today trying to figure out if there's any way in which Madeline's count is right, and I couldn't find any. Once again, I count: 24 promotions overall (including 3 individuals who

were promoted twice), 12 cases of promoted minorities (10 individuals who are minorities, and two were promoted twice). Thus, 24-3 = 21 individuals were promoted (including 12 women, and 10 minorities)." Similarly, Hsu wrongly stated that 60% (6/9) of men were tenured, whereas Martinez had correctly written 6/9 = 66%."

85. In the final version of the Report, Hsu again wrote: "this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender." *See* Exhibit 55. However, as noted above, Martinez would not have written this claim because the rate of 43% success in promotion cases for Hispanics, and 56% of women promoted, were concerning, and far below University averages. Accordingly, the authors of this section of the report on Promotions to Tenure, Megan Raby and Lina del Castillo wrote: "the authors of this section of the report would like to append to the subcommittee chair's statement that 'this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender' the qualification that the data we currently have is ambiguous." *See* Exhibit 56. In essence, Hsu highlighted her preemptive conclusion that no patterns of discrimination were present while understating or omitting underlying data.

86. Jones impeded Martinez from heading the analysis of issues of equity in the Department's governance. In May 2018, Jones had appointed Martinez to lead this very process in 2018-19. To that end, Martinez collected 15 years of data, and his Committee created and carried out a Climate Survey for the faculty. On January 30, 2019, Martinez reiterated his desire to lead this labor. Yet, on January

31, 2019, Jones unilaterally appointed Professor Jeremi Suri to be Chair of the Equity Subcommittee on Governance.

87. Suri carried out the role differently than what Martinez would do. This is not meant to criticize Suri, but to underscore that Jones thus impeded Martinez from preparing a Report on Governance based on the data: the tables stating which faculty members had participated in which administrative and service roles throughout 15 years (tables included in Martinez's draft Report of October 15, 2018), and, the numerical data and verbal faculty input collected in the Climate Survey designed by Martinez and the Equity Committee and completed by faculty in February 2019. Martinez provided data to the Subcommittee on Governance showing that in 15 years appointments to the Executive Committee were very unbalanced, especially for the lack of inclusion of faculty who are minorities. *See* Exhibit 57. The Report by Suri did not discuss discrimination or marginalization directly, but it specified: "Goal: To increase transparency, representativeness, equity, and diversity in appointments to department committees and other positions of department responsibility." *See* Exhibit 58. It proposed that creating a new committee on departmental appointments would help toward "discouraging entrenched interests."

88. In a Department meeting of May 16, 2019, Suri warmly thanked everyone who served on the subcommittee (including Martinez) and he frankly said, "I did not want to be Chair of this subcommittee." This again shows that Jones obstructed Martinez who did want to continue doing this labor, by replacing him with someone who did not.

35

89. In summer 2019, Jones received recommendations from a committee headed by Hsu to appoint faculty to departmental positions. However, as Chair of the Department, it remained entirely within Jones's purview to appoint anyone of her predilection to any position. Therefore, it is Jones's responsibility that she then removed Martinez from the Salary Committee and from the Equity Committee, contrary to his written requests.

90. Meanwhile, Martinez had found out that the false allegation that he made anti-Semitic statements had reached several of his coworkers.

91.  Feeling disenfranchised and alienated, Martinez did not attend the "end of the year" May 2019 faculty gathering, and he stopped attending faculty meetings in 2019-2020, and he avoided the History Office, until Jones stepped down from her role of Department Chair.

92. On October 8, 2019, Martinez was nominated for UT's Civitatis Award for outstanding service: nominated by 107 faculty and administrators, including Chairs, Directors, Deans, Vice Presidents, Vice Provosts, and professors from more than 54 departments and units, plus many students, and including the Vice President for Diversity Leonard Moore, and the Vice Provost for Diversity, Ted Gordon. See Exhibit 59. However, in a meeting with seven Hispanic faculty members, on October 10, 2010, Ted Gordon told them that after he signed the nomination in favor of Martinez he received emails and phone calls with awful allegations about Martinez. Importantly, OIE's investigations had already exonerated Martinez. Afterward, Martinez informed Gordon about his retaliation

and discrimination complaint. Despite the strong nomination, Martinez did not receive the award. *See* Exhibit 60.

93. On October 24, 2019, Martinez informed Jones' supervisor, Dean Ann Stevens, that he had sent a complaint of retaliation to the EEOC against Jones, explaining: "I could have made a bigger difference in helping to solve some inequities in [the Department of] History but unfortunately I was marginalized in the process and worse. Therefore in the end I had to defend myself against offensively false accusations by filing a formal complaint at the EEOC and the Texas Workforce Commission." Martinez sent a copy of his complaint to Stevens, which included the request that another supervisor be assigned to Martinez, not Jones. This accommodation was not made.

94. The consequences of false accusations with OIE are permanent. OIE propagated allegations during its investigations, by informing multiple interviewees as potential witnesses of the allegations against Martinez yet without subsequently informing them that such accusations were unsubstantiated and that there were no violations of policies or laws.  In this way, the damage to Martinez's professional reputation is permanent. For example, in March 2019, Martinez nominated himself to be the new Chair of the History Department, along with two other individuals, Jorge Cañizares-Esguerra and Jeremi Suri. The Chair of the Search Committee was Daina Berry. Allegations against Martinez, regarding alleged violations of Title IX, arose during a survey of faculty feedback on Martinez's interview, and also during a meeting of the Search Committee. In the end, the Dean chose to hire none of the three nominees, but to hire the Chair of Search

Committee. Martinez complained to Dean Stevens, in writing, that the process was "a conflict of interest," because the person who headed the job search, Daina Berry, was given the job. Dean Stevens offered to share any documents, but when Martinez requested the report about him, and the faculty's remarks about him, Dean Stevens did not send the documents.

## V. <u>FIRST CAUSE OF ACTION: TITLE VII</u>
### *Title VII: Retaliation*
**42 U.S.C. § 2000e-5(f), et seq.**

95. Plaintiff realleges and incorporates all the allegations contained in the preceding paragraphs of this Petition as though fully rewritten herein.

96. Plaintiff has exhausted the federal administrative remedies in this cause by filing a complaint with the Equal Employment Opportunity Commission ("EEOC") regarding the Defendant's alleged discriminatory conduct. The EEOC issued a Notice of Right to Sue letter, dated August 27, 2020, which Plaintiff received on August 31, 2020. *See* Exhibit 61.

97. Plaintiff's participation and leadership in the Department's Equity Committee constitutes a protected activity under Title VII. The below-described actions were taken against Martinez in retaliation for that protected activity:

98. Jones, using her power as an official and supervisor, retaliated against Professor Martinez by proposing to "disband the Equity Committee."

99. Jones further retaliated against Professor Martinez by falsely and repeatedly accusing him of writing "disparaging" and "denigrating" statements about women coworkers.

100. Jones retaliated against Professor Martinez by falsely accusing him with having a harmful and ongoing pattern of "Sexual Misconduct" with graduate students.

101. Jones retaliated against Professor Martinez by falsely accusing him of making "anti-Semitic statements."

102. Jones retaliated against Professor Martinez by falsely accusing him of creating a "toxic" and "divisive" work environment, and of dividing Jewish and non-Jewish employees.

103. Jones retaliated against Professor Martinez by assigning major parts of his duties to other employees, contrary to his federal right to continue his protected activities.

104. Jones retaliated against Professor Martinez by not meeting with him once she had delegated his duties to two other employees.

105. Jones retaliated against Professor Martinez by rejecting his input in formulating the goals of the subcommittees of his committee, and disregarding his input and corrections to the chairs of the subcommittees.

106. Jones retaliated against Professor Martinez by enabling the subcommittees of his committee to report directly to the Department, contrary to Martinez's request.

107. Jones retaliated against Professor Martinez by removing him from the Equity Committee and from the Salary Committee in Fall 2019.

108. Moreover, after Professor Martinez filed his charge of retaliation with the EEOC, asking UT to remove Jones from her position, UT chose not to assign a new supervisor to Martinez, contrary to his EEOC request.

109. Therefore, in her actions against Professor Martinez, Jones manifested multiple typical signs of retaliation: Suspicious Timing, False Pretexts, Change of Treatment, Disparate Treatment, Bias, Vague Pretextual Accusations, and Other Actions that Deterred his Protected Activities. Based on the timing of the above-described events and subsequent adverse actions taken by Department Chair Jones, it is clear that Jones' wrongful conduct was the direct and proximate result of Martinez having engaged in a protected activity. Thus, Jones' acts constitute unlawful retaliation in violation of federal and state employment practices.

110. Jones's retaliatory acts were materially adverse, and such acts would dissuade a reasonable person from engaging in a protected activity.

111. Jones's conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard to Professor Martinez's rights, entitling him to punitive damages.

112. By reason of the continuous nature of Jones's retaliatory conduct, Professor Martinez is entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

113. As a result of Defendant's unlawful retaliation, Plaintiff has suffered harm, including but not limited to humiliation, embarrassment, emotional and physical distress, and mental anguish.

114. Plaintiff is entitled to all legal and equitable remedies available for violations of Title VII, including compensatory damages, punitive damages, and other appropriate relief. *See, e.g.,* 2 U.S.C. § 1311(b)(1)(B).

115.     Plaintiff further seeks attorneys and experts' fees pursuant to 42 U.S.C. §

2000e-5(k). *See also* 42 U.S.C. § 1988(b)-(c).

**VI. SECOND CAUSE OF ACTION: TITLE VII**
*Title VII: Unlawful Discrimination Based on National Origin (Ethnicity)*
**42 U.S.C. § 2000e-2, et. seq.**

116.  Plaintiff realleges and incorporates all the allegations contained in the preceding

paragraphs of this Petition as though fully rewritten herein.

117.  Professor Martinez is one of the most productive members of the Department, in

terms of scholarly publications; as noted in the data he collected in his Report

on Salaries, and also by his own supervisor Jones on November 30, 2017.

118.  Professor Martinez has taught more courses than most faculty in the Department

in the last 15 years.

119.  According to UT Austin IRRIS data records, Hispanic full Professors at UT

Austin, like Professor Martinez, have been paid 12% less than their non-

Hispanic White peers at least from 2010 to 2019.  *See* Exhibit 62.

120.  Defendant acknowledged in an email of November 30, 2017, that Martinez was

one of the most underpaid faculty, whose salaries are "highly compressed."

121.  Defendant never appointed, or offered to appoint, Professor Martinez to any

positions of Departmental leadership which entail annual raises, just as she only

appointed non-Hispanic faculty to such positions, every year. Similarly, her

predecessor only appointed non-Hispanic faculty to such positions, every year.

122.  Even after Professor Martinez and other Hispanics pointed out, in writing and in

person, in May 2018, that Hispanic faculty were constantly excluded from all

such positions every year, Defendant persisted in not appointing any of them to

such positions.

123. Despite his painstaking labors, every year Martinez is compensated less than

many peers in his Department.

124. Every year, Defendant and the Dean of Liberal Arts had the power and ability to

assign raises.

125. Defendant had the obligation to enforce state and federal laws of equal pay and

equal employment opportunities, yet Defendant did not.

126. Defendant marginalized and underpaid Professor Martinez because of his

ethnicity.

127. Defendant has therefore violated Title VII.

## VII. <u>ATTORNEY'S FEES</u>

128. Plaintiff realleges and incorporates all the allegations contained in the preceding

paragraphs of this Petition as though fully rewritten herein.

129. Pursuant to 42 U.S.C. § 2000e-5(k), request is made for all costs and reasonable

and necessary attorney's fees incurred by Plaintiff herein, including all fees

necessary in the event of an appeal of this cause, as the Court deems equitable

and just.

## VIII.  <u>CONCLUSION</u>

130.      The EEOC specifies that "[a]n interpretation of Title VII that permits

some forms of retaliation to go unpunished would undermine the effectiveness of

the EEO statutes and conflict with the language and purpose of the anti-retaliation

provisions." Because UT and its Office for Inclusion and Equity failed to

adequately address Dr. Martinez's complaints as outlined above, it is incumbent upon the enforcement agencies to rectify the many wrongs committed by his supervisor, Department Chair Jones. Jones' conduct as outlined in great detail above demonstratively establishes retaliation in violation of the above-referenced EEO and State statutes. The temporal proximity of the events described to Martinez's work in the Equity Committee, protected activities, plus the statements of witnesses to OIE, give rise to the very reasonable inference that Jones engaged in wrongful conduct with the intent to dissuade Martinez from further protected work. As a result, Martinez seeks all available remedies from the enforcement agencies.

131.     This case is important not only because such retaliation must always be reported and penalized, but because it involves equity for esteemed Hispanic faculty at a major public university. The disparities in salaries as outlined above go far beyond UT's History Department. On Nov. 3, the Editorial Board of the largest newspaper in the city, *The Austin American-Statesman*, published a joint Editorial stating: "This cannot stand. We urge the university [UT Austin] to take this report [the Hispanic Equity Report, co-authored by Martinez] as a wake-up call and make clear, in words and deeds, that contributions by all faculty are welcome, valued and necessary to UT's success. That must start with providing Hispanic faculty members equal pay and equal opportunities for advancement." See Exhibit 63. Likewise, on January 22, 2020, the Editorial Board of *The Houston Chronicle*, the third largest newspaper in the nation, declared in a joint Editorial that the disparities affecting Hispanic professors at UT Austin are

"Unacceptable." *See* Exhibit 63. Multiple other newspapers statewide and nationwide have likewise reported about the inequities affecting Hispanic professors at UT Austin, thanks to the protected labors of Professor Martinez.

132.     In the course of seeking to correct longstanding, systemic disparities in opportunities and pay for Hispanic faculty at UT, Martinez's work through the Equity Committee represents the kind of core protected activity for which State and Federal law prohibit retaliation. And yet, Martinez's work in this regard led his employer and supervisor to engage in a relentless campaign to deter protected activity from taking place. Such unlawful conduct cannot continue and must be corrected by the appropriate State and federal agencies as requested herein.

## VIV.  DAMAGES

133.     Plaintiff seeks all damages allowed under the law, including monetary relief, and:

   a.   Plaintiff seeks an injunction prohibiting Defendant from engaging in unlawful practices.

   b.   Plaintiff seeks additional equitable relief as may be appropriate such as a raise to parity with White comparators, promotion, front pay, and court costs.

   c.   Plaintiff seeks compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, stress, and other nonpecuniary losses.

   d.   Plaintiff seeks reasonable attorney's fees and costs, including reasonable expert fees.

    e.  Plaintiff seeks pre- and post-judgment interest at the maximum rate allowed by law.

## X.  JURY DEMAND

135.      Plaintiff demands trial by jury on all issues and defenses in this case.

## XI.  PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiff respectfully prays that Defendant be cited to appear and, that upon a trial on the merits, that all relief requested be awarded to Plaintiff, and for such other and further relief to which Plaintiff is justly entitled.

Respectfully submitted,

DAVID K. SERGI AND ASSOCIATES, P.C.

*/s/ Katherine Frank*

**KATHERINE FRANK**
Texas Bar No. 24105630
Email: katie@sergilaw.com
329 S. Guadalupe St.
San Marcos, TX 78666
Tel. (512) 392-5010
Fax. (512) 392-5042
COUNSEL FOR PLAINTIFF
ALBERTO MARTINEZ