# Exhibit 1

## ALBERTO A. MARTINEZ

### Curriculum Vitae

Department of History
The University of Texas at Austin                         phone 512-517-2755
128 Inner Campus Drive, B7000                            fax +1 512-475-7222
Austin, TX  78712                                        almartinez@austin.utexas.edu

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| 2020 – present | Fellow, American Physical Society |
| 2015 – present | Professor, Department of History, University of Texas at Austin |
| 2017 – 2018 | Fellow of the John E. Green Regents Professorship in History |
| 2014 – present | Director, Certificate Program in History and Philosophy of Science, University of Texas at Austin |
| 2010 – 2015 | Associate Professor, Department of History, University of Texas at Austin |
| 2008 – 2010 | Assistant Professor, Department of History, University of Texas at Austin |
| 2005 – 2008 | Lecturer, Department of History, University of Texas at Austin |
| 2004 – 2005 | Weisman Instructor in History of Science, California Institute of Technology |
| 2003 – 2004 | Research Associate, Dibner Institute at M. I. T. |
| 2003 – 2004 | Research Fellow, Center for Philosophy and History of Science, and Center for Einstein Studies, Boston University |
| 2001 – 2003 | Postdoctoral Fellow, Dibner Institute for the History of Science and Technology, M. I. T., Cambridge, Massachusetts |
| 2001 – 2003 | Postdoctoral Fellow, Department of History of Science, Harvard University |
| 2001 | Resident Scholar, Dibner Library of the History of Science and Technology, National Museum of American History, The Smithsonian, Washington D.C. |

## EDUCATION

| | |
|---|---|
| 2001 | Ph.D.  University of Minnesota, Minneapolis: History of Science and Technology; Minor: Philosophy of Science  4.0 |
| 1995 | M.A.  New York University: Philosophy of Physics, Gallatin School, New York City, plus courses at Vassar College and the City University of New York  3.9 |

1992    B.A.  Universidad de Puerto Rico, Río Piedras, Puerto Rico: Estudios Generales, *magna cum laude*  3.8

## ACADEMIC AFFILIATIONS

2018-present   Affiliated Faculty, Lozano Long Institute of Latin American Studies

2009-present   Affiliated Faculty, The Thomas Jefferson Center for the Study of Core Texts and Ideas, College of Liberal Arts

2005-present   Affiliated Faculty, UTeach, College of Natural Sciences

2011-present   Affiliated Faculty, Human Dimensions of Organizations, College of Liberal Arts

## BOOKS

1.  ***Burned Alive: Giordano Bruno, Galileo and the Inquisition***                    (peer reviewed)
    (London: Reaktion Books, 2018), distributed by University of Chicago Press:
    http://press.uchicago.edu/ucp/books/book/distributed/B/bo28433424.html

2.  ***The Media versus the Apprentice: The Devil Mr. Trump***
    (Saltshadow Castle: Cambridge, 2019), iv+ 337 pp.  Featured on national TV news:
    http://fullmeasure.news/news/politics/the-media-and-trump

3.  ***The Cult of Pythagoras: Math and Myths***                    (peer reviewed)
    (Pittsburgh: University of Pittsburgh Press, hardcover, 2012), xxiv + 264 pp. (288 pp.).
    http://www.martinezwritings.com/m/Cult.html

3a. Paperback edition: *The Cult of Pythagoras: Math and Myths* (Pittsburgh: University of Pittsburgh Press, 2013), xxiv + 264 pp. (288 pp.).

Reviewed in: *American Mathematical Monthly*, 121:8, Oct. 2014, pp. 746-748, *Choice* 50, May 2013, p. 1; *Heinz History Center*, 2013, p. 1; *International History, Philosophy and Science Teaching Group: Newsletter*, July 2013, pp. 28-31; *Library Journal*, 137:17, Fall/Winter 2012, p. 7; *Mathematical Association of America Digital Library*, March 2013, pp. 1-2; *Mathematical Gazette*, March 2014, pp. 151-152; *The Mathematical Intelligencer*, 35:4, December 2013, pp. 81-82; *Mathematics Teacher*, 108:1, August 2014, p. 77; *Science & Education*, 22:9 (2013), pp. 2351-2355; *Texas Books in Review*, 32:3/4, Fall/Winter 2012, pp. 7-8; *ZentralblattMATH* (Germany), 2014, p.1. Academic Blogs: *Stephen R. Case, Historian of Science*, May 2014, p. 1-2; *Proceedings of the Friesian Academy*, 2013, pp. 11-14; Short Praise: *Athenaeum Boekhandel*, December 2012, p. 1; *The Alcalde*, March 2013, pp. 1-2; *Scientific American Book Club*, March 2013, p. 1; *The Chronicle of Higher

*Education*, Nov. 2012; p. 1; *Newsletter of the BIO-Oceans Association*, 56, October 2012; p. 5; *YBP Library Services*, April 2013, p. 1.

3b. Turkish translation: *The Cult of Pythagoras* (Turkey: Tübitak, The Scientific and Technological Research Council of Turkey, forthcoming).

4. ***Science Secrets: The Truth about Darwin's Finches，Einstein's Wife, and Other Myths***　　　　　　　　　　　　　(peer reviewed)
Pittsburgh: University of Pittsburgh Press, 2011) hardcover, xx + 324 pp. (344 pp.).
http://www.martinezwritings.com/m/ScienceSecrets.html

4a. Paperback edition, *Science Secrets: The Truth about Darwin's Finches, Einstein's Wife, and Other Myths* (Pittsburgh: University of Pittsburgh Press, 2012). (344 pp.).

4b. Japanese translation of *Science Secrets*: ニュートンのりんご，アインシュタインの神：科学神話の虚実 / Nyūton no ringo ainshutain no kami: kagaku shinwa no kyojitsu, trans. Naoko Nomura (Tokyo: Seidosha, June 2015). (405 pp.)

Reviewed in: *Annals of Science*, 71:2, 2014, 271-273; *Choice* 49, November 2011, p. 1; *Código Nuevo* (Spain), April 2014, *El Diari de L'Educació* (Spain, in Catalan), April 2014, pp. 1-3; pp. 1-2; *Isis* 103:2, June 2012, p. 387; *Materia* (Spain), January 2014, pp. 1-4; *Metascience*, 22:2, 2013, 509-511; *New Straits Times* (Malaysia), January 2012, pp. 1-4; *Physics in Perspective* 13:4, December 2011, pp. 495-497; *Physics World*, August 2011, pp. 38-39; *ShelfLife@Texas*, June 2011, pp. 1-4; ACM SIGACT News, Vol. 46, No. 2 (June 2015), pp. 13-15; *Yunnan Daily News* (China), June 2013, pp. 1-4; Academic Blogs, etc.: *Harvard Business Review Blog*, August 2011, pp. 1-2; *Panda's Thumb*, February, 2014, p. 1; *Steve Goddard's History Wire*, August 2011, p. 1; *Texas Book Festival*, 2012, p. 1; *YBP Library Services*, June 2011, p. 1-3.

5. ***Kinematics: The Lost Origins of Einstein's Relativity***　　　　　　(peer reviewed)
(Baltimore: Johns Hopkins University Press, 2009 hardcover), xix + 464 pp. (483 pp.).
http://www.martinezwritings.com/m/Kinematics.html

Reviewed in: *Choice* 47, December 2009, p. 1; *Contemporary Physics* 52:3, 2011, p. 258, *Physics in Perspective* 12:2, June 2010, pp. 236-238; *American Mathematical Society MathSciNet*, 2012, p. 1; *Historical Studies in the Natural Sciences*, 41:1, winter 2011, pp. 112-122; *Isis*, 101:3, September 2010, pp. 633-635; *Metascience*, 21:1 March 2012, pp. 131-134; *Science News*, 176:5, August 2009, p. 30. Other Academic Praise: *The Best Writing on Mathematics* (Princeton University Press 2011); *Historia Mathematica* 38, 2011, p. 575; *YBP Library Services*, 2010, pp. 1-2; *SciTech Book News*, August 2009, p. 1; *ShelfLife@Texas*, October 2009, p. 1; *Zentralblatt MATH* (Germany), 2010, p. 1.

6. ***Negative Math: How Mathematical Rules Can Be Positively Bent*** (peer reviewed) (Princeton: Princeton University Press, hardcover, 2006), x + 267 pp. (277 pp.). http://www.martinezwritings.com/m/NegativeMath.html

6a. Paperback edition, *Negative Math: How Mathematical Rules Can Be Positively Bent* (Princeton: Princeton University Press, 2014). (277 pp.).

6b. Japanese translation of *Negative Math:* Japanese translation:  負の数学：マイナスかける マイナスはマイナスになれるか? / *Fu no sūgaku : Mainasu kakeru mainasu wa mainasu ni nareruka*, trans. Yoshihiro Koya (Tokyo: Seidosha, 2007).

6c. Turkish translation of *Negative Math: Sıfırın Altında Matematik - Matematik Kurallarını Olumlu Anlamda Nasıl Bükebiliriz*, trans. Ekrem Emre Sezer (Turkey: Tübitak, The Scientific and Technological Research Council of Turkey, 2018), 278 pp. Paperback. http://esatis.tubitak.gov.tr/books/17911

Reviewed in: *American Scientist*, 94:3, May/June 2006, p. 283; *Choice* 43, May 2006 p. 1; *Books & Culture*, Jan/Feb 2009, pp. 1-4; *Convergence*: *Mathematical Association of America*, October 2006, pp. 1-2; *The Mathematical Gazette*, 91:520, March 2007, pp. 190-191; *The Mathematical Intelligencer*, 29:1, 2007, pp. 65-66; *Mathematics Teacher*, 100:2, September 2006, p. 159; *MathNEXUS*, August 2006, pp. 1-2; *SIAM News: Society of Industrial and Applied Mathematics*, 39:9, November 2006, pp. 7-9; *Plus Magazine: University of Cambridge*, 39, June 2006, pp. 1-3; *Publishers Weekly*, November 2005, p. 1; *ZentralblattMATH* (Germany), 2009, p. 1.  Other Academic Praise: *HubPages*, July 2006, p. 1; *PBS Teachers, Recommended Books Archive*, 2006; *Scientific American Book Club*, May 2006, p. 1; *UMAP Journal*: *Undergraduate Mathematics and its Applications*, 29:4, 2008, p. 407; *YBP Library Services*, March 2006, p. 1.

## BOOK CHAPTERS

7. "Dating Albert Einstein," chapter in *Curiosity's Cats: Writers on Research*, ed. Bruce Joshua Miller (St. Paul, Minnesota Historical Society Press, 2014), 48-72.

8. "Experiments and Experiences in Mentorship," *Looking Back as We Move Forward: The Past, Present, and Future of the History of Science: Liber Amicorum for Jed Z. Buchwald on his 70th Birthday* (New York City: INK, Inc., 2019), pp. 213-18.

## REPORTS

9. "Hispanic Equity Report," coauthored with Jorge Cañizares-Esguerra, Emilio Zamora, Gloria González-López, Francisco Gonzalez-Lima, Fred Valdez, Martha Menchaca, John Morán González (October 8, 2019), 188 pp.

## JOURNAL ARTICLES, Peer-Reviewed

10. "Melchior Inchofer, Giordano Bruno, and the Soul of the World," *Annals of Science* 76, No. 3-4 (July-Oct. 2019), 267-302.                                   (peer reviewed)

11. "Ten Censured Propositions in Giordano Bruno's Books," *Bruniana & Campanelliana* **22**, No. 2 (Fall 2016), 27-42.                                          (peer reviewed)

12. "Giordano Bruno and the Heresy of Many Worlds," *Annals of Science* **73**, No. 4 (October 2016), 345-374.                                                  (peer reviewed)

13. "Euler's 'Mistake'? The Radical Product Rule in Historical Perspective," *The American Mathematical Monthly* 114 (April, 2007), 273-285.                      (peer reviewed)

14. "Replication of Coulomb's Torsion Balance Experiment," *Archive for History of the Exact Sciences* 60 (2006), 517-563.                                        (peer reviewed)

15. "Conventions and Inertial Reference Frames," *American Journal of Physics* **73**, No. 5 (May 2005), 452-454.                                                 (peer reviewed)

16. "Handling Evidence in History: The Case of Einstein's Wife," *School Science Review*, Vol. 86, No. 316 (March 2005), 49-56.                                   (peer reviewed)

17. "Material History and Imaginary Clocks: Poincaré, Einstein, and Galison on Simultaneity," *Physics in Perspective* **6**, No. 2 (June 2004), 31-48.           (peer reviewed)

18. "Kinematic Subtleties in Einstein's First Derivation of the Lorentz Transformations," *American Journal of Physics* **72**, No. 6 (June 2004), 790-798.       (peer reviewed)

19. "Ritz, Einstein, and the Emission Hypothesis," *Physics in Perspective* **6**, No. 1 (April 2004), 4-28.                                                     (peer reviewed)

## ESSAY REVIEWS

20. "The Quantum Moment: How Planck, Bohr, Einstein, and Heisenberg Taught Us to Love Uncertainty, by Robert Crease and Alfred Goldhaber," *American Journal of Physics*, Vol. 83, No. 6 (2015), 573-575.

21. "The Questionable Inventions of the Clever Dr. Einstein," Essay Review of Jósef Illy's *The Practical Einstein: Experiments, Patents, Inventions,* in *Metascience*, Vol. 23, No. 1 (January 2014), 49-55.

22. "Revisiting the History of Relativity," Essay Review of Richard Staley's *Einstein's Generation: The Origins of the Relativity Revolution*, in *Metascience*, Vol. 20 (2011), 53-73.

23. "The Myriad Pieces of Einstein's Remains," Essay Review of *The Collected Papers of Albert Einstein*, Vols. 1 to 12, by John Stachel, Robert Schulmann, Diana Kormos Buchwald, et. al.," *Annals of Science*, Vol. 68, No. 2 (published online July 2010; published in print April 2011), 267-280.

24. "There's No Pain in the FitzGerald Contraction, Is There?" *Studies in History and Philosophy of Modern Physics*, Vol. 38 (2007), 209-215.

## OTHER ARTICLES

25. "Why did the Catholic Church really condemn Giordano Bruno?" *Dialog: Theologie & Naturwissenschaften*, February 2019
https://www.theologie-naturwissenschaften.de/startseite/leitartikelarchiv/giordano-bruno/
Translated into German:  https://www.theologie-naturwissenschaften.de/startseite/leitartikelarchiv/giordano-bruno-deutsch/

26. "Was Giordano Bruno Burned at the Stake for Believing in Exoplanets?" *Scientific American*, March 19, 2018: https://blogs.scientificamerican.com/observations/was-giordano-bruno-burned-at-the-stake-for-believing-in-exoplanets/

27. "Einstein's Girlfriend on National Geographic," *Sloan Science & Film*, April 25, 2017: http://scienceandfilm.org/articles/2893/einsteins-girlfriend-on-national-geographic

28. "Giordano Bruno and the Spirit that Moves the Earth," Not Even Past, March 8, 2017 https://notevenpast.org/giordano-bruno-and-the-spirit-that-moves-the-earth/

29. "Edward Snowden's Breaking Point," *New Standard Press*, November 20, 2106, 1 page. http://www.newstandardpress.com/edward-snowdens-breaking-point/

30. "Was Einstein Really Religious?" *Not Even Past*, History Department UT Austin, April 11, 2012, 3 pages. https://notevenpast.org/was-einstein-really-religious-0/

31. "Darwin's Finches and Other Science Myths," Monthly Feature in *Not Even Past*, History Department UT Austin (October 2011), 3 pages. https://notevenpast.org/alberto-martinez-darwins-finches-other-science-myths/

32. "Reply to Hubert Goenner," *Martinez Writings* (August, 2011), pp. 1-14, http://www.martinezwritings.com/m/Goenner.html

33. "Reply to Suman Seth," *Martinez Writings* (July 2011), pp. 1-5, http://www.martinezwritings.com/m/Seth.html

34. "Reply to Hans C. Ohanian," *Martinez Writings* (June 2011), pp. 1-17, http://www.martinezwritings.com/m/Ohanian.html

35. "Is the Civil War or First Human Spaceflight More Significant? An Historian Weighs In." Chron.com (*Houston Chronicle*, May 2011), pp. 1-2 (with responses). http://blog.chron.com/sciguy/2011/05/is-the-civil-war-or-first-human-spaceflight-more-significant-an-historian-weighs-in/

36. "Dividing by Nothing," *Not Even Past*, History Department UT Austin, 5 online pages, (12 April 2011). https://notevenpast.org/dividing-nothing/

37. "Relativity," *Oxford Encyclopedia of the Modern World*, ed. Peter N. Stearns (Oxford: Oxford University Press, 2008).

38. A. Martínez, S. S. Schweber, "Field Theories," in *New Dictionary of the History of Ideas*, ed. M. Horowitz, Vol. 2 (Charles Scribner's Sons / Thomson Gale, 2005), 831-834.

39. "Arguing about Einstein's Wife," *Physics World* **17**, No. 4 (April 2004), 14.

40. "Sobre *La Ilíada* y Otras Cosas," *Taller Literario*, Vol. 4 (Puerto Rico, 1996), 28-31.

41. "Explanation, Accounting, and Scientific Understanding," *Cogitemus* (NYU), No. 2 (Spring 1995), 24-37.

42. "La Tragaldábas Traslúcida," *Taller Literario*, Vol. 2 (Puerto Rico, 1994), 62-64.

43. "El General del Valle," *Taller Literario*, Vol. 1 (Puerto Rico, 1993), 21-25.

44. "Especímenes de la Universidad," *Diálogo* (University of Puerto Rico), San Juan (January 1992), 28-29.

45. "John y el Curioso Objeto de Cristal Roto," traducido por Diego Deni, *Claridad* (San Juan, November, 1991), 16-17.

46. "Acerca del Lenguage," *Wendigo*, Vol. 1, No. 1 (San Juan, September 1991), 17.

47. "Mechanical Ethics and Wicked Machines," *Wendigo*, Vol. 1, No. 1 (San Juan, September 1991), 11.


## BOOK REVIEWS

48. "Getting to Know Mileva Maric," *Review of Einstein's Wife: The Real Story of Mileva Einstein-Maric* (M.I.T. Press, 2019), in *Physics Today*, Vol. 72, No. 7 (July 2019), 53-54. Also at: https://physicstoday.scitation.org/doi/10.1063/PT.3.4251

49. *The Other Einstein: A Novel*, by Marie Benedict, *Physics in Perspective*, Vol. 20 (June 2018), 208-211.

50. "The Travelling Physicist," review of *Einstein on the Road*, by Josef Eisinger, in *Physics World*, Vol. 25, No. 4 (April 2012), 3-4.

51. "Science Myth-Busters," review of Ronald L. Numbers, ed., *Galileo Goes to Jail, and Other Myths about Science and Religion*; John Waller, *Einstein's Luck: The Truth About Some of the Greatest Scientific Discoveries*; and Tony Rothman, *Everything is Relative, and Other Fables from Science and Technology*, in *Not Even Past,* October, 2011.

52. *Einstein's Mistakes: The Human Failings of Genius*, by Hans C. Ohanian, *The Historian*, Vol. 72, No. 3 (September 2010), 722-723.

53. *Einstein's Generation: The Origins of the Relativity Revolution*, by Richard Staley, *Studies in History and Philosophy of Modern Physics*, Vol. 41 (2010), 366-367.

54. *Concepts of Simultaneity: From Antiquity to Einstein and Beyond*, by Max Jammer," *Physics Today*, Vol. 60, No. 8 (August 2007), 58-59.

55. *Einstein 1905: The Standard of Greatness*, by John Rigden, *Physics Today*, Vol. 59, No. 3 (March 2006), 64-65.

56. "Railways and the Roots of Relativity," *Einstein's Clocks, Poincaré's Maps: Empires of Time*, by Peter Galison," *Physics World*, Vol. 16, No. 11 (November 2003), 51.

57. *Knots: Mathematics with a Twist*, by Alexei Sossinsky, *Isis*, Vol. 94, No. 4 (December 2003), 693-694.

58. *Einstein from 'B' to 'Z,'* by John Stachel, *Physics in Perspective*, Vol. 5, No 3 (September 2003), 352-354.

## WORKS ON EDUCATION

59. "Why Study History?" *New Standard Press*, March 10, 2016.
http://www.newstandardpress.com/category/history/

60. Bruce Hunt and Alberto Martínez, "What UTeach and the Current Replication Initiative Mean for the History of Science," *Newsletter of the History of Science Society*, Vol. 39, No. 3 (July 2010), 19-23. Also at:
http://www.hssonline.org/publications/Newsletter2010/July-uteach.html

61. "Teaching Disagreements in Science and Math," *Newsletter of the History of Science Society*, Vol. 3, No. 1 (April 2010), 18-19. Also at:
http://www.hssonline.org/publications/Newsletter2010/April-teaching-tricks.html

62. *Perspectives on Science and Math*, *Version 1.0*, eighteen lessons with supplementary materials, online and CDs (Austin: UTeach Institute, 2009), 213 pp.

https://www.utexas.edu/uteach-institute/uti-courses/topics/per/

63. "Essential Science for Teachers: Physical Sciences," Science Historian (Presenter and Consultant) for Television Series and DVDs (now online), Harvard-Smithsonian Center for Astrophysics, Annenberg Foundation / Corporation for Public Broadcasting, Annenberg/CPB Channel, 2003-2004 http://www.learner.org/resources/series200.html

**SELECTED NEWS ARTICLES**

64. "Too Few Hispanic Faculty," The Daily Texan, November 22, 2020; also at: https://thedailytexan.com/2020/11/22/too-few-hispanic-faculty

65. "The Truth about a Warehouse in Puerto Rico," *Medium*, January 28, 2020. https://medium.com/@AlMartinezUT/the-truth-about-a-warehouse-in-puerto-rico-66d09861f20d

66. "Is the GWU Estimate of Hurricane Deaths in Puerto Rico Accurate?" *The Hill*, September 18, 2018:  https://thehill.com/opinion/healthcare/407186-is-the-gwu-estimate-of-hurricane-deaths-in-puerto-rico-accurate

67. "UT lawyers say professors don't have Academic Freedom," *Texas Tribune*, August 21, 2018: https://www.tribtalk.org/2018/08/21/ut-lawyers-say-professors-dont-have-academic-freedom/

68. "How to Count the Victims of Hurricane Maria," *Medium*, June 17, 2018: https://medium.com/@AlMartinezUT/how-to-count-the-victims-of-hurricane-maria-ebf754fa8629

69. "Teachers protest the collapse of public education in Puerto Rico," *The Hill*, April 5, 2018: http://thehill.com/opinion/education/381816-teachers-protest-the-collapse-of-public-education-in-puerto-rico

70. "Are UT Applicants Excluded Because of Color or Money?" *The Daily Texan*, Vol. 118, No. 115 (March 5, 2018), 4; also at: http://dailytexanonline.com/2018/03/04/are-ut-applicants-excluded-because-of-color-or-money

71. "What Children in Puerto Rico Learned from the Hurricane," *Latina*, December 29, 2017: http://www.latina.com/op-ed-what-children-puerto-rico-learned-hurricane

72. "Puerto Rican Students Deserve Support from University," *The Daily Texan*, November 9, 2017. https://www.dailytexanonline.com/2017/11/09/puerto-rican-students-deserve-support-from-university

73. "Overpaid in Puerto Rico's Huge Debt Crisis? A Lesson for the States," *Texas Perspectives*, October 19, 2017. https://news.utexas.edu/2017/10/19/overpaid-in-puerto-rico-s-huge-debt-crisis

74. "Trump's Pledge to Kill Innocent People," *New Standard Press*, December 20, 2016. http://www.newstandardpress.com/trump-kill-innocent-people/

75. "The Myth of Trump and the KKK," *New Standard Press*, December 19, 2016. http://www.newstandardpress.com/the-myth-of-trump-and-the-kkk/

76. "How they Scared us about Hillary and Donald," November 14, 2016, *versions of this op-ed were published in the USA Today Newspapers: Arizona Republic (AZ), The Coloradoan (CO), DelawareOnline (DE), Iowa City Press-Citizen (IA), Louisville Courier Journal (KY), Springfield News-Leader (MO), Star Gazette (NY), Cincinnati Enquirer (OH), Knoxville News Sentinel (TN), Corpus Christi Caller Times (TX), Texas Perspectives (TX), Waco Tribune Herald (TX), Burlington Free Press (VT), Green Bay Press Gazette (WI), and the Wausau Daily Herald (WI).*

77. "How Many People Celebrated in New Jersey on 9/11?" *New Standard Press*, January 21, 2016. http://www.newstandardpress.com/newjersey911/

78. "The Media Needs to Stop Telling this Lie about Donald Trump. I'm a Sanders Supporter—and Value Honesty," SALON, Editor's pick: front page feature (2,012 words), Dec. 21, 2015. http://www.salon.com/2015/12/21/the_media_needs_to_stop_telling_this_lie_about_donald_trump_im_a_sanders_supporter_and_value_honesty/

79. "UT Budget Should Allocate Less Money for Unaffordable Expenses," *The Daily Texan*, April 21, 2014; 2 pages plus editors note http://www.dailytexanonline.com/opinion/2014/04/21/ut-budget-needs-to-allocate-more-money-for-employee-salaries

80. "UT's Relationship with Accenture Should Raise Questions," *The Daily Texan*, January 20, 2014, p. 4 in print version, 2 online pages plus readers comments; http://www.dailytexanonline.com/opinion/2014/01/20/uts-relationship-with-accenture-should-raise-questions

81. "The Problem with Hegarty's Plan to Save UT Money? It Costs Too Much," *The Daily Texan*, November 14, 2013, p. 4; http://www.dailytexanonline.com/opinion/2013/11/14/the-problem-with-hegartys-plan-to-save-ut-money-it-costs-too-much

82. "UT is Eating Itself as Cuts Keep Coming," *Austin American-Statesman*, November 13, 2013, p. A10; http://www.mystatesman.com/news/news/opinion/martinez-ut-is-eating-itself/nbrB7/

83. "College Educators Could Earn More at McDonald's" *Austin American-Statesman*, September 15, 2013, p. E6; also as: "Would you Like some Fries with that Dante?" http://www.mystatesman.com/news/news/opinion/martinez-would-you-like-some-fries-with-that-dante/nZwjY/

84. "Who Earns More? Professor or Fry Cook?" in *The Chronicle of Higher Education* (October 21, 2013), 3 on-line pages; http://chronicle.com/blogs/conversation/2013/10/21/who-earns-more-professor-or-fry-cook

## ONLINE RESOURCES

85. "Ten Years to Einstein's Relativity" self-made website describing Albert Einstein's path to creating his special theory of relativity, including a collection of 172 photographs of people, places, and documents, with links to dozens of primary source documents and websites. http://www.martinezwritings.com/m/Kinematics6.html.

86. "Physics of Scale" (oral histories documenting the history of the physics of phase transitions) branch History of Recent Science and Technology project, Dibner Institute, M.I.T. Edited interviews of physicists: Peter Heller, Kenneth G. Wilson, Alexander Polyakov, Howard Schnitzer, Benjamin Widom, Alexander Patashinski, Igor E. Dzyaloshinskii. http://authors.library.caltech.edu/5456/  The following interviews of physicists were also edited by A. Martínez, with S. Schweber or K. Hall, pending approval from the interviewees: George Benedek, Michael E. Fisher, Giovanni Jona-Lasinio, Paul C. Martin, Valery L. Pokrovsy, H. Eugene Stanley, Peter Lepage.

## SELECTED INTERVIEWS

Front page news: "How Latinos are Getting Squeezed Out of Austin," *Austin American-Statesman*, Sunday November 22, 2020, pp. A1, A10; also at: https://www.statesman.com/news/20201120/hispanic-flight-from-austin-tied-to-affordability-gentrification-experts-say

"Editorial: A Goal at UT-Austin: The University Must Do Better to Hire and Nurture Latino Faculty and Fix Pay Disparity," by the Editorial Board of the *Houston Chronicle*, January 22, 2020, p. A14, also at: https://www.houstonchronicle.com/opinion/editorials/article/Why-can-t-UT-Austin-hire-keep-Latino-faculty-14993081.php

"Profesores Latinos Revelan Disparidad Salarial en la Universidad de Texas," *Yahoo News*, Agencia EFE (of Spain), January 9, 2020.  https://es-us.noticias.yahoo.com/n%C3%BAmero-latinos-grad%C3%BAa-secundaria-sube-151631840.html
Also at: *Impacto Latino* (New York), January 9, 2020. https://impactolatino.com/profesores-latinos-revelan-disparidad-salarial-en-la-universidad-de-texas-2/

Also at: *Alianza Metropolitan News* (California), January 9, 2020.
http://www.noticias.usa.alianzanews.com/6467_usa-hispanos/6539222_el-numero-de-latinos-que-se-gradua-de-la-secundaria-sube-el-9-2-en-florida.html

"Latino Faculty Face 'Gross' Pay Disparities at UT Austin," interviewed by Olivia Tallet, *Houston Chronicle*, January 6, 2020. Front Page, p. A1; also at:
https://www.houstonchronicle.com/local/education/campus-chronicles/article/Latino-professors-confront-grotesque-14948691.php

"Latino Professors at the University of Texas are Paid Less, Few are in Leadership, Study Finds," *NBC News*, interviewed by Suzanne Gamboa, November 25, 2019.
https://www.nbcnews.com/news/latino/latino-professors-univ-texas-austin-are-paid-less-few-are-n1090886

"Denuncian Pagos Injustos para Profesores Hispanos en la UT en Austin," November 22, 2019. https://www.univision.com/local/austin-kakw/denuncian-pagos-injustos-para-profesores-hispanos-en-la-ut-en-austin-video

"Equity for Hispanic Professors," *Inside Higher Ed*, October 30, 2019,
https://www.insidehighered.com/news/2019/10/30/ut-austin-faculty-group-wants-institution-fix-what-it-says-system-marginalizes

"Report Shows Inequities against Hispanic Faculty at UT," *The Austin American-Statesman*, October 23, 2019, https://www.statesman.com/news/20191023/report-shows-inequities-among-hispanic-faculty-at-ut

"Report Exposes Inequalities against Hispanics at UT," *The Daily Texan*, Oct. 22, 2019.
https://thedailytexan.com/2019/10/22/report-exposes-inequalities-against-hispanics-at-ut

"This is Democracy: Ep. 62 – Puerto Rico – Statehood Debate," interviewed by Jeremi Suri, October 25, 2019. https://podcasts.apple.com/us/podcast/ep-62-puerto-rico-statehood-debate/id1420520464?i=1000454839974

"Hurricane Recovery," interviewed on *Full Measure*, by Sharyl Attkisson, winner of five Emmy Awards for investigative journalism on television, Oct. 6, 2019
http://fullmeasure.news/news/cover-story/hurricane-recovery

"G: Relative Genius," *Radiolab* episode, June 28, 2019.
https://www.wnycstudios.org/story/g-relative-genius

"Mileva Marić, dans l'ombre d'Albert Einstein," *Les Cahiers de Science et Vie*, no. 186, June 5, 2019, interviewed by Anne Debroise https://www.epresse.fr/magazine/les-cahiers-de-science-et-vie/2019-06-05/sommaire

"Study Finds Hispanic UT Professors to be underpaid, underrepresented," *The Daily Texan*, April 18, 2019.  https://www.dailytexanonline.com/2019/04/18/hispanic-faculty-found-to-be-underrepresented-underpaid

"Here's what's known about Fred Trump's arrest after a KKK clash," *PolitiFact*, March 28, 2019.  https://www.politifact.com/facebook-fact-checks/statements/2019/mar/28/facebook-posts/heres-whats-known-about-fred-trumps-arrest-after-k/

"Radical Cosmology," SETI Institute, *Big Picture Science*, February 18, 2019
http://bigpicturescience.org/episodes/radical-cosmology

*15 Minute History*: Episode 117: "Albert Einstein – Separating Man from Myth," February 8, 2019.  https://15minutehistory.org/2019/02/08/episode-117-albert-einstein-separating-man-from-myth/

"Hoaxed: The Movie," El Ride Productions, January 24, 2019
https://www.imdb.com/title/tt8991264/   Available at: http://hoaxedmovie.com/

"Hurricane Maria [A Year Later]," interviewed on *Full Measure*, by Sharyl Attkisson, winner of five Emmy Awards for investigative journalism on television. Sept. 16, 2018.
http://fullmeasure.news/news/politics/hurricane-maria

"Rebuilding Puerto Rico," *Pale Blue Dot: Daily Texan Podcast*, March 8, 2018:
https://soundcloud.com/thedailytexan/pale-blue-dot-rebuilding-puerto-rico

"On Their Own… Puerto Ricans in Texas find Lack of Initiative from the State's Universities," interviewed by Albert Zhao, *Daily Texan Atavist*, Nov. 19, 2017,
https://thedailytexan.atavist.com/on-their-own

"UT Professor's Research Dispels Archaic Notions of Skin Color," interviewed by Albert Zhao for *The Daily Texan*, October 20, 2017 https://www.dailytexanonline.com/2017/10/20/ut-professors-research-dispels-archaic-notions-of-skin-color

"Double Disaster: Puerto Rico's Crisis," interviewed on *Full Measure*, by Sharyl Attkisson, winner of five Emmy Awards for investigative journalism on television. Oct. 15, 2017.
http://fullmeasure.news/news/cover-story/double-disaster

"The Media and Trump," interviewed on *Full Measure*, by Sharyl Attkisson, winner of five Emmy Awards for investigative journalism on television, Oct. 1, 2017
http://fullmeasure.news/news/politics/the-media-and-trump; also aired on December 24, 2017: http://fullmeasure.news/news/politics/the-media-and-trump-12-18-2017

"Einstein Historians Give *Genius* a Chance," *Physics Today*, with Prof. Daniel Kennefick, edited by Melinda Baldwin, May 23, 2017
http://physicstoday.scitation.org/do/10.1063/PT.6.3.20170523a/full/

"Why Were Racial Categories Created and Why Do They Persist Today?" Interview with Maggie Martin for the radio show "Houston Matters" (Houston, TX), February 29, 2016; http://www.houstonmatters.org/segments/segment-b/2016/03/02/why-were-racial-categories-created-and-why-do-they-persist-today

"Secretos de la Ciencia," in radio program "Es la Tarde," EsRadio station (Spain) May 2, 2014.

"Associate Professors' Salaries Increase at a Slower Rate than Salaries of Assistant Professors," *The Daily Texan*, April 18, 2014, pp. 1-2; http://www.dailytexanonline.com/news/2014/04/18/associate-professors-salaries-increase-at-a-slower-rate-than-salaries-of-assistant

"Shared Services or Shared Suffering: UT's Plan to Cut 500 Jobs," *Austin Chronicle*, January 24, 2014; p. 14; http://www.austinchronicle.com/news/2014-01-24/shared-services-or-shared-suffering-uts-plan-to-cut-500-jobs/

Interview on Science Secrets, by Jessica Sinn, in *UT Know* (online), reissued in *Further Findings*, *ShelfLife@Texas*, CoLA main webpage, College of Liberal Arts Public Affairs website, *Highbeam Research*, *Life & Letters Magazine* (print and online), all in Fall 2011. http://www.dailytexanonline.com/news/2014/04/18/associate-professors-salaries-increase-at-a-slower-rate-than-salaries-of-assistant

Video Interview on Science Secrets, by Joan Neuberger, in *Not Even Past* (online), October 1, 2011. https://notevenpast.org/alberto-martinez-darwins-finches-other-science-myths/

Newspaper Interview: "Professor Promotes Book on Myths of Science," *The Daily Texan*, June 9, 2011. http://www.dailytexanonline.com/news/2011/06/09/professor-promotes-book-on-myths-of-science

Department Interview: "Al Martínez to Speak and Sign Copies of his Third Book," June 7, 2011. http://www.utexas.edu/cola/depts/history/news/3974

Newspaper Interview: "Einsteins Ideenwelt unter der Lupe," *Neue Zürcher Zeitung* (Switzerland), October 13, 2005.  https://www.nzz.ch/articlecyzi2-1.156933

## RESEARCH GRANTS and AWARDS

Subvention Grant, Office of the President, and Office of the Vice President for Research, UT Austin 2017-2018; for *Burned Alive* (Reaktion Books)

Research Fellow, Institute for Historical Studies, UT Austin, 2016-2017

Scholarly Activities Grant, Department of History, UT Austin, Mexico Summer 2016

Scholarly Activities Grant, Department of History, UT Austin, Italy, Summer 2015

Scholarly Activities Grant, Department of History, UT Austin, Italy, Summer 2014

Scholarly Activities Grant, Department of History, UT Austin, Summer 2013

Modified Instructional Duties, UT Austin; research project: "Pythagorean Heresies
 in the Copernican Revolution," Fall 2012 (2 course teaching release)

Scholarly Activities Grant, Department of History, UT Austin, Summer 2011

Special Research Grant, Department of History, UT Austin, Summer 2011

Subvention Grant, University of Texas Co-Operative Society, for Fall 2010

Scholarly Activities Grant, Department of History, UT Austin, Summer 2010

Research Fellow, Poincaré Archives, Université Nancy 2, Nancy, France, June 2010

College Research Fellowship, University of Texas at Austin, Fall 2009

Summer Research Assignment, University of Texas at Austin, 2009

Travel and Research Grant, California Institute of Technology, 2005

Research Grant, American Institute of Physics, History Center, Maryland, 2004

Fellow, Center for Philosophy and History of Science, Boston University, 2003-2004

Postdoctoral Fellow, Dibner Institute for the History of Science, M.I.T., 2001-2003

Postdoctoral Fellow, Department of History of Science, Harvard University, 2001-2002

Smithsonian Fellow, National Museum of American History, Washington D.C., 2001

Dissertation Fellow, University of Minnesota, Minneapolis, 1999-2000

Graduate Fellow, University of Minnesota, Minneapolis, 1995-1996

Fellow of the Institute of Science and Arts, New York University, 1994

Research Assistant, MILAGRO Cosmic Gamma-Rays Detector, NYU 1994-1995

Graduate Gallatin Scholar, New York University, 1994-1995

Graduate Opportunity Fellow, New York University, 1993

Language Fellow, Vassar College, New York, 1992-1993

Marrero Award, Highest Honors, General Studies, Universidad de Puerto Rico, 1992

Diálogo Writing Award, San Juan, Universidad de Puerto Rico, 1991


## OTHER CREDITS

Public Voices Fellow, The Op-Ed Project, 2017-2018.  https://www.theopedproject.org/
https://news.utexas.edu/opinions/public-voices-fellowship/about

*The Cult of Pythagoras*:

#1 featured book in the University of Pittsburgh Press, fall 2012 catalog.
#1 featured book in the History and Philosophy of Science, UPP 2012 catalog.
#6 National Bestseller in Mathematics, 2012-13, YBP Library Services, *Library Journal*
#3 Best New Book on Ancient Philosophy, *Athenaeum Boekhandel* (Netherlands)
Chosen as a major selection by Scientific American Book Club (Library of Science)

*Science Secrets: The Truth About Darwin's Finches, Einstein's Wife, and Other Myths*
#2 featured book in the History and Philosophy of Science, UPP 2012 catalog.
#1 featured book in the University of Pittsburgh Press, spring/summer 2011 catalog.
#5 National Bestseller in History of Science, 2011-12, YBP Library Services, *Library Journal*
Selected book: Texas Book Festival, Fall 2011

*Kinematics: The Lost Origins of Einstein's Relativity*
#2 National Bestseller in Mathematics, 2009-2010, YBP Library Services, *Library Journal*

*Negative Math: How Mathematical Rules Can be Positively Bent*
#2 National Bestseller in Mathematics, 2005-2006, YBP Library Services, *Library Journal*

*Perspectives on Science and Math*, Version 1.0, Eighteen Lessons with Supplementary Materials, online and CDs (Austin: UTeach Institute, 2009), 213 pp.; part of the national replication of the UTeach program, used currently in 35 universities: Northern Arizona University; University of Arkansas at Fayetteville, University of Arkansas at Little Rock, University of Central Arkansas, University of California Berkeley; University of California Irvine, University of Colorado, Boulder, University of Colorado, Colorado Springs; Florida Institute of Technology, Florida State University; University of Florida, Columbus State University (Georgia); Southern Polytechnic State University (Georgia), University of West Georgia; Boise State University (Idaho), University of Kansas, Western Kentucky University, Louisiana State University, Towson University (Maryland), University of Massachusetts Lowell, Cleveland State University (Ohio), Temple University (Pennsylvania), Middle Tennessee State University, University of Memphis (Tennessee), University of Tennessee, Chattanooga, University of Tennessee, Knoxville, University of Houston, University of North Texas, University of Texas, Arlington, University of Texas, Austin; University of Texas, Brownsville; University of Texas, Dallas; University of Texas, Pan American; University of Texas, Tyler, Old Dominion University (Virginia). http://uteach-institute.org/

Nominated by the History Department for the Regents' Teaching Excellence Award, fall 2015.
Nominated by the History Department for the President's Associates Teaching Excellence Award, fall 2014/spring 2015.
Nominated by the History Department and by Dean Randy Diehl of the College of Liberal Arts for the William David Blunk Memorial Professorship, January 2014.
Nominated by the History Department for the Ransom Teaching Award, January 2013.
Nominated by the History Department for the William David Blunk Memorial Professorship, January 2012.

**TALKS and KEYNOTE LECTURES**

"Latina/o Equity in U.S. Higher Education," National Campaign for Equity Assessment Policy: League of United Latin American Citizens (LULAC), October 13, 2020

"Lies & Truth in the History of Science," Harris Distinguished Lecture: California Institute of Technology, February 27, 2020. https://youtu.be/vAHQeZ8hVg8

"Hispanic Equity Report," presentation to the Mexican American Legislative Caucus, at the Texas State Capitol, November 22, 2019. https://cbsaustin.com/news/local/hispanic-professors-at-ut-are-demanding-equal-pay-and-equal-opportunities https://telemundoaustin.com/news/local/informe-de-docentes-de-ut-revela-supuesta-falta-de-equidad-en-el-campus

"Galileo and Giordano Bruno: Philosophers on Trial for Heresies," University of Colorado at Boulder, November 1, 2019.

"Burned Alive: Giordano Bruno, Galileo and the Inquisition," IHS Book Talk, Institute for Historical Studies, UT Austin, October 17, 2019

"Galileo Galilei and the Philosopher who was Burned Alive," OLLI/Quest Talk, Thompson Conference Center, September 30, 2019.

"Very 'Easy' Electrical Experiments," Conference in Honor of Jed Buchwald, California Institute of Technology, April 26, 2019. https://youtu.be/yV8bHfuIY4Q

"Popular Myths about the Famous Mr. Einstein," 130th Anniversary of the History Department, Garrison Hall, UT Austin, November 10, 2018.

"Intro to Perspectives on Science and Math," UTeach Conference, ATT Conference Center, May 22, 2018.

"Giordano Bruno, Galileo, and the Moving Earth," Center for Inquiry, Austin, TX, April 16, 2018.

"Giordano Bruno, Galileo, and the Cosmology of Many Worlds," Physics Colloquium for Students and Faculty, UT Austin, John A. Wheeler Lecture Hall, March 28, 2018.

"Bruno, Galileo and the Heresy of the Soul of the World," History of Science Society Annual Meeting, Toronto, Canada, November 11, 2017.

"UTeach Workshop: Using History in Science and Math Classes," UTeach Institute, University of Texas at Austin, October 25-26, 2017.

"Negative Signs in the History of Algebra, Vectors, and Relativity," Fall Central Sectional Meeting of the American Mathematical Society, University of North Texas, Denton, TX, September 10, 2017.

"Pythagoras and Other Fictions: Do We Need Them in Math?" Annual Public Lecture, Math Awareness Month, Mathematics Department, Cornell University, April 13, 2017. http://www.math.cornell.edu/m/Community/mam_lectures.html

"Giordano Bruno: Suns, Exoplanets, and the Catholic Inquisition," Physics Department, Baylor University, March 29, 2017.

"Roasted and Broiled Alive: The Inquisition, Bruno, Galileo, and the Spirit that Moves the Earth," Institute for Historical Studies, UT Austin, February 6, 2017

"How to Write Grant Applications" for the European Area graduate students, Dept. of History, UT Austin, September 29, 2016.

"Classifying People by Color: How Racial Categories Change over Time," Ethics in Science Lecture Series, University of Houston, February 29, 2016.

https://uh.edu/ethicsinscience/Seminars/Alberto-Martinez.php
https://uh.edu/ethicsinscience/Media/Alberto-Martinez.mp4

"The Heresies of Bruno and Galileo," History of Science Society, Annual Conference, San Francisco, November 19, 2015.

"The Catholic Inquisition versus Giordano Bruno," Center for Inquiry-Austin, "Food for Thought," Trinity UMC, November 16, 2015.

"Pythagoras: Myths and Math," Jefferson Scholars Program, Core Texts and Ideas, UT Austin, October 29, 2015.

"Galileo and the Heresy of Many Worlds," History and Philosophy of Science Colloquium, UT Austin, October 23, 2015.

"From Bruno to Galileo: The Heresy of Many Worlds," 12th Biennial Conference on the History of Astronomy, University of Notre Dame, June 25, 2015.

"Graduate School Admissions Workshop," Phi Alpha Theta at UT Austin, April 15, 2015.

"New Book Series: *The Cult of Pythagoras: Math and Myths*," Institute of Historical Studies, March 25, 2015

"Bruno, Galileo, Einstein: The Value of Myths," American Physical Society Annual Conference, San Antonio, March 2, 2015.

"Galileo, Giordano Bruno and Science during the Inquisition," Houston Community College Alief Hayes Campus, October 14, 2014.

"Galileo, Giordano Bruno and Science during the Inquisition," Houston Community College Katy Campus, Pandora's Box series, October 14, 2014.

"The Elegance of Euler's *Algebra* of 1770," The Euler Lecture: Keynote address for the 12th Annual Meeting of the Euler Society, St. Edward's University, Austin Texas, July 21, 2014.

"How should we Write about Race or Ethnicity in History?" presentation and discussion for Phi Alpha Theta students and history majors, Student Activities Center, UT Austin, April 2 and 22nd, 2014.

"Myths and Stories in Science," Research + Pizza lecture series: University of Texas Libraries, UT Austin, March 5, 2014. http://www.lib.utexas.edu/lsl/events/research-pizza-dr-alberto-mart-nez

"Textbook Stories and True Stories," Keynote address, 7th Annual Conference of Texas STEM Teachers (Science, Technology, Engineering, and Math Education), Dallas, Texas February 8, 2014.

"Should We Centralize Staff at UT?" Invited presentation for the Graduate Student Assembly, UT Austin, December 13, 2013.

"Why did the Roman Inquisition Kill Giordano Bruno?" History and Philosophy of Science, Friday Talks, UT Austin, October 25, 2013.

http://youtu.be/i7lqEa_e6CE

"Einstein's Path to the Relativity of Time," College of Liberal Arts / College of Natural Sciences, Honors Programs, UT Austin, October 16, 2013.

"Darwin, Biogeography and the Galápagos Islands," College of Liberal Arts / College of Natural Sciences, Honors Programs, UT Austin, October 14, 2013.

"Einstein, Darwin, and the Importance of Primary Sources," Keynote address, 2013 Texas STEM Librarians' Conference, UT Austin, Austin, Texas, July 26, 2013.

"Pursuing Graduate Studies in History," for the UT chapter of Phi Alpha Theta, National History Honors Society, UT Austin, April 17, 2013.

"How History Helped Einstein in Special Relativity," American Physical Society, Annual Conference, Denver, Colorado, April 15, 2013.
http://absuploads.aps.org/presentation.cfm?pid=10788

"Einstein, Relativity and Myths," Jefferson Center for the Study of Core Texts and Ideas, UT Austin, October 18, 2012. http://youtu.be/srXCfnpBjd0

"Einstein's Path to the Relativity of Time," College of Liberal Arts / College of Natural Sciences, Honors Programs, UT Austin, October 17, 2012.

"Darwin, Biogeography and the Galápagos Islands," College of Liberal Arts / College of Natural Sciences, Honors Programs, UT Austin, October 15, 2012.

"Franklin's Kite and Other Stories: Myths in History of Science?" Alumni College, Texas Exes, Connally Banquet Hall of the Alumni Center, UT Austin, June 22, 2012.

"Science Secrets: The Truth About Darwin's Finches, Einstein's Wife and Other Myths," UT NOVA, at UT Austin, February 8, 2012. http://youtu.be/Zf5giuGCzvA

"Teaching Sciences and Math, using Myths," UTeach Institute National Workshop, UT Austin, November 11, 2011.

"Teaching History of Mathematics," Workshop for Instructors Replicating the Course 'Perspectives on Science and Math," UTeach Institute, UT Austin, Student Activities Center, November 11, 2011.

"Imagining Numbers! Inquiry Based Learning" Workshop for Instructors Replicating the Course 'Perspectives on Science and Math," UTeach Institute, Student Activities Center, UT Austin, November 11, 2011.

"Teaching Perspectives" Workshop for Instructors Replicating the Course 'Perspectives on Science and Math," UTeach Institute, UT Austin, Student Activities Center, November 10, 2011.

"Galileo, pagan heresies, and the Catholic Inquisition," History of Science Colloquium, UT Austin, October 28, 2011.

"Science Secrets: The Truth About Darwin's Finches, Einstein's Wife, and Other Myths," Texas Book Festival, Texas State Capitol, Austin, Texas, October 23, 2011.

"The Evolution of Myths in History of Science: Galileo, Darwin, Einstein," University of Minnesota, History of Science Colloquium, Minneapolis, Minnesota, September 23, 2011.

"Teaching Sciences and Math, using Myths and Disagreements," Discovery Learning Project / Educational Advancement Foundation, UT Austin, Student Union, September 21, 2011.

"Discovery and Invention in History of Science," Annual Student Research Reception: Student Senate of College Councils, UT Austin, Etter-Harbin Alumni Center, UT Austin, April 25, 2011.

"Darwin's Finches, Einstein's Wife, Franklin's Kite," Annual Reception for Dean's Scholars Students, College of Natural Sciences, UT Austin, Welch Hall, April 8, 2011.

"The Evolution of Myths in the History of Science," Reiter's Books, Washington, D.C., July 17, 2011.

"Franklin's Kite and Darwin's Finches," National Museum of American History, Smithsonian Institution, Washington, D.C., July 19, 2011.

"Book Launch: *Science Secrets*," BookPeople, Austin, Texas, June 8, 2011.

"A Crisis in Physics and its Roots in Post-Revolutionary Paris," Gastcolloquium, Instituut voor Geschiedenis en Grondslagen, Utrecht, Netherlands, June 17, 2010.

"The Rise of Abstraction at the École Polytechnique," Poincaré Archives, Université Nancy 2, Nancy, France, June 9, 2010.

"Algebra against Geometry at the École Polytechnique," Fondation Maison des Sciences de l'Homme, Paris, France, June 7, 2010.

"The Function of Myths in History of Science," Phi Alpha Theta National Honor Society, Induction Ceremony for Students, UT Austin, September 30, 2010.

"Secrets and Myths: Einstein's Path to Special Relativity," Physics Colloquium for Students and Faculty, UT Austin, John A. Wheeler Lecture Hall, September 22, 2010.

"French Military Algebra and its Troubles in Modern Physics," Mathematics Department, Northern Arizona University, April 20, 2010.

"Crimes of the Imagination in the History of Impossible Numbers," Annual Lecture for Honors Students in Mathematics, Northern Arizona University, April 20, 2010.

"Albert Einstein and the Structure of Scientific Revolutions," UT LAMP (Learning Activities for Mature People) lecture, Thomson Conference Center, Austin, February 2, 2010.

"Perspectives on Science and Math Conference," National Math and Science Initiative / UTeach Institute Workshop, University Teaching Center, Austin, October 30-31, 2009.

"From the Dissertation to the Book," presentation for History graduate students, History Department, University of Texas at Austin, October 16, 2009.

"Perspectives Roundtable Discussion," NMSI / UTeach Institute Annual Conference, AT&T Executive Education and Conference Center, Austin, May 28, 2009.

"De Galileo a Einstein: Paradojas de la Luz," 4to Centenario de los Descubrimientos de Galileo, Universidad de Puerto Rico, 19 March 2009.

"La Inquisición Católica y Galileo," 4to Centenario de los Descubrimientos de Galileo, Universidad de Puerto Rico, 17 March 2009.

"From Ampère's Kinematics to Einstein's Relativity, in the HSS session: "Divergent Struggles in the Evolution of Relativity," History of Science Society Annual Meeting, Pittsburgh, November 7, 2008.

"Co-Plenary Workshop: The National Replication of UTeach," History of Science Society Annual Meeting, Pittsburgh, November 6, 2008.

"Intellectual Entrepreneurship: Pre-Graduate School Internships," Presentation for Students, Panelist, LBJ Room, Communication School, UT Austin, October 9, 2008.

"Teaching History to Science and Math Majors," UTeach National Conference, Thomson Conference Center, UT Austin, May 22, 2008.

"A Crisis in Science and its Roots in Modern France," Modern Studies Group, Blanton Museum, UT Austin, March 28, 2008.

"Tracing Back from Relativity to Developmental Psychology" History Department, Michigan State University, East Lansing, January 17, 2007.

"Subtractive Talk: Writing about Einstein in 1905 (after the 2005 Commotion has Finally Died Down)" Southwestern University, Georgetown, Texas, April 21, 2006.

"Did Miza Make Relativity?" Einstein-Jahr in Bern; Entdeckung, Kreativität und Innovations-kultur. Universität Bern, Kultur-Casino Bern, Switzerland, July 7, 2005.

"La Educación como la quería Einstein," Simposio Centenario de la Relatividad: Obra de Einstein y sus Implicaciones, Universidad de Puerto Rico, San Juan, March 29, 2005.

"Patent Disagreements in the Histories of Special Relativity" HGR7. Seventh International Conference on the History of General Relativity, Max Planck Institute for the History of Science and Fundación Orotava, Tenerife, Canarias, March 10, 2005.

"Creative Moment: Making Special Relativity" Einstein Centennial Event, Center for Philosophy and History of Science, and, Center for Einstein Studies, Boston University, Boston, December 6, 2004.

"Recent Controversies in the History of Einstein's Relativity"  Humanities and Social Sciences Division, California Institute of Technology, Pasadena, CA, October 23, 2004.

"Conventional Quantities and Possible Measurements" Philosophy of Physics Group, Boston University, Boston, Mass. April 28, 2004.

"Classifying Kinematics: My Science is More Fundamental than Yours!" Dibner Institute for the History of Science and Technology, at M.I.T. Cambridge, Mass. May 7, 2002.

"An Overview of Nineteenth Century Kinematics," Laws of Motion Group at M.I.T.

(George Smith, Domenico Bertoloni Meli, Jim Voelkel, Mordechai Feingold, Andrew Janiak, Manolis Patiniotis). Cambridge, Mass. December 4, 2001.

"Much Ado About Less than Nothing: forgotten paradoxes showing that you actually had good reasons to be confused by negative and imaginary numbers in school, sensing important issues in the history of physics and math."  National Museum of American History, Smithsonian Institution. Washington D.C.  June 19, 2001.

"Origins of Special Relativity in Electrodynamics, Optics, and Kinematics" University of Maryland, College Park, Maryland. April 17, 2001.


## STUDENT ADVISING

### Faculty Adviser

UT chapter of Phi Alpha Theta, National History Honors Society, including weekly meetings, organizing events, hosting the Induction of new members each semester, submitting new members to the national organization, operating listserv, distributing membership certificates and honors cords, and other duties, June 2011-2015

### Dissertation Supervisor

John Lisle (fall 2014-19)

### Adviser for Undergraduate Theses

Greg Lyons (Plan II, 2017 to May 2018)
Max Parks (Humanities Honors Program, 2016 to May 2017)
Michael Stanley (History Honors, 2016 to May 2017)
Lee Lueder (Plan II, 2016)
Austin Hembd (TIP Fellows, 2011)

### Reviewer for Theses or Dissertations

Angela Smith (Graduate History PhD, 2010 - 2015)
Fank Benn (Graduate History MA, 2012 - 2016)
Ruben Martínez (Graduate History PhD, 2009 - 2011)
Andrew M. Smith (Plan II, 2015)
Lorna Ebner (History, 2015)
Harris Holley (History, 2015)

Stephanie Benítez (European Studies, 2013)
Edward Standefer (History Honors, 2011)
Forrest Wilkinson (Plan II, 2011)

**Student Internships** (mentoring UTeach Natural Sciences students on teaching techniques, lesson planning, and classroom management)
Daniel High, 2010, Anne Terry, 2010

## ADMINISTRATIVE and COMMITTEE SERVICE  -  UT AUSTIN

| | |
|---|---|
| 2014-present | Director, History and Philosophy of Science Undergraduate Certificate Program |
| 2020-present | Member, Provost's Equity Review Process Committee |
| 2020-present | Elected Member, Provost Search Committee |
| 2020-present | Elected Member, Executive Committee of Faculty Council |
| 2020-present | Elected Member, Liberal Arts Diversity and Inclusion Task Force |
| 2020-present | Member, Technology-Enhanced Education Oversight Committee |
| 2020-present | Member, Comprehensive Faculty Review Committee |
| 2019-present | Member, Committee of Counsel on Academic Freedom and Responsibility |
| 2019-present | Member, Hispanic Faculty and Staff Association |
| 2020-present | Member, Faculty Advisors to the Deans' Equity Committee |
| 2018-present | Chair, Independent Equity Committee |
| 2018-2019 | Chair, Committee on Equity, Department of History |
| 2017-present | Salaries Committee, Department of History |
| 2016-2017 | European Area Chair, Department of History |
| 2011-present | Jefferson Center Steering Committee, Core Texts and Ideas |
| 2015-2016 | Scholarly Activities Grant Committee, Department of History |
| 2014-2016 | Retention and Recruitment Committee, Department of History |
| 2013-2014 | Organizer, History and Philosophy of Science Weekly Talks, UT Austin |
| 2013-14 | Committee on Undergraduate Degree Program Review, member |
| 2013-14 | Educational Policy Committee of Faculty Council |
| 2012-14 | UT Faculty Council |
| Spring 2013 - 2014 | Undergraduate Research Scholarship Committee, Liberal Arts |
| Aug-Sept 2013 | Special Committee on Budgets (chaired by Martha Hilley) |
| May 3-4, 2013 | Student Staff Coordinator, Texas History Day, Texas State Historical Association: solicited, hired, scheduled, and oriented 52 history majors to carry out 71 work shifts. |
| 2012-13 | Budget Advisory Committee of the UT Faculty Council |
| 2012 | Committee on Associate Professors, History Department |
| 2010-12 | Executive Committee, History Department |
| 2011 | Faculty Guest Speaker, Camp Texas New Students Event |
| 2009 and 2011 | "History Graduate Studies" recruitment brochure (12 pages) for prospective students |
| Fall 2011 | Promotion sub-committee |

| 2010-11 | Post-Tenure review committee |
|---------|------------------------------|
| Fall 2010 | Promotion sub-committee |
| 2010 | Faculty Guest Speaker, Camp Texas New Students Event |
| 2010-12 | Executive Committee, History Department, 2010-12 |
| 2010 | Faculty Guest Speaker, Camp Texas New Students Event, 2010 |
| 2010 | History Salaries sub-committee, Spring 2010 |
| 2009-10 | Lathrop Prize committee for undergraduate theses, 2009-10 |
| 2008-09 | Eastern European Search committee, 2008-09 |
| 2008-09 | History Dept. Graduate Admissions committee, 2008-09 |
| 2010 | History Dept. Minority Liaison Officer, 2008-09, Spring 2010 |

## PUBLIC SERVICE

Chair, Independent Equity Committee, at UT Austin 2018-

Member, Community Action Group on Equity 2018-19

Executive Committee member, Forum for History of Physics, American Physical Society, 2014-present

Member, Historic Sites Committee, Forum for History of Physics, APS, 2018-20

Member, American Physical Society, 2012-present

Reviewer of grant applications: National Science Foundation (2019, 2015), Le Studium Institute for Advanced Studies (France) 2019.

Reviewer of manuscripts for:  M.I.T Press (July 2017), Princeton University Press (July 2014), *American Journal of Physics* (February 2014), *Historical Studies in the Natural Sciences* (December 2013; December 2010), Oxford University Press (March 2012), *Physics Essays* (February 2012; November 2011), and *Science & Education* (July 2011)

Faculty Adviser: LULAC student group at UT (League of United Latin American Citizens), 2007-09.

Events Organizer, and member of the Postdoctoral Scholars of MIT, 2002-2004.

Invited Participant, Dibner Institute 10th Year Anniversary Conference, M.I.T., 2003.

Consultant, Instituto de la Ciencia y Tecnología en América Latina, 2006.

Panelist, 25th Anniversary Symposium, Dibner Library for the History of Science and Technology, Smithsonian Institution, October 2001.

Organizer, Seminar on the Investigation of Difficult Things, Minnesota 1999-2000.

Invited Participant, Seven Pines Symposium for History and Philosophy of Physics 1997, 1999.

Organizer, Seminar on Natural Philosophy, Minnesota 1996.

## LANGUAGES

Spoken and reading: Spanish, English, French
Reading only: German, Italian, Latin

**WEBSITES**

"Alberto A. Martinez" faculty profile in the Department of History at UT Austin.
https://liberalarts.utexas.edu/history/faculty/aam829

"Martinez Writings," Includes academic articles, introductions and reviews of the books *Negative Math* (Princeton 2005), *Kinematics* (Johns Hopkins 2009), *Science Secrets* (Pittsburgh 2011), and *Cult of Pythagoras* (Pittsburgh 2012):
http://www.martinezwritings.com/m/About.html

"New Standard Press," popular articles in the format of an online news magazine, including draft chapters from Martinez's book on the political news media:
http://www.newstandardpress.com/

"History and Philosophy of Science Certificate Program," website that pulls together the courses, faculty, events, and resources on HPS at UT Austin:
https://liberalarts.utexas.edu/hps/index.php

"Puerto Ricans at UT Austin" website that unites Puerto Ricans and promotes the Puerto Rican Organization for Educational Support and Advocacy:
http://sites.utexas.edu/puertorico/

# Exhibit 2



From: Jones, Jacqueline jjones@austin.utexas.edu
Subject: FW: Documents for FII Two
Date: February 23, 2020 at 6:17 AM
To: Llado, Jacqueline jllado@austin.utexas.edu

Text below only is fine

**From:** Jones, Jacqueline <jjones@austin.utexas.edu>
**Sent:** Saturday, February 22, 2020 7:06 PM
**To:** Jones, Jacqueline <jjones@austin.utexas.edu>
**Subject:** Fw: Documents for FII Two

**From:** Jones, Jacqueline
**Sent:** Thursday, November 30, 2017 11:05 PM
**To:** Jones, Jacqueline <jjones@austin.utexas.edu>
**Subject:** FW: Documents for FII Two

Dear Dean Randy Diehl:

Attached please find these documents from the History Department: A one-page FII Two strategic hiring proposal and an Excel sheet listing recommendations for retention salaries. Below I describe the procedures we followed to develop these documents. I also include notes about the salary recommendations and the hiring plan.

<u>History Department Procedures for FII Two Strategic Hiring Plan</u>
<u>and Recommendations for Retention Raises</u>

<u>Strategic hiring</u>—In early November the Chair sent out an announcement to the department that included CoLA guidelines related to the FII Two elements—hiring and raises—and called a department meeting for November 8 to discuss hiring priorities and also a procedure for deciding on the recommendations for raises. I also encouraged faculty who could not attend that meeting to contact me either in person or via email to weigh in on these issues. On November 8, the department met, with 29 in attendance (another three emailed me about the issues), to consider FII Two. Six people are currently on leave, absent from campus and in some cases out of the country, indicating that a considerable proportion of the department currently teaching contributed to the discussion. During that meeting faculty engaged in a robust discussion about hiring priorities, and reached a consensus (see attached document). At that meeting it was also suggested that the recommendations for raises be decided by a committee consisting of the Chair, an Assistant Professor, an Associate Professor, and another Full Professor.

Given the large number of faculty present, I decided to write up a tentative one-page report as a summary. I distributed that to the entire faculty and solicited comments. I also suggested that we could meet again on November 29 to review or further discuss that document. On November 15 the EC met and approved this process for developing a strategic hiring plan for the next 3-5 years, and also approved the document that reflected the consensus of the November 8 meeting.

<u>Retention raises</u>—On November 15 the department also approved my plan to recommend

*1*

colleagues for FII Two raises. I struck a committee of faculty, consisting of Sam Vong (Assistant Professor), Tatjana Lichtenstein (Associate Professor), and Jeremi Suri (Full Professor). I proceeded to cull from cvs evidence of productivity, and on November 28 the committee met to discuss my preliminary recommendations. I made it clear to the committee members that, although I incorporated their suggestions into the final document, ultimately I would be the one responsible for the list sent to the Dean.

Finally, I should note that a small group of faculty met on November 29 to suggest that the original document be amended to reflect the fact that the FII One Ottoman History search had not been successful, and that we consider a hire in that field to be a priority. This suggestion has been incorporated into the final report.

Recommendations for Retention Raises

I gather that some of the other CoLA chairs have had difficulty identifying 30-40 percent of their faculty as worthy recipients of FII Two raises. That is not a problem I face. We have a large productive department—six members have published major single-authored monographs this year alone (one Assistant Professor, one Associate, and Four Fulls). My committee and I identified the most productive members of the department, and within that group of high-achievers are two overlapping subgroups: Minority scholars and colleagues with highly compressed salaries. Here are those two groups:

Minority
Daina Berry
Jorge Cañizares-Esguerra
Indrani Chatterjee
Lina Del Castillo
Toyin Falola
Sumit Guha
Madeline Hsu
Huaiyin Li
Al Martinez
Abena Osseo-Asare
Cynthia Talbot
Sam Vong
Emilio Zamora

Compressed Salaries
Jonathan Brown*
Erika Bsumek
Lina Del Castillo
David Crew
Ginny Garrard
Huaiyin Li
Al Martinez
Joan Neuberger
Denise Spellberg
Cynthia Talbot
Ann Twinam

# THE UNIVERSITY OF TEXAS SYSTEM

## Exhibit 3

# OPERATING BUDGET SUMMARIES

### AND RESERVE ALLOCATIONS FOR LIBRARY, EQUIPMENT, REPAIR AND REHABILITATION AND FACULTY STARs

## FISCAL YEAR 2016



## AUGUST 2015

The University of Texas at Arlington ◆ The University of Texas at Austin ◆ The University of Texas at Brownsville ◆ The University of Texas at Dallas ◆ The University of Texas at El Paso ◆ The University of Texas-Pan American ◆ The University of Texas of the Permian Basin ◆ The University of Texas Rio Grande Valley ◆ The University of Texas at San Antonio ◆ The University of Texas at Tyler ◆ The University of Texas Southwestern Medical Center ◆ The University of Texas Medical Branch at Galveston ◆ The University of Texas Health Science Center at Houston ◆ The University of Texas Health Science Center at San Antonio ◆ The University of Texas M. D. Anderson Cancer Center ◆ The University of Texas Health Science Center at Tyler ◆ The University of Texas System Administration

**The University of Texas at Austin**
**Operating Budget Highlights**
**For the Year Ending August 31, 2016**

## Introduction - Major Goals Addressed by FY 2016 Budget

The University of Texas at Austin remains committed to pursuing the goal of becoming one of the top public universities in the world.  U. T. Austin will continue to be innovative in educating our undergraduate students to be tomorrow's leaders in a globally competitive and diverse environment while increasing opportunities to learn from its research mission. And U. T. Austin will transform lives by sharing its unique resources with the state, nation, and the world.

To maintain competitiveness for faculty, it is essential to pre-emptively adjust the salaries of the best faculty across all departments. The Faculty Investment Initiative was funded to provide recurring salary support for the upper decile of senior faculty as identified by deans of the colleges and schools.  In addition, senior hiring in strategic areas for selected departments was budgeted at salaries in the upper decile.  For the first time since FY 2009, U. T. Austin was able to fund an institutional merit pool of 2 percent for faculty, which was augmented by an additional 1 percent by each college or school.  Deans will use this merit pool to address high-priority salary competitiveness for faculty not included in the Faculty Investment Initiative.

Undergraduate education and student success initiatives remain critical elements of this budget.  Campus conversation will begin to develop a roadmap for undergraduate education at a top research university.  U. T. Austin hopes to capitalize on the unique resources and expertise of the residential research campus to create a holistic, diverse, and transformative undergraduate educational experience for students as they learn to become tomorrow's innovators, problem solvers, inventors, and entrepreneurs.

The goal, as one of the largest doctoral-granting institutions in the nation, is to recruit and train the highest caliber pool of graduate students possible, creating the next generation of leading scholars and researchers.  Funds were budgeted to offer more competitive graduate fellowships to recruit top talent to the University.  Such graduate students create a more vibrant innovation ecosystem at the University and often stay in the region to advance discoveries, either through post-doctoral research or commercialization of innovations.

As the first new medical school in 50 years to be established at a member of the American Association of Universities, the Dell Medical School will create the health care system of the future with person-centered, valued-added healthcare that provides for healthier communities.  To achieve this goal, the Dell Medical School will: 1) have a strong research base, including life sciences and technology research to dramatically improve diagnosis and treatment of disease at lower cost; 2) develop a new model for medical education that is highly engaged, combines basic science clinical experiences through experiential learning, and is team-based and multi-professional; and 3) create a vital, inclusive, and innovative health ecosystem for Travis County through clinical partnerships.

Crucial to the University's success in meeting its teaching and research mission, and in being counted among the world's best institutions of higher education, is addressing the challenges of providing a diverse campus.  The University must continue to devote financial resources to this goal if it is to sustain progress in diversity.

## Revenue

The state general revenue funding for FY 2016 increased by $40.7 million.  This includes a $13.4 million increase in special items, a $9.2 million increase for the DKR Alzheimer's Initiative that moved from U. T. System Administration to U. T. Austin, and a $5.0 million increase in staff benefits.  Central Health funding for Dell Medical School of $35.0 million is being budgeted for the first time. Tuition revenue decreased slightly due to enrollment changes and no tuition increase.  The overall Available University Fund (AUF) amount increased by $4.7 million.  Sponsored program and gift estimated revenue increased to align with historical actual revenue.

## Expenses

Subject to approval by the Board of Regents, U. T. Austin plans to implement a modest strategic merit-based salary increase policy to remain a leading university that is competitive in attracting and retaining talented faculty and staff.  Central Health funding for Dell Medical School of $35.0 million is being budgeted for the first time.  The state general revenue was budgeted for the special items, DKR Alzheimer's Initiative, faculty and staff salary increases, staff benefits, and other strategic priorities.  The AUF increase will be used to fund academic initiatives.  Scholarships decreased slightly due to the change in the B-On-Time Loan program that was previously budgeted at $7.5 million.

Exhibit 4

Committee on Equity
Department of History, University of Texas at Austin

October 15, 2018

# Report:
# Equity in Salaries and Raises

In May, Hispanic faculty voiced concerns about lack of inclusion in our department governance, while other faculty members voiced complementary concerns, such as being burdened with service in too many committees. Our faculty then agreed to create a New Committee on Equity (CE) to work on three areas: (1) propose improvements for departmental governance, (2) revise the Guidelines for merit raise increases, (3) propose improvements for the tenure process. Accordingly, the CE has labored to identify inequities, to "review equity broadly to include not just Hispanics, but other minorities, gender, and any colleagues who feel disenfranchised." As requested, we have collected year-by-year roster data on our large department, including hires, promotions, resignations; data that spans 15 years. We will carry out a Climate Survey to listen and respond to faculty concerns. Our goal, in the words of our Department Chair, is to "develop positive recommendations related to departmental structures and policies that will ensure an equitable distribution of resources and influence among various groups and all individuals."

The present Report is a draft that aims to discuss "compression," that is, inequities in salaries, and to make proposals for how to improve the Guidelines of the Salary Committee. This report consists of two parts: Proposals and Data in the appendices.

# Proposals

Many factors affect faculty compensation: when faculty were hired, publications, promotions, service, outside job offers, serving as head of departments or centers, varying annual budgets, etc. Over the years, compression of salaries and other inequities arise. Following an overview of concerns, below is a draft of proposals that were discussed and voted on in the CE. Once such proposals have been discussed by the department they'll be revised and presented as Recommendations. Then there will be a faculty vote on any such proposals that seem helpful. *Current Guidelines for raises are summarized in Appendix 1.*

## A. Concerns

(1) Discussions of salaries include the question: Is service sufficiently compensated? What kinds of service deserve more compensation? Surprisingly, the cumulative effect of raises for certain kinds of service (e.g., Associate Chair, Graduate Advisor) is greater than publishing a scholarly book. *See Appendix 2.* Note also that compensated departmental positions of service should include minorities, to better include diversity in governance. *See Appendix 3.* Still, we recognize that any analysis of who is underpaid should involve multiple factors—such as publications, service, outreach, teaching, and awards.

(2) Inequities presently exist in faculty salaries. Some individuals are paid far less than others with comparable CVs. This especially affects faculty who have been at UT for multiple years. Newer faculty are sometimes hired at salaries that exceed those of longtime senior faculty. *To see History faculty listed by years at UT, see Appendix 4.* Thus, some full professors are paid less than several Associate

Professors. Also, some faculty who have published more scholarly publications earn less than colleagues who are newer to a field. Compression affects some senior faculty, some minorities, and other individuals. *For examples, see Appendices 5 to 7.*

(3) It's necessary to clarify procedures so that Guidelines for raises are carried out consistently. The procedures for evaluating CVs are not the same every year. For example, in 2017 the SC looked at each Faculty Activity Report on the projector screen as a group, whereas in some other years, the SC group didn't debate whether each item in such reports counts for a raise or not; e.g., is a particular public talk a scholarly presentation? (Only the latter are rewarded with raises.) How long is a "brief book"? Etc.

(4) Sometimes faculty are puzzled as to whether their labors were entirely or fairly rewarded. In some years, faculty have received a letter explaining their raise, in others they haven't.

(5) Raises from the Faculty Investment Initiative (FII) have helped alleviate inequities in some salaries, for some individuals. However, several faculty deserved such raises but received none, so our Department should work with solidarity to use departmental funds to offset some of the extant differences in salaries. *For an overview of the FII raises, see Appendix 8.*

## B. Procedures:

(1) At the start of the year all faculty should receive an email specifying how raises are awarded: what kinds of contributions count and how much. This email should closely resemble the sheet later used by the Salary Committee to evaluate each faculty member.

(2) In accord with the instructions from Dean Diehl, faculty members should be informed of the raises proposed for them in the summer. We therefore propose that when raises are first set by the Salary Committee, each faculty member should receive an email from the SC specifying what raise has been proposed and for what reasons. By sending this note promptly, any faculty member might appeal whether the Guidelines have not been applied correctly, before raises are finalized.

(3) Later, once raises have been finalized, our Department or SC should likewise give a letter to each faculty member specifying why they received that raise: specifically, which contributions were rewarded.

## C. Equity Merit Raises:

(4) In order to identify individuals who deserve an equity raise, individual faculty members may self-nominate. To that end, the Faculty Activity Report that each faculty member submits to the Salary Committee should have a new brief section in which the person may specify whether they believe that they deserve an equity raise and for what reasons. (Still, the Salary Committee, the Committee on Equity, or the Department Chair may also identify individuals who seem to deserve an equity raise.)

(5) We propose a 3-year effort of prioritizing equity in raises. Equity raises already exist in the Guidelines and in practice, but are presently awarded only if funds remain after all other raises have been allocated.

(6) We propose that the Salary Committee continue to prioritize awarding peer-reviewed publications: books, journal articles, and chapters (Ratings 1, 1A, 2, 3), but that subsequently it prioritizes Equity merit raises above "pluses" (Rating 4).

2

(7)  We propose that after awarding books, journal articles, and chapters, 60% of the remaining funds should be allocated for equity raises. This percentage aims to say that we recognize that compensating for inequities in salaries should presently be of greater importance than giving the usual raises for "pluses" such as presentations. (For years, the latter have been granted greater importance and precedence before equity, thus increasing inequities.)

In summer 2018, the categories of books + journal articles + book chapters constituted $38,250 in awards. The total funds allocated by CoLA for our raises were $79,615 (which was 1.4% of all our salaries). Therefore, after awarding $38,250 the remainder was $41,365. If 60% of this amount were allocated for equity raises, then it would be $41,365 x 0.60 = $24,819. That would leave $16,546 for service and pluses (instead of the $21,200 that were in fact awarded in these categories in summer 2018).

This summer, Jackie allocated $17,500 in remainder funds for equity raises, which she awarded to certain full Professors as follows: three received raises of $5000, one received $2500. (In a previous year, Jackie awarded equity raises to Associate Professors.) If we had applied our presently suggested proposal to such funds, there would be ~$24.8K for equity raises (that is, $7.3K more than the $17.5K). Note that there was also a remainder of $2,665 that Jackie allocated in smaller amounts to individuals.

(8) To identify inequities, the Salary Committee should look at salaries, not just raises. Equity raises need not take into account only publications but also other factors such as outreach, years of service to UT, number of courses taught, etc.


## D. Other Modifications to Salary Guidelines

In order to award new categories and reserve more funds for Equity, we decided to reduce some current merit raises, as follows.

(9)  Presently, a journal article, book chapter, or ***coauthored*** articles and chapters all receive a $750 raise. We propose instead that a single authored journal article or book chapter receive $750 while coauthored articles and chapters receive $500 raises. (Similarly, the SC awards $5000 to a single-author book but less to a *coauthored* book, namely $2000)

(10)  Presently, an edited or coedited book both receive a $1500 raise. Instead, we propose that an edited book receives a $1500 raise, but a coedited book receives a $1000 raise. Or, consider the following.

(11) An edited book should not yield a higher raise than a co-authored book. Presently, there is an ambiguity in the Guidelines: since an edited book yields a raise of $1500 and a book chapter yields a raise of $750, some Salary Committees have awarded a $2250 raise for an edited (or even co-edited) book that includes a chapter by the editor. This is disproportionate because coauthored books earn raises of $2000. Thus, e.g., an edited book with just *one chapter* by an author receives a bigger raise than a book with, say, *four chapters* by one author. Therefore, we propose either of these alternatives:

> (11a) All edited books earn $1500 and coedited books earn $1000, regardless of whether such books include chapters by an editor.
> (11b) Edited books earn $1000 and coedited books earn $750, but if such books include chapters by the author, and/or a substantial scholarly introduction, such edited books can also earn up to two pluses, that is, $200 or $400 more.

(12) What is "a brief book"?  Brief books usually receive a raise of $2000, instead of $4,000 or now $5000.  We propose that a brief book is anything shorter than 50,000 words.

(13) Presently, Assistant Professors alone can each earn $200 per book review and up to $800 per year in book reviews. This is a detrimental incentive; no Assistant Professors should be encouraged to spend time

on four book reviews in one year; instead, they should focus on their book and journal articles. Therefore we propose to reduce this category to $400 max per year.

(14) Page 2 of the salary Guidelines includes this clause: "The salary committee reserves the right to make adjustments to these monetary awards on the basis of the length of books or articles, their importance in the field, the prestige of the press or journal that publishes them, or the timing of publications." We think that this gives the SC too much leeway to modify awards and to thus create inconsistencies or inequities. We therefore propose that this entire clause be eliminated.

(15)  Do scholarly translations count? We propose that scholarly translations (that are annotated and include a substantial introduction) should be rewarded as "annotated, scholarly editions." Such works would be in Rating 1A and thus earn $2000. Or should they count for $1500?

(16) FII raises are still scheduled to happen in the next two years. Should someone who receives an FII raise also be eligible for a Departmental merit raise? We agreed that the Salary Committee may check whether, for a particular faculty member, merit raises in a single merit year exceed what that person receives as an FII raise; and if the merit raises exceed the FII raise, then the Salary Committee may award the excess to that person. Otherwise, faculty who receive FII raises in a given year will not also receive departmental merit raises.

## E. Other Questions

(17) We agreed that the SC should reward *community outreach and engagement*, as distinct from service to the department and college. But how much? The present Guidelines specify "The salary committee may also allocate three $500 raises each year to individual faculty who are judged to have contributed an extraordinary amount of service to the Department, College, or University, or who have served in some prominent professional capacity outside the University." Should this be further elucidated?

(18) Similarly, the category of "Public Intellectual" should be clarified. In 2018, some members of the SC thought the maximum awarded in that category should be a raise of $200, while others argued for more. Presently, op-eds do not entail raises. But should they? In particular, we might ask: how many op-eds are equivalent to a single peer-reviewed journal article?

(19)  We discussed whether textbooks should receive raises. They usually don't because the authors are compensated with royalties. Still, should such work be rewarded somehow? We discussed whether textbooks might constitute "pluses."

(20) Aside from Equity raises, should there be a limit of how much of an annual budget for raises is awarded to one faculty member for publications and service? For example, if one year the budget is $79,000 and if one person is awarded $8000 in raises then that means that more than 10% of the budget has been allocated to one person, out of 60 faculty. In practice, the Department Chair does limit how much funds can be awarded, say for publications, to any one person in a given year. Should that number be formally set, say, at $6000?

*Committee on Equity members:*
Alberto Martínez (Chair), Peniel Joseph, Mark Lawrence, Joan Neuberger, Megan Raby, Juliet E. K. Walker, Emilio Zamora.

4

# Appendices
# Data on Faculty and Salaries

## Appendix 1
## Summary of Present Criteria for Raises

Since UT Austin is a Research 1 university, the Salary Committee (SC) of our Department aims to award merit raises *mainly* on the basis of *scholarly publications*. As stated in the Guidelines for Recommending Merit Increases:  "Note: In all of the ratings below [Ratings 1 to 4], the salary committee aims primarily to reward publications that make original contributions to the discipline." This is fair, arguably, because: (1) Some service is expected of all faculty; (2) certain service is rewarded by course reductions and raises; (3) promotions, teaching awards, and book prizes are rewards in themselves; (4) etc. Hence, the SC awards raises mainly on the basis of publications, by kind and quantity. Some faculty have suggested that the SC should reward *quality* of publications. In principle, this sounds good, but in practice it can be very difficult. However, the SC traditionally doesn't take quality into account because its members don't presume to know how to compare the relative merits among new publications in many varied and technical subfields of history. They also lack time to read all publications. In many or most cases, raises are awarded without reading publications at all and often before communities of peer experts have passed lasting judgment on each contribution's importance.

**Merit Raises for Tenure-Track Faculty** (the following sums were valid as of May 2018)

Presently and in recent years the SC has awarded raises as follows:  Single-authored book ($4000 in most years, but sometimes and now $5,000), brief book ($2,000), coauthored book ($2,000), annotated edition ($2,000), edited book ($1,500), coedited book ($1,500), substantially revised book edition ($750), editor of journal special issue ($750), journal article ($750, 10+ pages), book chapter ($750, 10+ pages), coauthored scholarly article ($750, 10+ pages), book review ($200 assist. profs. only), creating a website ($200), creating a database ($200), online essays, op-eds, or interviews ($0)

Special service (Graduate Adviser, Assoc. Chair, IHS Director: $1,500 each), extraordinary service ($500), extraordinary teaching activities ($500), major grants ($500), honors program ($300), book award ($200), external scholarly presentation ($200, up to 4 x year), public intellectual contributions ($200)

*Other departmental raises:*  Equity ($ variable), across-the-board raise ($ variable)

*Other sources of raises:*  Promotion to full ($5,000 from CoLA + $10,000 from University), promotion to associate ($3,000 from CoLA + $7,000 from University); retention for outside job offers (variable, from CoLA and/or University)

**Note:**  To some extent salaries are within each person's control inasmuch as gaining raises is a matter of "playing the game." (E.g., publishing, getting salary supplements from other units at UT, getting outside job offers, advocating for oneself, getting certain admin jobs, etc.). However, our concern for Equity should discard the notion that laboring professors are comparable to a game, since "the rules" are not equally applied, understood, or followed by all faculty and not all have the same opportunities. Moreover, common practices can be problematic; even if they're common in other universities it does not mean that they're examples of best practices.

**Appendix 2**
**Compensation for Service**

Presently certain kinds of university service are rewarded above everything else (e.g., serving as Associate Dean, Chair of a Department, et cetera). Are other positions of service fairly compensated? The usual impression in salary discussions is that service doesn't receive enough compensation. (By "service" we mean service in a departmental position, not community outreach.) However, by analyzing some of the raises for service, we see that some compensation is substantial.

Consider a major service role, such as working as Associate Chair, Graduate Advisor, or IHS Director If a faculty member served in that capacity, say, for 5 years, then that person received a total raise of $1,500 x 5 years = $7,500 in raises. It constituted a total raise larger than publishing 1 single-author book ($4,000).

Moreover, the raise for publishing the book arrives only *a year later*, whereas in these service roles it begins from the start. E.g., when a faculty member managed to publish 1 book after 5 years of research and writing, then that person earned $4,000 in income for that book at the end of the 6th year:

|  | year 1 *research & writing* | year 2 *research & writing* | year 3 *research & writing* | year 4 *writing & editing* | year 5 *book published* | year 6 *raise awarded* | Total raise income in 6 years: |
|---|---|---|---|---|---|---|---|
| *income from book* | 0 | 0 | 0 | 0 | 0 | 4,000 | $4,000 |

Meanwhile, in those 6 years, a Graduate Advisor earned a raise of $1,500 each year:

|  | raise year 1 | year 2 | year 3 | year 4 | year 5 | year 6 | Total raise income in 6 years: |
|---|---|---|---|---|---|---|---|
| *income from service* | 1,500 | 3,000 | 4,500 | 6,000 | 7,500 | 9,000 | $31,500 |

If a Graduate Advisor ceases to work in that role after the sixth year, that person will continue to earn $9,000 per year for having served in that role during 6 years. Meanwhile, the person who wrote a book will earn $4,000 per year for that book.

Here, service counts *more* than researching, writing, and publishing a scholarly monograph. We should also take into account the fact that the positions of Graduate Advisor, Associate Chair, and IHS Director already involve a 50% course-load reduction. These faculty members teach 1 course less per semester, so 33% of their salary is being paid effectively to carry out these service roles. (Normally, 66% of our salary is for teaching 4 courses, and 33% is for research. Therefore, this 2 course reduction allocates 66% ÷ 2 = 33% of one's salary for the service job.)

If a professor earns $100,000 per year, and that person serves in one of the departmental service duties above, then each year they are being paid $33,333 to do that job, given their course reduction. Thus, the actual total income for serving as, say, Associate Chair, would be:

|  | raise year 1 | year 2 | year 3 | year 4 | year 5 | year 6 | Sum: |
|---|---|---|---|---|---|---|---|
| *raise* | 1,500 | 3,000 | 4,500 | 6,000 | 7,500 | 9,000 | $31,500 |
| *course release* | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | 33,333 | $199,998 |
| *Total compensation for Associate Chair duties only:* | | | | | | | $231,498 |

Thus an Associate Chair who earns roughly $100,000 a year, is compensated $231,498 throughout six years exclusively for the function of being Associate Chair. In contrast, another professor, who also is paid $100,000 per year and who uses 33% of the time to write a book, is compensated $199,998 + $4,000 = $203,998 for having done the research and work for that book (over a six year period).

Again, the comparison of $4,000 versus $31,500 in six years is noteworthy because it shows that contrary to our Salary Committee's ostensible practice and aim of rewarding mainly *original scholarly contributions*, in reality service is often rewarded more than publications.

There are positions of service to the University, outside of the History Department, that also provide compensation. For example, service on the CoLA Dean's Committee on Promotions and Tenure occasionally leads to compensation by the Dean. History faculty members who have served in that committee include: Hardwick (4 yrs.), Twinam (3 yrs.), Levine, Neuberger, Cañizares-Esguerra (2 yrs. each), Walker (1 year).

**Appendix 3**
**Service, Part 1:  Faculty Service to the History Dept., Compensated  (*since 2003*)**

| | Dept. Chair | Assoc. Chair | NEP Director | Graduate Adviser Chair, Grad. Prog. C. Chair, Grad. Adm. C. | IHS Director | Honors Program | Assessment Director | Director, Normandy | Chair, Salaries Com. |
|---|---|---|---|---|---|---|---|---|---|
| Brian Levack | X | | | | | | | | 7 |
| Alan Tully | 11 | | | | | | | | |
| Jackie Jones | 5 | | | 3 | | | | | 1 |
| Joan Neuberger | | | 9 | | | | | | 2 |
| Julie Hardwick | | | | | 6 | | 3 | | |
| Alison Frazier | | | | 5 | | 1 | | | |
| Jim Sidbury | | | | 4 | | | | | |
| Bruce Hunt | | | | 4 | | | | | |
| George Forgie | | 5 | | .5 | | | | | |
| S. Deans-Smith | | 3.5 | | | | | | | |
| Virginia Garrard | | 6.5 | | | | | | | |
| Seth Garfield | | | | | 4 | | | | |
| Miriam Bodian | | | | | 2 | | | | 1 |
| Charters Wynn | | | | | | | | 9 | |
| Judy Coffin | | | | | | 7 | | | |
| Denise Spellberg | | | | | | 5 | | | |
| Mary Neuburger | | | | | | 2 | | | 1 |
| Cynthia Talbot | | 1 | | | | | | | 1 |
| Mark Lawrence | | | | | | 1 | | | |
| Tracie Matysik | | | | | | | | | 1 |
| Ann Twinam | | | | | | | | | 1 |
| Philippa Levine | | | | | | | | | 1 |
| David Oshinsky | | | | .5 | | | | | |

**Compensation**

| | |
|---|---|
| Department Chair: | approx. 3 course releases per year + salary from Dean |
| Associate Chair: | 2 course releases per year + $1,500 raises per year |
| Graduate Adviser: | 2 course releases per year + $1,500 raises per year |
| IHS Director: | 2 course releases per year + $1,500 raises per year |
| Director of *Not Even Past*: | 2 course releases per year |
| Assessment Director: | course releases? |
| Honors Program Director: | 1 course release per year + $300 raises per year |
| Director, Normandy Prog.: | 1 course release per year, at least since 2013 |
| Chair, Salary Committee: | occasional raise at the Dept. Chair's discretion |

**Note:**  It's apparent that no minorities (Black, Hispanic, Asian, Foreign) have served in the categories of service compensated by the Department, at least in the period reviewed (except for one faculty of member of "2 or more ethnicities").

**Service, Part 2:  Other Service, History Department**

| | Executive Committee member | Area Chair AAME | Area Chair EUR | Area Chair LAH | Area Chair USA | Search Committee Chair | Post Tenure Rev. Chair | Instructional Techn. Comm. Chair | Mentoring Comm. Chair | Gender Symposium | Lunchtime Seminar | Atlantic History Seminar | Latin America Speaker Series | Littlefield Lecture | Sci., Med. & Tech. Symposium | Comm. Guest Speakers, Chair | Phi Alpha Theta Mentor | Undergrad. Recruitment, Chair | Hist. & Phil. Sci. Certif., Director | Peer Observations, Chair | SAG Committee, Chair | Underg. Scholarship Comm. Chair | Social Media Committee, Chair | Dora Bonham Committee | Lathrop Prize, Chair | Perry Prize, Chair | Teaching Awards Comms. Chairs | Pre-Law Advisor | Faculty Counselor / Ombuds | Library Liaison | Minority Liaison | Undergrad Research Coord. | Comm. on Equity, Chair | Comm. on Scheduling, Chair | Comm. on Dual Enrollment | 130th Anniversary Chair | Assoc. Profs. Comm., Chair |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Abzug | 5 | | | | | 1 | | | | | | | | | | | | | | 1 | | | | | | | 1 | | | | | | | | | | |
| Berry | 4 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bodian | 4 | | 1 | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Brands | 7 | | | | 4 | 3 | | | | | | | | | | 2 | | | | | | | | | | | | | | | | | | | | | |
| Brower | 4 | | | | | | | | | | | | | | | | | | | | | | | | 1 | | | | | | | | | | | | |
| Brown | 2 | | | 5 | | .5 | 2 | | | | | | | | | | | | | | | | | | 2 | | | | | | | | | | | | |
| Bsumek | 8? | | | | | | | 1 | 1 | | | | | | | | | | | | | | | | | | 4 | | | | | | | | | | |
| Buenger | 0 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Butler | 3 | | 2 | | | | | | | | | | 4 | | | | | | | | | | | | 1 | | | | | | | | | | | | |
| Cañizares | 3? | | | | | 1 | | | | | | | | 5 | 1 | | | | | | | | | | | | | | | | | | | | | | |
| Chatterjee | 3 | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Coffin | 1 | | 1 | | | | | | | | 2 | | | | | | | | | | | | | | 2 | | | | | | | | | | | | |
| Crew | 6 | | 2 | | | 1 | 2 | | | | | | | | | | | | | | | | | | | | 3 | | | | | | | | | | |
| Deans-S. | 4 | | | 4 | | 1 | | | | | | | | | | | | | | | | | | 4 | | | 1 | | | | | | | | 1 | | |
| DelCastillo | 2.5 | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 | | | | | | | | |
| Di-Capua | 4 | | | | | | | | | | | | | | | | | | | | | | | | 1 | | | | | | 1 | | | | | | |
| Falola | 1 | | | | | 1 | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Forgie | 1 | | | | | | | 1 | | | | | | | | | | | | | | | 5 | | 2 | | 1 | 16 | | 1 | | | | | | | |
| Frazier | 2.5 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 3 | | | | | | | |
| Frens-St. | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Garfield | 2 | | | | | | | | 1 | | | | | | | | | | | | | | | | 1 | | | | | | | | | | | | |
| Garrard | 4 | | | | | | | | | | | | | | | | | | | | | | | 6 | 1 | | | 1 | | | | | | | | | |
| Green | ? | | | | | | | 1 | 7 | 1 | | | | | | | | | | | 1 | | | | | | | | | | | | | | | | |
| Guha | 2 | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Hardwick | 3 | | | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Hsu | 2 | | | | | | | | | | 1 | | | | | | | | | | | | 4 | | 1 | | | | | | | | | 5 | | | 1 |
| Hunt | 5 | | | | | | | | | | | | | | 6 | | | | | | | | | | 1 | 1 | | | | | | | | | | | |
| Jones | 8 | | | | | 2 | | | | | | | | | 8 | | | | | | | | | 3 | | | | | | | | | | | | | |
| Joseph | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Kamil | 4 | | | 1 | | | | | | | | | | | | | | | | | | | | | 1 | | | | | | | | | | | | |
| Lawrence | 5 | | | | | | | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Levack | 6 | | | | | 1 | 2 | | | | | | | | | | | | | | | | | | 1 | | | | | | | | | | | | |
| Levine | 5 | | | | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Li | 0 | | | | | 2 | | | | | | | | | | | | | | | | | 1 | | 1 | | | | | | | | | | | | |
| Lichtenst. | 4 | | | | | | | | | | | | | | | | | | 3 | | | | | | | | | | | | | | | | | | |

| | Executive Committee member | Area Chair AAME | Area Chair EUR | Area Chair LAH | Area Chair USA | Search Committee Chair | Post Tenure Rev. Chair | Instructional Techn. Comm. Chair | Mentoring Comm. Chair | Gender Symposium | Lunchtime Seminar | Atlantic History Seminar | Latin America Speaker Series | Littlefield Lecture | Sci., Med. & Tech. Symposium | Comm. Guest Speakers, Chair | Phi Alpha Theta Mentor | Undergrad. Recruitment, Chair | Hist. & Phil. Sci. Certif., Director | Peer Observations, Chair | SAG Committee, Chair | Underg. Scholarship Comm. Chair | Social Media Committee, Chair | Dora Bonham Committee | Lathrop Prize, Chair | Perry Prize, Chair | Teaching Awards Comms. Chairs | Pre-Law Advisor | Faculty Counselor / Ombuds | Library Liaison | Minority Liaison | Undergrad Research Coord. | Comm. on Equity, Chair | Comm. on Scheduling, Chair | Comm. on Dual Enrollment | 130th Anniversary Chair | Assoc. Profs. Comm., Chair |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Louis | 0 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Martinez | 2 | | | | | | | | | | | | | | 2 | | 5 | | 5 | | | | | | | | | | | | | | | 2 | | 1 | |
| Matysik | 5.5 | | | | | | | | | | | | | | | | | | | | | | | | | 2 | | | | | 3 | | | | | | |
| Mintz | 0 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Moore | 2 | | | | | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Neuberger | 5 | 3 | | | | | | 2 | | 1 | | | | | | | | | | | | | | | 4 | | | | | | | | | | | | |
| Neuburger | 2 | 4 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | 1 |
| Newman | 1 | | | | | | | | | | | 1 | | | | | | | | | | | | | | | | | 8 | | | | | | | | |
| O'Connell | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Olwell | 2? | | | 1 | 1 | | | | 2 | | | 1 | 5 | | | | | | | | | | 3 | | | | | | | | | | | | | | |
| Osseo-A. | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Raby | 3 | | | | | | | | | | | | | | 2 | | | | | | | | | | | | | | | | | | | 2 | | | |
| Seaholm | 0 | | | | | | | | | | | | | | | 4 | 3 | | | | | | | | | | | | | | | | | | | | |
| Spellberg | 2 | 2 | | | | | | | 1 | | | | | | | | | | | | | | 5 | | | | | | | | | | | | | | |
| Stoff | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Suri | 4 | | | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Talbot | 5 | 4 | | | | 1 | | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Tully | 10 | | | | | | | | 2 | | | | | | | | | | | | | | | | | | 8 | | | | | | | | | | |
| Twinam | 3 | | | 2 | | .5 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Vaughn | 3 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Vong | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Walker | 0 | | | | | | | | | | | | | | | | 3 | | | | | | | | | | | 1 | 1 | | | | | | | | |
| Wynn | 3 | 3 | | | | 2 | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Zamora | 1 | | | | 3 | .5 | | | | | | | | | | | | | | | | | | | | | | 1 | | | | | | | | | |

**Notes:**

This table does not list all service on committees; instead, it lists only service as Chair of committees or faculty members as officers in one capacity. Most committee service is counted only since 2003-04. Question marks indicate any mismatch between info on a CV and info on annual committee rosters, or mean that the actual number may be higher, considering lack of data for previous years. Also, some data is missing, especially for 2004-05. *This table is a draft; please send any corrections to Alberto Martínez.*

**Appendix 4**
**Faculty listed by Years at UT**

| | | years at UT as faculty | year of arrival as faculty |
|---|---|---|---|
| 1 | Roger Louis | 48 | 1970 |
| 2 | George Forgie | 44 | 1974 |
| 3 | Bob Abzug | 40 | 1978 |
| 4 | Michael Stoff | 39 | 1979 |
| 5 | Jonathan Brown | 35 | 1983 |
| 6 | Susan Deans-Smith | 34 | 1984 |
| 7 | David Crew | 34 | 1984 |
| 8 | Bruce Hunt | 33 | 1985 |
| 9 | Martha Newman | 30 | 1988 |
| 10 | Virginia Garrard | 28 | 1990 |
| 11 | Joan Neuberger | 28 | 1990 |
| 12 | Denise Spellberg | 28 | 1990 |
| 13 | Charters Wynn | 28 | 1990 |
| 14 | Megan Seaholm | 28 | 1990 |
| 15 | Toyin Falola | 27 | 1991 |
| 16 | Neil Kamil | 25 | 1993 |
| 17 | Bob Olwell | 25 | 1993 |
| 18 | Judy Coffin | 24 | 1994 |
| 19 | Cynthia Talbot | 23 | 1995 |
| 20 | Alison Frazier | 22 | 1996 |
| 21 | Mary Neuburger | 21 | 1997 |
| 22 | Seth Garfield | 18 | 2000 |
| 23 | Mark Lawrence | 18 | 2000 |
| 24 | Alan Tully | 17 | 2001 |
| 25 | Juliet Walker | 17 | 2001 |
| 26 | Julie Hardwick | 17 | 2001 |
| 27 | Laurie Green | 17 | 2001 |
| 28 | Emilio Zamora | 16 | 2002 |
| 29 | Erika Bsumek | 16 | 2002 |
| 30 | Tracie Matysik | 16 | 2002 |
| 31 | Bill Brands | 14 | 2004 |
| 32 | Ann Twinam | 14 | 2004 |
| 33 | Cañizares-Esguerra | 13 | 2005 |
| 34 | Alberto Martinez | 13 | 2005 |
| 35 | Yoav Di-Capua | 13 | 2005 |

| | continued | years at UT as faculty | year of arrival as faculty |
|---|---|---|---|
| 36 | Madeline Hsu | 12 | 2006 |
| 37 | Huaiyin Li | 12 | 2006 |
| 38 | Leonard Moore | 11 | 2007 |
| 39 | Matthew Butller | 10 | 2008 |
| 40 | Jackie Jones | 10 | 2008 |
| 41 | Matthew Butler | 10 | 2008 |
| 42 | James Vaughn | 10 | 2008 |
| 43 | Miriam Bodian | 9 | 2009 |
| 44 | Ben Brower | 9 | 2009 |
| 45 | T. Lichtenstein | 9 | 2009 |
| 46 | Philippa Levine | 8 | 2010 |
| 47 | Daina Berry | 8 | 2010 |
| 48 | Jeremi Suri | 7 | 2011 |
| 49 | Steven Mintz | 6 | 2012 |
| 50 | Lina Del Castillo | 6 | 2012 |
| 51 | Sumit Guha | 5 | 2013 |
| 52 | Indrani Chatterjee | 5 | 2013 |
| 53 | Megan Raby | 5 | 2013 |
| 54 | A. Osseo-Asare | 4 | 2014 |
| 55 | Peniel Joseph | 3 | 2015 |
| 56 | Sam Vong | 3 | 2015 |
| 57 | J. Frens-String | 2 | 2016 |
| 58 | Walter Buenger | 1 | 2017 |
| 59 | Aaron O'Connell | 1 | 2017 |
| 60 | Ashley Farmer | 0 | 2018 |
| | | | |
| | Christopher Ernst | | |
| | Cheryl Kaufman | | |
| | Robert Icenhauer-Ramirez | | |
| | Rachel Ozanne | | |
| | Bradley Dixon | | |
| | John Alaniz | | |
| | William Kramen | | |

**Note:** Equity raises should take into account the years of service that individual faculty have contributed to UT. Also, faculty members should not be underpaid because they are older.

**Appendix 5**
**History faculty listed by annual Salaries, as of May 2018**

| | | rank in April 2018 | total compensation, Texas Tribune public report online, April 2018; not up to date? | UT 2017-18 Budget, base salary paid by History Dept. without including endowments, salary supplements, etc. | base salary, CoLA records | |
|---|---|---|---|---|---|---|
| 1 | Jones | Prof. | **302,763** | 216,352 | 228,468 | incl. 15,000 salary suppl., etc. |
| 2 | Abzug | Prof. | **285,177** | 163,883 | 171,094 | incl. 50,000 salary suppl., etc. |
| 3 | Suri | Prof. | **284,186** | 99,645 | 201,282 | incl. LBJ School, Clements Ctr. |
| 4 | Tully | Prof. | **269,425** | 249,425 | 249,425 | incl. 20,000 salary supplement |
| 5 | Joseph | Prof. | **267,466** | 100,400 | 200,800 | incl. LBJ School |
| 6 | Moore | Prof. | **265,813** | 165,000 | 180,000 | VP Division of Diversity |
| 7 | Brands | Prof. | **261,803** | 200,353 | 200,353 | |
| 8 | Levine | Prof. | **247,547** | 190,000 | 194,180 | |
| 9 | Cañizares | Prof. | **208,000** | 192,000 | 192,000 | incl. 20,000 salary suppl., etc. |
| 10 | Louis | Prof. | **193,843** | 140,340 | 143,427 | incl. 5,000 salary suppl., etc. |
| 11 | Falola | Prof. | **186,590** | 186,491 | 192,491 | |
| 12 | Stoff | Assoc. | **185,680** | 150,693 | 157,323 | |
| 13 | Guha | Prof. | **179,250** | 178,250 | 178,608 | |
| ?? | Mintz | Prof. | **XXX,XXX** | no info | 150,000 | |
| ?? | O'Connell | Assoc. | **XXX,XXX** | no info | 160,000 | |
| 16 | Garrard | Prof. | **158,750** | 122,250 | 129,096 | LLILAS Director |
| 17 | Chatterjee | Prof. | **150,600** | 150,600 | 152,350 | |
| 18 | Berry | Assoc. | **150,000** | 75,000 | 160,000 | |
| 19 | Twinam | Prof. | **136,046** | 135,043 | 136,243 | |
| 20 | Hsu | Prof. | **134,928** | 133,928 | 138,278 | |
| 21 | Neuburger | Prof. | **134,528** | 138,528 | 145,782 | 138,528 includes a 9,000 raise |
| 22 | Bodian | Prof. | **132,950** | 132,528 | 134,700 | |
| ?? | Buenger | Prof. | **129 TA&M** | no info | 150,000 | |
| 24 | Hardwick | Prof. | **128,675** | 115,808 | 117,608 | |
| 25 | Walker | Prof. | **127,033** | 127,033 | 129,533 | |
| 26 | Lawrence | Assoc. | **124,041** | 89,041 | 89,441 | incl. Clements center? |
| 27 | Newman | Assoc. | **119,592** | 119,592 | 102,942 | |
| 28 | Li | Prof. | **119,201** | 128,201 | 128,201 | 128,201 includes a 9,000 raise |
| 29 | Neuberger | Prof. | **118,513** | 106,662 | 107,462 | |
| 30 | Garfield | Prof. | **116,342** | 104,708 | 107,608 | |
| 31 | Crew | Prof. | **113,128** | 111,628 | 111,628 | |
| 32 | Deans-S. | Assoc. | **111,335** | 89,456 | 92,356 | |
| 33 | Zamora | Prof. | **111,120** | 110,919 | 112,619 | |
| 34 | Spellberg | Prof. | **110,701** | 105,701 | 106,401 | |
| 35 | Talbot | Prof. | **109,730** | 103,180 | 109,730 | 109,730 includes a 10,000 raise |
| 36 | Restad | DS.Lect. | **109,120** | no info | | |
| 37 | Martínez | Prof. | **103,650** | 102,650 | 104,550 | salary in pay stubs is 104,550 |

| 38 | Brown | Prof. | **101,567** | 101,567 | 102,367 | |
| 39 | Frazier | Assoc. | **99,879** | 89,891 | 92,391 | |
| | Farmer | Assist. | **n/a** | n/a | 95,000 | new hire, starting fall 2018 |
| 40 | Butler | Assoc. | **95,950** | 86,950 | 89,250 | |
| 41 | Hunt | Assoc. | **90,769** | 90,769 | 90,969 | |
| 42 | Bsumek | Assoc. | **90,504** | 85,504 | 86,104 | 90,504 incl. 5K teaching award |
| 43 | Matysik | Assoc. | **87,533** | 87,533 | 91,333 | |
| 44 | Lichtenst. | Assoc. | **86,600** | 76,100 | 101,650 | Director, Schusterman Center |
| 45 | Wynn | Assoc. | **85,952** | 80,952 | 81,352 | |
| 46 | Vong | Assist. | **85,556** | 70,000 | 70,200 | |
| 47 | Osseo-A. | Assoc. | **84,800** | 91,800 | 98,000 | |
| 48 | Forgie | Assoc. | **83,917/2** | 83,917 | 84,084 | |
| 49 | Green | Assoc. | **83,648** | 83,648 | 84,648 | |
| 50 | Di-Capua | Assist. | **83,271** | 83,271 | 84,021 | |
| 51 | Kamil | Assoc. | **83,198** | 83,198 | 84,198 | |
| 52 | Brower | Assoc. | **82,600/2** | 81,400 | 81,800 | |
| 53 | Coffin | Assoc. | **82,451** | 80,951 | 81,951 | |
| 54 | Olwell | Assoc. | **80,762** | 80,762 | 81,762 | |
| 55 | Ernst | Lect. | **77,139** | no info | | |
| 56 | Seaholm | S.Lect. | **77,019** | no info | | |
| 57 | Frens-Str. | Assist. | **no info** | 70,000 | 70,000 | |
| 58 | Raby | Assist. | **68,146** | 68,146 | 70,096 | |
| 59 | Del Castillo | Assist. | **67,350** | 67,350 | 68,350 | |
| 60 | Vaughn | Assist. | **65,415** | 65,415 | 65,415 | 68,965 incl. 3,500 summer course |
| 61 | Ma | Lect. | **60,811** | no info | | |
| 62 | Kaufman | Lect. | **6,999** | no info | | |
| 63 | Icenhauer | Lect. | **no info** | no info | | |

Notes:  At UT Austin, individual faculty decide whether they wish to be paid in 9 months or 12 months. The same salary can be distributed one way or the other. Still, administrative positions for faculty are usually defined and compensated in 11 month periods. This leads to the question: Should we compare 11 month faculty/admin salaries with 9 month faculty salaries?  It's possible to list all faculty by "9-month" salaries only, or, to mix "9-month" salaries with "11-month" salaries. However, most faculty carry out scholarly and/or service work *during all 12 months of the year*. (For example, much of my research and editing work happens during the summer, and I understand that my annual salary pays for that.) Therefore, the tables below lists all History faculty *by annual compensation* (from all or most UT sources).

**Appendix 6**
**History faculty listed by Publications**

| | | | rank in April 2018 | total compensation, Texas Tribune public report online, April 2018; not up to date? | *single author scholarly books* | *brief books (less than ~200pp of text), coauthored books, annotated editions* | *edited books, e-books, textbooks, self-published, memoirs + co-edited books* | *single author articles in peer-reviewed journals, in print* | *chapters in ed. vols., peer rev. or not, other scholarly articles, essays, reports (in print),* | *co-authored scholarly articles or chapters, peer-rev. or not* | *encyclopedia articles, newspaper pieces, online articles, and others, without counting book reviews* |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 377750 | Falola | Prof. | 186,590 | 16 | 30 | 24,108 | 49 | 82 | 23 | many |
| 2 | 146250 | Brands | Prof. | 261,803 | 24 | 10 | 3, 1 | 17 | 16 | | many |
| 3 | 95500 | Louis | Prof. | 193,843 | 7 | 1 | 18, 14 | 25 | 7 | 1 | many |
| 4 | 76250 | Levine | Prof. | 247,547 | 4 | 3 | 5, 5 | 26 | 27 | 4 | 21+ |
| 5 | 63250 | Suri | Prof. | 284,186 | 4 | 3 | 0, 3 | 14 | 35 | 3 | 154+ |
| 6 | 62250 | Jones | Prof. | 302,763 | 8 | | 1, 2 | 9 | 26 | 2 | 22+ |
| 7 | 60250 | Mintz | Prof. | XXX,XXX | 3 | 7 | 1, 3 | 12 | 27 | 1 | 15+ |
| 8 | 56250 | Cañizares | Prof. | 208,000 | 3 | | 1, 4 | 20 | 27 | 7 | 28+ |
| 9 | 53250 | Guha | Prof. | 179,250 | 4 | | 1, 3 | 26 | 17 | 1 | 8+ |
| 10 | 48000 | Garrard | Prof. | 158,750 | 2 | | 2, 4 | 17 | 25 | 3 | 13+ |
| 11 | 46000 | Brown | Prof. | 101,567 | 5 | | 1, 2 | 9 | 19 | 3 | 9+ |
| 12 | 35000 | Bodian | Prof. | 132,950 | 2 | | | 13 | 23 | | 6 |
| 13 | 34500 | Zamora | Prof. | 111,120 | 2 | 2 | 0, 6 | 5 | 15 | 3 | 5 |
| 14 | 33500 | Martínez | Prof. | 103,650 | 5 | | 3, 0 | 9 | 3 | | 38+ |
| 15 | 32250 | Walker | Prof. | 127,033 | 2 | 1 | 2, 0 | 8 | 17 | 1 | 50+ |
| 16 | 31250 | Lawrence | Assoc. | 124,041 | 1 | 2 | 1, 6 | 3 | 18 | | 39+ |
| 17 | 30750 | Joseph | Prof. | 267,466 | 3 | | 2, 0 | 7 | 14? | | 200+ |
| 18 | 30500 | Li | Prof. | 119,201 | 3 | 1 | | 18 | 4 | | 1 |
| 19 | 29750 | Hsu | Prof. | 134,928 | 2 | 1 | 1, 2 | 9 | 12 | 1 | 15 |
| 20 | 28500 | Butler | Assoc. | 95,950 | 1 | | 1, 5 | 9 | 15 | | 3 |
| 21 | 28000 | Buenger | Prof. | 129 TA&M | 2 | 2 | 0, 2 | 14 | 4 | 1 | 13 |
| 22 | 26250 | Neuberger | Prof. | 118,513 | 1 | 2 | 0, 4 | 4 | 15 | | 30+ |
| 23 | 24750 | Twinam | Prof. | 136,046 | 3 | | | 2 | 15 | | 2 |
| 24 | 23750 | Chatterjee | Prof. | 150,600 | 2 | | 1, 1 | 8 | 9 | 1 | 1 |
| 25 | 23250 | Talbot | Assoc. | 109,730 | 2 | 1 | 1, 0 | 6 | 9 | 1 | 3 |
| 26 | 21750 | Hunt | Assoc. | 90,769 | 1 | 1 | | 8 | 13 | | 12 |
| 27 | 21500 | Hardwick | Prof. | 128,675 | 2 | | | 11 | 7 | | 3 |
| 28 | 21000 | Berry | Assoc. | 150,000 | 2 | | 0, 3 | 4 | 8 | 2 | 37+ |
| 29 | 20750 | Garfield | Prof. | 116,342 | 2 | | | 9 | 8 | | |
| 30 | 20250 | Deans-S. | Assoc. | 111,335 | 1 | | 0, 3 | 6 | 11 | 1 | 6 |
| 31 | 19500 | Abzug | Prof. | 285,177 | 2 | 3 | 0, 1 | 2 | 4 | | 1 |
| 32 | 19250 | Spellberg | Prof. | 110,701 | 2 | | | 5 | 10 | | 20 |
| 33 | 19000 | Neuburger | Prof. | 134,528 | 1 | 1 | 0, 1 | 12 | 4 | | 8 |
| 34 | 18750 | Tully | Prof. | 269,425 | 2 | | 0, 1 | 8 | 5 | | |
| 35 | 17750 | Di-Capua | Assoc. | 83,271 | 2 | | | 9 | 4 | | 2 |
| 36 | 16500 | Frazier | Assoc. | 99,879 | 1 | | 2, 2 | 2 | 8 | | 2 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | *continued from previous page* | *rank in April 2018* | *total compensation, Texas Tribune public report online, April 2018; not up to date?* | ***single author scholarly books*** | *brief books (less than ~200pp of text), coauthored books, annotated editions* | *edited books, e-books, textbooks, self-published, memoirs + co-edited books* | ***single author articles in peer-reviewed journals, in print*** | *chapters in ed. vols., peer rev. or not, other scholarly articles, essays, reports (in print),* | *co-authored scholarly articles or chapters, peer-rev. or not* | *encyclopedia articles, newspaper pieces, online articles, and others, without counting book reviews* |
| 37 | 16000 | Crew | Prof. | 113,128 | 2 | 1 | 2, 0 | 2 | 2 | | 5 |
| 38 | 15250 | Coffin | Assoc. | 82,451 | 1 | | 1, 0 | 8 | 5 | | 7 |
| 39 | 15000 | Moore | Prof. | 265,813 | 2 | 1 | | 2 | 2 | 4 | 10+ |
| 40 | 14000 | Matysik | Assoc. | 87,533 | 1 | | 0, 1 | 4 | 8 | | 3 |
| 41 | 13750 | Stoff | Assoc. | 185,680 | 1 | 1 | 0, 4 | 1 | 4 | | 3 |
| 42 | 13750 | Brower | Assoc. | 82,600/2 | 1 | | | 6 | 7 | | 8 |
| 43 | 13250 | Olwell | Assoc. | 80,762 | 1 | | 0, 1 | 4 | 7 | | 5 |
| 44 | 12250 | Newman | Assoc. | 119,592 | 1 | | | 4 | 7 | | 4 |
| 45 | 10250 | Bsumek | Assoc. | 85,504 | 1 | | 1, 1 | 2 | 3 | | 11 |
| 46 | 10250 | O'Connell | Assoc. | XXX,XXX | 1 | | 1, 0 | 2 | 3 | 2 | 7 |
| 47 | 10000 | Del Castillo | Assist. | 67,350 | 1 | | | 2 | 6 | | 3 |
| 48 | 9500 | Green | Assoc. | 83,648 | 1 | | 0, 1 | 2 | 4 | | 7 |
| 49 | 8750 | Kamil | Assoc. | 83,198 | 1 | | 0, 1 | 3 | 2 | | 1 |
| 50 | 7750 | Lichtenst. | Assoc. | 86,600 | 1 | | | 4 | 1 | | 8 |
| 51 | 7750 | Restad | DS.Lect. | 109,120 | 1 | | | 1 | 4 | | 3 |
| 52 | 7000 | Osseo-A | Assoc. | 84,800 | 1 | | | 4 | | | 4 |
| 53 | 7000 | Raby | Assist. | 68,146 | 1 | | | 2 | 2 | | 9 |
| 54 | 7000 | Forgie | Assoc. | 83,917/2 | 1 | | | | 4 | | 6 |
| 55 | 6250 | Wynn | Assoc. | 85,952 | 1 | | | 2 | 1 | | 3 |
| 56 | 1500 | Ma | Lect. | 60,811 | | | | | 2 | | |
| 57 | 1250 | Vaughn | Assist. | 65,415 | | | | 1 | | 1 | 1 |
| 58 | 750 | Seaholm | S. Lect. | 77,019 | | | | | 1 | | 4 |
| 59 | 000 | Frens-Str. | Assist. | 70,000 | | | | | | | 6 |
| 60 | 000 | Vong | Assist. | 85,556 | | | | | | | |
| 61 | 000 | Ernst | Lect. | 77,139 | | | | | | | 1 |
| 62 | 000 | Kaufman | Lect. | 6,999 | | | | | | | |
| 63 | 000 | Icenhauer | Lect. | | | | | | | | |

**Notes:** The second-leftmost column tallies one publication score per author. In accord with salary Guidelines, it counts single author books as 4000 ($4000 raise), brief books as 2000 (and annotated editions), edited books 1500, journal articles 750, chapters 750, etc. Fairly, our department rewards any *coauthored book* as constituting less work (2000) than a single-author book (4000). Accordingly, this table doesn't count coauthored works as equal to works authored *without* the help of coauthors. It counts coauthored books as 1000, and coauthored articles as 500. Coedited books are listed after a comma, for example: (1, 2). *Not counted:* departmental committees service, promotions, entries in the rightmost column, book reviews, forthcoming works, introductions, chapters in a self-edited book (that is, edited books count only once), reprints, series editor, revised editions, translations, etc. Differences of ordering by 1 or 3 positions are within a margin of error, depending on length of publications, publications missing from CVs that were thus not counted, minor counting errors, and other factors. (By margin of error, I also mean *actual errors* on my part: that in my various efforts to revise and polish the table, I've found (and fixed) a few errors that affected the ordering slightly. –*A.M.*)

**Appendix 7**
**How Can We Identify Inequities in Salaries?**

The following summarizes a preliminary analysis from Summer 2018. In order to include total compensation in 2017-18, instead of base salary, it involves data from the *Texas Tribune*. The column in the Salaries List, above, titled "base salary, CoLA records," was obtained later.

Since the SC aims to award raises mainly on the basis of scholarly publications, we can compare salaries and publications in order to make a first approximation at identifying any inequities. To be sure, in the humanities we don't necessarily use numerical measures, such citations, as indicators of scholarly achievement. Quality is ultimately more important than quantity, so the preceding table doesn't aim to imply that whomever has published more has done better work than someone who has published fewer works. Still, the number of peer-reviewed scholarly publications is often used for determinations such as raises, earning tenure, promotion to full Professor, post-tenure review, etc.

Listing faculty by salaries alone doesn't compare all the relative merits of scholarly labors. Likewise, listing faculty by number of publications doesn't compare all relative merits either.

Still, by identifying individuals who are low in a Salaries List but much higher in a Publications List, it's possible to identify some who are relatively underpaid given our Department's Guidelines, aims, and priorities for merit raises. For some faculty, the rankings in both tables are very similar. For example, in the table of Salaries in May 2018, Prof. Hsu was #20 and #19 in Publications; Prof. Garfield was #29 in Salaries and #30 in Publications; Prof. Spellberg was #34 in Salaries and #32 in Publications; Prof. Green was #49 in Salaries and #48 in Publications; etc. Such differences are insignificant, because the two lists don't presume that the two numbers should be identical.

Differences that are much, *much larger* are problematic and vexing. The numbers in the two lists need not agree in any case, yet when they disagree to a large degree the difference can illustrate a sense of inequity that the individual faculty member already feels. Given our longstanding merit-raises priorities, it's important to measure whether individual faculty are underpaid for the quantity of their peer-reviewed scholarly publications. By comparing the two tables, we can identify faculty who are paid much less than many colleagues. To highlight the largest differences, I list only those who have differences of 10 or more between the person's rank in the two tables, as on the right:

| | *rank in Salaries list minus rank in Publications list* | *# of faculty who have higher salaries but fewer publications* |
|---|---|---|
| Brown | 38 − 11 = | 27 |
| Martinez | 37 − 14 = | 23 |
| Zamora | 33 − 13 = | 20 |
| Butler | 40 − 20 = | 20 |
| Hunt | 41 − 26 = | 15 |
| Di-Capua | 50 − 35 = | 15 |
| Coffin | 53 − 38 = | 15 |
| Del Castillo | 59 − 47 = | 12 |
| Olwell | 54 − 43 = | 11 |
| Walker | 25 − 15 = | 10 |
| Falola | 11 − 1 = | 10 |
| Li | 28 − 18 = | 10 |
| Talbot | 35 − 25 = | 10 |
| Lawrence | 26 − 16 = | 10 |
| Brower | 52 − 42 = | 10 |

16

Some of these inequities are for Associate Professors who have been in rank for a while and that hence they can be remedied once such professors become promoted to full Professor. Those individuals are: Butler, Hunt, Di-Capua, Coffin, Olwell, Lawrence, Brower.

The other Associates have all been in rank for a while, except for Yoav Di-Capua and Ben Brower, who have been Associates for only 8 years and 5 years, respectively, so consider their cases below.

The remaining ten individuals are: Di-Capua, Brower, Brown, Martínez, Zamora, Del Castillo, Falola, Walker, Li, Talbot. In the interest of equity in diversity, it is necessary to point out that 7 of these 10 faculty members are minorities, including 3 Hispanics, 2 African or African American, 2 Asian or Asian & other. Overall, 3 are women and 7 are men.

It's also worth noting why, among the latter ten individuals there are 7 full Professors, 1 Assistant Professor, and 2 Associate Professors. One reason why there are fewer inequities among Assistant Professors is that they're hired at much higher salaries than 10 or 20 years ago. One reason why there are fewer inequities among Associate Professors (who haven't been many years in rank) is because Jackie Jones had already flagged the problem of compression (salary inequities) among Associates a few years ago and rightly raised the salaries of several Associates who were underpaid.
Consider now the ten individuals listed.

**Prof. Yoav Di-Capua**
By May 2018, at $83,271, he had published 2 books, 9 peer-reviewed journal articles, and 4 book chapters. His second monograph was published in March 2018 so this entry in his list is very new, not a longstanding inequity. His raise for that book by itself would raise his salary to a point in which there are no longer 15 faculty who earn more than him (with fewer publications), but just three. However, in Fall 2018, Di-Capua received instead an FII raise that eliminated much or most of the difference anyhow.

**Prof. Ben Brower**
In May 2018, at $82,600, he earned less than 10 faculty who had published fewer scholarly works. He was the 3rd lowest-paid Associate Professor. As of spring 2018, he had published 6 peer-reviewed journal articles, 7 book chapters, plus his book. This is a solid record of scholarship. Still, one of Brower's chapters was slated to give him a raise by October 2018, plus two external invited talks which will raise his salary a bit so that there would be 8 or 9 faculty (with fewer publications) who earn more than him, not 10, which is the present focus. Thus, his case is not among the most notable in the present list, but his salary should be kept in mind, if there were funds for equity after others, below, have been prioritized.

**Prof. Lina Del Castillo**
Del Castillo's case (salary of $67,350 in 2017-18) was comparable to that of the Associate Professors, because she is up for tenure in Fall 2018. If she receives the promotion, she will have a raise in October 2019 which will cut down the evident inequity in her salary: Twelve faculty members have higher salaries than Del Castillo even though she already has more scholarly publications. She is the second lowest-paid Assistant Professor (out of 6), and was paid less than 3 Lecturers. It is unsatisfactory that the only Latina woman in our department earns less than 12 faculty with fewer publications.

**Prof. Toyin Falola**
It is very impressive that Prof. Falola has the largest number of scholarly publication in our department and is one of the most published historians in the nation. His salary of $186,590 is substantial, though we must note that he teaches 6 courses (spring + fall) instead of 4 (as most of us) or even 2 (as some). Ten History faculty members earn more than Falola despite having fewer publications. But at their range of productivity and expertise (most of them are the top of their fields) it is by no means self-evident how one

should compare their relative rankings in terms of scholarly merit. Certainly, *quantity* of publications should *not* be the only criterion. At the Salary Committee meeting in May 2018, we had a full bag of new books by Falola—all published in 2017—and we didn't even know how to assess the question of his merit raise. It's very plausible that Falola could earn more (or that he deserves to earn more). But since 45 faculty in our department (including Lecturers) earn *much less* than $150,000, and since our funding for merit raises is limited, it's not necessarily the case that our job should be to award restitution to anyone who already makes more than $150,000. Besides, Falola's case is opaque inasmuch as he's the only person in the list above with an endowed chair, and funds from chairs are not listed as salary, so his actual compensation was larger than specified here. Nevertheless, there is a complex equity issue here that deserves discussion: our most published faculty member is an Black man, but yet his compensation seems to be 11th overall. (Still, it is reassuring that two of the top six highest earners in our Department are African Americans: Moore and Joseph.)

**Prof. Huaiyin Li**
The case of Prof. Li seemed noteworthy initially: it seemed that there was a difference of 10 (as noted above) between his rank in the Salaries list and his position in the Publications list. But actually, that's an artifact of the data set from the *Texas Tribune*, which in some cases is more accurate than the data from the printed UT budget, but in this case is not correct (Li's salary = "$119,201"). The printed UT 2017-18 budget shows instead that Li received an FII raise of $9,000 in Oct. 2017, which raised his salary to $128,201. Taking this into account, we can consider the inequity as fully solved because then the difference between Li's standing in the Salaries list and the Publications list was not 10 places, but much fewer, and moreover, because Li received an additional FII raise of $21,500 in October 2017.

**Prof. Alberto Martínez**
Martínez received an FII raise of $12,500 in October 2018.

**Professor Cynthia Talbot**
She earned $109,730 in 2017-18. As noted, ten History faculty with fewer publications had higher salaries at the time. Her salary was undermined by the fact that she was an Associate Professor for 16 years, from 2001 until 2017. Thus the academic year 2017-18, was her first year as a full Professor, and as such she became the 3rd lowest-paid full Professor (after Brown and Martínez, who had already been full Professors for 25 years and 2 years, respectively). However, compared to other faculty listed here, the apparent or evident inequity in Talbot's salary perhaps is not as large or as urgent as, for example, Jonathan Brown or Juliet Walker, who have been full Professors for 35 years and 28 years respectively.

**Prof. Jonathan Brown**
He has the largest mismatch of publications versus salary in our Department. At $101,567, his 2017-18 salary was the lowest of any full Professor, and even lower than 6 Associate Professors, and 1 Senior Lecturer. Unacceptably, 27 History faculty members earned more than Brown, even though he has published more than each of them. Prof. Brown has been a faculty member at UT since 1983 = 35 years, with distinction. However, he earns less than Talbot and Martínez, who have been full Professors just 1 year and 3 years respectively. Brown has successfully carried out a constant and outstanding record of publications (#11 in quantity of publications in our Department) and student mentorship. He is the foremost scholar on the Cuban Revolution in the United States, and one of the top experts on Cuban History, plus he researches the history of other Latin American countries. He has been an important member of our nationally #1 ranked area of Latin American History. Also, Brown is contemplating retirement so his present and final salaries, whatever they be, are urgent matters.

**Prof. Emilio Zamora**
In 2017-18, his annual salary was $111,120 and thus 20 other faculty in History received higher salaries although Zamora had more scholarly publications. By itself, this disparity is alarming without even taking

18

into account his longstanding, extraordinary record of service to disadvantaged minority communities in Texas. He has won 7 book awards, 1 article award, plus 13 scholarship and public service awards. Despite being a full Professor, there are 6 Associate Professors who earn more than Zamora in our department, plus 14 full Professors, although he has more scholarly publications and more community outreach contributions as a public intellectual. It is also striking that Zamora earned less than history Prof. Andrés Tijerina *at Austin Community College*, who earns $130,000 despite a shorter record of scholarly achievements.

**Prof. Juliet E. K. Walker**
At $127,033, in 2017-18 Walker earned much more than Brown or Zamora, yet she was the 2nd lowest paid Black faculty member (of 6 in our department) although she was the 2nd most published Black faculty member (after Falola). She had won 12 publication awards plus more than 10 professional and educational awards and numerous honors. Walker has been a full Professor at UT for 17 years, plus 11 years as a full Professor at Illinois, Urbana. At our meeting, she frankly stressed the importance of having created and developed a new subfield of history: Black Business History, in contrast to faculty in our department who have added to fields that were already well-explored. Moreover, Walker has been underserved at UT inasmuch as she was recruited with the promise that UT would create the Center for Black Business History but instead only a website exists, with no funds, offices, or staff. Lastly, there were years when Walker didn't submit the forms for raises to the Salary Committee, which is another reason why her salary could and should well be higher.

The significant cases of Professors Brown, Zamora, and Walker suggest that our Department should be mindful of the compensation of senior faculty, since they are especially affected by salary compression because younger faculty are most recently hired at higher pay rates. Our Department should work to undermine any semblance of *ageism*, even if it was fostered by recruitment policies at the College and University levels. There is a possibility that our Department or the Salary Committee could reward merit raises on the basis of "historical significance of a person's scholarly work." Since the present cases of Brown, Zamora, and Walker involve senior faculty, we can consider Equity raises not merely as a way to compensate for compression, but as a particular way to reward scholarly merit: Quality of peer-reviewed publications over many years, as judged by numerous awards and honors. In this case, an Equity merit raise is also a raise about both quantity and quality of publications, akin to "lifetime achievements."

The present summaries were written by Martínez and are not meant to be exclusive of any others that can and should be made as potential equity raises. These examples serve to illustrate how salaries, number of publications, years of service to UT, awards, etc., might be used to identify candidates for Equity raises.

19

**Appendix 8**
**Faculty Investment Initiative (FII) raises, 2015-2020**

|  |  | *FII raises* | *first FII raise to last FII raise* | *Total FII raises* |
|---|---|---|---|---|
| 1 | Mary Neuburger | 5 raises of $9,000 each, plus 3 raises of $16,667 each, overlapping | 2015-20 | $95,001 |
| 2 | Huaiyin Li | 5 raises of $9,000 each, plus 3 raises of $12,500 each, overlapping | 2015-20 | $82,500 |
| 3 | Yoav Di-Capua | 3 raises of $12,500 each | 2018-20 | $37,500 |
| 4 | Seth Garfield | 3 raises of $12,500 each | 2018-20 | $37,500 |
| 5 | Julie Hardwick | 3 raises of $12,500 each | 2018-20 | $37,500 |
| 6 | Madeline Hsu | 3 raises of $12,500 each | 2018-20 | $37,500 |
| 7 | Alberto Martínez | 3 raises of $12,500 each | 2018-20 | $37,500 |
| 8 | A. Osseo-Asare | 3 raises of $12,500 each | 2018-20 | $37,500 |
| 9 | Denise Spellberg | 3 raises of $12,500 each | 2018-20 | $37,500 |
| 10 | Ann Twinam | 3 raises of $12,500 each | 2018-20 | $37,500 |
| 11 | Sam Vong | 3 raises of $10,000 each | 2018-20 | $30,000 |
| 12 | Jeremi Suri | 3 raises of $6,250 each | 2018-20 | $18,750 |
| 13 | Bill Brands | 5 raises of $4,000 each | 2015-19 | $20,000 |
| 14 | J. Cañizares-Esg. | 5 raises of $4,000 each | 2015-19 | $20,000 |

**Notes:**  The FII raises were first given to four History faculty members. Each award consisted of a series of five raises, over five years. In the fourth year (Oct. 2018), additional FII raises were awarded: two for faculty members who already had FII raises, plus, to ten additional faculty members. The FII selection committee considered factors such as "merit," "risk of flight," and ethnicity (thus 8 of the 16 awards were granted to 7 minorities, among 14 faculty).

## 2017-18 Annual Review of Faculty results

# Exhibit 5

## Llado, Jacquelin <jllado@austin.utexas.edu>

Wed 4/10/2019 2:39 PM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>

Dear Al,

Thank you for submitting your 2017-18 Annual Review of Faculty. The EC has completed their evaluation of the 2017-18 Annual Review of Faculty and you have received a rating of **Exceeds Expectations**. The results will be submitted to the Dean's Office on May 1st.

If you have any questions about the review or would like to discuss your results, please contact Jackie Jones at your earliest convenience. Thank you.

Best,

Jackie Llado
Faculty Matters Coordinator
Department of History
University of Texas at Austin
512-475-7276

Re: Salary guidelines

Exhibit 6

Alberto A. Martinez

Thu 4/19/2018 9:07 AM

Sent Items

To: Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Restad, Penne <restad@mail.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>;

hi everyone,

Jorge is right: there are longstanding problems in our department governance. Maybe it's a structural problem, or cultural, but it's here. As he has pinpointed, there is a kind of discrimination that is "the unwitting creation of unquestioned everyday choices."

Like Jorge, English isn't my first language, and I did not grow up in the states; I grew up in Puerto Rico, a crowded and now-wrecked colony of the US empire (even if my friend Tony Hopkins prefers to call it a "hegemon"). Whether one is a foreigner, a minority, or a colonial subject, one has ethnic and cultural differences and therefore, to some extent, one accepts a marginal role in the periphery, partly by simply assuming: it's probably not about ethnicity or race, maybe it's just personalities, that is, people don't all get along equally well.

But I don't think that anymore.

Jorge, I'm sorry to hear that you've had insufficient opportunities to contribute to our department. Why has nobody replied?? And I'm also completely surprised --- because I had always assumed that YOU were the one Latino faculty member in our department who had successfully become part of the Top Tier.

In other words, I knew that Anne Martínez and John McKiernan-González had big complaints about how they were treated here. Similarly, I knew that Emilio has never been elected or given the opportunity to

serve in the EC, and that he has additional equity concerns. And I knew that my good friend Neil Foley (Mexican-American) felt very disenfranchised here, and so he left. What about Frank Guridy, why did he leave? What about Lina? As for myself, I too have often felt disenfranchised from our department governance and events. (For example, I've been here 13 years but I've never been invited to give a talk at a History Dept. or IHS conference, or to comment on a paper, or even to chair a session. I was in the EC one time, but only because I campaigned and begged. I was in the IHS once, but only after complaining about being rejected while white colleagues were appointed two and three times. Since November, I finally have allocated research funds, but only after I pointed out that I didn't receive research funds when I was promoted to Associate or full Professor, whereas others did. Still, I am thankful for the opportunities I've received.)

But it never, Never, occurred to me that YOU (Jorge) were somehow disenfranchised too, because I knew that you have a high international profile, and well-deserved, and I assumed that you were treated here as one of "the stars."

So thank you for frankly though painfully listing the ways in which you have not had enough access to participate in governance at UT. This is important, so I commend you for your belated honesty. For years, I've heard many faculty complaints about this and that, usually in hallways, in whispers, and in "Please don't tell anyone, but..."

It's unacceptable that Assistant Professors are socialized to be quiet. Who exactly is giving such awful advice? It's unacceptable that Associate Professors likewise learn to be quiet even though they have tenure. As for full professors, what can I say?

I think we'd be much better off if everyone actually says what they think. (And I know that culturally this is one reason why a Puerto Rican might seem annoying at UT: "He doesn't know his place..." I've actually heard that here.)

I started out as a visiting Lecturer here, so I know what it's like to be in the invisible category. Over the years, I've seen a lack of solidarity toward Assistant Professors in this department (more than in any other), especially when going up for tenure. I've also seen a lack of solidarity toward Associate Professors here. So too, certain minorities also face obstacles here, whether they arise from an inconsiderate thoughtlessness or an unconscious bias.

To those who don't know me, I apologize for not speaking up more over the past few years-- I've been very busy. But to be clear, there are systematic, long-lasting issues of marginalization and inequity in this department. Even if they are not intentional, they do exist and have affected multiple faculty members, and not just minorities.

We need to discuss ways to rotate appointments fairly and to improve governance and equity.

Sincerely,

Alberto


Professor, Department of History
Director, Certificate Program in History & Philosophy of Science
John E. Green Regents Professorship in History

University of Texas at Austin
128 Inner Campus Dr., Stop B7000
Austin, TX  78712-0220

Exhibit 7

May 2, 2018

PUBLIC STATEMENT ON GOVERNANCE

For the Hispanic faculty in our department, the recent request to review our governance structure gave us an opportunity to review equity issues. Some disparities have originated from outside, from broader university policies. Yet certain issues have arisen from within. We realize that they can arise unintentionally: marginalization happens as the unwitting consequence of unexamined assumptions and everyday choices. We want to share some of our experiences in order to illustrate how some faculty members can be inadvertently excluded from our governance:

(1) In the past fourteen years, we have not had the opportunity to serve in key positions such as Chair, Associate Chair, Director of the IHS, Chair of the Salaries Committee, Graduate Advisor, or Director of Graduate Studies. Likewise, none of us has been appointed to serve as chair of a Faculty Search Committee, even in our own fields of specialty.

(2) None of us has served as Chair of any of the more than fifteen "Ad Hoc Committees" in our department. These include the IHS Steering Committee, Third Year Review Committee, Post Tenure Review Committee, Teaching Excellence Committee (or its two subcommittees), Curriculum Action Team, Assessment Committee, Undergraduate Scholarship Committee, Endowment Review Committee, Social Media Committee, Recruitment & Retention Committee, Dual Enrollment Committee, and FII Hires Committee.

(3) None of us has been *elected* to the Executive Committee, with only one exception (in 2010, Martínez actively campaigned but was then tied with Karl Miller, leading to a run-off election in which Miller kindly endorsed Martínez).

(4) Three Hispanic faculty (but not Cañizares-Esguerra) are nearly at the bottom of the pay scales by rank, contrary to our long records of publication and scholarship.

(5) We would like to help define departmental fundraising campaigns. Hispanic faculty should be part of our fundraising efforts, since more that 40% of the population in Texas is Hispanic and nationally our Department is #1 in Latin American History.

(6) None of us has received a teaching award, despite our record of pedagogical innovation and excellence.

Similar issues affect other colleagues too, although they don't voice them publicly. Therefore, we request an internal assessment, a Report, to help fix inequities. It should review equity *broadly*, to include not just Hispanics, but other minorities, gender, and any colleagues who feel disenfranchised.

Cordially,

Emilio Zamora
Jorge Cañizares-Esguerra
Alberto A. Martínez

**Committee on Equity**

<span style="float:right">Exhibit 8</span>

## Alberto A. Martinez <almartinez@austin.utexas.edu>

Sat 5/5/2018 10:07 AM

**To:** Raby, Megan <meganraby@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>
**Cc:** Jones, Jacqueline <jjones@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>

hi Joan, Emilio, Megan, Michael,

thank you for kindly agreeing to serve on our Committee on Equity.

As Jackie said near the end of our meeting, we'll look at three main areas of concern listed in Wednesday's Agenda: Department governance, Merit increase guidelines, and nurturing of junior faculty. In agreement with Emilio, we'll create "a Report, and a plan of action to help fix inequities," and to "review equity *broadly* to include not just Hispanics, but other minorities, gender, and any colleagues who feel disenfranchised." In agreement with Jeremi we'll base our report on a careful collection of facts, and in agreement with Martha, Megan, and Jackie we'll also carry out some sort of Climate Survey, in order to solicit, listen, and respond to how faculty feel in our department.

I fly to Puerto Rico today until the 19th, and I understand that Michael is on leave during the summer. Still, we will begin the process of collecting data presently. So, if you have any relevant information please do share it. For example: old lists of membership in committees for the past 15 years, and as Alan fairly suggests, "a year-by-year roster on hirings, potential hirings, resignations, terminations, leaves and information as to who is up for promotion and promotion and tenure."

Finally, any suggestions are welcome.

Many thanks again,
Al


Chair,
Committee on Equity

Exhibit 9

**Selection of written statements by faculty which evince inequities, marginalization, discrimination, or racism in the History Department.**

Emphases added in bold, race/ethnicity added in brackets.

10/12/2016    Lina Del Castillo [Hispanic] to seven professors

"this language of 'Latin American Area' or 'Latin American Area Faculty' [which excludes the only Latin American professor] deeply concerns me in terms of the potential **hostile environment** that it could create for Jorge, for me, and for Jorge's students, many of whom are mine as well."

10/12/2016    Del Castillo [Hispanic] to Alison Frazier [White]

"I am truly disturbed by the idea that this is not going to hurt Jorge. It is. Of course it is.  . . .  I do think that **this interaction is hostile,** for **it marginalizes Jorge,** the person who is MOST from Latin America (I was born there, but raised here) from being considered worthy of teaching 'core' courses in Latin America, EVEN IF ALL THE CONTENT HE TEACHES IS RELATED TO LATIN AMERICA."

3/6/2018      Prof. Juliet Walker [Black] to Alberto Martínez  [Hispanic]

"the **racism expressed by many history department faculty,** I am not surprised. ... African American history illuminates the extent to which Black Progress in the search for equality only comes with protest but protest followed by creative new strategies to maintain the racial status quo.  ...  **a climate of racial hostility in the history department.**"

4/13/2018     Jorge Cañizares-Esguerra [Hispanic] to faculty

"The current structure of executive committee **systematically marginalizes** those who do not cultivate social or political relations within the department."

4/13/2018     Alberto Martínez [Hispanic] to faculty

 "the current structure of the EC **marginalizes** various members of our department. ... For example, Erika Bsumek [White] has kindly served in the EC six times (six years) in 14 years. Yet in the same time period Juliet Walker [Black] and Emilio Zamora [Hispanic] have not been in the EC even once."

4/14/2018     Tracie Matysik [White] to Martínez [Hispanic]

"**I am staying quiet** about this publicly, mostly because I am associate, and I am told over and over again that I should ignore these things and get my book done. But I thank you for speaking up publicly."

4/16/2018     Jorge Cañizares-Esguerra [Hispanic] to faculty

"I have experienced governance as **marginalization** due to the lack of clarity in the composition of committees and how some of them operate."

4/16/2018      Emilio Zamora [Hispanic] to faculty

"some colleagues have served an inordinate number of times while others have
consistently voted for themselves and lobbied for votes, but have served
little or not at all. ... address **equity issues**."

4/16/2019      Emilio Zamora [Hispanic] to faculty

"I do not know if the **salary Committee** or the EC has given any weight to
this important part of my work as a scholar."

4/17/2019      Jorge Cañizares-Esguerra [Hispanic] to faculty

"I am also **fearful of creating a backlash** that would ultimate affect how the
department votes for Lina in August. We have to tread carefully. Yet given
the nature of our discussion, **I cannot remain quiet**. I think the subtext of
Al [Martínez]'s message is the undertow of **racial discrimination** our current
structures of governance promote. **Blatant discrimination** is not a diabolic
master plan; it is the unwitting creation of unquestioned everyday choices...
I know this note is not meant to offer solutions. It is simply to avoid that
the department sweeps Al's comments (and mine) under the rug."

4/17/2018      Alberto Martínez [Hispanic] to Cañizares-Esguerra

"thank you for sharing your thoughts and concerns with the Department. I'm
surprised that nobody has replied yet. It will be stunning if nobody
addresses **the racial factor** directly. Yes, I was certainly thinking about **the
racial factor** when I wrote my group email. For too many years I've seen that
**several faculty here treat me differently than they treat others. I can think
of many instances**, such as that I've Never been invited to speak at any of
the many department conferences, nor to chair a session, or even to comment
on a paper. If one compares it to how often they've invited, say, Bruce [Hunt /
White] or Megan Raby [White], to speak or comment, the difference is stark,
especially given that my fields of scholarship in history of science are
broader than theirs, and that I've published more, and have a higher rank. So
why is it? ... **This kind of discrimination** seems to be the result of an
inconsiderate thoughtlessness, a failure to extend credibility and respect.
Similarly, I have emails from Juliet telling me of how she has been **neglected
and ignored** for years. Emilio [Hispanic] too has sometimes told me that he is
not appointed to Search Committees in which he'd be a perfect fit, and that
he has never been in the EC, although he has wanted to be. Ruramisai [Charumbira
/ Black] likewise **complained** (informally and formally) about being **ignored and
excluded**. Lina has experienced **enormous stress**. Anne Martinez [Hispanic] and
John McKiernan-González [Hispanic] **both complained** that they were not treated
fairly by the Department. As far as I know, Huaiyin Li [Chinese] has never been
in the EC. My good friend James Wilson, who is African American, also **felt
very excluded** here, and I remember several incidents, such as when he once
scheduled a talk in the Department, and he was hurt to see that not a single
professor attended, other than me."

4/18/2018      Jorge Cañizares-Esguerra [Hispanic] to Martínez

"I have other more damning stories to tell but I restrained myself for
Lina's sake. **The scale of the disrespect is monumental.**  What happened to me
with our Latinamericanists is surreal: 7 gringos decided that the only Latin
American in the department should not be in the LA area and have a voice on

decisions affecting his own students. 7 white colleagues decided I was not sufficiently of a Latinamericanist... Lina [del Castillo / Hispanic] formally filed a complaint with the university over **hostile working environment.**"

4/18/2018     Tracie Matysik [White] to Martínez

"And would love to talk with you one on one at some point about this EC stuff.  I think it is important, and I'm glad Jorge named the **structural racism** that it perpetuates."

4/19/2018     Alberto Martínez [Hispanic] to faculty

"Jorge is right: there are longstanding problems in our department governance. Maybe it's a structural problem, or cultural, but it's here. As he has pinpointed, **there is a kind of discrimination** that is "the unwitting creation of unquestioned everyday choices."  Like Jorge [Hispanic], English isn't my first language, ... Whether one is a foreigner, a minority, or a colonial subject, one has ethnic and cultural differences and therefore, to some extent, one accepts a **marginal role...**   I knew that Anne Martínez [Hispanic] and John McKiernan-González [Hispanic] had big **complaints** about how they were treated here. Similarly, I knew that Emilio has never been elected or given the opportunity to serve in the EC, and that he has additional **equity concerns**. And I knew that my good friend Neil Foley (Mexican-American) felt very **disenfranchised** here, and so he left. What about Frank Guridy [Black], why did he leave? What about Lina [Hispanic]? As for myself, **I too have often felt disenfranchised** from our department governance and events. (For example, I've been here 13 years but I've never been invited to give a talk at a History Dept. or IHS conference, or to comment on a paper, or even to chair a session. I was in the EC one time, but only because I campaigned and begged. I was in the IHS once, but only after complaining about being rejected **while white colleagues** were appointed two and three times. ... certain **minorities** also face obstacles here, whether they arise from an inconsiderate thoughtlessness or an **unconscious bias**. ... to be clear, **there are systematic, long-lasting issues of marginalization and inequity in this department.**"

4/19/2018     Aaron O'Connell [White] to faculty

"'why has nobody replied?' - **silence is no longer an option for me.**  If three of **our Latinx colleagues feel there is a disparity** in our governance structures, then we cannot ignore it or it will surely fester and breed greater resentment. Jorge and Alberto and Emilio have done the socially-difficult thing of raising **an uncomfortable issue**; ...  My own experience has been almost the exact opposite of what Alberto and Jorge noted about opportunities within the department and around the university.  ... I do know that **we can't ignore the issue, or it will surely get worse.**"

4/19/2018     Martha Newman [White] to faculty

"Some in the department feel that there is an undertow of **racial discrimination** in our governance structures. Some feel that there are severe **gender inequities** in the ways essential administrative work"

4/19/2108     Tracie Matysik [White] to faculty

"I want to thank Al and Jorge for raising the issue of the culture of our department and the **structural exclusions** it has created. I do hope we will devote serious energy to and intentional conversation about our departmental

culture and governance, **seeking to establish explicitly anti-racist and inclusive practices** as a result. I hope we will also take a hard look at the situation of assistant professors in our department and the way that **marginalization / alienation** may undermine their ability to be successful here. In the 14 years that I've been here, 11 assistant professors have been denied tenure or – in three cases – have left before being denied (having been told that their prospects were not good). That is a disastrous rate that harms the individuals involved as well as our department as a whole. What can we do to create an environment that is **more inclusive** and more conducive to success for our faculty at every rank?"

4/21/2018     Jorge Cañizares-Esguerra [Hispanic] to faculty

 "but I also shed tears of anger and frustration. ... I was on campus in the hallways this week and I felt **deeply uncomfortable**,  .... there are **appalling salary inequities,**"

4/23/2018     Alberto Martínez [Hispanic] to Martha Newman

 "for years some have voiced concerns about **gender inequities**, and about **inequities in salaries**, and about excessive service obligations. What's new for me is realizing that there's a pattern in how **some of us have been marginalized**, whether it was inadvertently or intentionally.  ...  **ugly inequities**."

4/24/2018     Martha Newman [White] to Martínez

 "I think it is important for us to recognize the pattern and the perceptions of **marginalization** that you, Emilio, and Jorge are articulating. **Racial and ethnic marginalization has been a problem in the department for a very long time.**"

5/1/2018     Alberto Martínez [Hispanic] to Juliet Walker

 "As you know, Jorge, Emilio and I have been putting some things on the table, in group emails, because **we're tired of being disenfranchised**. Still, **I respect your silence** in the group email chain, since it's not a very dignified venue. ... lead to appropriate actions in terms of solving **compensation inequities,**"

5/2/2018     Juliet Walker [Black] to Martínez

 "WOW!--you put in a tremendous amount of work to compile this information. ...  the EXCom-and other dept 'somebodies' **have turned me into a scholar nonentity**, notwithstanding all I have done as exemplified by my 66 page CV. ... all these **negative actions** and assessments of me by **this group of white supremacists** in the dept--as well as the black loyalists--I guess if I was making their money, I would also go shuffling around, too. Fortunately, I do have a record of an impeccable record of scholarship--"

5/4/2018     Alberto Martínez [Hispanic] to Huaiyin Li [Asian]

 "I was glad that you appreciated the points we were making at the faculty meeting on Wednesday, and I was especially glad that you appreciate the value of having a systematic accounting of publications. As I suggested at the meeting, I'm disappointed that **you have not had the opportunity** to serve on the EC, since it's a chance to help steer the department. To that end, I'm hoping that you can please join my Committee. Like myself, and like Emilio,

Juliet, and others, you have personally experienced what it's like to be a bit invisible in this department, and this is what I want to fix, the **unconscious bias**. The department should belong to all of us, and it should offer **equal opportunities** for its members."

5/4/2018    Huaiyin Li [Asian] to Martínez

"I enjoyed our conversation yesterday and fully support your leadership of the equity committee."

5/5/2018    Alberto Martínez [Hispanic] to Committee on Equity

"As Jackie [Jones] said near the end of our meeting, we'll look at three main areas of concern listed in Wednesday's Agenda: **Department governance, Merit increase guidelines, and nurturing of junior faculty.** In agreement with Emilio, we'll create 'a Report, and a plan of action to **help fix inequities**,' and to 'review equity broadly to include not just **Hispanics, but other minorities, gender,** and any colleagues who feel disenfranchised.' In agreement with Jeremi we'll base our report on a careful collection of facts, and in agreement with Martha, Megan, and Jackie we'll also carry out some sort of **Climate Survey**, in order to solicit, listen, and respond to how faculty feel in our department."

5/6/2018    Alberto Martínez [Hispanic] to Juliet Walker

"at the faculty meeting, I was stunned again that nobody expressed the basic kind of courtesy that one would expect when three Hispanics (and implicitly four) openly state that for 14 years they've been excluded from serving as chair in any of the ad hoc committees, and have likewise been **marginalized in several ways.** The least I'd expect would be: 'I'm surprised and sorry to hear that you've been **disenfranchised**, or have felt excluded, but I want you to know that such oversights won't happen anymore and I look forward to working with you to help make things better. **Discrimination of any kind** will not be tolerated in this Department.' But no. Nobody said anything like that, as you saw, despite the big turnout: more than 50 faculty. It's stunning. The closest sympathetic comment was from Ginny [Virginia Garrard], who rightly said that 'as a white woman, ... we should take a long, careful look at ourselves,' suggesting that at least some faculty may be under the spell of an **unconscious bias.** And indeed they are. (Or at least I don't know if it's intentional.)"

5/11/2018    Jacqueline Jones [White] to Committee on Equity

"My chief suggestion is that, looking to the future, you develop positive recommendations related to departmental structures and policies that will **ensure an equitable distribution of resources and influence** among various groups and all individuals."

5/11/2018    Alberto Martínez [Hispanic] to Committee on Equity

"**My aim is to help increase equity** in our department, and to that end we will prepare a Report with recommendations. It'll be based on historical data, faculty input, and your thoughtful analysis. I certainly agree with Jackie's suggestion that we should 'develop positive recommendations related to departmental structures and policies that will **ensure an equitable distribution of resources and influence** among various groups and all individuals.'"

7/20/2018      Cynthia Talbot [White, Asian] to Martínez

 "I'm glad you have the spirit and energy to engage in this effort; **I have
frankly given up.**  ... Thanks for the consideration you've shown to my
circumstances."


9/24/2018      Abena Osseo-Asare [Black] to Martínez

 "**I felt quite uncomfortable** about how **my concerns were constantly dismissed**
[by Julie Hardwick].  ...  the genuine and important **perspectives of the minority**
and that is something we need to grapple with. I was especially concerned
with how it would impact the African history classes. ... **the way that I was
treated** [by Julie Hardwick] and the whole style of leadership for that committee
that got to me."


10/19/2018  Toyin Falola [Black] to Martínez

 "Here is my personal advice, which I am making to remove yourself from the
center of all the **unnecessary attacks** (I was expecting disagreements but not
at **this sustained level of anger**) is to say that you are just dealing with
compilation of facts and records  . . . .  As you can tell, I keep to myself,
which is why **I am super productive, although I am not rewarded for it.**"

Re: on the lack of black students at UT

Exhibit 10

Walker, Juliet E K

Tue 3/6/2018 11:53 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Hi Alberto,

Yes, I read your op-ed piece--you should send it to the NYTimes op ed section with another title, maybe something including "No Black Panthers at UT Austin"  Moreover, of the blk students admitted each year--how many admitted, how many are athletes?

If UT admission representatives are a reflection of the racism expressed by many history department faculty, I am not surprised.  Yes, the history department has its "favorite blacks" among the few in the department and I am not one of them.  African American history illuminates the extent to which Black Progress in the search for equality only comes with protest but protest followed by creative new strategies to maintain the racial status quo.

But increasingly, class is becoming the dominant actor.  As you indicated, many of the black students admitted came from schools that require tuition--thus, counterparts to the many white students from wealthy families.  Moreover, ironically, Nigerians in the USA as well as England, have the highest percentage of advanced degrees.  Why?  How?  They are black--the real "Black Panthers?"At the same time, the new class system has awakened the white working class to a position where they are beginning to recognize that in 21st century America being white alone will no longer guarantee them the status of white supremacy that existed for the past four centuries.

As for me, I do my job--teaching- and research and writing in a climate of racial hostility in the history department. And, I say again, the history departments has its approved blacks but how many have:  12 publication awards?  have recognition for establishing a new field in African American history?   have won three lifetime achievement awards, elected a "Texas 10" --but yes another black was elected a "Texas 10."
Why do I spend time responding to your email--you have been one of the five out of 65 history department faculty who has spoken to me over the years.  Indeed, Sam Vong was the first Asian who spoke to me--a few Indians.  Recently, like this 2018, a few more dept members will nod when they see me.  Before, two or three whites.

As indicated earlier--you should send your op-ed to the NYTimes, but like the TX papers, most likely, they will ignore it, maybe not.   Maybe, if you could include info on universities whose blk students have increased, such as Harvard.  Or, take a look at the various University of California schools---in each, I believe, whites are in the minority such as at UC Berkeley --blue 35.3% Asian and Red, 26.9% whites.



Ethnic Diversity of Undergraduate Students at University of California - Berkeley

- Asian — 35.4%
- White — 26.3%
- Hispanic/Latino — 14.7%
- Non-Resident Alien — 12.9%
- Black or African American
- Ethnicity Unknown — 8.4%
- Other

https://www.collegefactual.com/colleges/university-of-california-berkeley/student-life/diversity/

The other U CA schools have similar admissions  See for UCLA:

UCLA is an ethnically diverse campus, but the small number of **African American** undergraduates continues to be an issue. Among the nearly 25,300 U.S undergraduates there, about 39% are **Asian American** or **Pacific Islander**, 31% are white, 20% are **Latino** and 4% are black, according to last fall's statistics.May 4, 2014

Anyway,  doubtless, the mentality of UTAustin's Admissions people can be compared to the white working class being left behind.

I commend your bravery for writing such an important article and glad, at least, that UT's newspaper was not afraid to publish it.

Best,
Juliet

---

**From:** Alberto A. Martinez
**Sent:** Tuesday, March 6, 2018 9:37:47 AM
**To:** Walker, Juliet E K
**Subject:** on the lack of black students at UT

hi Juliet,

I here send you an op-ed I published in the Daily Texan yesterday. I had actually sent it to the Statesman and the Houston Chronicle, but they didn't even reply. So I'm glad the students at the DT ran it:

http://dailytexanonline.com/2018/03/04/are-ut-applicants-excluded-because-of-color-or-money

Pleas share it with anyone.
I do hope that it can help raise awareness of the problem. Decades ago, 0% black enrollments was awful, but we shouldn't be complacent with 4% undergrads, not at a public university. Plus, it's absurd that at the same time, 38% to 56% of our students come from rich families, it's outrageous.

Best,
Al

# changes to major

Abena Dove Osseo-Asare <osseo@utexas.edu>

Mon 9/24/2018 9:34 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Hi Al,

It was nice to see you last weekend. I was thinking it would be good to do some kind of revisit of the proposed changes to the major to ensure equity. I was on that committee and have to say I felt quite uncomfortable about how my concerns were constantly dismissed. The funny thing about democratic approaches, and majority rules is that it can really minimize the genuine and important perspectives of the minority and that is something we need to grapple with. I was especially concerned with how it would impact the African history classes since currently students are supposed to take a certain number of non-West and this gets us a lot of traffic.

Then there is the question of all pre-1800 requirements as opposed to some pre-1800 or even just pre-1900. To be honest, I think the changes will be the death knell in an already floundering history major program. Students come to my office so sad they are senior history majors with what they perceive to be no job prospects. I do fear it is going to be a rich kid's major, where if you need a "practical" degree to get a job to help support your family you will have to turn elsewhere. We really need to think more deeply about how what we do interfaces with communication studies, digital history. Making students take additional courses in pre-1800 history may actually be a disaster. I realize people are trying to make sure their courses are required, but if doing so kills the whole department then that is a bigger fiasco.

Was trying to find all the correspondence on this to forward your way, but might make sense to set up a time to chat, too. It really was not just about pre-1800 in the end, but the way that I was treated and the whole style of leadership for that committee that got to me.

best,

Abena

Abena Dove Osseo-Asare

# RE: Action Required: Department Governance Structure Vote

## Canizares, Jorge Canizares-Esguerra

Fri 4/13/2018 12:00 PM

To: Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@austin.utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>;

Dear Art

This is the first time I have had the opportunity to vote on issues of self-governance. Although we are just asked to vote, I think this is too important not to express an opinion. The current structure of executive committee systematically marginalizes those who do not cultivate social or political relations within the department. With dying parents, a toddler, and a dozen graduate students, I really have had no time to try to create the networks to be popular and be elected. The current structure, moreover, has given extraordinary power to a very small group to make decisions on promotion and tenure. Our record is alarming. The choice of the "budget council" in this ballot,  on the other hand, seems to marginalize all associate and assistants. It is really not a serious option.  Finally the choice of an "extended budget council" seems to imply that associates and assistants might or might not  be "invited". It is not a realistic option either. Worse, it seems to give the chair and the Dean immense power. I would have liked to have the opportunity to think about all this and give ourselves real alternatives of representation and rotation. I think the EC works but people who have been elected can't serve again until everybody else within rank has also served. In the case of tenure/promotion, every tenured faculty should vote and participate in the same way we vote when we hire someone. I really cannot vote on any of these three options.

Best

Jorge

---

**From:** Flores, Arturo R
**Sent:** Friday, April 13, 2018 1:10 PM
**To:** Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Abzug,

# Re: Action Required: Department Governance Structure Vote

## Burnett, Virginia Garrard

Fri 4/13/2018 2:04 PM

To:Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>;

Cc:Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Restad, Penne <restad@mail.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>;

Having served on the EC a number of times, I like proposal #1. But I feel real concern about debating tenure cases within the general faculty, primarily to protect the privacy and the intellectual integrity of every candidate; like it or not, these discussions are not always dignified. We do have the (usually poorly attended) open meeting on tenure cases and that is something we should all engage with much more seriously, in my opinion.

Virginia Garrard
Director and Professor of History



**LLILAS Benson**
**Latin American Studies and Collections**
University of Texas, Austin 78712
SRH 1.314D, 2300
Red River St.,  Stop D0800
Austin, Texas
78712-1428    512.232.2409

On Apr 13, 2018, at 3:57 PM, Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu> wrote:

I reiterate my two proposals:
1. Those who have been elected to the EC can't serve again until everybody else within rank has also served (we have cases of senior full and associate faculty who in two decades have never served in the EC)

# Re: Action Required: Department Governance Structure Vote

## Alberto A. Martinez

Fri 4/13/2018 7:21 PM

To: Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>;

Cc: Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huayin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Restad, Penne <restad@mail.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn @utexas.edu <wynn@utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>;

hi everyone,

I agree with Jorge's frank remark that the current structure of the EC marginalizes various members of our department. For me, it's especially unfair that the current process creates anomalies such as reappointing colleagues who already served multiple times (and don't necessarily want to do it again so soon) -- instead of asking others who have never done it, or nearly never, whether they'd like to participate.

For example, Erika Bsumek has kindly served in the EC six times (six years) in 14 years. Yet in the same time period Juliet Walker and Emilio Zamora have not been in the EC even once. It's not entirely helpful in Erika's path to promotion to be busied by the EC so many times, and meanwhile, our department misses out on not having Juliet and Emilio participate in the EC. To be sure, Juliet and Emilio both started as full professors here, but still, there should be better means of ensuring that everyone gets a chance to contribute.

So, I basically agree with Jorge's Proposal #1:
"Those who have been elected to the EC can't serve again until everybody else within rank has also served (we have cases of senior full and associate faculty who in two decades have never served in the EC)." And sure, we can refine the wording.

Also, I propose that the election of EC members should be preceded by a group question: "Is there anyone who wants to serve in the EC next year?" I assume that if some colleagues reply "I would," and

are therefore designated as willing, motivated candidates, then others would be more prone to vote for them.

I also agree with Jorge that the current EC structure gives too much power to a small group to make tenure decisions. I worry that in tenure decisions our department grants too much weight to the opinion of colleagues who (a) have little or no expertise in the field they are evaluating, and (b) disagree with the recommendations of outside scholars who are top experts in the field in question. (I'm trying to recall an instance in which a UT committee instructed our department that we should take more seriously the solicited, outside tenure evaluations by experts; I think it was the Committee of Counsel on Academic Freedom and Responsibility?)

Therefore, I agree with Jorge's Proposal #2 that perhaps voting for promotions need not be restricted to the EC, but could well include votes by other faculty members. Thus, we would get a better sense of whether "the Department" wants to promote a colleague or not.

I also agree that we need to discuss what we can do to help support, advance and promote our colleagues. Discussions of promotion should always be dignified, and if they're not then that has to be fixed; I like openness and transparency, so a dose of less secrecy might help in securing fairness.

Best wishes,
Al


Professor, Department of History
Director, Certificate Program in History & Philosophy of Science
John E. Green Regents Professorship in History

University of Texas at Austin
128 Inner Campus Dr., Stop B7000
Austin, TX  78712-0220
tel. 512-517-2755, fax 512-475-7222
almartinez@austin.utexas.edu
http://liberalarts.utexas.edu/history/faculty/aam829
http://www.martinezwritings.com/m/About.html
http://liberalarts.utexas.edu/hps/

---

**From:** Burnett, Virginia Garrard
**Sent:** Friday, April 13, 2018 2:04 PM
**To:** Canizares, Jorge Canizares-Esguerra
**Cc:** Flores, Arturo R; Llado, Jacquelin; Berry, Daina R; Bodian, Marion E; Brands, H W; Brower, Benjamin C; Brown, Jonathan C; Bsumek, Erika M; Buenger, Walter L; Butler, Matthew J; Chatterjee, Indrani; Coffin, Judith G; Crew, David F; Deans-Smith, Susan; Del Castillo, Lina M; Di-Capua, Yoav; Toyin Falola; George Forgie; Frazier, Alison K; Frens-String, Joshua; Garfield, Seth W; Laurie Green; Guha, Sumit; Hardwick, Julie; Hsu, Madeline Y; Hunt, Bruce J; Jones, Jacqueline; Joseph, Peniel E; Kamil, Neil D; Lawrence, Mark A; Levine, Philippa J; Li, Huaiyin; Tatjana Lichtenstein; British Studies; Alberto A. Martinez; Matysik, Tracie M; smintz@utexas.edu; Moore, Leonard N; Neuberger, Joan H; Neuburger, Mary C; Newman, Martha G; O'connell, Aaron; Olwell, Robert A; osseo@utexas.edu; Raby, Megan; Restad, Penne; Seaholm, Megan; Spellberg, Denise A; Stoff, Michael B; Suri, Jeremi; Talbot, Cynthia M; Tully, Alan; Twinam, Ann; Vaughn, James M; Vong, Sam C; Walker, Juliet E K;

# Re: one more thing

Alberto A. Martinez

Sun 4/15/2018 5:03 PM

Sent Items

To: Matysik, Tracie M <matysik@austin.utexas.edu>;

hi Tracie,

thank you for writing. I agree that we should have some sort of a rotating system for the EC, as Jorge too suggested.

And I also think that it should include people who allegedly or presumably don't want to do it. Who? Is that why some people never serve? Or others who have never had a chance even though they repeatedly nominate themselves, such as Emilio.

Among the names of the never-there in the EC during the last eight years or so, we have: Emilio, Falola, Walker, Frazier, Roger L, Julie, Seth, Laurie, Mintz, Olwell, Denise, Ann Twinam, etc. Not a few! (This is an initial tally, from EC email lists and pdfs, I have to cross-check names with CVs too.)

Anyhow, I also agree with you that the more important, neglected and urgent issue is how to improve our tenure process. Anyone who often votes against our colleagues might think that this is all normal and fine --yet it isn't in other departments!

Best,
Al

---

**From:** Matysik, Tracie M
**Sent:** Saturday, April 14, 2018 3:12:56 AM
**To:** Alberto A. Martinez
**Subject:** one more thing

I wouldn't generally advertise this information, but as Erika knows, she and I have served mirror terms on the EC – we tend to rotate.  And in apparent direct contradiction with the guidelines Art circulated, I have not only served 4 times on Salary Committee but even chaired it two years ago.

My own over-service is not really the issue, though.  I am most concerned, like you, about our broken tenure system.  It is a calamity that we cannot continue to ignore.  While our governance structure is not the sole cause of this ongoing calamity, we have to inspect it as well as our culture as a whole to see how we continue to inflict horrible losses on ourselves.

One option for the EC would be to have a rotating system rather than elected?  And tenure should be decided by the department as a whole – trust in democracy that way.

I am staying quiet about this publicly, mostly because I am associate, and I am told over and over again that I should ignore these things and get my book done.  But I thank you for speaking up publicly.

Tracie

# RE: department governance structures

## Canizares, Jorge Canizares-Esguerra

Mon 4/16/2018 9:58 AM

To: Llado, Jacquelin <jllado@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Restad, Penne <restad@mail.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>;

I appreciate Jackie's effort to compile all this evidence from COLA department in such record time. Sociology, that knows how societies work, I think nails it: " Sociology has a hybrid structure.  We have an all-rank EC that is both elected and appointed. It handles most departmental governance.  For promotions, hiring, and major programmatic decisions, however, the full faculty votes (or tenured faculty for promotions)."

The other thing that these answers show is that power in the governance of departments manifests itself in the composition of committees. We need a hybrid structure of governance that is also mindful of the composition of committees, alternance in roles of leadership, and transparency in self-governance. This demands some reflection to avoid the type of inequities that Al pointed out in his email. I offer my own personal experience.
.
I have participated in search committees several times. I have never chaired one. I have never chaired a committee in 14 years in UT. Period.

Who participates in these committees reflects not only issues of departmental power but also of national power. I think, for example, that the committee (donors committee?) that reaches out to donors should reflect conceptions of US history that reflect the full panoply of the scholarship in our department. I have never met a donor (university, college, or departmental) and yet I have important public contributions to make to the conceptualization and teaching of US colonial (and national) history. This of course is not just about donors. It is  about the public face of our department.
.
Then there is the committee of endowed chairs. This adds a layer of opaque hierarchies to our already hierarchical system. Is there a threshold? Who gets to decide? On what terms: outside offers, publications, prizes?

==I want to be constructive== using my own experience to draw upon. ==I have experienced governance as marginalization== due to the lack of clarity in the composition of committees and how some of them operate.

Jorge

---

**From:** Llado, Jacquelin
**Sent:** Monday, April 16, 2018 9:10 AM
**To:** Abzug, Robert H <zug@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Restad, Penne <restad@mail.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu; Zamora, Emilio <e.zamora@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>
**Subject:** department governance structures

Dear Colleagues,

    FYI, attached are the responses of 18 CoLA chairs in response to my query about their unit/departmental governance structures.  The largest departments (Government, English, Economics) are listed first.

    FYI, here are the members of this year's EC:

Jonathan
Indrani
Madeline
Peniel
Jeremi
Cynthia
Erika
Matthew
Bruce
Tatjana

# Re: Action Required: Department Governance Structure Vote

## Zamora, Emilio

Mon 4/16/2018 8:54 AM

To: Newman, Martha G <newman@austin.utexas.edu>;

Cc: Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Restad, Penne <restad@mail.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>;

All,

   I agree that the EC form offers the best possibilities, however, we can make it better with a rotating system. Many know or should know that some colleagues have served an inordinate number of times while others have consistently voted for themselves and lobbied for votes, but have served little or not at all. I would also suggest rotating key committee assignments, but this should be a more "relaxed" system to preserve the Chair's administrative prerogatives. Finally, can we assess the salary structure over the last 5 or 10 years and determine if we need to address equity issues. Emilio

Sent from my iPhone

On Apr 15, 2018, at 4:04 PM, Newman, Martha G <newman@austin.utexas.edu> wrote:

> Dear all,
>
> A couple of resources that might be useful in this discussion:
>
> I don't think we have the option to "mix and match" our governance options. That is, we either have an Executive Committee, an extended Budget Council, or a Budget Council. I don't think we can make some decisions (i.e. promotions) one way, and others another. But the person to ask about this is Ann Kelble, in the Deans office.
>
> I know we do get to decide how we want to constitute an EC or an extended BC. It might be useful to look at how other large departments do this. English, I think, has a system to choose its EC that in part involves a rotation and in part involves

nominations and elections.  I think.  I looked at this some time ago and have forgotten the details.   Psychology might provide another interesting model.  Both these departments have been very successful recently in supporting their assistant professors for promotion, so I don't think there is an inherent problem with an EC.

In any case, before we try to reinvent our system, it might be helpful to find out what other large departments do, and what their faculty think the pros and cons of their systems to be.

Martha


Martha G. Newman
Graduate Advisor, Religious Studies
Associate Professor, History and Religious Studies

newman@austin.utexas.edu

Please pardon typos.  I am writing with a broken wrist.



On Apr 13, 2018, at 3:57 PM, Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu> wrote:

I reiterate my two proposals:
1.   Those who have been elected to the EC can't serve again until everybody else within rank has also served (we have cases of senior full and associate faculty who in two decades have never served in the EC)
2.   Cases of tenure/promotion to Assistant and Associate should be discussed in general faculty meetings. Voting, however, should be restricted  only to faculty with tenure, in case of promotion to associate, and full professors, in case of promotion to full.

I am not sure whether #2 is the best alternative to address the record we have accumulated since I have been here (denial of tenure of 80 % of our assistant professors). I would be interested in hearing if there are other potential options. We are either doing a very bad job at the hiring end (which I don't think is the case) or we are doing something that is structurally wrong in the way we are handling the evaluation and the vote (which I think is the case).


Jorge

Jorge Cañizares-Esguerra
Alice Drysdale Shefield Professor of History
University of Texas at Austin
https://utexas.academia.edu/JorgeCanizaresEsguerra/

# RE: Action Required: Department Governance Structure Vote

## Zamora, Emilio

Mon 4/16/2018 12:46 PM

To: Jones, Jacqueline <jjones@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'Connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@utexas.edu>;

All,

Sorry for sending two messages with mostly the same content.  My laptop went down, and an early message went out late.

I wish to add one more observation on the governance issue: We need to acknowledge and reward community engagement activities, especially if faculty can demonstrate that their scholarship and possibly teaching are integral to the person's portfolio, and if the activity advances the community relations interests of the university, COLA and our department.  I'll use myself as an example, I serve on the boards of four scholarly organizations (including a journal), a school district curriculum committee and a school renaming task force,  two City of Austin advisory committees, the K-12 Committee of the Tejas Foco (chapter) of the National Association of Chicana and Chicano Studies, founder and member of an Austin-based Saturday morning cultural revitalization educational program for fifth graders (the Austin ISD-sponsored school has completed four years of operation), founder and member of Raza Round Table (an Austin confederation of community organizations that has been active since 2010), (last year) received one national, one state and one local recognition for my public service and am in line to assume the position of President of the Texas State Historical Association in March 2019.   I could add the numerous instances when I have participated in public campaigns to advance ethnic and Mexican American Studies, given interviews to the media on issues related to social justice and the Mexican community and used electronic media to address these and other important issues, but this is enough to say that I do not know if the salary Committee or the EC has given any weight to this important part of my work as a scholar.  They may have, but the process of evaluation has not been transparent or obvious.

Emilio

**From:** Zamora, Emilio
**Sent:** Monday, April 16, 2018 1:39 PM
**To:** Jones, Jacqueline <jjones@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu
**Subject:** RE: Action Required: Department Governance Structure Vote

All,

    I recommend that we keep the EC form of self-governance.  It can be the fairest if we can assure full participation, that is, if our system of election and selection to the EC (as well as other departmental assignments of importance) guarantees everyone an opportunity to serve periodically.  I know some long-standing faculty who have never served on the EC despite voting for themselves and lobbying for additional votes from colleagues.  I also know relatively new faculty who have been assumed important departmental duties.

Emilio

---

**From:** Jones, Jacqueline
**Sent:** Friday, April 13, 2018 2:59 PM
**To:** Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola

# RE: Salary guidelines

## Canizares, Jorge Canizares-Esguerra

Tue 4/17/2018 1:40 PM

To: Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Berry, Daina R
<drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower,
Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M
<embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>;
Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F
<dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>;
Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>;
Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W
<sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>;
Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y
<myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel
E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>;
Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>;
British Studies <britishstudies@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Matysik, Tracie M
<matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N
<LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C
<burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'connell, Aaron
<Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>;
Raby, Megan <meganraby@austin.utexas.edu>; Restad, Penne <restad@mail.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>;
Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi
<suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann
<anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>;
Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@austin.utexas.edu>; Zamora, Emilio
<e.zamora@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>;

Dear Colleagues

I have hesitated to send this message because I don't want to alienate my colleagues any more than I have
already have.  I am also fearful of creating a backlash that would ultimate affect how the department votes for Lina
in August.  We have to tread carefully. Yet given the nature of our discussion, I cannot remain quiet.

I think the subtext of Al's message is the undertow of racial discrimination our current structures of governance
promote. Blatant discrimination is not a diabolic master plan; it is the unwitting creation of unquestioned everyday
choices and, in this particular case, of whom we consider worthy of representing us.

The other big issue Al addresses, worthy of robust debate,  is the toxic, growing separation between the majority
and a cohort of "superstars." We are increasingly becoming a department of two tiers in teaching. We have long
been a department with two tiers in governance.

Of the four Latinx faculty in our department, I am the one who is best paid and with most seniority. I cannot speak
for others, so let me share with you how I, as a privileged Latino in Texas, experiences these structures.

In 2016 I was nominated and elected by faculty in other departments to the Faculty Council,  largely due to my
public role in opposing classroom carry. As part of my service in FC,  I participated in 2017 in the Library
Committee where I had  an important public role in confronting the administration in the dismantling of the Fine
Arts Library at the time when most folks appeared silent and pliant. In short, I have vigorously (and according to
family members recklessly) participated in the public life of this university.

I was once appointed to the EC, the COLA P&T, and to the founding steering committee of the IHS by Alan.

I have never chaired a committee in this department on anything, not even a search committee. Not once in 14 years.

I have served in the EC for two years when Alan appointed me. I have never been elected. I have voted on two tenure cases. One down, one up. I have in the meantime participated as an outside reviewer in 54 tenure and promotion cases, including appointments to full professor for every Ivy League in this country: Harvard (twice), Yale, Columbia, Cornell, University of Pennsylvania (4 times), Princeton. I have evaluated professorships in France.  I have written evaluations for 2 Dean appointments in R 1 universities. I am currently an outside evaluator for a Provost appointment at Case Western University.

I have never been invited to meet (let alone dine) with university, college or, worse, departmental donors, despite the fact of my massive public intervention of how to rewrite the history of colonial US. Not once. I have no idea who is in those committees and who represents the public face of our department. I don't do history of presidents, foreign policy, or military history but my scholarship and training of graduate students is visibly changing the way the history of USA colonial past is conceived and taught in this country.

 I have never been invited by the Dean, Provost, or President to any personal meeting of any kind. Not once.  I have never met a President of the university with the exception of Faulkner when 14 years ago I was a Harrington Faculty Fellow and had to go to Amarillo to a public event. I knew Powers through photographs.  I know Fenves through photographs.

 I have never been nominated to any prize, with the exception of my sole self-nomination to a prize as a graduate advisor the year my qualifications in the training of graduate students were publicly questioned.

It turns out that there is a departmental committee of endowed chairs and no Latino or Latina belongs in the latter's rarefied club. I was not aware of these hierarchies until recently. I honestly did not know there was a difference between an endowed chair and a professorship. I naively thought they were both "endowed" but through different means.  My professorship and whatever perks I got (including earmarked dean's money for two Latin American graduate students every 5 and 4 years respectively) were the result of my having received many (three), separate, outside offers during my time at UT. Had I known about these hierarchies, I would have negotiated differently the very first time.  As recently as September, I was approached by the University of Illinois for an endowed chair. I did not act because I know I have worn my welcome at UT and this time I (we) would have to pack up and go.

I know this note is not meant to offer solutions. It is simply to avoid that the department sweeps Al's comments (and mine)  under the rug. A discussion of how to create fair institutions of governance without honestly tackling our record in governance and promotion is a formula for  marginalization, silencing, and alienation within,  all the while we go out into classrooms to teach our students about how these historical forces have shaped our present

Best

---

**From:** Flores, Arturo R
**Sent:** Tuesday, April 17, 2018 7:27 AM
**To:** Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin,

# reply to Jorge's email

Alberto A. Martinez

Tue 4/17/2018 11:51 PM

Sent Items

To: Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>;

Cc: Zamora, Emilio <e.zamora@austin.utexas.edu>;

hi Jorge, (and cc to Emilio)

thank you for sharing your thoughts and concerns with the Department. I'm surprised that nobody has replied yet. It will be stunning if nobody addresses the racial factor directly.

Yes, I was certainly thinking about the racial factor when I wrote my group email. For too many years I've seen that several faculty here treat me differently than they treat others. I can think of many instances, such as that I've Never been invited to speak at any of the many department conferences, nor to chair a session, or even to comment on a paper. If one compares it to how often they've invited, say, Bruce or Megan Raby, to speak or comment, the difference is stark, especially given that my fields of scholarship in history of science are broader than theirs, and that I've published more, and have a higher rank. So why is it?

This kind of discrimination seems to be the result of an inconsiderate thoughtlessness, a failure to extend credibility and respect. Similarly, I have emails from Juliet telling me of how she has been neglected and ignored for years. Emilio too has sometimes told me that he is not appointed to Search Committees in which he'd be a perfect fit, and that he has never been in the EC, although he has wanted to be. Ruramisai likewise complained (informally and formally) about being ignored and excluded. Lina has experienced enormous stress. Anne Martinez and John McKiernan-González both complained that they were not treated fairly by the Department. As far as I know, Huaiyin Li has never been in the EC. My good friend James Wilson, who is African American, also felt very excluded here, and I remember several incidents, such as when he once scheduled a talk in the Department, and he was hurt to see that not a single professor attended, other than me.

I hardly knew Frank Guridy or Tiffany Gill, so they didn't confide any experiences to me, but they both did leave UT. And there are other examples.

The cumulative effect of the many inconsiderate incidents of exclusion is that as time passes by one feels more foreign in this department, not less.

Certainly, there are plenty of nice, kind colleagues in our department, such as Tracie, Erika, Indrani, etc. But somehow, the lack of inclusion continues. As you rightly pinpoint, it's the result of "unquestioned everyday choices" by the faculty who run our department.

Thus, it's incredible that, after painstakingly pointing out how you've been marginalized in the department, not a single peer has deigned to publicly reply. Personally, I certainly will publicly reply, but it won't be a laundry list like this email; I'll just pick one or two points that we may constructively pursue.

Still, this is the kind of reply that I'd have hoped to see anyone write:

"Dear Jorge, thank you for frankly sharing your concerns and worries – over the years I certainly have tried to treat everyone fairly, including minorities, so I certainly regret any thoughtless oversights, and I'm alarmed to see that you've been excluded and have felt excluded from aspects of our departmental governance. Certainly, there should be diversity in all our committees, leadership, and in the public face of our department. We must now analyze how this has affected any other colleagues and our department overall. I look forward to working together to solve any such problems."

But it's baffling: -- NOBODY has written any such comment. Again, at best it's a kind of insensitive thoughtlessness, at worse it's something else. Regardless, we have to fix it.

Gracias por tu atención a este problema,

Alberto




Salary guidelines
CC Canizares, Jorge Canizares-Esguerra

Reply alll
Today, 1:40 PM
Flores, Arturo R; Llado, Jacquelin; +58 more


Dear Colleagues

I have hesitated to send this message because I don't want to alienate my colleagues any more than I have already have.  I am also fearful of creating a backlash that would ultimate affect how the department votes for Lina in August.  We have to tread carefully. Yet given the nature of our discussion, I cannot remain quiet.

I think the subtext of Al's message is the undertow of racial discrimination our current structures of governance promote. Blatant discrimination is not a diabolic master plan; it is the unwitting creation of unquestioned everyday choices and, in this particular case, of whom we consider worthy of representing us.

The other big issue Al addresses, worthy of robust debate,  is the toxic, growing separation between the majority and a cohort of "superstars." We are increasingly becoming a department of two tiers in teaching. We have long been a department with two tiers in governance.

Of the four Latinx faculty in our department, I am the one who is best paid and with most seniority. I cannot speak for others, so let me share with you how I, as a privileged Latino in Texas, experiences these structures.

In 2016 I was nominated and elected by faculty in other departments to the Faculty Council,  largely due to my public role in opposing classroom carry. As part of my service in FC,  I participated in 2017 in the Library Committee where I had  an important public role in confronting the administration in the dismantling of the Fine Arts Library at the time when most folks appeared silent and pliant. In short, I have vigorously (and according to family members recklessly) participated in the public life of this university.

I was once appointed to the EC, the COLA P&T, and to the founding steering committee of the IHS by Alan.

# RE: reply to Jorge's email

### Canizares, Jorge Canizares-Esguerra

Wed 4/18/2018 1:10 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Cc: Zamora, Emilio <e.zamora@austin.utexas.edu>;

Thank you Al. I later cc my message to the dean, the provost, and the president, for this is also their business.

Wow. NEVER an invitation to comment or talk whereas a junior new comer is constantly tapped? WTF!!

I have other more damning stories to tell but I restrained myself for Lina's sake. The scale of the disrespect is monumental.

What happened to me with our Latinamericanists is surreal: 7 gringos decided that the only Latin American in the department should not be in the LA area and have a voice on decisions affecting his own students. 7 white colleagues decided I was not sufficiently of a Latinamericanist because the only Latin American was insistently and relentlessly critical of how Latin America is Orientalized in US academia. 7 colleagues who conceive of the area differently asked me to leave the area if Lina was to be hired. It is the equivalent of having the only  African American historian in a department ( who specializes in African American history, who has a national and international reputation as the foremost African American historian in the country, and who is critical how African American history is defined) kindly asked to leave the African American area by 7 non African Americans who believe the African American professor does not really belong.

I complied so Lina could be let in. I was in the wilderness for four years. After there was a flare up because there area was deliberately sanctioning policies targeting my students and Lina was asked not to share any of this with me, the scandal was becoming unmanageable. After Lina formally filed a complaint with the university over hostile working environment. Clear policies were put in place and I was reinstituted into the area. I have to concede Jackie helped to arbitrate this case. But to the bitter end she repeatedly and forcefully asked me to avoid casting this in racial terms.

Lina's third year review was written last semester (this is after she begged for it) when the book was finalizing production. The review was critical of the book and asked for important clarifications and reconceptualizations. Regardless of whether the "third-year" review of Lina's book was fair  or useful ( I think Seth and Jeremy, the authors, misunderstood the book and Seth offered useful comments), Lina had ten (10) days to change the manuscript before she had to turn in the copy-edited manuscript to the press. Such a review was not only useless but dammingly harmful. You either give the candidate enough time to introduce changes or you evaluate the second book manuscript. And then the department wonders why Assistant Professors like Lina fail. I was summoned to Jackie's office with notarial witnesses present to explain myself why I had muttered a personal comment to Julie the day the third year review came out. I mentioned in a personal conversation to Julie that such a third year review was a law suit waiting to be filed. I was yelled at, infantilized, and disrespected in Jackie's office for having dared to  imply in my law-suit comment that there was even an iota of discrimination and mismanagement of Lina's tenure file. I was asked not to say a word again to anyone on Lina's case.

I have a thick dossier of 1,000 pages of what happened to Sandra, my first wife, in the College of Fine Arts:  a scandal of biblical proportions in which the department voted 10 to 5 against tenure and the college P&T committee, appalled by the blatant shenanigans of marginalization and disrespect for the candidate, voted unanimously for tenure. This is the first case I know of such public rebuke by a college P&T committee of a departmental decision. One of the leading civil-rights law firm in Los Angles volunteered pro-bono to take on the

university for repeated, systemic blatant racial discrimination. Sandra decided to leave and no to fight any longer. She is now in NJ. Happy I guess that she left the shithole that was fine arts. I was left, however, deeply resentful of the ways a cohort of white academics marginalized and pushed out the only Latina in the fine arts department on the grounds that her art was "domestic" and ethnic. I regret that due to our divorce, she did not have anyone to mentor her in the years leading to tenure. She was left alone to drown. She was deliberately and systematically led to fail. I documented every step of her case. It is a file that would embarrass this university. And it should. Unfortunately nothing happened.

Please Emilio, it is time to frankly say how you feel: all those hallway conversations we have had over the years. This place demands a shakeup.

.
Jorge

---

**From:** Alberto A. Martinez
**Sent:** Wednesday, April 18, 2018 1:51 AM
**To:** Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>
**Cc:** Zamora, Emilio <e.zamora@austin.utexas.edu>
**Subject:** reply to Jorge's email

hi Jorge, (and cc to Emilio)

thank you for sharing your thoughts and concerns with the Department. I'm surprised that nobody has replied yet. It will be stunning if nobody addresses the racial factor directly.

Yes, I was certainly thinking about the racial factor when I wrote my group email. For too many years I've seen that several faculty here treat me differently than they treat others. I can think of many instances, such as that I've Never been invited to speak at any of the many department conferences, nor to chair a session, or even to comment on a paper. If one compares it to how often they've invited, say, Bruce or Megan Raby, to speak or comment, the difference is stark, especially given that my fields of scholarship in history of science are broader than theirs, and that I've published more, and have a higher rank. So why is it?

This kind of discrimination seems to be the result of an inconsiderate thoughtlessness, a failure to extend credibility and respect. Similarly, I have emails from Juliet telling me of how she has been neglected and ignored for years. Emilio too has sometimes told me that he is not appointed to Search Committees in which he'd be a perfect fit, and that he has never been in the EC, although he has wanted to be. Ruramisai likewise complained (informally and formally) about being ignored and excluded. Lina has experienced enormous stress. Anne Martinez and John McKiernan-González both complained that they were not treated fairly by the Department. As far as I know, Huaiyin Li has never been in the EC. My good friend James Wilson, who is African American, also felt very excluded here, and I remember several incidents, such as when he once scheduled a talk in the Department, and he was hurt to see that not a single professor attended, other than me.

I hardly knew Frank Guridy or Tiffany Gill, so they didn't confide any experiences to me, but they both did leave UT. And there are other examples.

The cumulative effect of the many inconsiderate incidents of exclusion is that as time passes by one feels more foreign in this department, not less.

Certainly, there are plenty of nice, kind colleagues in our department, such as Tracie, Erika, Indrani, etc. But somehow, the lack of inclusion continues. As you rightly pinpoint, it's the result of "unquestioned everyday choices" by the faculty who run our department.

# happy hour Friday?

Matysik, Tracie M

Wed 4/18/2018 7:58 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Hi Al,

Did you guys end up having happy hour last week?  If not, should we try for one this Friday?  I would be in.

Hope to see you soon.  And would love to talk with you one on one at some point about this EC stuff.  I think it is important, and I'm glad Jorge named the structural racism that it perpetuates.

Best,

Tracie

# Re: reply to Jorge's email

Alberto A. Martinez

Thu 4/19/2018 12:11 AM

Sent Items

To:Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>;

hi Jorge,

yes, you may certainly forward my email to Peniel.

What amazes me most about the information that you sent is that I knew nothing about it. I didn't know about what the faculty in Fine Arts did to Sandra, just as I did not know that the seven white professors of Latin American History had removed you from LAH for years. And I didn't know about the other awful incidents that you describe.

It really goes to show how institutions, poor governance, and needless secrecy prevent coworkers from even knowing what their peers are experiencing. It's odd to see how one can be isolated for so long, not knowing that the incidents that one endures are part of a defective pattern, that there are others that have similar concerns.

I'm still vexed that nobody replied to the email discussion you raised, talk about being insensitive -- so I'll certainly reply publicly tomorrow.

Al

---

**From:** Canizares, Jorge Canizares-Esguerra
**Sent:** Wednesday, April 18, 2018 1:19:46 AM
**To:** Alberto A. Martinez
**Subject:** RE: reply to Jorge's email

Dear Al, do you mind if I share your email with Joseph Peniel? He asked me to meet and talk.
Jorge

---

**From:** Alberto A. Martinez
**Sent:** Wednesday, April 18, 2018 1:51 AM
**To:** Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>
**Cc:** Zamora, Emilio <e.zamora@austin.utexas.edu>
**Subject:** reply to Jorge's email

hi Jorge, (and cc to Emilio)

thank you for sharing your thoughts and concerns with the Department. I'm surprised that nobody has replied yet. It will be stunning if nobody addresses the racial factor directly.

Yes, I was certainly thinking about the racial factor when I wrote my group email. For too many years I've seen that several faculty here treat me differently than they treat others. I can think of many instances,

## Re: Salary guidelines

Alberto A. Martinez

Thu 4/19/2018 9:07 AM

Sent Items

To: Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Restad, Penne <restad@mail.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>;

hi everyone,

Jorge is right: there are longstanding problems in our department governance. Maybe it's a structural problem, or cultural, but it's here. As he has pinpointed, there is a kind of discrimination that is "the unwitting creation of unquestioned everyday choices."

Like Jorge, English isn't my first language, and I did not grow up in the states; I grew up in Puerto Rico, a crowded and now-wrecked colony of the US empire (even if my friend Tony Hopkins prefers to call it a "hegemon"). Whether one is a foreigner, a minority, or a colonial subject, one has ethnic and cultural differences and therefore, to some extent, one accepts a marginal role in the periphery, partly by simply assuming: it's probably not about ethnicity or race, maybe it's just personalities, that is, people don't all get along equally well.

But I don't think that anymore.

Jorge, I'm sorry to hear that you've had insufficient opportunities to contribute to our department. Why has nobody replied?? And I'm also completely surprised --- because I had always assumed that YOU were the one Latino faculty member in our department who had successfully become part of the Top Tier.

In other words, I knew that Anne Martínez and John McKiernan-González had big complaints about how they were treated here. Similarly, I knew that Emilio has never been elected or given the opportunity to

serve in the EC, and that he has additional equity concerns. And I knew that my good friend Neil Foley (Mexican-American) felt very disenfranchised here, and so he left. What about Frank Guridy, why did he leave? What about Lina? As for myself, I too have often felt disenfranchised from our department governance and events. (For example, I've been here 13 years but I've never been invited to give a talk at a History Dept. or IHS conference, or to comment on a paper, or even to chair a session. I was in the EC one time, but only because I campaigned and begged. I was in the IHS once, but only after complaining about being rejected while white colleagues were appointed two and three times. Since November, I finally have allocated research funds, but only after I pointed out that I didn't receive research funds when I was promoted to Associate or full Professor, whereas others did. Still, I am thankful for the opportunities I've received.)

But it never, Never, occurred to me that YOU (Jorge) were somehow disenfranchised too, because I knew that you have a high international profile, and well-deserved, and I assumed that you were treated here as one of "the stars."

So thank you for frankly though painfully listing the ways in which you have not had enough access to participate in governance at UT. This is important, so I commend you for your belated honesty. For years, I've heard many faculty complaints about this and that, usually in hallways, in whispers, and in "Please don't tell anyone, but..."

It's unacceptable that Assistant Professors are socialized to be quiet. Who exactly is giving such awful advice? It's unacceptable that Associate Professors likewise learn to be quiet even though they have tenure. As for full professors, what can I say?

I think we'd be much better off if everyone actually says what they think. (And I know that culturally this is one reason why a Puerto Rican might seem annoying at UT: "He doesn't know his place..." I've actually heard that here.)

I started out as a visiting Lecturer here, so I know what it's like to be in the invisible category. Over the years, I've seen a lack of solidarity toward Assistant Professors in this department (more than in any other), especially when going up for tenure. I've also seen a lack of solidarity toward Associate Professors here. So too, certain minorities also face obstacles here, whether they arise from an inconsiderate thoughtlessness or an unconscious bias.

To those who don't know me, I apologize for not speaking up more over the past few years-- I've been very busy. But to be clear, there are systematic, long-lasting issues of marginalization and inequity in this department. Even if they are not intentional, they do exist and have affected multiple faculty members, and not just minorities.

We need to discuss ways to rotate appointments fairly and to improve governance and equity.

Sincerely,

Alberto


Professor, Department of History
Director, Certificate Program in History & Philosophy of Science
John E. Green Regents Professorship in History

University of Texas at Austin
128 Inner Campus Dr., Stop B7000
Austin, TX  78712-0220

# Re: Salary guidelines

## O'connell, Aaron

Thu 4/19/2018 1:48 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@austin.utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@austin.utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@austin.utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Restad, Penne <restad@mail.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>;

Dear Colleagues –

I have followed these conversations over email with interest and concern and have kept mostly silent, because I am still new to the Department and know little of the background of these governance matters. But, after reading Alberto's most recent message – which asks, among other things, "why has nobody replied?" – silence is no longer an option for me.

If three of our Latinx colleagues feel there is a disparity in our governance structures, then we cannot ignore it or it will surely fester and breed greater resentment. Jorge and Alberto and Emilio have done the socially-difficult thing of raising an uncomfortable issue; I feel I should at least be brave (or foolish) enough to add my voice as a white, male, tenured faculty member, who is brand new to the department and therefore can plead ignorance for a little while longer on the backstory of these difficult subjects.

My own experience has been almost the exact opposite of what Alberto and Jorge noted about opportunities within the department and around the university. Since arriving in August, I've had dinner with some of the university's leadership; I've been invited to lunches with donors; I've been invited to serve on search committees and to participate in all of the department's activities: an IHS talk, graduate mentoring roundtables, the Normandy Scholars' Program, the grad admissions process – really everything.

Is this evidence of implicit bias or unfair advantages based on race, gender, rank, or area of research? It's impossible for me to say with any certainty. Those receiving advantages are usually not best suited to comment on the reasons for them.

But details always matter.  In my own case, the opportunities seem to have stemmed from different sources. Being affiliated with the Clements Center for National Security is part of the story – that' s what brought me to Chancellor McRaven's house in October.  Some opportunities have to do with the weird place of military history in the Academy and here at UT – that's what led to a lunch with a donor and a still-developing opportunity to organize a conference next year. My IHS talk is part of the "New Book Series," which the organizers were kind enough to include me in even though my most recent publication is only an edited collection and not on par with a full manuscript.  So that opportunity probably has to do with the decision to organize a series around new scholarship in our department more than anything else.

And finally, on the EC: I neither campaigned to be on the EC nor voted for myself, but am happy and honored that others did.  Is this evidence of bias? I don't even know how to test the question. I think it's beyond obvious that innumerable things are easier in America when one is white and male and heterosexual (and sadly for me, tall), but I don't know how those structures of feeling have contributed to my warm welcome here – if at all.  And, more importantly, I don't know if my advantages came at the expense of other scholars in our department or are a form of favoritism – it seems to me that there are far too many variables to make a case about motivations, as my previous paragraph tried to illustrate.

I do know that we can't ignore the issue, or it will surely get worse.  So, to the three senior scholars that have noted the problems via email, let me say that I agree -- staying silent is no solution. I hope that we as a department can find a way to address your concerns while still preserving the basic system of holding elections for the EC. I can tell you I am committed to doing so.

To that end: I  liked Erica's suggestion of at least polling the department in advance of EC voting to see who would like to serve.  Are there disadvantages to this suggestion? Won't this at least prevent new people like me from voting from a place of ignorance while highlighting the trends of who has served in years past and who has not?

Sincerely,

Aaron

Aaron O'Connell
Associate Professor of History &
Faculty Fellow, Clements Center for National Security
The University of Texas at Austin

---

**From:** Alberto A. Martinez
**Sent:** Thursday, April 19, 2018 12:07:32 PM
**To:** Canizares, Jorge Canizares-Esguerra; Flores, Arturo R; Llado, Jacquelin; Berry, Daina R; Bodian, Marion E; Brands, H W; Brower, Benjamin C; Brown, Jonathan C; Bsumek, Erika M; Buenger, Walter L; Butler, Matthew J; Chatterjee, Indrani; Coffin, Judith G; Crew, David F; Deans-Smith, Susan; Del Castillo, Lina M; Di-Capua, Yoav; Toyin Falola; George Forgie; Frazier, Alison K; Frens-String, Joshua; Garfield, Seth W; Burnett, Virginia Garrard; Laurie Green; Guha, Sumit; Hardwick, Julie; Hsu, Madeline Y; Hunt, Bruce J; Jones, Jacqueline; Joseph, Peniel E; Kamil, Neil D; Lawrence, Mark A; Levine, Philippa J; Li, Huaiyin; Tatjana Lichtenstein; British Studies; Matysik, Tracie M; smintz@utexas.edu; Moore, Leonard N; Neuberger, Joan H; Neuburger, Mary C; Newman, Martha G; O'connell, Aaron; Olwell, Robert A; osseo@utexas.edu; Raby, Megan; Restad, Penne; Seaholm, Megan; Spellberg, Denise A; Stoff, Michael B; Suri, Jeremi; Talbot, Cynthia M; Tully, Alan; Twinam, Ann; Vaughn, James M; Vong, Sam C; Walker, Juliet E K; wynn@utexas.edu; Zamora, Emilio; Abzug, Robert H
**Subject:** Re: Salary guidelines

hi everyone,

Jorge is right: there are longstanding problems in our department governance. Maybe it's a structural problem, or cultural, but it's here. As he has pinpointed, there is a kind of discrimination that is "the unwitting creation of unquestioned everyday choices."

# RE: Salary guidelines

## Canizares, Jorge Canizares-Esguerra

Sat 4/21/2018 3:51 AM

To: O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Restad, Penne <restad@mail.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>;

Dear Aaron
What at a nice, elegant, honest letter! Your account is Al's inverted mirror image.

I had a strong emotional reaction to your letter, particularly when you describe how your new edited collection was featured by the IHS. I felt happy for you, but I also shed tears of anger and frustration. As recently as this February, I wrote to Jackie twice to ask that my edited volume, Entangled Empires (Penn, 2018), be used as a tool to communicate with donors. I did not reach out to promote myself but to promote the topic and the remarkable story behind the volume. Please Aaron, let me share with you the story.

The book seeks to demonstrate the small and forgotten ways the Atlantic global South shaped US colonial history. It is a strong intervention in the age of Trump, DACA, and white supremacy. Imagine: Latinx among our founding fathers! More important, the book features six of our former and current graduate students.

Mark Sheaves reveals the large mestizo Anglo-Iberian merchant communities in Seville  (and Lisbon) circa 1492 that co-created the fifteenth- and sixteenth-century American and African trades of slaves, dyes, and spices. Editorial institutions of the confessional age erased this archive and forced these merchants to choose either to be English Protestant or Spanish Catholics. Brad Dixon (recently appointed IHS postdoctoral fellow) argues that the British, like the Spaniards, had a Republica de Indios. The natives in the South East learned to deploy petitioning (not calumet pipes as the Orientalizing Anglo American historiography insists) to create a legal framework with "European" empires.  Southeast Indians first introduced this legal framework in  "Florida,"  out of  their interactions with Franciscan missionaries and mestizo soldiers from central Mexico. Brad transforms our understanding of Bacon's rebellion and the Yamasee war. Kristie Flannery dismounts the Seven Year War  history of the "easy" conquest of the British of Manila. Over the course of two centuries, the "Spanish" (mostly Mexican mestizos, including friars) created a formidable empire built on anti-piracy alliances with the Pampanga, the

Tagalog, and Sangley (Chinese) populations of Luzon. This alliance made Luzon nearly impenetrable to the "British," who were greeted as Muslim pirates. The "British" learned how to do empire in Manila. Ben Breen demonstrates the Portuguese African and Brazilian origins of the natural history of the Royal Society of London, Boyle and Hans Sloane included. Chris Heaney demonstrates that the regency of Phillip II in London wetted the appetite of English conquistadors for Inca mummies (and thus graveyard plunder). It was the English search for their own "Incas de Inglaterra" in the American northeast that drove the Elizabethan expansion. Finally, Cameron Strang shows the key role of Afro-Anglo-Spanish mestizo families in Florida as the linchpin for the successful territorial possession of Florida in the Age of Revolutions. Cameron, Ben, and Chris are all assistant professors at R 1 universities and Lathrop-prize winners, in addition to regular contributors to the New Yorker and various mass media.

This long summary of our graduate students' contributions to the book seeks to highlight two things: the extraordinary students we produce and the importance  and (political)  relevance of the scholarship that is produced in our department.  My pitches to organize somethings around this book were ignored

I was on campus in the hallways this week and I felt deeply uncomfortable, Aaron. I feel some people believe my interests are solely mercenary: "this privileged dude complaints because all he wants is even more money. Doesn't he have enough already? What about all other salary inequities in our department?" It is true, there are appalling salary inequities, particularly having to do with gender and service and I hope women in this department publicly speak up. My complaints, however, have nothing to with money.  I do not want more money. I have enough.

When I negotiated my appointment twice with UT, I could have inflated my salary an additional 50,000 dollars. I could be one of the highest paid professor in our department second to Jackie,  Peniel, Jeremy, Alan, and Bill. I chose not to do that.  I earmarked money I could have pocketed for two annual fellowships for graduate students from Latin America.  You see, Aaron, I do not give a shit about money. Well that is not true since I had to put two kids through private colleges and to this day I help pay for nurses for my aging mother ---I helped financed the nursing arrangements to manage my  father's evolving dementia and mental illness for 10 years until he died.

I found, Aaron, your honesty refreshingly disarming, so I want to share with you even more since you were so generous.  I survived a civil war ( I don't want to be presumptuous but I can teach you a thing or two about war).  I came exiled to this country thirty years ago, without a word of English. I put myself through graduate school by scrubbing toilets. After I won an SSRC and returned from Mexico and Madrid, my department finally appointed me as a TA. The silent, inarticulate person who learned his English circling words in Time magazine, it turns out, was not an idiot after all. My story is the story of millions, most of whom are still in the shadows, cowering in corners waiting to be deported. Many see them as anonymous victims, largely because the undocumented speak English poorly. I learned English to write several award winning books.

I appreciate you honesty Aaron. So in the spirit of sharing, let me be ruthlessly honest. I don't want cash. All I want from this department is  not to  disrespected, yelled at, and infantilized by the chair again. Not to be told how to properly conceive of Latin America again. Not to be told how to properly train graduate students again. I want to chair search committees. I want to be part of crucial tenure decisions in this department.  I want my work with graduate students to be recognized, with respect and nominations to teaching prizes, not cash. I want clear explanations as to the criteria used to determine who deserves professorships and endowed chairs. It all boils down to respect and transparency.


Best
Jorge

---

From: O'connell, Aaron
Sent: Thursday, April 19, 2018 3:48 PM
To: Alberto A. Martinez <almartinez@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E

# thank u for writing

Alberto A. Martinez

Sat 4/21/2018 3:43 PM

Sent Items

To: O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>;

hi Aaron,

we haven't met yet, but I saw you in one or two faculty meetings.
Thank you for writing frankly to everyone. When writing a group email, one never knows if few or many will reply, but in this case the topic was significant, so I was surprised that so few people frankly spoke up, so I'm very glad you did, thank you.

You asked, so here's the background.
The emails we wrote are a new topic, meaning that never before (as far as I know), had Latino faculty in our department written publicly about such things. But the initial issue was governance, and that certainly is not a new issue. There's something dysfunctional in our EC structure. E.g., someone told me yesterday that she votes for EC members as a way "to punish" people, that is, if u don't like someone, u vote for them. Accordingly, some  colleagues end up in committees in which they don't want to serve, and tenure cases often turn out negative. Still, I'm not convinced that the reason why Emilio, Jorge, Juliet, Huaiyin, Toyin, myself, are never or nearly never in the EC is because people really like us. There are, as I mentioned, various other instances of exclusion. And at the same time, Erika and Tracie are voted-in so much that they beg not to be on the EC.

My impression is that despite any promotions or publications, some faculty remain invisible to their colleagues. Most certainly, I believe that nobody in our department wakes up thinking: "How can I exclude x, y, z today?" Still, even if it's not an intentional exclusion, the net result is almost indistinguishable: certain faculty are aware that they're not included.

It's for that reason that Jorge and others are advocating for a kind of rotation in the EC.

Anyhow, being in the EC is no coveted walk in the park. Jorge's initial point, which started this line of emails, was just that the EC doesn't work. He's right. Many people agree, in person and in individual emails. That's why Jackie very fairly asked for a robust discussion online.

About the apparent inequities -- you're right that we did a socially-difficult thing: raising the issue. Almost everyone has a reason not to talk. It's as if the system of "reward-by-carrots" creates a silence that ever grows. Some don't speak up because they're new. Others are utterly quiet because they're going up for tenure. Others are silent because they've been associates for a long time and don't want to rock the boat, since there are new issues ongoing, such as teaching 3/3 instead of 2/2. And yesterday, Laurie Green told me, at a group meeting of the Salaries Committee, that women can't speak up openly in emails and list their concerns as I did. Some can, I'm sure, but her point is fair enough: that there's a culture of silence.

(By the way, after years of asking to be in the Salaries Committee, I'm in it Only because I complained in an email, last year, that there are inequities in how raises are awarded.)

Last, I want to thank you for rightly doing one more thing: writing "details always matter," which led to your friendly and forthright account of some of your experiences. Here, and in meetings of professors generally, there's often an insidious tendency to euphemize and understate rather that clearly say what happened, or what's a problem.

As I wrote, I do wish people would just say what they honestly think, rather than putting a mask of silence on it.

I look forward to talking one-on-one at some point soon. You have my full welcome here -- and I congratulate you for knowing that speaking frankly should be the norm, not the exception. (I barely even knew Jorge two weeks ago, and only because he spoke up do I now understand better who he is.)

Sincerely,

Al


Professor, Department of History
Director, Certificate Program in History & Philosophy of Science
John E. Green Regents Professorship in History

University of Texas at Austin
128 Inner Campus Dr., Stop B7000
Austin, TX  78712-0220
tel. 512-517-2755, fax 512-475-7222
almartinez@austin.utexas.edu
http://liberalarts.utexas.edu/history/faculty/aam829
http://www.martinezwritings.com/m/About.html
http://liberalarts.utexas.edu/hps/


Dear Colleagues –

I have followed these conversations over email with interest and concern and have kept mostly silent, because I am still new to the Department and know little of the background of these governance matters.  But, after reading Alberto's most recent message – which asks, among other things, "why has nobody replied?" – silence is no longer an option for me.

If three of our Latinx colleagues feel there is a disparity in our governance structures, then we cannot ignore it or it will surely fester and breed greater resentment.   Jorge and Alberto and Emilio have done the socially-difficult thing of raising an uncomfortable issue; I feel I should at least be brave (or foolish) enough to add my voice as a white, male, tenured faculty member, who is brand new to the department and therefore can plead ignorance for a little while longer on the backstory of these difficult subjects.

My own experience has been almost the exact opposite of what Alberto and Jorge noted about opportunities within the department and around the university. Since arriving in August, I've had dinner with some of the university's leadership; I've been invited to lunches with donors; I've been invited to serve on search committees and to participate in all of the department's activities:  an IHS talk, graduate

Re: Salary guidelines

Newman, Martha G

Tue 4/24/2018 7:57 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Al,

Thanks for your note.  As I tried to imply, I am not even sure "even-handed" is a good thing right now.

I think it is important for us to recognize the pattern and the perceptions of marginalization that you, Emilio, and Jorge are articulating.  Racial and ethnic marginalization has been a problem in the department for a very long time, and it is good for us to realize that sometimes "liberal" forms of governance actually perpetuate inequities:  we are good at recognizing that in our work, and less so in our daily lives.

I don't think that modifying the governance structure will much help with the gender problems, however.  I also think we all need to recognize the importance of intersectionality and that most of us have some form of privilege (whether white, male, class-related, or even connected to our topics of research)  as well as some form of alienation.   Just as an example, given your concern for research funds: are you aware that you were not the only full professor in the European area without a research fund?  There are 5 European-area full professors who do not have research endowments, and 4 of them are very senior women (Joan, Miriam, Julie, and Mary).

I'd be happy to continue to discuss this if you'd like to get coffee sometime.


All best

Martha



Martha G. Newman
Graduate Advisor, Religious Studies
Associate Professor, History and Religious Studies
newman@austin.utexas.edu

Please pardon typos.  I am writing with a broken wrist.



On Apr 23, 2018, at 9:26 PM, Alberto A. Martinez <almartinez@austin.utexas.edu> wrote:

hi Martha,

thank you for kindly writing a few days ago.
I appreciate the even-handed and thoughtful tone of your email.
It's certainly alarming that an ordinary query about EC governance quickly became an opportunity for airing grievances. In a way, our department has been coasting for years, in the sense that it moves in the same direction, even though there are multiple problems here. For years we've been annoyed by the two-(or-three)-tier system, for years some have voiced concerns about gender inequities, and about inequities in salaries, and about excessive service obligations.

What's new for me is realizing that there's a pattern in how some of us have been marginalized, whether it was inadvertently or intentionally. Jorge was always evidence for me, I thought, that whatever degree of invisibility had been ascribed to me was, well, who knows, a kind of rudeness or thoughtlessness. But when Jorge, who was a bit of a stranger to me, started detailing his experiences, I recognized much of the same, unfortunately; and there are others.

Anyhow, I do think that modifying the governance structure will help. Certainly rotation, not just election; plus, having people say whether they want to serve in specific committees. There should also be a kind of general accounting, keeping track of who did what, when, and who gets what and why, otherwise, we do get the ugly inequities.

Thanks again,
Al

---

**From:** Newman, Martha G
**Sent:** Thursday, April 19, 2018 11:45:12 AM
**To:** Alberto A. Martinez
**Cc:** Canizares, Jorge Canizares-Esguerra; Flores, Arturo R; Llado, Jacquelin; Berry, Daina R; Bodian, Marion E; Brands, H W; Brower, Benjamin C; Brown, Jonathan C; Bsumek, Erika M; Buenger, Walter L; Butler, Matthew J; Chatterjee, Indrani; Coffin, Judith G; Crew, David F; Deans-Smith, Susan; Del Castillo, Lina M; Di-Capua, Yoav; Toyin Falola; George Forgie; Frazier, Alison K; Frens-String, Joshua; Garfield, Seth W; Burnett, Virginia Garrard; Laurie Green; Guha, Sumit; Hardwick, Julie; Hsu, Madeline Y; Hunt, Bruce J; Jones, Jacqueline; Joseph, Peniel E; Kamil, Neil D; Lawrence, Mark A; Levine, Philippa J; Li, Huaiyin; Tatjana Lichtenstein; British Studies; Matysik, Tracie M; smintz@utexas.edu; Moore, Leonard N; Neuberger, Joan H; Neuburger, Mary C; O'connell, Aaron; Olwell, Robert A; osseo@utexas.edu; Raby, Megan; Restad, Penne; Seaholm, Megan; Spellberg, Denise A; Stoff, Michael B; Suri, Jeremi; Talbot, Cynthia M; Tully, Alan; Twinam, Ann; Vaughn, James M; Vong, Sam C; Walker, Juliet E K; wynn@utexas.edu; Zamora, Emilio; Abzug, Robert H
**Subject:** Re: Salary guidelines

Dear all,

I wrote a version of this on Tuesday, in response to Jorge's email, but then my husband suggested I not send it, reminding me, in the words of Jim Hightower, that "There's nothing in the middle of the road but yellow lines and dead armadillos."  This morning, I decided to join the armadillos anyway.

I live between two departments and on the edge of a couple of others, and in the last weeks have seen departments pulled apart in terribly acrimonious ways over what initially seemed to be easy matters that people thought they could discuss by email. In one case, what should have been a simple discussion ended with accusations of anti-Semitism.

Welcome to Trump's America.  When Trump was elected, many of us hoped to take care of our local communities because we suspected the worst nationally. For some time, perhaps, we did this.  But now, over a year after the election, our anger and our fears, and the fact that Trump's discourse has only made long-standing problems more obvious, are eroding our local communities too.  We need to figure out how to fix our communities, not drive them to pieces.

I have heard a number of issues expressed over the last few days, some in emails, others in face-to-face conversations.  Some in the department feel that there is an undertow of racial discrimination in our governance structures.  Some feel that there are severe gender inequities in the ways essential administrative work within the department is distributed, of which governance is only a part.  Some feel there is a lack of transparency in the way research funds and endowed positions are assigned, or in the ways graduate courses are distributed, or lecturers hired.  Our university administration, as AI suggests, wants to divide us into the "superstars" and the "rest," and they have instituted salary structures (among other things) that by-pass departmental salary guidelines and decision making. As a result, our salary structure is also way out of wack.  And, of course, we all work in a profession that is increasingly disrespected by our national political conversations, and we all feel overworked and under-appreciated, often in multiple ways.

We have so far managed a civil email discourse which I think speaks to the collegiality of our department.  But I don't think these issues can be fixed through email conversation.  Maybe we need a Festivus pole to air our grievances?

More seriously, how do we work towards fixing some of these things?  Discussions about governance is a start, I think.  But I am not sure where to go from there, besides the usual call for more communication and more transparency about departmental decisions.  What else?

Martha

Martha G. Newman
Graduate Advisor, Religious Studies
Associate Professor, History and Religious Studies

newman@austin.utexas.edu

Please pardon typos.  I am writing with a broken wrist.

On Apr 19, 2018, at 11:07 AM, Alberto A. Martinez <almartinez@austin.utexas.edu> wrote:

hi everyone,

Jorge is right: there are longstanding problems in our department governance. Maybe it's a structural problem, or cultural, but it's here. As he has pinpointed, there is a kind of discrimination that is "the unwitting creation of unquestioned everyday choices."

Like Jorge, English isn't my first language, and I did not grow up in the states; I grew up in Puerto Rico, a crowded and now-wrecked colony of the US empire (even if my friend Tony Hopkins prefers to call it a "hegemon"). Whether one is a foreigner, a minority, or a colonial subject, one has ethnic and cultural differences and therefore, to some extent, one accepts a marginal role in the periphery, partly by simply assuming: it's probably not about ethnicity or race, maybe it's just personalities, that is, people don't all get along equally well.

But I don't think that anymore.

Jorge, I'm sorry to hear that you've had insufficient opportunities to contribute to our department. Why has nobody replied?? And I'm also completely surprised --- because I had always assumed that YOU were the one Latino faculty member in our department who had successfully become part of the Top Tier.

In other words, I knew that Anne Martínez and John McKiernan-González had big complaints about how they were treated here. Similarly, I knew that Emilio has never been elected or given the opportunity to serve in the EC, and that he has additional equity concerns. And I knew that my good friend Neil Foley (Mexican-American) felt very disenfranchised here, and so he left. What about Frank Guridy, why did he leave? What about Lina? As for myself, I too have often felt disenfranchised from our department governance and events.  (For example, I've been here 13 years but I've never been invited to give a talk at a History Dept. or IHS conference, or to comment on a paper, or even to chair a session. I was in the EC one time, but only because I campaigned and begged. I was in the IHS once, but only after complaining about being rejected while white colleagues were appointed two and three times. Since November, I finally have allocated research funds, but only after I pointed out that I didn't receive research funds when I was promoted to Associate or full Professor, whereas others did. Still, I am thankful for the opportunities I've received.)

But it never, Never, occurred to me that YOU (Jorge) were somehow disenfranchised too, because I knew that you have a high international profile, and well-deserved, and I assumed that you were treated here as one of "the stars."

So thank you for frankly though painfully listing the ways in which you have not had enough access to participate in governance at UT. This is important, so I commend you for your belated honesty. For years, I've heard many faculty complaints about this and that, usually in hallways, in whispers, and in "Please don't tell anyone, but..."

It's unacceptable that Assistant Professors are socialized to be quiet. Who exactly is giving such awful advice? It's unacceptable that Associate Professors likewise learn to be quiet even though they have tenure. As for full professors, what can I say?

## Re: Today! Nomination -- urgent

Alberto A. Martinez

Tue 5/1/2018 9:33 PM

Sent Items

To: Li, Huaiyin <hli@utexas.edu>;

📎 1 attachments (223 KB)

Salaries and Publications.pdf;

hi Huaiyin,

thank you for offering to meet today, but I couldn't, Tuesdays are a mess for me this semester, because I teach 2 to 6:30, plus office hours.

I'm quickly running out of time slots to meet, because I fly to Puerto Rico on Saturday. How about Thursday at 12:00?

By the way, I've been tallying salaries and publications, to identify any inequities. If you look at the attached document, two long tables, you'll see that the salaries of Emilio, Lina, and myself look a bit out of place. And certainly, there are other anomalies. Let me know if you see any inaccuracies in your rows, pp. 1 and 3.

Best,
Al

---

**From:** Li, Huaiyin
**Sent:** Monday, April 30, 2018 5:10:04 AM
**To:** Alberto A. Martinez
**Subject:** Re: Today! Nomination -- urgent

Sorry, Al, I won't be on campus today.  How about tomorrow at 2:30pm?  I can stop by your office for a chat.

Best,
Huaiyin

Sent from my iPhone

On Apr 29, 2018, at 9:58 PM, Alberto A. Martinez <almartinez@austin.utexas.edu> wrote:

hi Huayin,

thank u for voting for Jorge--!

A few days ago, I met with him, Emilio and Lina, for the first time ever as a group, to discuss issues that affect us in the Dept.

I'm wondering if you'll be on campus tomorrow Monday afternoon, and if so, whether you and I can meet to talk about such things for a bit, for example, that like Emilio you too have never been in the EC, as you mentioned.

# Re: Today! Nomination -- urgent

Li, Huaiyin

Tue 5/1/2018 9:58 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Hi Al,

You did a huge and very important task.  Thanks for sharing it with me.  How about meeting in your office on Thursday at 10:00 am?  I will have a meeting from 10:30 am and then lunch with guests until 2 pm.

Best,
Huaiyin

Sent from my iPhone

On May 1, 2018, at 11:33 PM, Alberto A. Martinez <almartinez@austin.utexas.edu> wrote:

> hi Huaiyin,
>
> thank you for offering to meet today, but I couldn't, Tuesdays are a mess for me this semester, because I teach 2 to 6:30, plus office hours.
>
> I'm quickly running out of time slots to meet, because I fly to Puerto Rico on Saturday. How about Thursday at 12:00?
>
> By the way, I've been tallying salaries and publications, to identify any inequities. If you look at the attached document, two long tables, you'll see that the salaries of Emilio, Lina, and myself look a bit out of place. And certainly, there are other anomalies. Let me know if you see any inaccuracies in your rows, pp. 1 and 3.
>
> Best,
> Al
> _____
> **From:** Li, Huaiyin
> **Sent:** Monday, April 30, 2018 5:10:04 AM
> **To:** Alberto A. Martinez
> **Subject:** Re: Today! Nomination -- urgent
>
> Sorry, Al, I won't be on campus today.  How about tomorrow at 2:30pm?  I can stop by your office for a chat.
>
> Best,
> Huaiyin
>
> Sent from my iPhone
>
> On Apr 29, 2018, at 9:58 PM, Alberto A. Martinez <almartinez@austin.utexas.edu> wrote:
>
>> hi Huayin,
>>
>> thank u for voting for Jorge--!

# Committee on Equity

Alberto A. Martinez

Fri 5/4/2018 5:44 PM

Sent Items

To: Li, Huaiyin <hli@utexas.edu>;

hi Huaiyin,

it was good talking with you yesterday. I was glad that you appreciated the points we were making at the faculty meeting on Wednesday, and I was especially glad that you appreciate the value of having a systematic accounting of publications.

As I suggested at the meeting, I'm disappointed that you have not had the opportunity to serve on the EC, since it's a chance to help steer the department. To that end, I'm hoping that you can please join my Committee. Like myself, and like Emilio, Juliet, and others, you have personally experienced what it's like to be a bit invisible in this department, and this is what I want to fix, the unconscious bias. The department should belong to all of us, and it should offer equal opportunities for its members.

Jackie gave our committee three things to review: department governance, guidelines for merit raises/salary, and the nurturing of junior faculty (how can we create a support system that helps faculty get tenure?). All of these issues are about equity, looking carefully at our department in order to find defects and propose ways to improve it.

I hope you can join, or let me know if you have any questions.

Thank you,
Al

# Re: Committee on Equity

## Li, Huaiyin

Fri 5/4/2018 7:03 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Hi Al,

I enjoyed our conversation yesterday and fully support your leadership of the equity committee.  This academic year, in addition to chairing the search committee in East/Southeast Asian history, I've spent too much time on administrative duties as the director of the Center for East Asian Studies, and will serve in that capacity for one more year in 2018-19.  I guess there will be a good chance for me to chair another search committee for the position in East/Central Asian history in Fall 2018, which once again will be very time-consuming.  So I'd prefer to refrain from taking on any additional service duties in 2018-19, but would be happy to sit on this committee in 2019-20, that is, after I step down from CEAS directorship.  I'd be also happy to join the equity committee in Fall 2018 if the Department does not implement the East/Central Asian history search– I hope I will able to hear from Jackie on this in August.

Best,
Huaiyin

**Huaiyin Li**
Professor of History
Director, Center for East Asian Studies
University of Texas at Austin
Office: GAR 3.202
Phone: 512-475-7910

**From:** "Alberto A. Martinez" <almartinez@austin.utexas.edu>
**Date:** Friday, May 4, 2018 at 7:44 PM
**To:** "Li, Huaiyin" <hli@utexas.edu>
**Subject:** Committee on Equity

hi Huaiyin,

it was good talking with you yesterday. I was glad that you appreciated the points we were making at the faculty meeting on Wednesday, and I was especially glad that you appreciate the value of having a systematic accounting of publications.

As I suggested at the meeting, I'm disappointed that you have not had the opportunity to serve on the EC, since it's a chance to help steer the department. To that end, I'm hoping that you can please join my Committee. Like myself, and like Emilio, Juliet, and others, you have personally experienced what it's like to be a bit invisible in this department, and this is what I want to fix, the unconscious bias. The department should belong to all of us, and it should offer equal opportunities for its members.

**From:** Walker, Juliet E K
**Sent:** Wednesday, May 2, 2018 5:40:56 AM
**To:** Alberto A. Martinez
**Subject:** Re: Salaries and Publications

Hi Alberto,

Will write more later--have not joined in the discussion because of the negative reviews made of me--like I do nothing, I have low teaching evaluations--could go on and on--but WOW!--you put in a tremendous amount of work to compile this information.  (but I have more than 8 journal articles and probably almost 50 encyclopedia articles.

As to my low teaching scores--as I told Jackie, "how is it that in a dept of some 60 profs, only 3 have won the Texas 10 award for those professors whose classes have been the most important in providing a basis for success after graduation, and I should  3 out of 3200 profs.  I will see her this Friday--

What I'm says is that the EXCom-and other dept "somebodies" have turned me into a scholar nonentity, notwithstanding all I have done as exemplified by my 66 page CV.

My belief was that, had I added my comments--the criticism against your group would have been focused on me, so that way, they would not have to address your issues since they would spent time focused on me--

Anyway, am getting it together--Emilio said something about a meeting on Wednesday--was he referring to the faculty meeting today--or to your group--if it is your group having a meeting--I would like to be there.

Anyway, more later,    but let me add--the other Afr-Amer in the dept--Berry, Moore, Joseph, they are the darlings and will never complain about the history department being racist--indeed, they even support Jones in her assessments, etc. of me--at least that's what I believe--check out their salaries---of course, the answer would be--Walker does nothing and whatever she does is inconsequential --  oh well--but I wonder why--all these negative actions and assessments of me by this group of white supremacists in the dept--as well as the black loyalists--I guess if I was making their money, I would also go shuffling around, too.  Fortunately, I do have a record of an impeccable record of scholarship--

Anyway--got to get to campus--talk to you later and again, all congrats on your tremendous work--


Best
Juliet

---

**From:** Alberto A. Martinez
**Sent:** Tuesday, May 1, 2018 11:09:02 PM
**To:** Walker, Juliet E K
**Subject:** Salaries and Publications

hi Juliet,

I hope you're well. As you know, Jorge, Emilio and I have been putting some things on the table, in group emails, because we're tired of being disenfranchised.  Still, I respect your silence in the group email chain, since it's not a very dignified venue.

Also, I want you to know that I'm in the Salaries Committee this year (finally, for once), and I earnestly recommended raises for you based on your presentations and publications. But more significantly, for days I've been working on a couple of tables that systematically tally the salaries and publications of everyone in our department. To you, the results will be unsurprising but validating. Look for your name on p.1 and p.3.

It's still a draft, attached, but I put a ton of hours into it, combing through résumés, etc. I don't know whether the final version of these tables will lead to appropriate actions in terms of solving compensation inequities, but I do think that once our colleagues see them, eventually, they'll be able to more clearly see what they just don't see.

Best,
Al

Re: Salary guidelines

Newman, Martha G

Tue 4/24/2018 7:57 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Al,

Thanks for your note. As I tried to imply, I am not even sure "even-handed" is a good thing right now.

I think it is important for us to recognize the pattern and the perceptions of marginalization that you, Emilio, and Jorge are articulating. Racial and ethnic marginalization has been a problem in the department for a very long time, and it is good for us to realize that sometimes "liberal" forms of governance actually perpetuate inequalities: we are good at recognizing that in our work, and less so in our daily lives.

I don't think that modifying the governance structure will much help with the gender problems, however. I also think we all need to recognize the importance of intersectionality and that most of us have some form of privilege (whether white, male, class-related, or even connected to our topics of research) as well as some form of alienation. Just as an example, given your concern for research funds: are you aware that you were not the only full professor in the European area without a research fund? There are 5 European-area full professors who do not have research endowments, and 4 of them are very senior women (Joan, Miriam, Julie, and Mary).

I'd be happy to continue to discuss this if you'd like to get coffee sometime.

All best

Martha


Martha G. Newman
Graduate Advisor, Religious Studies
Associate Professor, History and Religious Studies
newman@austin.utexas.edu

Please pardon typos. I am writing with a broken wrist.



On Apr 23, 2018, at 9:26 PM, Alberto A. Martinez <almartinez@austin.utexas.edu> wrote:

hi Martha,

thank you for kindly writing a few days ago.
I appreciate the even-handed and thoughtful tone of your email.
It's certainly alarming that an ordinary query about EC governance quickly became an opportunity for airing grievances. In a way, our department has been coasting for years, in the sense that it moves in the same direction, even though there are multiple problems here. For years we've been annoyed by the two-(or-three)-tier system, for years some have voiced concerns about gender inequities, and about inequities in salaries, and about excessive service obligations.

What's new for me is realizing that there's a pattern in how some of us have been marginalized, whether it was inadvertently or intentionally. Jorge was always evidence for me, I thought, that whatever degree of invisibility had been ascribed to me was, well, who knows, a kind of rudeness or thoughtlessness. But when Jorge, who was a bit of a stranger to me, started detailing his experiences, I recognized much of the same, unfortunately; and there are others.

Anyhow, I do think that modifying the governance structure will help. Certainly rotation, not just election; plus, having people say whether they want to serve in specific committees. There should also be a kind of general accounting, keeping track of who did what, when, and who gets what and why, otherwise, we do get the ugly inequities.

Thanks again,
Al

---

**From:** Newman, Martha G
**Sent:** Thursday, April 19, 2018 11:45:12 AM
**To:** Alberto A. Martinez
**Cc:** Canizares, Jorge Canizares-Esguerra; Flores, Arturo R; Llado, Jacquelin; Berry, Daina R; Bodian, Marion E; Brands, H W; Brower, Benjamin C; Brown, Jonathan C; Bsumek, Erika M; Buenger, Walter L; Butler, Matthew J; Chatterjee, Indrani; Coffin, Judith G; Crew, David F; Deans-Smith, Susan; Del Castillo, Lina M; Di-Capua, Yoav; Toyin Falola; George Forgie; Frazier, Alison K; Frens-String, Joshua; Garfield, Seth W; Burnett, Virginia Garrard; Laurie Green; Guha, Sumit; Hardwick, Julie; Hsu, Madeline Y; Hunt, Bruce J; Jones, Jacqueline; Joseph, Peniel E; Kamil, Neil D; Lawrence, Mark A; Levine, Philippa J; Li, Huaiyin; Tatjana Lichtenstein; British Studies; Matysik, Tracie M; smintz@utexas.edu; Moore, Leonard N; Neuberger, Joan H; Neuburger, Mary C; O'connell, Aaron; Olwell, Robert A; osseo@utexas.edu; Raby, Megan; Restad, Penne; Seaholm, Megan; Spellberg, Denise M; Stoff, Michael B; Suri, Jeremi; Talbot, Cynthia M; Tully, Alan; Twinam, Ann; Vaughn, James M; Vong, Sam C; Walker, Juliet E K; wynn@utexas.edu; Zamora, Emilio; Abzug, Robert H
**Subject:** Re: Salary guidelines

the equity report

# Exhibit 11

## Burnett, Virginia Garrard <garrard@austin.utexas.edu>

Wed 10/17/2018 4:06 PM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>

Hi, Al—I'm sorry I missed the meeting this morning, but I'll be at the next one.

I so appreciate the hard work and startling evidence you came up with in the report. It offers quite a remarkable snapshot of our department. .. and not a particularly pretty one, at that.
There were 2 mistakes regarding information on me (and given the mass of data you sorted through, no wonder), but let me pass them along. The substantive one is that my base salary is $129,000, not $154k. It's quite a big difference! I do have summer money for being LLILAS Benson director, but that will disappear when I'm done with that job—and the base academic rate is what they figure in the TRS formula for retirement. So that matters very much indeed! The other is that I was on the Teaching Awards committee of 6 years, not 1. But so what, right?
Thanks for doing this. It was a Herculean effort, and it definitely shines light in a lot of dark corners
All the best,
Ginny

VIRGINIA GARRARD, Director & Professor of History
The University of Texas at Austin | LLILAS Benson Latin American Studies and Collections | 512-232-2410 | llilasbenson.utexas.edu

# Equity Report

### Di-Capua, Yoav

Mon 10/15/2018 4:58 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Al,

Just a quick note to thank you and associates for this enormous piece of work.

best, Yoav

--

Yoav Di-Capua
Associate Professor, History Department
University of Texas at Austin
128 Inner Campus Dr. B7000

GAR 1.104

Austin, Texas 78712-1739

# correction to appendix 3

Talbot, Cynthia M

Mon 10/15/2018 5:23 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Dear Al,

Thanks for all your work on this issue and thanks for pointing out how low my pay is, relatively speaking.  I'm sure you will be inundated with details from others, but I would really appreciate it if you could note that I was Associate Chair for TWO years (2002-2003 & 2003-2004), on appendix 3.  I have never worked so hard in my life; those years are indelibly impressed on my mind!

Thanks,
Cynthia

# Equity Report

Toyin Falola

Mon 10/15/2018 4:23 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Dear Alberto:

What a fascinating report! I enjoyed reading it for its sheer knowledge. I don't know many of the information, and I even forgot that I have spent 27 years here!  How did I survive it?

How do you reward editorship of journals and series? My cumulative work editing six monograph series, two for university presses (Cambridge and Rochester) and four for notable non-University houses (Palgrave, Routledge, Rowman), is more than what the director of graduate studies or the Assistant Chair does! Or teaching an additional class is worth more, in terms of the collective agenda of the university, that serving on a committee!!

I also had a good laugh: how do you measure happiness, and its incremental index?

It is a lot of work, and I am grateful.
Best
TF

Toyin Falola

Department of History

The University of Texas at Austin

104 Inner Campus Drive

Austin, TX 78712-0220

USA

512 475 7224

512 475 7222 (fax)

http://sites.utexas.edu/yoruba-studies-review/

http://www.toyinfalola.com

http://www.utexas.edu/conferences/africa

http://groups.google.com/group/yorubaaffairs

http://groups.google.com/group/USAAfricaDialogue

# Re: Equity Report

## Alberto A. Martinez

Tue 10/16/2018 9:22 PM

Sent Items

To: Toyin Falola <toyinfalola@austin.utexas.edu>;

hi Toyin,

thank you for writing, I'm glad you liked it !
Needless to say, not everybody does, though I imagine some would if only they were at the very top of the publishing list as you are. (I spent more than two hours on your super long CV alone, trying to sort it all into categories!)

Yep, 27 years. And since you ask, I don't know how you survived that time at UT, but I suspect that your survival plan included creating an island within Texas, including the Africa Conference and other venues, where you run or help run the operations. Still, when I look at the past pattern of service and leadership in our department I do think that our department would have benefitted by having some minorities in positions of leadership.

As for rewarding editorial work in journals and series, to date our Salary Committee doesn't reward it, as far as I know. Also, I've been working on a separate table that tallies every course taught by each faculty member since 2003, and your total is far and away above all others, so far, namely 79 courses since 2003, whereas most other faculty seem to have taught around 40, and none has taught even 60. (This is incomplete data though, just results for roughly 30 faculty.)

And how do we measure happiness?? Certainly not by doing the numerical work I'm doing... I'm burned out.

Anyhow, I do hope that you attend our meeting tomorrow Wed. at noon, since, who knows, there might be a shortage of colleagues who think this is useful work. I know of three who just can't attend.

Thanks again,
Al

---

**From:** Toyin Falola
**Sent:** Monday, October 15, 2018 4:23:55 PM
**To:** Alberto A. Martinez
**Subject:** Equity Report

Dear Alberto:

What a fascinating report! I enjoyed reading it for its sheer knowledge. I don't know many of the information, and I even forgot that I have spent 27 years here!  How did I survive it?

How do you reward editorship of journals and series? My cumulative work editing six monograph series, two for university presses (Cambridge and Rochester) and four for notable non-University houses (Palgrave, Routledge, Rowman), is more than what the director of graduate studies or the Assistant Chair does! Or teaching an additional class is

# Re: Equity Report

## Toyin Falola

Wed 10/17/2018 4:09 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Thanks, Alberto. I am making a quick day trip to San Francisco as we are expecting a grand-daughter any time from now. Our last girl, a dermatologist, lives there with her husband.

Ted and Joni changed the dynamics on campus by creating AADS—and this new Dept is over-generous in its salary structure and other things. Hopefully, others will imitate them in due course.

The work you have done is so detailed and impressive. Institutions are slow to change. And those in power follow the pet theory---reward your friends and allies!!

TF

Toyin Falola
Department of History
The University of Texas at Austin
104 Inner Campus Drive
Austin, TX 78712-0220
USA

512 475 7224

512 475 7222 (fax)

http://sites.utexas.edu/yoruba-studies-review/
http://www.toyinfalola.com
http://www.utexas.edu/conferences/africa
http://groups.google.com/group/yorubaaffairs
http://groups.google.com/group/USAAfricaDialogue

---

**From:** "Alberto A. Martinez" <almartinez@austin.utexas.edu>
**Date:** Tuesday, October 16, 2018 at 11:22 PM
**To:** Toyin Falola <toyinfalola@austin.utexas.edu>
**Subject:** Re: Equity Report

hi Toyin,

thank you for writing, I'm glad you liked it !

Needless to say, not everybody does, though I imagine some would if only they were at the very top of the publishing list as you are. (I spent more than two hours on your super long CV alone, trying to sort it all into categories!)

# Meeting today re: Equity Committee

Berry, Daina R

Wed 10/17/2018 8:37 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Cc: Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>;

Dear Committee Members-

Thank you for your work on the detailed report regarding the History Department and Equity issues. I am traveling today and will not be able to attend the meeting.  I plan to participate going forward.

Best,
Daina

Daina Ramey Berry, Ph.D.
Oliver H. Radkey Regents Professor of History,
African and African Diaspora Studies
University of Texas
drb@austin.utexas.edu
www.drdainarameyberry.com

# RE: Committee on Equity open meeting Wednesday, October 17th at noon, GAR 1.102

Brown, Jonathan C

Wed 10/17/2018 6:54 PM

To: Seaholm, Megan <seaholmm@gmail.com>; Coffin, Judith G <jcoffin@austin.utexas.edu>;

Cc: Matysik, Tracie M <matysik@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha S <newman@austin.utexas.edu>; O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Farmer, Ashley <adf@austin.utexas.edu>;

I just want to say that I support Al Martínez and his committee's efforts to correct inequities in salaries.  And inequity is monetary. Do not mistake it for "culture" or anything else.  It may be too late for me to benefit from his suggestions.  But I would caution the younger faculty that to ignore the issues he poses might ultimately condemn you to my situation.  Jonathan Brown

**From:** Megan Seaholm <seaholmm@gmail.com>
**Sent:** Wednesday, October 17, 2018 10:48 AM
**To:** Coffin, Judith G <jcoffin@austin.utexas.edu>
**Cc:** Matysik, Tracie M <matysik@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit

# RE: Committee on Equity open meeting Wednesday, October 17th at noon, GAR 1.102

## Hsu, Madeline Y

Wed 10/17/2018 5:15 PM

To: Frazier, Alison K <akfrazier@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'Connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@austin.utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Farmer, Ashley <adf@austin.utexas.edu>;

I want to add ==my thanks to Tracie and to the equity committee who have put a lot of work and thought into these difficult discussions.==  However, I think we are better for being proactive in tackling what can be highly divisive issues imposed in large part by external pressures.  I am hoping we can work out strategies that build upon a shared sense of commitments and priorities that validates the many forms of important work that we all undertake.

Madeline

---

**From:** Frazier, Alison K
**Sent:** Wednesday, October 17, 2018 2:13 PM
**To:** Matysik, Tracie M <matysik@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Coffin, Judith G <jcoffin@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard

# coffee next week?

### Bsumek, Erika M

Thu 10/18/2018 9:30 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Hi Al,

I know things are tense in the department now — and I appreciate your hard work on the report. I think a few things weren't clear to me initially (i.e. that this was the first of three reports, etc.) and I hope that I conveyed my concerns appropriately. I value your friendship and admire you ability to try to help the department work through them.

Could we have coffee next week just to check in as friends?

respectfully,
Erika

# yesterday !

Alberto A. Martinez

Thu 10/18/2018 11:21 AM

Sent Items

To: Neuberger, Joan H <neuberger@austin.utexas.edu>;

hi Joan,

thank you for your participation in the meeting yesterday.

As you may imagine I have a series of long emails to reply to, including Jackie's and Julie's, and I will. I've also invested some time in emails with Mary, and I send you our full exchange below, for your reference. The ones that matter most are at the top.

Still, I wanted to send you a special thanks for being fair, supportive, understanding, and patient -- and, for helping to clearly moderate the discussion yesterday. Thank you. I especially admire the respect you've earned over the years, and how inspires trust in our colleagues.

I also want you to know that I had several very positive talks with the people there after the meeting, and thus for example, Susan warmly thanked me in person, and she then wrote: "I just wanted to make very clear that I recognize how much work you are putting into this important departmental task. We may not agree on everything but I do also want you to know that I have tremendous respect and admiration for you and I'm glad to have you as a colleague and friend." I will reply to her too, and plan to meet one-on-one.

I spoke with Bob too for a while, and we had multiple agreements, ideas, laughter, and he too warmly thanked me in emails.

Likewise, several people have written to me or talked with me, and not to the whole list (the problem of silence), thanking us for our work -- I'm even tempted to forward all the emails to our group, but they include Jonathan, Ginny, Jorge, Ben, Yoav, Toyin, Daina, Cynthia, Lina, Abena, Josh, etc.

I guess I say all this to reassure you that we're making some progress --

Yes, let's try to meet early next week (I'll email everyone), with an update. I fly to a conference on Wed., and my most busy day is always Tuesdays, so how about Monday, would that work for you?

Again, I'll reply to everyone to the group emails sent by you, Jackie, Daina, Julie. And I hope to reply today too to the email thread started by Tracie, who has always been a close friend of mine in the department, and who I too trust, and agree with.

PS, below are my exchanges with Mary --

Thanks again,
Al

**Re: yesterday !**

## Neuberger, Joan H <neuberger@austin.utexas.edu>

Thu 10/18/2018 2:59 PM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>

Dear Al,
I'm glad that some of the people who were the angriest have calmed down and come to a clearer
understanding of what we're doing.
I can meet on Monday anytime after 1:00
Joan


Prof Joan Neuberger
Department of History
The University of Texas at Austin
128 Inner Campus Drive B7000
Austin, Texas 78712

Not Even Past | 15 Minute History | Thinking in Public | Behind the Tower


On Oct 18, 2018, at 1:21 PM, Alberto A. Martinez <almartinez@austin.utexas.edu>
wrote:

hi Joan,

thank you for your participation in the meeting yesterday.

As you may imagine I have a series of long emails to reply to, including Jackie's and
Julie's, and I will. I've also invested some time in emails with Mary, and I send you
our full exchange below, for your reference. The ones that matter most are at the
top.

Still, I wanted to send you a special thanks for being fair, supportive, understanding,
and patient -- and, for helping to clearly moderate the discussion yesterday. Thank
you. I especially admire the respect you've earned over the years, and how inspires
trust in our colleagues.

I also want you to know that I had several very positive talks with the people there
after the meeting, and thus for example, Susan warmly thanked me in person, and
she then wrote: "I just wanted to make very clear that I recognize how much work
you are putting into this important departmental task. We may not agree on
everything but I do also want you to know that I have tremendous respect and
admiration for you and I'm glad to have you as a colleague and friend." I will reply to
her too, and plan to meet one-on-one.

I spoke with Bob too for a while, and we had multiple agreements, ideas,
laughter, and he too warmly thanked me in emails.

# Re: Committee on Equity open meeting Wednesday, October 17th at noon, GAR 1.102

## Zamora, Emilio

Thu 10/18/2018 6:45 PM

To: Brown, Jonathan C <j.brown@austin.utexas.edu>; Seaholm, Megan <seaholmm@gmail.com>; Coffin, Judith G <jcoffin@austin.utexas.edu>;

Cc: Matysik, Tracie M <matysik@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>; Abzug, Robert H <zug@austin.utexas.edu>; Berry, Daina R <drb@austin.utexas.edu>; Bodian, Marion E <bodian@austin.utexas.edu>; Brands, H W <hwbrands@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Bsumek, Erika M <embsumek@austin.utexas.edu>; Buenger, Walter L <w-buenger@austin.utexas.edu>; Butler, Matthew J <mbutler@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Chatterjee, Indrani <ichatterjee@austin.utexas.edu>; Crew, David F <dfcrew@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; George Forgie <forgie@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Frens-String, Joshua <jfstring@austin.utexas.edu>; Garfield, Seth W <sgarfield@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Laurie Green <lbgreen@austin.utexas.edu>; Guha, Sumit <sguha@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Hunt, Bruce J <bjhunt@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Kamil, Neil D <kamil@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Levine, Philippa J <philippa@austin.utexas.edu>; Li, Huaiyin <hli@utexas.edu>; Tatjana Lichtenstein <lichtens@austin.utexas.edu>; British Studies <britishstudies@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; smintz@utexas.edu <smintz@utmail.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>; O'connell, Aaron <Aaron.OConnell@austin.utexas.edu>; Olwell, Robert A <rolwell@austin.utexas.edu>; osseo@utexas.edu <osseo@utmail.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Spellberg, Denise A <spellberg@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Tully, Alan <tully@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Vaughn, James M <jmvaughn@austin.utexas.edu>; Vong, Sam C <svong@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; wynn@utexas.edu <wynn@utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Farmer, Ashley <adf@austin.utexas.edu>;

Corrections to All,

    I regret not attending yesterday's meeting, but thankful for the helpful suggestions to our equity committee. You can be sure that we will prepare a second report with all your recommendations in mind  including others you may wish to share with any member of the committee.  Defensive statements and injured sensibilities against the committee's preliminary report, however, were unfortunate.

    As some have noted, Alberto has devoted an extraordinary amount of time and effort in preparing the committee's report and all of us on the committee have been honest and diligent in carrying our charge for the good of the department. I also need to remind everyone that I reported a couple of weeks ago that the committee would come forward with a preliminary report and a request for constructive guidance from the faculty.

    The expectation was that everyone would trust that our committee would come forward with a preliminary report on salaries, governance, salary guidelines and cultural environment, all in response to the expressed will and direction of the faculty.  At no time did members of the committee do or say anything that in my opinion would warrant offensive and disrespectful reactions.  I know that most everyone has appreciated our work and have expressed an interest in helping us.  But it is unfortunate that one or a few voices can unwittingly diminish the importance of demonstrable cases of inequity in our department.

Many of us in the department want to make  sure that our work environment is as equitable as possible and should always assure colleagues that we will give serious attention to any concerns they bring forward.  Of course, our assessments should be fair, but a spirit of trust and mutual support should prevail in all that we do.

My hope is that we support the current efforts to identify inequities and to correct them, just like we supported the work of the Gender Equity Task Force beginning in 2007 and continuing into the present.

Emilio

---

**From:** Zamora, Emilio
**Sent:** Thursday, October 18, 2018 8:11:08 PM
**To:** Brown, Jonathan C; Seaholm, Megan; Coffin, Judith G
**Cc:** Matysik, Tracie M; Llado, Jacquelin; Abzug, Robert H; Berry, Daina R; Bodian, Marion E; Brands, H W; Brower, Benjamin C; Bsumek, Erika M; Buenger, Walter L; Butler, Matthew J; Canizares, Jorge Canizares-Esguerra; Chatterjee, Indrani; Crew, David F; Deans-Smith, Susan; Del Castillo, Lina M; Di-Capua, Yoav; Toyin Falola; George Forgie; Frazier, Alison K; Frens-String, Joshua; Garfield, Seth W; Burnett, Virginia Garrard; Laurie Green; Guha, Sumit; Hardwick, Julie; Hsu, Madeline Y; Hunt, Bruce J; Jones, Jacqueline; Joseph, Peniel E; Kamil, Neil D; Lawrence, Mark A; Levine, Philippa J; Li, Huaiyin; Tatjana Lichtenstein; British Studies; Alberto A. Martinez; smintz@utexas.edu; Moore, Leonard N; Neuberger, Joan H; Neuburger, Mary C; Newman, Martha G; O'connell, Aaron; Olwell, Robert A; osseo@utexas.edu; Raby, Megan; Spellberg, Denise A; Stoff, Michael B; Suri, Jeremi; Talbot, Cynthia M; Tully, Alan; Twinam, Ann; Vaughn, James M; Vong, Sam C; Walker, Juliet E K; wynn@utexas.edu; Flores, Arturo R; Farmer, Ashley
**Subject:** Re: Committee on Equity open meeting Wednesday, October 17th at noon, GAR 1.102

All,
I regret not attending yesterday's meeting, but gratified for the helpful suggestions to our equity committee. You can be sure that we will prepare a second report with all your recommendations in mind  including others you may wish to share with any member of the committee.  Defensive statements and injured sensibilities against the committee's preliminary report, however, are unwarranted.

As some have noted, Alberto has devoted an extraordinary amount of time and effort in preparing the committee's report and all of us on the committee have been honest and diligent in carrying our charge for the good of the department. I also need to remind everyone that I reported a couple of weeks ago that the committee would come forward with a preliminary report and a request for constructive guidance from the faculty.

Many of us in the department want to make sure that our work environment is as equitable as possible and should always assure colleagues that we will give serious attention to their concerns, especially since some salary and governance inequities are obvious.  Of course, our assessments should be fair, but a spirit of collegiality and mutual should prevail in all that we do.

---

**From:** Brown, Jonathan C
**Sent:** Wednesday, October 17, 2018 8:54:32 PM
**To:** Seaholm, Megan; Coffin, Judith G
**Cc:** Matysik, Tracie M; Llado, Jacquelin; Abzug, Robert H; Berry, Daina R; Bodian, Marion E; Brands, H W; Brower, Benjamin C; Bsumek, Erika M; Buenger, Walter L; Butler, Matthew J; Canizares, Jorge Canizares-Esguerra; Chatterjee, Indrani; Crew, David F; Deans-Smith, Susan; Del Castillo, Lina M; Di-Capua, Yoav; Toyin Falola; George Forgie; Frazier, Alison K; Frens-String, Joshua; Garfield, Seth W; Burnett, Virginia Garrard; Laurie Green; Guha, Sumit; Hardwick, Julie; Hsu, Madeline Y; Hunt, Bruce J; Jones, Jacqueline; Joseph, Peniel E; Kamil, Neil D; Lawrence, Mark A; Levine, Philippa J; Li, Huaiyin; Tatjana Lichtenstein; British Studies; Alberto A. Martinez; smintz@utexas.edu; Moore, Leonard N; Neuberger, Joan H; Neuburger, Mary C; Newman, Martha G; O'connell, Aaron; Olwell, Robert A; osseo@utexas.edu; Raby, Megan; Spellberg, Denise A; Stoff, Michael B; Suri, Jeremi; Talbot, Cynthia M; Tully, Alan; Twinam, Ann; Vaughn, James M; Vong, Sam C; Walker, Juliet E K; wynn@utexas.edu; Zamora, Emilio; Flores, Arturo R; Farmer, Ashley
**Subject:** RE: Committee on Equity open meeting Wednesday, October 17th at noon, GAR 1.102

I just want to say that I support Al Martínez and his committee's efforts to correct inequities in salaries.  And inequity is monetary. Do not mistake it for "culture" or anything else.  It may be too late for me to benefit from his

# Re: Equity report - resending

## Canizares, Jorge Canizares-Esguerra

Fri 10/19/2018 5:00 AM

To: Matysik, Tracie M <matysik@austin.utexas.edu>;

Cc: Toyin Falola <toyinfalola@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>;

Frankly airing views should not lead to "war" or to the dissolution of a committee whose labor has been herculean. To address inequities and unwitting discrimination-marginalization, we need honesty and transparency, I rather feel uncomfortable with Julie's email than be met by politeness and silence. I also value the public and respectful airing of our differences. I value Al's careful and thoughtful replies to Julie and Mary. We need more of this, not avoidance. Stopping the committee now would not stop the public airing of any of this.  As you know a committee of 20 university wide individuals (CREED) is now working on a report for the Provost after we uncovered striking patterns of inequities this summer regarding Latinx faculty on campus: salary, governance,  numbers, power. There are remarkable inequities in our institution that need to be identified. The quicker we address alternative paths,  the better. The committee suggested solutions. I respectfully suggest we pay attention to them as well. The utter silence on their proposed solutions is deafening.
 Best
Jorge

Sent from my iPhone

On Oct 19, 2018, at 7:54 AM, Matysik, Tracie M <matysik@austin.utexas.edu> wrote:

> Dear All,
>
> Thank you, Toyin, for your call to peace in the department as a top priority, even as we deal with challenging issues.  I want to echo that call.  My own email of a couple of days ago asked us to think and work collectively – a goal that, I would hope, could be seen as a complement to the laborious work done by the members of the Equity Committee.   It was not intended to add division but rather to provide an alternative discourse.  As to going forward, I do not think the committee should be disbanded until we as a department are comfortable that the work is truly complete (unless, of course, the committee members themselves prefer to disband and/or reassemble).
>
> Best wishes to all,
>
> Tracie

---

**From:** Toyin Falola
**Sent:** Friday, October 19, 2018 4:48 AM
**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>; Hardwick, Julie <jhardwick@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>
**Cc:** Jones, Jacqueline <jjones@austin.utexas.edu>; Deans-Smith, Susan

# Equity report

Laurie Green

Sun 10/28/2018 10:26 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;


Hi Al,

<mark>I am SO appreciative of your hard work and, really, determination on behalf of equity in really important areas in our department.</mark> Here are a few points I wanted to get in before Wednesday's meeting.

Information about me and the publication chart:
1. I have served one term on the EC.
2. I've lost 2 publications. There should be another edited volume, and another peer-reviewed chapter.
3. Did my chapter disappear because it was in a book I co-edited? The year-plus I spent on the chapter is the same year-plus I would have spent no matter what peer-reviewed book or journal it was published in.
4. I'm concerned about the weighting and grouping of publications. We have long been assured by our department chairs that in our profession, articles in a peer-reviewed journals and a chapters in peer-reviewed books have the same value. It was worrying to have the latter separated out from journal articles and put into a category with various non-peer reviewed publications.

I've written up some different comments about what "equity" means (or doesn't) in our new context, can share with you if you wish.

Laurie


--
Laurie B. Green, Assoc. Professor
University of Texas at Austin
History Department
128 Inner Campus Drive B7000
Austin, TX. 78712-1739
lbgreen@austin.utexas.edu
512-475-7245

Please see these publications:
Battling the Plantation Mentality: Memphis and the Black Freedom Movement
Precarious Prescriptions: Contested Histories of Race and Health in North America, coedited with John Mckiernan-Gonzalez and Martin Summers

**Today Is Latina Equal Pay Day. Here's What That Means**

## Abena Dove Osseo-Asare <osseo@utexas.edu>

Thu 11/1/2018 2:25 PM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>

http://fortune.com/2018/11/01/latina-equal-pay-day-explained/?
utm_source=emailshare&utm_medium=email&utm_campaign=email-share-
article&utm_content=20181101

Some stats fyi. Also, hope your important work on equity is not being coopted! Missed yesterday as I have been sick this week.

## Re: Today Is Latina Equal Pay Day. Here's What That Means

Alberto A. Martinez

Thu 11/1/2018 1:32 PM

Sent Items

To: osseo@utexas.edu <osseo@utmail.utexas.edu>;

hi Abena!

thanks for sharing, will read it with interest -- useful.

Also, you'll be glad to know that yesterday's meeting went very well, almost every comment was positive and constructive. Among the many people who say good things, there were: Yoav, Tracie, Indrani, Sumit, Ben, Aaron, Jorge, Laurie, Martha, Ginny, Miriam, Emilio, Megan, Joan, Cynthia, -- a couple said nothing but I sense are supportive, such as Matthew, and more importantly, nobody there said anything very negative !

It was, as they say, night and Day --

Still, there are some who by their absence I think they are dis-pleased, Julie, maybe Stoff, maybe Suri, etc.

Al

---

**From:** Abena Dove Osseo-Asare <osseo@utexas.edu>
**Sent:** Thursday, November 1, 2018 12:23:39 PM
**To:** Alberto A. Martinez
**Subject:** Today Is Latina Equal Pay Day. Here's What That Means

http://fortune.com/2018/11/01/latina-equal-pay-day-explained/?utm_source=emailshare&utm_medium=email&utm_campaign=email-share-article&utm_content=20181101

Some stats fyi. Also, hope your important work on equity is not being coopted! Missed yesterday as I have been sick this week.

RE: email from Jorge about teaching awards

## Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>

Sat 11/3/2018 2:13 PM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>

Thank you Al, would tables of nominations be in report appendices or just the actual teaching awards? I have many other issues on governance that might then have to wait for next semester, but I wonder if the committee could obtain a list of IHS fellowships for example? Some folks have received three. Lina has none. How many more faculty members have never been fellows? We also need a different structure of how resources-conferences are allocated in the IHS. I have been teaching in the 4 flour and is remarkable to see on conference posters the same names repeatedly on print, while many others never appear. Those conference resources need to circulate and rotate. They surely should not be going to people who already have huge endowments. Do IHS steering committees have ever considered equity issues? Sorry to be adding even more demands on the committee whose labors are herculean in terms of collecting data. I thank the committee because the report has been truly illuminating.

Thanks

Jorge

---

**From:** Alberto A. Martinez
**Sent:** Saturday, November 3, 2018 11:16 AM
**To:** Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>
**Cc:** Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>
**Subject:** email from Jorge about teaching awards

hi all,

Jorge sent a group email today to Jackie, the Dean, the Vice Provost, CREED, and others, and he asked me to share it also with our committee, so here it is, -- the third email below.

Jorge -- thank you for sending this information and concerns. I'll reply to the original thread soon. Our committee is busy working on the Salary proposals now, and on the Climate Survey, so I anticipate that we won't be able to look at the issue of teaching awards in any significant depth until next semester, as part of our review of governance. As for tables on teaching, I do have a table of all (or most) teaching awards plus Jackie has twice asked that I include the information about nominations, which she has already given me. Some such table of teaching awards will be in the data appendices of our revised Report on equity in raises, because some colleagues have asked for additional measures of faculty contributions, other than publications, admin, service, and years at UT.

Still, I understand your concerns and hope that the Teaching Awards Committee can meet with you soon to discuss this; and I'm glad that CREED will discuss it too.

Best wishes,

# Equity report

# Exhibit 12

### Hardwick, Julie

Wed 10/17/2018 8:41 AM

To: Neuberger, Joan H <neuberger@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>;

Cc: Alberto A. Martinez <almartinez@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>;

Dear Colleagues,

I am not attending the meeting today as the report does not do anything in terms of the important - indeed essential and pressing - project of sorting out equity issues in the department.  Instead it creates further murkiness and in fact exacerbates equity issues. And the department can't afford to waste this opportunity to deal with equity issues.

 1) Accuracy.  I am confident everyone on the committee has my email address or could get it in seconds.  Likewise someone in seconds could have emailed me to ask what compensation I am getting for wrangling assessment.  I would have answered in seconds. Instead nobody on the committee bothered to ask me and it appears as a mystery speculation.  Likewise everyone on the committee knows that Mary Neuburger has two excellent monographs that were the basis of her rapid promotion to full professor.  Yet nobody on the committee corrected the report when Al disqualified one of them as "too short". I am confident external reviewers for promotion and the promotion committees are better judges of whether its length is appropriate for a substantial monograph. I have heard from many people the report also includes errors about them.  Transparency requires accuracy and fact checking - that can be done very quickly.  I have no idea why there was no fact checking.

2) The salary table is a chaotic mess.  It needs to be sorted into multiple columns that show clearly current information - these should include separate columns for current year base, FIIs (with the projected end salaries too) plus separate columns for temporary supplements tied to doing jobs, salary supplements taken from chairs/professorships, research money (a critical source of "untaxed salary supplement" as Anne Martinez pointed out years ago), and supplements that are simply supplements.  A clear, accurate, comprehensive table is essential for any discussion of equity in terms of salary.  It can be achieved by simply asking people or asking Jackie for full disclosure, not just disclosure of the base.

 3) The classification of service (actually essential administrative work) as overcompensated and a source of salary inequity is completely unjustified.  The calculations of the gains made from service are preposterous.  The report is offensive in the way it indicates that people who do service do that instead of working on their research.   It represents a complete misunderstanding of the essential nature of administrative work to the running of the department and of the volume of work involved - and also represents people doing essential work as service drudges.

I can tell you I work overtime - lo and behold I do a lot of research work while dealing with my administrative work.  It's not either/or for me or anyone doing these jobs. I have spent 11 of the last 12

years doing major service jobs for the department.  I am happy to send you my cv (although this also is easily available on my faculty page) and a time sheet so you can see I'm not underproducing and overcompensated for service. Other people doing this work are also juggling competing demands, not giving up research to do "service".

4) The mean spirited nature of the specific example about Susan's job to demonstrate overcompensation is mind blowing.  It shows an utter lack of respect for a critical colleague who facilitates your work in a 1000 ways while doing the research work that makes her a very visible member of her field. The calculations as to the gains are literally fantasies.  Perhaps you should try doing her job for one week before you decide she is overpaid even with her actual compensation.  It would be useful for committee members to think instead about how much compensation would be necessary for one of you agree to do Susan's job.

5) The report has no analysis of the fact that all major service jobs are done by women - women who the report represents as not doing research work because they are too busy doing shit work for the department for which they are overpaid.

 4) I notice nobody on the committee except Joan has done a major administrative job.  It's your turn because you've enjoyed the privilege of working on your books without the competition of major essential administrative work for the department without which the department will not function. An important principle of equity is for everyone to share the essential administrative work.  Jackie is currently looking for someone to take over from me and she will be looking for someone to take over from Susan next year. I look forward to two of the committee members (not Joan who has done her share) telling Jackie cheerfully that they are willing to do these jobs.

Jorge, Mark, Emilio, Peniel and Al - you in particular on the basis of this report and our current overpaid and feminized "service" faculty should step up to do one of these two absolutely essential jobs.  Equity requires this work is not gendered.  Since your reports indicates we have overcompensated women doing all this work, perhaps you'd like to do it in a manly way with no compensation. Jackie will be delighted (and surprised) to hear she has takers for these positions.

5) Virtually none of the current insane salary structure - a bizarre combination of acute compression and hyper inflation - is due to the salary committee which has routinely done its job as fairly as possible.  The salary structure is due to deals made with the chair, deals made with the dean, and the Tower's varied crazy policies of the last ten years (including years when only 30% of people could get raises, external FFII hiring, internal Fii policies, emphasis on senior hiring only etc etc).

I suggest you withdraw this report and re-present it when it accurately and fairly represents our colleagues' published work, their full compensation packages, the full range of essential administrative work they have done, the full complexity of major administrative jobs that almost nobody in the department is willing to do, and the impact of multiple factors outside the salary committee on the salary structure.  I suggest you think much more about intersectionality - and the ways in which many (in)equity fault lines are at work. Then we can get to grips with how to make concrete progress with our equity challenges.

Yours,

Julie

Julie Hardwick
Professor, Department of History
UT System Regents Distinguished Teaching Award Professor
University of Texas at Austin
128 Inner Campus Drive B7000
Austin, TX 78712-1739
http://www.utexas.edu/cola/depts/history/faculty/jholwell

Re: Equity report - resending

Exhibit 13

Alberto A. Martinez

Fri 10/19/2018 1:37 AM

Sent Items

To: Hardwick, Julie <jhardwick@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>;

Cc: Jones, Jacqueline <jjones@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Burnett, Virginia Garrard <garrard@austin.utexas.edu>; Brown, Jonathan C <j.brown@austin.utexas.edu>; Talbot, Cynthia M <ctalbot@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; Frazier, Alison K <akfrazier@austin.utexas.edu>; Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>; Matysik, Tracie M <matysik@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>;

Dear Julie,

thank you for sharing your frank impressions and critique of the draft report, and for explaining why you chose not to attend. I agree that our department "can't afford to waste this opportunity to deal with equity issues." Let me reply to each of the points you raise.

My answers, below, are a bit long, which is only for clarity, transparency, and to respectfully answer your questions fully, as you deserve.

(Since you put Jorge in this email thread, I've kept his email in the list, but please note that he's not in the Committee on Equity, and I have added Juliet Walker, who is. Likewise, I have to add Susan Deans-Smith, since you write about her at length, and I reply to such points. I've also cc'd each of the persons I quote.)

(1) Why did I not contact you to ask what is the compensation that you receive for working as Assessment Director?

There are several reasons. Already since the summer, I had been working on a series of tables about service and administrative labors in the department, for which I therefore have an individual list for each such duty year by year. Last Friday at a meeting, the committee members present asked me to please include in the draft report tables for salaries, publications, service, seniority by years, and FII raises. However, the tables I had for service, listing individual names year-by-year for each committee and officer (based on rosters kindly given to me by Alan, plus CVs, all of which I can share), ranging only from 2003 to 2018 = 15 years (as requested and agreed in the Department meeting in May), occupy 23 pages in MS Word format – clearly too much, so I had to create a new way to synthesize all that data into one or two tables. Therefore, last weekend I spent between 20 and 25 hours working on the two draft tables on pages 8-10 in the report. Naturally, since the tables in question aim to convey the participation of 59 faculty members throughout 15 years there were a few points where I didn't have the information in hand. The example, you point out: what is the compensation for Assessment Director, is one such example, and it was for that reason that I included it in the table with a question mark, meaning that as of the moment of writing the table I didn't know the answer. Certainly I could well have emailed you or Jackie to ask. Why didn't I?

Mainly because (1) I was too busy working on the tables and draft report so I lacked time to write emails to each faculty member for which I lacked a data point; (2) contrary to your fair reassurance that you

would have replied instantly, there have been multiple instances, with other colleagues, in which I have sent emails asking for some info, and because of their busyness I have not received a reply, which is very understandable, so it led me to think that even if I did write several emails to faculty in the weekend, while I was working, I might not get a reply by Monday, (3) also because, as Emilio reported in a Department meeting, our committee would soon distribute a draft report in which we would solicit suggestions, ideas, corrections, (4) because I assumed that it would be more effective to simultaneously share with the department the data that the committee members requested (which I myself collected or which has been kindly provided by Jackie, Art, Alan, Cynthia, Bruce, and others), and finally (5) because in American culture it is often perceived as rude to ask people directly about their compensation; I've only asked one faculty member by email, in this process, and entirely understanding that it's ok if no such info is provided, and indeed, I received no reply on this particular point. Nevertheless, I do believe you when you write that if I had asked you would have promptly replied. I'm only trying to explain why I didn't ask.

Still, I do therefore ask you now to please let us know what is the actual compensation for serving as Assessment Director. Jackie had previously provided me with Art's spreadsheet about proposed raises for 2018-19, but in the column for "Service," which includes awards of $1,500 for three other positions (Associate Chair, Graduate Adviser, IHS Director) there is no entry in the line with your name – I did see this, and I understood that if the job of Assessment Director is defined to include a raise (and any course releases) then in the present year that raise just would not be listed because you were awarded an FII raise, and each person who would receive such a raise was not listed for other raises in the Spreadsheet. Likewise, I did know about the probable raises for Associate Chair, Graduate Adviser, and IHS Director, not because I asked the individuals in question, but because I was copying data as it plainly appears in the spreadsheet in question which confirms the quantities specified in the Guidelines of the Salary Committee for years. In the case of Assessment Director, raises for that position have not yet been noted in the Salary Guidelines. And for the record, I have no objection for such a raise.

To be sure, instead of using the data in the spreadsheet or in the Guidelines, I could well have emailed each person in a present departmental position to ask them what they each presently earn, or used to earn. But again, even if they kindly did answer such questions, and I have no doubt that some would, it still leaves room for clarification. Just to give one example, when Susan saw the report she was surprised that it claims that the Associate Chair receives a raise of $1500; she had the impression, as she informed me, that it was $1000 instead. Therefore, she fairly emailed Art Flores to ask him for clarification. He sent her correspondence from 2016 about it. Then I suggested that she please also contact Jackie to confirm whether her raise for 2018-19 was indeed $1000, or $1500, as I understood it. Then Jackie immediately did clarify it.

(2)  Next, you raise the issue of why I "disqualified" one of Mary's books. Similarly, in a series of emails, Mary contacted me to request that her book not be included in the category of "brief books" and to be counted instead in the standard category of book. To answer this question, I exchanged several emails with Mary. I have pasted all my emails to her below. The summary is that any categorization of publications, as done annually by the Salary Committee, can involve certain ambiguities; and in this case the ambiguity is: what does our Department mean by the category of "book" in contradistinction to the category of "brief books"? I surmise that you may have different notion than mine; from what you write, if I understand you correctly, Mary's book clearly isn't a brief book because it was her tenure book and was rightly appreciated by external reviewers for promotion and the promotion committees as having the appropriate length of a substantial monograph. I entirely agree that reviewers and committees rightly appreciated Mary's book. However, my approach to the question of length was not about quality, but much more simply about text, content. Since the Salary Guidelines specify no information on how to distinguish between a book and a brief book (though we can well improve them to do so), I defined a short book at 200 pages of text, not counting front matter, images, indices, etc. Mary frankly complained about my criterion, and I do recognize that there is room for both error on my part, and disagreement among individuals about whatnot. I finally agreed with Mary to change my criterion, yes, but bear in mind that this issue of brief book involves making distinctions that affect multiple books, certainly not just

Mary's. Thus when I defined a brief book as less than 200 pages of text, this meant, for example, that certain single-author books, such as by Bruce (JHUP 1992, 192 pp.), Madeline (Oxford 2016, 184 pp.), Emilio (Secretaría, 1986, 2015 pp.), Toyin (Greenwood, 2001, 202 pp.), and others, appear in my table as brief books. When Emilio saw that there were only two books in his column of "books" he asked me where is the third one, and I explained that I had to set some operational definition of what is a so-called "brief book" and that I had tried to apply it consistently. Like Mary, he would prefer to have his book count as a book, period, and I understand that.

We may well ask whether the ambiguity (of what fairly counts as a brief book) can be solved by consulting the records of past salary committees, to find out what they awarded each book. However, this path can hardly work because past Salary Committees have in fact been inconsistent about how much of a raise is awarded to a seemingly brief book, such as the ones I point out above. For example, in her Faculty Activity Report of 2018, Madeline duly noted that she has received no raise, $0, for her book of 2016. I know of other faculty who have received $4000 for a brief book that did not count for promotion. Others have received $2000. Etc.

Therefore, my main recommendation is that, as a Department, we need to collectively specify in our Salary Guidelines what counts as a brief book. I do understand Mary's argument, and I agreed to change how I define a brief book, such that her book counts in the standard category in my table. But ultimately whatever I think is just my personal opinion, and an exercise in analyzing the questions at hand. What matters more instead is: what is the approach that is preferred by most people in the department? We can have this discussion without finding out how every such book has been rewarded in the past, which is why the Committee on Equity has not focused on discovering causes. (E.g., why exactly is Jonathan Brown the lowest paid full professor in our department?) But I can tell you with certainty that awards haven't been allotted consistently, despite any fair and good intentions of members of the Salary Committee across the years. I'm not interested in identifying or blaming anyone for any inconsistencies in how raises are awarded across the years. Instead, I think we agree that we can well improve the Guidelines, for equity, clarity, and consistency.

(3) You write: "I have heard from many people the report also includes errors about them."
I hope that you can please encourage such colleagues to convey and correct any such errors to me or to anyone in our committee, or even to Jackie Jones. Since Jackie Llado shared the draft report, I have received the following corrections or questions:

 Susan asked about the $1500, which I still understand is correct. Cynthia kindly emailed me that she was Associate Chair also in 2002-03. But actually, I hadn't included 2002-03 only because my tables list only data since 2003-04, as requested by our Committee's mandate in May. Cynthia also wrote: "Thanks for all your work on this issue and thanks for pointing out how low my pay is, relatively speaking." Joan informed me that her course release for NEP is not 3 but 2 (my mistake stemmed from seeing only the list of her courses in the History website, not her UGS courses). Ginny wrote: "my base salary is $129,000, not $154k." However, actually, the report doesn't state that her base salary is $154K, what it actually states is that her "Total compensation" is $158,750, and that her base salary is "129,096," so the information is correct. Ginny fairly noted that she does have "summer money for being LLILAS Benson Director" (which is why the total compensation in the table differs from the base salary). At the same time, Ginny kindly wrote "I so appreciate the hard work and startling evidence you came up with in the report. It offers quite a remarkable snapshot of our department ... and not a particularly pretty one at that," and she warmly thanked me for the "Herculean effort, and it definitely shines light in a lot of dark corners." Charters kindly clarified that he no longer receives a course release for directing NSP.

By the way, I have received multiple other kind compliments, and I really appreciate them. It's unfortunate that not all faculty feel comfortable voicing their comments publicly in a group email, but for the record I'll share with you just two more examples: Yoav kindly wrote "to thank you and associates for this enormous piece of work." Toyin warmly wrote "What a fascinating report! I enjoyed reading it for its

sheer knowledge. I don't know many of the information, and I even forgot that I have spent 27 years here!  How did I survive it?" He added "It is a lot of work, and I am grateful."

Likewise, after our open Meeting, despite her frank initial critique, Susan kindly wrote to me: "I just wanted to make very clear that I recognize how much work you are putting into this important departmental task. We may not agree on everything but I do also want you to know that I have tremendous respect and admiration for you and I'm glad to have you as a colleague and friend." I am moved by her words.

I only give a few examples, but I fairly need to let you know that not everyone shares your impressions. It is sad and regrettable that not everyone dares to voice their opinions openly in our department. I have said this in department meetings, and I have told Jackie personally.

Still, I don't doubt that some of our colleagues do share your impressions, even if they have not yet conveyed them to me. To that end, you are very welcome to please share my present email with anyone.


(4) Next, you write:  "The salary table is a chaotic mess."
I don't agree, but I welcome your suggestions.
You write:  "It needs to be sorted into multiple columns that show clearly current information - these should include separate columns for current year base, FIIs (with the projected end salaries too) plus separate columns for temporary supplements tied to doing jobs, salary supplements taken from chairs/professorships, research money (a critical source of "untaxed salary supplement" as Anne Martinez pointed out years ago), and supplements that are simply supplements.  A clear, accurate, comprehensive table is essential for any discussion of equity in terms of salary.  It can be achieved by simply asking people or asking Jackie for full disclosure, not just disclosure of the base."

These suggestions are fair, and we might do them, if the Committee on Equity agrees.

Soon after you had written to Megan about including the various categories of income, (1) I did discuss this with Jackie in a meeting, and (2) we did discuss it in a Committee meeting. I asked Jackie for the data about research funds but she explained that there are so many various sources of funding that she has no such single list. Also, she and I agreed that research money is not an "untaxed salary supplement." There are state and federal laws plus University regulations that regulate this, and therefore, for example, research funds cannot be used to make mortgage payments, buy a car, etc.

Still, I do agree with you that it would be good to see a full list of salaries, supplements, research funds, etc. I have not knocked on every door to have all such data, but you are welcome to take any initiatives you wish, as is anyone in our faculty and committee. Besides, whether our committee will indeed produce the table you are requesting is something that we'll have to discuss and decide in a meeting, and in consultation with Jackie.


(5) Next, you write:
"The classification of service (actually essential administrative work) as overcompensated and a source of salary inequity is completely unjustified. "
At no point in the report is anything classified as "overcompensated." I do not think that administrative work such as being Associate Chair is overcompensated. What the report shows, instead, is that it is insufficient to think that someone who serves in that position earns a raise of $1500, whereas someone who publishes a book gets $4000 – just because there is a cumulative effect of annual raises that, potentially, over time, is not only comparable to publishing that book, but can also exceed it. A single raise of $4000 after, say, 6 years of research and writing, is plainly not as much as six annual raises of $1500 each. And it need not be. At no point does the report say: "and therefore the latter raise should be eliminated." At no point does it say that "therefore the raise for books should be increased."

But I do understand now that you and some others thought that such is the tendency of the text, and that it's insinuated somewhere between the lines. But it just doesn't say that, and our Committee did not propose that. On Wednesday's meeting, I explained that despite any inadvertent aspects of how I framed the draft report, I do respect and value the work done by our Associate Chair, Susan, just as I have told her by email, after her kind and understanding email to me.

Since I wrote "Associate Chair" in our report, as an example, I can now understand why Susan frankly expressed her concern in our meeting. However, I was referring to the position, not the individual – I was not criticizing the position, and I was not criticizing her. Why would I dislike Susan?? At no point has Susan or any Associate Chair said or done anything to upset me. At no point have I been annoyed or disappointed by Susan's labors. At no point has anyone given me any reason to even doubt Susan's professionalism and diligence, which I've experienced.

At no point did I even write "the Associate Chair," but instead explicitly wrote: "serving as, say, Associate Chair, would be," and "an Associate Chair" (meaning a colleague who has done this labor in the past or might do it in the future), and I named not one individual but four who have labored as Associate Chair: Cynthia, Ginny, Susan, George.

Needless to say, if someone doesn't know me well, then the lack of trust (that one may earn over time) can well engender impressions that when one writes something it also might mean something worse. Let me reassure you that I try to be frank and direct. I do not like innuendos. I grew up overseas, speaking Spanish, in a place where we don't communicate as in the US.  In Puerto Rico, we tend to say what we think, and with good nature, so we don't need to spend as much time figuring out what the other person subtly meant.

As I explained in the open Meeting, the fact that an administrative position can involve an annual raise of $1500, plus two course releases, is not something that, to me, means that such jobs should be avoided, but, to the contrary.

(6) Next you argue as if the draft report says that it's "either / or " in doing research or administrative work.

At no point in the report is any such claim made. Just because I compare income from publishing one book with income from laboring in administrative work, that does not mean that the two are mutually incompatible. Nobody has made that claim.

Yet you write: "The report is offensive in the way it indicates that people who do service do that instead of working on their research."

To the contrary, the report specifically says: "Some service is expected of all faculty," on p. 5. Moreover, in no page did we segregate ourselves or our colleagues into two groups: those who do service and administrative work and those who publish. It would be absurd. Page 6 plainly states that for certain positions such as Graduate Advisor, there is roughly "33% of one's salary for the service job" – this means that another 33% of the salary might be for publishing and another 33% might be for the teaching part of the job. None of this is inventive, original, controversial, or ill-willed.

Again, I'm afraid that you are reading between the lines in an arbitrary way.

For years, I have believed that the University pays me to teach 4 courses/year, which is roughly 66% of my job, plus carry out research, which is roughly 33% of my job. Obviously the percentages are not exact accounts of how I or anyone spend our time; obviously the daily percentages fluctuate. The point in the discussion was simply (and non-controversially) that if one gets two course releases as a kind of

partial compensation for carrying out administrative work then the corresponding portion of one's time, might be spent on such work.

(7) You write:
"The mean spirited nature of the specific example about Susan's job to demonstrate overcompensation is mind blowing.  It shows an utter lack of respect for a critical colleague who facilitates your work in a 1000 ways while doing the research work that makes her a very visible member of her field."

At no point does the report state that Susan is compensated more than she deserves. I'm sorry if that's really what you think it says.

I have no shortage of respect for Susan. I regret that it didn't even occur to me that this report could be construed as critique of her. I am fully glad that Susan is a member of our department and a longtime member of the #1 nationally-ranked program in Latin American History. And by the way, I'm from Latin America.

(8) You write: "The calculations as to the gains are literally fantasies."

There are no "fantasies" and no mistakes in these elementary calculations.
I encourage you to please consider the difference between raises and their cumulative effect: "the total raise income" in a period of years. Income. I encourage you to show p.6 of my report to any trained accountant. My father was a professor of finance. My mother was an economist. I teach a course about the History of Money. I have written two peer-reviewed books on history of mathematics with top university presses. My book on history of Einstein's relativity was the #2 bestselling book in all libraries across the United States in the category of Mathematics. I have given a keynote talk to the department of Mathematics at Cornell. I am not a mathematician, an accountant, or an economist. But what I wrote is correct.

(9)  You write: "Perhaps you should try doing her job for one week before you decide she is overpaid even with her actual compensation."

At no point does the report claim that Susan is overpaid with her actual compensation. The report only compares the potential income in two categories, it does not say that they're mutually exclusive or that one of the two is more worthy than the other.

(10) You write: "Perhaps you should try doing her job for one week before you decide she is overpaid even with her actual compensation.  It would be useful for committee members to think instead about how much compensation would be necessary for one of you agree to do Susan's job."

I'm sorry, I am running out of replies.

(11)  You write: "The report has no analysis of the fact that all major service jobs are done by women"

This is correct, and this is an important area to work on.

(12) You write: "women who the report represents as not doing research work because they are too busy doing shit work for the department for which they are overpaid."

What you have written is astonishing; at no point does the report say any such thing about women and at no point are any labors for the department represented as "shit work." And in no way do I think any of that, and I trust that nobody in the Committee on Equity has such ideas.

(13) You write:
"I notice nobody on the committee except Joan has done a major administrative job.  It's your turn because you've enjoyed the privilege of working on your books without the competition of major essential administrative work for the department without which the department will not function.  An important principle of equity is for everyone to share the essential administrative work.  Jackie is currently looking for someone to take over from me and she will be looking for someone to take over from Susan next year. I look forward to two of the committee members (not Joan who has done her share) telling Jackie cheerfully that they are willing to do these jobs.   Jorge, Mark, Emilio, Peniel and Al - you in particular on the basis of this report and our current overpaid and feminized "service" faculty should step up to do one of these two absolutely essential jobs.  Equity requires this work is not gendered.  Since your reports indicates we have overcompensated women doing all this work, perhaps you'd like to do it in a manly way with no compensation. Jackie will be delighted (and surprised) to hear she has takers for these positions."

Jorge is not on the committee. Juliet Walker is on the Committee, alongside Joan, Megan, Mark, Emilio, Peniel. I thank them for their thoughtful and well-intentioned help.

I agree with you that "An important principle of equity is for everyone to share the essential administrative work."
I agree that "Equity requires this work is not gendered."

Yet I realize, by this point, that you have inverted the goals of the report. There is hardly any mention, in your comments, of our goal to identify individuals in our department who are underpaid. Instead, you construe much of this text as being about identifying or humiliating individuals who are overpaid.

In no sense have we sought to do what you say.

I don't yet know whether I will offer to work in the two positions that you suggest for me.

I see that you focus on an analysis that pits men against women. But, as far as I know, the women and men in our committee have no such intention.

In the department Meeting that you chose not to attend, Jackie fairly voiced the problem that too much of the administrative and service labors in our department are done by women. I agree, as do you. I also agree with Jorge that part of the solution is to institute a system of rotation for a number of duties. In a good one-on-one meeting that you and I had a few months ago, you also spoke in favor of rotation, if I'm not mistaken.

It has taken me quite some effort to reply to each of your statements, and that's ok, but I have to add that I find some of your statements to be rude, offensive, and stunning. I understand that you're angry or outraged, and that you think our draft report and my work had some awful intentions. But I had no such intentions, frankly, and I encourage you to please share it with anyone.

I encourage you to reflect seriously on what it's like to be Hispanic or foreign or relatively isolated in this department, and on the points that are actually documented in the report. We haven't done everything that you would have done, but I appreciate your suggestions despite the degree of acrimony. I am disappointed that you wrote not one sentence recognizing the unfortunate or inadvertent lack of inclusion for some individuals here. I worry that my ethnicity, the way I talk, my other-ness, is part of the reason why my expressions seem or sound so offensive, untrustworthy, and egregious to you, when I've actually labored to work meticulously, fairly, transparently, and in good faith. It took me years to understand it. (E.g., just one example: ten years of not getting the invitations to coffee that my friends Tracie, Erika, Karl, Carolyn, James Vaughn so often received from senior faculty; while Emilio, John, and myself did not.) Years of voicing suggestions at faculty meetings that were just shrugged off, while other colleagues' suggestions were readily taken into account. Other Hispanics in our department have had similar experiences, and I have spoken with multiple Hispanic professors at UT who frankly detail similar problems. What worries me is unconscious bias.

I understand that you're more focused on gender. And I'm no friend of the patriarchy, toxic masculinity, etc.

(14) You write:
"I suggest you withdraw this report and re-present it when it accurately and fairly represents our colleagues' published work, their full compensation packages, the full range of essential administrative work they have done, the full complexity of major administrative jobs that almost nobody in the department is willing to do, and the impact of multiple factors outside the salary committee on the salary structure.  I suggest you think much more about intersectionality - and the ways in which many (in)equity fault lines are at work. Then we can get to grips with how to make concrete progress with our equity challenges."

Thank you for voicing your critique and requests, the Committee on Equity will discuss and consider them. The present draft report focuses only on Salary Guidelines and makes specific recommendations that are by no means final.

Best wishes,


Alberto Martinez

Chair,
Committee on Equity

---

**From:** Hardwick, Julie
**Sent:** Wednesday, October 17, 2018 9:00 AM
**To:** Neuberger, Joan H; Raby, Megan
**Cc:** Alberto A. Martinez; Canizares, Jorge Canizares-Esguerra; Lawrence, Mark A; Joseph, Peniel E; Zamora, Emilio; Jones, Jacqueline
**Subject:** Re: Equity report - resending because .I had a bad address bounce back

Dear Colleagues,

Mail - Alberto A. Martinez - Outlook

Jackie's thoughts after today's meeting

# Exhibit 14

## Jones, Jacqueline <jjones@austin.utexas.edu>
Wed 10/17/2018 7:10 PM

**To:** Neuberger, Joan H <neuberger@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>
**Cc:** Alberto A. Martinez <almartinez@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>

Dear Al and Equity Committee Members:

I thought I would send you some of my thoughts in light of the discussion we had at noon today. Now seems to be a good time to assess where we are going with this report, and to contemplate a way forward.

First, I want to commend you on compiling this document, which I know took many hours of hard work. It pinpoints inequities in salary based on any number of factors. As I mentioned in the meeting today, I think the committee's specific proposals (pp. 2-4) are good ones and I would recommend that the department approve them. Whether the annual merit pools will be sufficient to address salary compression/inequities in any meaningful way is another question; but we can try.

At the same time (as the conversation today suggested) it is time to step back and look at the forest (now that we see the trees) or, perhaps, the larger lay of the land (now that we see the weeds).
What do we mean when we say that we as a department prize the concept of equity? Certainly there are many forces at work here. The Tower seems bent on mocking the whole notion when it doles out favors for a very few when many are deserving. The mandates related to FII hires and salary increases demonstrate that some critical factors are out of our control. The Dean sets salaries for our colleagues who are department chairs and heads of centers and institutes. The History Department salary guidelines are actually quite rigid—so much for a book, so much for a peer-reviewed article—and most years we have discretion over only the funds left over. And then of course as scholars we have at least some control over how we allocate our time and energies—some of us apply for external grants and get time off from teaching, some reach wider audiences with our scholarship and commentary, some write textbooks in the expectation of royalties, and some take on arduous administrative duties (over and above the "service" expected of everyone). My point is that we should strive for equity broadly defined-- a fair salary, one that reflects what we do and what our peers are doing, but there are certain structural realities and individual proclivities that we must contend with.
Are there other ways that we as a Department can compensate people for what they do, and do well, when their salaries are not what they should be?

I realize that on p. 1 you list some of the many factors that affect levels of compensation. However, the chart on pp. 14-5 elides all those factors, and presents individuals as the sum of their salary (a number) and their publications (another number). And then at the bottom of p. 16 you make explicit your premise: That rank in salary can and should be compared to rank in number of publications. Missing from this chart is the heart and soul of the department—Tracie alluded to this in her message to the department—all the different kinds of historical research that goes on in the department, the many talents of our colleagues, the ways our colleagues are constantly striving to make this Department a better place. But at the end of this report we are left with the metrics—and I think we are so much more than the sum total of our numbers.

Also, please consider scrapping or radically reworking Appendix 2 ("Compensation for Service") altogether. I know it is not meant to, but this section seems to denigrate the industrial-strength administrative work that some of our colleagues do. And this section suggests that this kind of work is a boondoggle. Not true! As I mentioned in the meeting, there is a reason why we have to offer incentives—the people who do them must deal with multiple constituencies in and outside the department; wrangle their colleagues to do things they don't want to do; meet frequent, routine deadlines for reports; and deal regularly with personnel issues that are emotionally fraught. All this is to say that labor-intensive administrative tasks are no picnic.
And I must object to the notion that a course off for "service" amounts to $33K in income—administrative responsibilities usually consume more time than teaching one course would, and it is not as if one can buy a new car with that phantom $33K. I know Ben Franklin said that "Time is money," but he never had to cajole a reluctant colleague to teach a MWF schedule.
So what, we might ask, is the bottom line? Does the Department systematically discriminate against groups of people? To me the data suggest that the longer one remains an Associate Professor, the more egregious the inequities

will be, since the Department primarily rewards books and articles and the Tower rewards promotions.  Also, Full Professors who have been in rank for a long time suffer in comparison to their peers, especially when new Fulls are brought in at the high salaries that the market seems to dictate.


Here I ask some questions, and urge you to keep certain things in mind as you revise this report.  I am including some information and also noting inaccuracies and misleading statements or claims that should be corrected at some point.  I know you are going to do a table with released time from teaching.  Please check with Art, as he has the most accurate information.  Also, if you look at teaching awards:  Keep in mind that this summer Jackie L. prepared a year-by-year, comprehensive list of nominees and not just winners.

--Please note that during the first and second round for FII One and Two raises, the department committees charged with making recommendations made cases for more faculty than eventually received those raises (this amounted to a concerted effort to address equity issues, one that was only partially successful).

p. 2 (5)—"departmental funds" should be changed to "annual departmental merit pool" as we do not budget for salaries or raises in the regular budget.

In terms of procedures:  We could send the sheet that Salary Committee members fill out (for their initial meeting) to the individual faculty member; those sheets list the various categories for raises.  This would eliminate the need for a separate letter for each faculty member, minimizing the work of staff, who are already overworked and underpaid.

Also, as you know, it is difficult for the Salary Committee to meet in person over the summer.  Do you propose that these back and forth negotiations with faculty who want their proposed raise revisited should take place over email?  That's fine, as long as everyone remembers that emails can be forwarded to other people at any time.

p. 3  Art notes that if 60 percent of the merit pool left over after awards for books and articles are made, the spreadsheet that lists proposed increases must be amended.  Just a reminder.

Appendices
Appendix 2
Again, I would like this section excised or radically reworked. I do object to the implication that those who perform labor-intensive service in the department are somehow grossly overpaid.

Appendix 3
I am confused by this table.  Alan served as chair for 12 years, not 9; I am in the beginning of my 5th year as chair—I have not served as 6 years.  Other figures in this chart are inaccurate.
Same goes for compensation on that page:  Joan gets 2 courses off a year, not 3.
Also, please note that serving as Area Chair is a form of service that, for the last four years at least, has come with an annual bonus (not raise) of $1K.

Appendix 5
Please note again that some faculty receive at least part of their salary from the Dean or other units—either because they have joint appointments, or because they are serving as heads of centers, institutes, departments, divisions, and so forth.
Also (and this applies to some people on your list there at the end), please note that in cases where faculty have won outside grants, the department has tried to top-off their awards so that they do not lose any salary when they accept them.  This is a form of compensation.  For those who have taken multiple leaves, the amount the department has spent on those top-offs has been considerable.  They are not listed here.
p. 13  Iris Ma's salary is covered by the LBJ School and the Provost, and Kaufman and Icenhauer-Ramirez are part-time lecturers.

Appendix 6
I have expressed my dismay with this chart, which seeks to correlate publications with salary, and show that discrepancies in the two rankings mean there are equity issues; sometimes that is the case, sometimes not.

Appendix 7
You state that "the numbers in the two lists need not agree in any case, yet when they disagree to a large degree the difference can illustrate a sense of inequity that the individual faculty member already feels."  As you note however, of the 15 faculty on the list, 8 are either Assistant or Associate Professors who will get a sizable raise when they are

Mail - Alberto A. Martinez

promoted.  One of those and two others are recipients of FII Two raises, so 10 of the people listed here can shortly be taken off this list.

pp. 17-18  I don't want to name names here, but here are some of the factors that mitigate at least some of the presumed inequities affecting salaries listed:

--imminent promotion (in the fall of 2019)

--FII Two raises ($37,500 over three years)

--Cost-sharing top-offs for multiple leaves in the last few years

Again, once these factors are taken into consideration, it is not clear to me that all of these cases  illustrate deep inequities in the department's salary structure.


Jackie

Private

# Exhibit 15

Toyin Falola <toyinfalola@austin.utexas.edu>

Fri 10/19/2018 6:25 AM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>

📎 3 attachments (223 KB)
PHOTO-2018-10-18-12-28-36[4].jpg; PHOTO-2018-10-18-12-28-36[5].jpg; PHOTO-2018-10-18-12-28-36[6].jpg;

Dear Al:
I wanted to call you yesterday but I was dealing with the excitement around the addition to the family—Simone Sade, photos attached.

Here is my personal advice, which I am making to remove yourself from the center of all the unnecessary attacks (I was expecting disagreements but not at this sustained level of anger) is to say that you are just dealing with compilation of facts and records and let Jackie deals with its interpretations, using the EC or another committee.

I have served on various peace missions, and you cannot drive change if established and privileged vested interests are not ready for it. One has to seek other instruments.

**This is a private note**, but you don't want to give yourself emotional agonies that can be transferred to the Head of Department who is well paid.

**See my message as private**. As you can tell, I keep to myself, which is why I am super productive, although I am not rewarded for it.

Best
TF

Toyin Falola
Department of History
The University of Texas at Austin
104 Inner Campus Drive
Austin, TX 78712-0220
USA
512 475 7224
512 475 7222 (fax)
http://sites.utexas.edu/yoruba-studies-review/
http://www.toyinfalola.com
http://www.utexas.edu/conferences/africa
http://groups.google.com/group/yorubaaffairs
http://groups.google.com/group/USAAfricaDialogue

can we meet soon?

Exhibit 16

Alberto A. Martinez

Mon 2/4/2019 5:21 PM

Sent Items

To: Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Newman, Martha G <newman@austin.utexas.edu>;

hi Lina and Martha,

I write as Chair of the Equity Committee and Minority Liaison, since Lina is our department's Ombuds and Martha used to be. I'm hoping the three of us can meet soon so that I may get your advice on a difficult situation.

Basically, last semester after the Eq Committee presented our draft Report on Salaries, Jackie called a meeting of the Executive Committee in which she asked them to "disband" the Eq. C. However, the Executive Committee objected and decided not to do that, but that we should be allowed to proceed doing our work.

However, Jackie soon told me that she wanted to create subcommittees of the Eq C so that more faculty could participate. I thought that was fine, but she didn't tell me how members of the subcommittees would be selected and didn't seem to like my suggestion that we just ask everyone in the department who'd like to join. She asked me a few times which members of the Eq C wanted to be in the subcommittees and last Tuesday I sent her the names of which subcommittees we each had chosen. The very next day, Madeline emailed that Jackie appointed her chair of the subcommittee on Promotions. I was annoyed that Jackie did that without consulting me or the Equity Committee, but I try to be flexible so I emailed Jackie saying it's fine, but that I do want to be chair of the subcommittee on Governance. She emailed me the next day, saying she asked Jeremi to chair that subcommittee and that he accepted. This top-down way of doing things is exasperating and inappropriate, and it's the kind of problem that led to the creation of the Eq. Committee in the first place. I explained in an email to Jackie why this is procedurally wrong; I've copied it below.

So, I'm hoping to get your advice in person — to discuss my options. Option 1: keep all faculty that Jackie appointed to the subcommittees. Option 2: we don't, because she did it without even consulting the Eq C.  Maybe Madeline and Jeremi can well be members of the committees but I seriously worry that Jeremi might be counterproductive as chair because he's the only faculty member in the department who has told me at length that there are no significant inequities in governance in our department (e.g., he said that anyone who doesn't get elected into the EC doesn't have the trust of the department, that some people can't be trusted in certain roles, that people don't trust me in particular because I'm "an antagonistic person," that those who think they're underpaid are not, that if anyone wants more than they have "they just have to play the game," etc.) I appreciate Jeremi's honesty, but chairs of subcommittees are usually appointed by the choice of committees themselves.

I'm exasperated by all this, and there's more, but we can talk about it.
Can we meet maybe tomorrow Tuesday at noon? Or at some time on Wednesday?

Thanks,
Al

Exhibit 17

**Equity Committee Meeting**
February 6, 2019
**Problems for Discussion**

After we presented the draft Report on Salaries, ==Jackie asked the Exec. C. (EC) to disband the Eq. Comm. The EC disagreed and re-asserted that we must be allowed to do our job.==

Jackie decided that Susan DS is a subcommittee of the Eq. Com. But this was beyond our original scope: We were appointed to analyze equity issues in salaries, governance, promotions.

Jackie decided that our Eq. C. should have two more subcommittees: Promotions and Governance. She asked us to choose in which subcommittees we want to be.

Once we chose, she unilaterally appointed Madeline to be chair of Promotions subc., without consulting us.

When I found out Jackie had done that, I wrote her that I want to be chair of the Gov. Sub. But the next day, she told me that she appointed Jeremi, and that he accepted, again, without consulting us, as a *fait accompli*, as already decided before those affected hear about it.

==I emailed Jackie that she proceeded inappropriately, by not consulting us.== I explained that subcommittees can have external members but they can or should be chaired by members of the parent committee. And, subcommittees must report only to the parent committee.

Jackie then reiterated her previous statements. And she ignored my complaints about how she proceeded improperly, without consultation and disregarding our autonomy, and about how the subcommittees must report only to the Equity Committee.


**Some Options for Discussion:**

1) Revoke all members and chairs of the Governance and Promotions subcommittees, since they were appointed without consultation, and invite everyone in the Dept. to join, including those individuals. Appoint as chairs only members of the Eq. C.

2) Retain all members and chairs of the subcommittees, but under the condition that they agree to follow the standard rules of order, and, in particular, that they will report only to the Eq. Committee, and submit drafts of reports to be edited by the Eq. C.

3) Retain some members and chairs of subcommittees, under the same condition above, and invite other members openly, any faculty.

4) Discharge the Subcommittee on Curriculum and Scheduling, that is, give SDS independence in a separate committee, since that area was not one of our original charges.

Jeremi might be counterproductive as chair because he's the only faculty member in the department who has told me at length that there are no significant inequities in governance in our department (e.g., he said that anyone who doesn't get elected into the EC doesn't have the trust of the department, that some people can't be trusted in certain roles, that people don't trust me in particular because I'm "an antagonistic person," that those who think they're underpaid are not, that if anyone wants more than they have "they just have to play the game," etc.) I appreciate Jeremi's honesty, but chairs of subcommittees are usually appointed by the choice of committees themselves.

Huaiyin 13 years at UT never in EC
Emilio  13 years until EC
Juliet 0 times in past 15 years
Falola 1 time in 15 years

Matysik 6 years
Bsumek 8 years
Joan 5 yrs
Philippa 5 yrs
David Crew 6 years

appoint individuals who don't want to serve, appoint some who have already served too much, not appoint others who do want to serve

Alberto A. Martinez
Mon 2/4, 5:21 PM
hi Lina and Martha,

I write as Chair of the Equity Committee and Minority Liaison, sinceLina is our department's Ombuds and Martha used to be. I'm hoping the three of us can meet soon so that I may get your advice on a difficult situation.

Basically, last semester after the Eq Committee presented our draft Report on Salaries, Jackie called a meeting of the Executive Committee in which she asked them to "disband" the Eq. C. However, the Executive Committee objected and decided not to do that, but that we should be allowed to proceed doing our work.

However, Jackie soon told me that she wanted to create subcommittees of the Eq C so that more faculty could participate. I thought that was fine, but she didn't tell me how members of the subcommittees would be selected and didn't seem to like my suggestion that we just ask everyone in the department who'd like to join. She asked me a few times which members of the Eq C wanted to be in the subcommittees and last Tuesday I sent her the names of which

New Equity Committee in place: Your charge

# Exhibit 18

Jones, Jacqueline

Fri 5/11/2018 1:42 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>;

Cc: Tully, Alan <tully@austin.utexas.edu>;

Dear Al, Emilio, Joan, Megan, Peniel, Mark, Leonard, and Juliet,

      Thank you for agreeing to serve on the department's New Equity Committee, which Al is chairing. I have included everyone on this committee who wished to be part of it; but at 8 people,  it's probably big enough now. I'll tell other colleagues who want to join that it is now closed (though I assume you welcome input from interested parties generally).

      A couple of things:  Please cc me on all your email correspondence, so that I can serve as a resource when needed.

      As of now, the committee's charge is broad and vague.  How can we narrow and focus it?  I'll leave it to you to make suggestions.  I know that certain colleagues not on the committee have a keen interest in related issues (the nurturing of junior faculty, for example), and perhaps you want to identify those issues that can be handled by another group, or by the department as a whole. I don't want you to think that you have to tackle every problem. My chief suggestion is that, looking to the future, you develop positive recommendations related to departmental structures and policies that will ensure an equitable distribution of resources and influence among various groups and all individuals.

      In any case I think it will be best that you decide on your charge before going much further; I'm happy to weigh in if you want me to, but  Al  will moderate the discussion.

      Again, thank you for agreeing to serve.

Cheers,
Jackie

Exhibit 19

On Nov 30, 2018, at 10:44 AM, Jones, Jacqueline <jjones@austin.utexas.edu> wrote:

Hi Megan,

   Jack Davis told me he had dinner with you at UF! I hope you enjoyed your visit! Jack is a great guy (did he tell you he was my first grad student at Brandeis?) and will be our Littlefield Lecturer in 2020.
   I hate to keep bothering you, but I am checking in about the Climate Survey. What is the division of labor on the Equity Committee related to this? Al asked me to put out a call to our colleagues for questions, but I have had no responses yet.
   I am hoping we can keep things pretty simple: For example, What suggestions do you have for strengthening or changing the governance structures of the department, especially the EC? And What suggestions do you have for improving the tenure and promotion process in the department?
   In all honesty I have not heard a lot of grumbling about either one of these, but that is what the survey is for I suppose, to solicit opinions that folks have but have not verbalized or otherwise communicated to the department.
   Once again, I feel badly writing just to you, but do not know whether or not you have a committee, or whether or not others on the Equity Committee are actively involved in this project with you.
Jackie

Re: checking in

Exhibit 20

## Jones, Jacqueline

Fri 11/30/2018 10:18 AM

To: Raby, Megan <meganraby@austin.utexas.edu>;

Cc: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Thanks Megan. Either I didn't get the drafts or I missed them— would you mind resending? Thank you.
Jackie

Get Outlook for iOS

---

**From:** Raby, Megan
**Sent:** Friday, November 30, 2018 11:16:08 AM
**To:** Jones, Jacqueline
**Cc:** Alberto A. Martinez
**Subject:** Re: checking in

Hi Jackie,

The committee is on track with the climate survey. Yes we're actively working on it as a whole—with additional feedback from emails, conversations, my meeting with Indrani and Martha, etc. I thought you were on the last email exchange, before Thanksgiving, when some drafts were circulated, but perhaps I am wrong? I think we will need 1-2 more meetings for the committee to come to consensus about the questions. (Al, I've cc'ed you: can the Equity Committee meet next week and/or during finals to finalize the questions?) I've learned how to use Qualtrix, so over the break I'll use it create the survey itself using the questions we decide on. I'll make sure you continue to be Cc'ed on future correspondence. I'm in agreement re: relative simplicity—that is exactly what has taken some time to craft. I think we're almost there.

Yes, I had a great dinner with Jack and was planning to pass along my greeting to you from him! You beat me to it!  I'm so thrilled he'll be here as Littlefield Lecturer. And I had a great time at UF—it is nice to have such a positive response to my research from both historians and ecologists.

Best,
Megan

Megan Raby
Assistant Professor
Department of History
University of Texas at Austin

www.meganraby.com
New book: **American Tropics: The Caribbean Roots of Biodiversity Science**

On Nov 30, 2018, at 10:44 AM, Jones, Jacqueline <jjones@austin.utexas.edu> wrote:

Hi Megan,
    Jack Davis told me he had dinner with you at UF!  I hope you enjoyed your visit!  Jack is a great guy (did he tell you he was my first grad student at Brandeis?) and will be our Littlefield Lecturer in 2020.
    I hate to keep bothering you, but I am checking in about the Climate Survey.  What is the division of labor on the Equity Committee related to this?  Al asked me to put out a call to our colleagues for questions, but I have had no responses yet.
    I am hoping we can keep things pretty simple: For example, What suggestions do you have for strengthening or changing the governance structures of the department, especially the EC?  And What suggestions do you have for improving the tenure and promotion process in the department?

Important                                                        Exhibit 21

## Raby, Megan

Mon 12/10/2018 10:41 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Hi Al,

I am **so sorry** to do this, but I have just told Jackie that I must resign from further involvement in a climate survey. Jackie has contacted me with objections about the survey, and I feel that I am stuck in an untenable position, forced to mediate between her and the committee.

Let me figure out how to turn over the Qualtrics draft to you. I won't go to the meeting tomorrow. If it is OK with you, I'll rejoin the equity committee if/when we move on from the survey to other items. Let me explain this in person if you are around today. I'm very sorry—this must be unexpected and inconvenient.

Thanks for understanding, and for being a good friend,
Megan

Megan Raby
Assistant Professor
Department of History
University of Texas at Austin

www.meganraby.com
New book: American Tropics: The Caribbean Roots of Biodiversity Science

# Re: Important

Alberto A. Martinez

Mon 12/10/2018 11:32 AM

Sent Items

To: Raby, Megan <meganraby@austin.utexas.edu>;

hi Megan,

wow, this is surprising and rough.
You can well send me her objections, if that's ok, and it's too bad, as I thought the Survey was going very well, and my impression this weekend was that the version online is looking good even though most of the material isn't in there yet. Had I imagined that she might complain about draft 2.0 before it's not even finished I would have insisted that I do it this weekend, rather than you.

Note also that Jackie could better have sent any concerns to all of us, rather that just you, but oh well.

In any case, ok, you can step away from the CS, and I'll complete it, with everyone's input, including Jackie's.

And of course, I do want you to continue in our committee for the promotion and governance issues.

I'm not on campus yet, but might be a bit later -- I'm not sure yet, but I'll call you on your cell phone today.

And thank you for all your good work!!

Al

---

**From:** Raby, Megan
**Sent:** Monday, December 10, 2018 10:41:36 AM
**To:** Alberto A. Martinez
**Subject:** Important

Hi Al,

I am **so sorry** to do this, but I have just told Jackie that I must resign from further involvement in a climate survey. Jackie has contacted me with objections about the survey, and I feel that I am stuck in an untenable position, forced to mediate between her and the committee.

Let me figure out how to turn over the Qualtrics draft to you. I won't go to the meeting tomorrow. If it is OK with you, I'll rejoin the equity committee if/when we move on from the survey to other items. Let me explain this in person if you are around today. I'm very sorry—this must be unexpected and inconvenient.

Thanks for understanding, and for being a good friend,
Megan

Megan Raby
Assistant Professor
Department of History
University of Texas at Austin

Re: Salary Guidelines: Voting Results

Exhibit 22

Brower, Benjamin C

Mon 12/17/2018 9:38 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Dear Al, A well deserved vote of confidence for the committee's hard and thoughtful work.  Thanks again for your efforts.  Best, Ben

Benjamin Claude Brower
Associate Professor

History Department
University of Texas at Austin
104 Inner Campus Dr. Stop B7000

Austin TX 78712-0220
USA
tel. +1 512-475-6813
benbrower@utexas.edu
webpage: http://www.utexas.edu/cola/depts/history/faculty/bcb936
Office: Garrison Hall GAR 3.204

On Dec 16, 2018, at 11:26 PM, Alberto A. Martinez <almartinez@austin.utexas.edu> wrote:

hi everyone,

as you know, the Committee on Equity developed 23 proposals, in consultation with faculty members and Jackie Jones, with the aim of improving our Salary Guidelines, especially in the interest of equity issues such as compression. We invited the 60 tenured and tenure-track History faculty to vote (not including lecturers, Affiliated Faculty, or Emeriti), that is, everyone who is directly affected by our Salary Guidelines. Jackie Llado received 41 ballots, which is a pretty good turnout (68%).

On Wednesday Jackie Llado and I tallied the ballots in Jackie Jones' office while she too was there.
Results:  the faculty vote approved all 23 proposals for improving the Salary Guidelines.

The two proposals with most votes in favor received 38 votes each and are #16 (about the 60% for equity raises) and #22 (about being informed about itemized reasons for raises received). The proposal with fewest votes had 26 votes and was Proposal #9 (about editing a journal special issue). Again, all proposals did pass. To me, it's especially gratifying that we did choose to grant greater priority to Equity Raises than what was stated in past Guidelines; it's a kind gesture of solidarity for our colleagues.

I've attached the tally of vote counts: Yes, No, Abstain. Jackie Llado has all the ballots and voting list.

Thank you for participating -- and for your suggestions during the process.
Also, I warmly thank Jackie Jones, Jackie Llado, and the members of the Committee for their good work: Joan, Emilio, Megan, Juliet, Mark, Peniel.


Al Martinez

Chair,
Committee on Equity

**From:** Alberto A. Martinez
**Sent:** Monday, December 10, 2018 1:29 AM
**To:** Abzug, Robert H; Berry, Daina R; Bodian, Marion E; Brands, H W; Brower, Benjamin C; Brown, Jonathan C; Bsumek, Erika M; Buenger, Walter L; Butler, Matthew J; Canizares, Jorge Canizares-Esguerra; Chatterjee, Indrani; Coffin, Judith G; Crew, David F; Deans-Smith, Susan; Del Castillo, Lina M; Di-Capua, Yoav; Toyin Falola; Farmer, Ashley; George Forgie; Frazier, Alison K; Frens-String, Joshua; Garfield, Seth W; Burnett, Virginia Garrard; Laurie Green; Guha, Sumit; Hardwick, Julie; Hsu, Madeline Y; Hunt, Bruce

Exhibit 23

**Office for Inclusion and Equity**

| | |
|---|---|
| **From:** | noreply@utexas.edu |
| **Sent:** | Monday, January 14, 2019 12:28 PM |
| **To:** | equity@utexas.edu |
| **Subject:** | Office of Institutional Equity Data Intake Form |
| **Categories:** | ██████████████ |

**Recipient Data:**
**Time Finished:** 2019-01-14 12:27:52 CST
**IP:** 128.83.117.25
**ResponseID:** R_2wjeWXzNLMEpVVt
**Link to View Results:** Click Here
**URL to View Results:**
https://proxy.qualtrics.com/proxy/?url=https%3A%2F%2Futexas.qualtrics.com%2FCP%2FReport.php%3FSID%3DSV_8iAZSunZGgcGC4l%26R%3DR_2wjeWXzNLMEpVVt&token=sRJPXnp%2Bxiz4w11rzj%2BVmMtC3B6jMK8f5XXHzkPCefo%3D

**Response Summary:**

NAME:
  Jacqueline Jones

HOME ADDRESS:
  █████████████████████████████

PHONE:
  █████████████████████████████

EMAIL:
  ████████████████████

UT DEPARTMENT:
  History

UT EID:
  ██████████████

I am a:
  UT Employee

Have you been to this office previously?
  Yes

If "yes", date of visit:
  No apppointment-- I have apassed along a Title IX complaint

Please briefly describe why you are visiting the Office for Inclusion and Equity:
  As Chair of the History Department, I was contacted by ███████████████████
████████ this morning. ████ told me that ████████████████ had informed ████ that
a current faculty member of the department had engaged in inappropriate conduct with graduate students in the
past, and was dating a graduate student now. ████████ said ████████████████ were concerned about the
well-being of the graduate student(s). ████ email address is ████████████████

NAME:
  Alberto Martinez

JOB TITLE:
  Professor

DEPARTMENT:
  History Department

Earliest:
  ??

Latest:
  currently dating a graduate student

Continuing Harm:

BASIS OF HARM:
  Sexual Misconduct

EMPLOYMENT or ACADEMIC HARM: (If Applicable)

INITIALS:
  JJ

DATE:
  January 14, 2019

RE: subcommittees

Exhibit 24

Jones, Jacqueline

Thu 1/31/2019 10:47 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Hi Al,
Thank you for your message.  I wanted you to know that I have asked Jeremi to chair the subcommittee on Governance, and he has agreed.
Since you are the chair of the Equity Committee, I do not think it would be appropriate for you also to chair this subcommittee.  I am chair of the department, but in virtually all cases I leave chairing departmental committees to others.  Of course as a member of the committee, you'll play a major part in shaping its work.
I think we have a good core of people on the committee—you, Mark, Peniel, Juliet, and Emilio.  I'll be asking a couple of other people to serve as well.
I'll let you know when the committee is complete.  Thanks so much.
Best,
Jackie

**From:** Alberto A. Martinez <almartinez@austin.utexas.edu>
**Sent:** Wednesday, January 30, 2019 7:56 PM
**To:** Jones, Jacqueline <jjones@austin.utexas.edu>
**Subject:** subcommittees

hi Jackie,
Madeline sent me a group email saying that she'll serve as chair of the subcommittee on Promotions, which is fine with me. Still, I'm just writing to say that I do want to serve as chair of the subcommittee on Governance. Or, let me know if you were thinking of appointing someone else. I assume that Susan will lead the subcommittee on Curriculum and Scheduling, as you had mentioned.

Madeline reached out to Abena, Lina, and Yoav to join the subcommittee, which sounds good to me too.

Thanks,

Al

**Committee on Equity**

Exhibit 25

Alberto A. Martinez <almartinez@austin.utexas.edu>

Sat 5/5/2018 10:07 AM

**To:** Raby, Megan <meganraby@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Stoff, Michael B <mbstoff@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>
**Cc:** Jones, Jacqueline <jjones@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>

hi Joan, Emilio, Megan, Michael,

thank you for kindly agreeing to serve on our Committee on Equity.

As Jackie said near the end of our meeting, we'll look at three main areas of concern listed in Wednesday's Agenda: Department governance, Merit increase guidelines, and nurturing of junior faculty. In agreement with Emilio, we'll create "a Report, and a plan of action to help fix inequities," and to "review equity *broadly* to include not just Hispanics, but other minorities, gender, and any colleagues who feel disenfranchised." In agreement with Jeremi we'll base our report on a careful collection of facts, and in agreement with Martha, Megan, and Jackie we'll also carry out some sort of Climate Survey, in order to solicit, listen, and respond to how faculty feel in our department.

I fly to Puerto Rico today until the 19th, and I understand that Michael is on leave during the summer. Still, we will begin the process of collecting data presently. So, if you have any relevant information please do share it. For example: old lists of membership in committees for the past 15 years, and as Alan fairly suggests, "a year-by-year roster on hirings, potential hirings, resignations, terminations, leaves and information as to who is up for promotion and promotion and tenure."

Finally, any suggestions are welcome.

Many thanks again,
Al


Chair,
Committee on Equity

# Re: New Equity Committee in place: Your charge

## Alberto A. Martinez

Fri 5/11/2018 4:33 PM

Sent Items

To: Zamora, Emilio <e.zamora@austin.utexas.edu>; Neuberger, Joan H <neuberger@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Moore, Leonard N <LeonardMoore@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>;

Cc: Jones, Jacqueline <jjones@austin.utexas.edu>;

Dear Emilio, Joan, Juliet, Leonard, Mark, Megan, Peniel,

welcome to our new committee -- I'm glad to have you on board. I forward to you, below, the first email I sent to this committee, less than a week ago.

As you may know, in April Jackie kindly called for a "robust online discussion on departmental governance issues." It led to a series of frank emails in which some faculty members, including myself, raised concerns about apparent inequities and about how we might well improve our governance to solve them.

I thank and value Jackie's trust in appointing me to chair this new committee. Near the end of our Faculty Meeting, on May 2, she said we'd look at the three areas in the Agenda: governance, merit increase guidelines, and nurturing of junior faculty. Still, she also notes that our charge is broad, so we may well focus it.

My aim is to help increase equity in our department, and to that end we will prepare a Report with recommendations. It'll be based on historical data, faculty input, and your thoughtful analysis. I certainly agree with Jackie's suggestion that we should "develop positive recommendations related to departmental structures and policies that will ensure an equitable distribution of resources and influence among various groups and all individuals."

Bear in mind that this won't be a diffuse or protracted process. We should work for equity and inclusiveness now, promptly, not years from now.

So, please tell us what specific problems you'd like us to address and work on. My previous email, below, includes good suggestions from our colleagues.

With best wishes,
Al

Chair,
Committee on Equity

Subject: Committee on Equity
Sat 5/5/2018 8:07 AM
To: Raby, Megan; Zamora, Emilio; Stoff, Michael B; Neuberger, Joan H

**Survey and subcommittees**                          Exhibit 26

## Alberto A. Martinez <almartinez@austin.utexas.edu>

Mon 2/4/2019 1:25 AM

**To:** Jones, Jacqueline <jjones@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>
**Cc:** Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>

📎 1 attachments (716 KB)
Survey Review.pdf;

hi everyone,

the Climate Survey is finished. I've taken account of all your feedback and tried to incorporate nearly all your suggestions as well as Jackie's. Once I have the final approval of members of the Equity Committee, we will distribute it to the department. I expect we can do this within a week. Here it is:
https://utexas.ca1.qualtrics.com/jfe/preview/SV_2bKPcvl92bvxKHb?Q_SurveyVersionID=current&Q_CHL=preview

Note: our drafts used to have some fill-in-the-bubble matrices (known as Likert) but in the end I had no choice but to change it to an uglier choose-the-rectangle system (known as Profile) because Qualtrics kept complaining that using any Likert-answer-matrix "Does Not Meet Web Accessibility Standards": won't display in all devices, and Qualtrics would not issue a sharable link using that format.

I also attach a pdf evaluation produced by the Qualtrics system, so you may see the kinds of restrictions that the system tracks. This survey has a rating of "Good" because it's mobile-optimized, its display logic functions properly, very few questions have conjunctions, it allows people with disabilities to participate, etc. The minor defects are that the predicted duration is 13.6 minutes (rather than an ideal 7), and there are multiple matrix questions and text entry boxes (instead of just three, which is absurdly low for our purposes).

Please let me know if you approve it.

Next we have to discuss the issue of subcommittees. Jackie, I'm surprised and disappointed that you didn't let me chair the Governance Subcommittee. When you requested subcommittees you said it'd be "to open it up" to more faculty in the dept. I'm all for inclusion, so it sounded good to me to invite others to contribute, but I would've preferred to have the invitation be announced and extended to everyone in the department as I said. Personally, I didn't think it would be "inappropriate" for me to chair the Subcommittee on Governance, since that's one of the three tasks for which the Equity Committee was created, and it didn't occur to me that you'd appoint anyone to chair our subcommittees without consulting me or the committee. I thought members of the Eq. Committee could chair its subcommittees, since normally subcommittees do just consist of members of a committee, though they may pull in consultants and others too.

In any case, I do expect and require that the subcommittees will follow the standard rules of order, and in particular, that they won't issue any reports to the department, to you, or to the Executive Committee, but that they will serve and report to the Equity Committee. As explained in Robert's Rules of Order, "A committee that is a subset of a larger committee is called a

subcommittee. Committees that have a large workload may form subcommittees to further divide the work. Subcommittees report to the parent committee and not to the general assembly."

I respectfully agree with you that as department Chair you generally shouldn't chair other committees, yet I feel that by appointing the chairs of all our subcommittees and by choosing all the additional members without consulting us you are really infringing on the autonomy of our committee. I'm flexible, so I accepted it when you decided that Susan's work on Curriculum and Scheduling was a subcommittee of the Equity Committee. Similarly, when you requested that we create other subcommittees, I said fine. And so forth, yet the Equity Committee really needs to participate in deciding the composition of its own subcommittees, instead of it being done in this top-down manner.

To that end, I will meet with the Equity Committee to discuss how to proceed. I do agree of course that the subcommittee on Governance "should consider the responses to the Climate Survey and consult with members of the department generally (who would be encouraged to contact the committee through email or in person or anonymously) to pinpoint policies and structures related to departmental governance that could be improved in some way." Still, the Equity Committee should now discuss and decide how to proceed.

Sincerely,

Al

subcommittees

# Exhibit 27

Alberto A. Martinez

Sat 2/9/2019 5:14 PM

Sent Items

To: Jones, Jacqueline <jjones@austin.utexas.edu>;

Cc: Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>;

hi Jackie,

the Equity Committee met to discuss how to proceed with regard to the subcommittees. We agreed that since you already appointed Madeline and Jeremi to chair the subcommittees on Promotions and Governance none of us wants to chair those committees now, and we expect to work well with them. We do agree that both of them and the other new members you appointed can contribute valuable expertise and good will to work on these areas. Still, most of us felt disappointed and uncomfortable that you just didn't consult us.

Still, we do want to keep working on these issues so we wish to make a few requests. We want to meet soon with Madeline, Jeremi, and Susan to give them an overview of our work and findings to date, since we've been discussing these issues for eight months. Also, we think that the three of them should well be members of the Equity Committee, in order to have a good working relationship. Finally, we'd like to invite all the faculty to see if others want to join the subcommittees, to be open and inclusive.

Best,

Al, Mark, Megan, Juliet, Emilio, Peniel

Re: equity

# Exhibit 28

**Suri, Jeremi**
Mon 4/22/2019 8:40 AM

**To:** Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu>
**Cc:** Alberto A. Martinez <almartinez@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Toyin Falola <toyinfalola@austin.utexas.edu>; Neuburger, Mary C <burgerm@austin.utexas.edu>; Twinam, Ann <anntwinam@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>

Dear Jorge,

Thanks for your message. Our governance subcommittee has worked very hard to promote the values that underlie your message: transparency, representativeness, equity, diversity, efficacy, and access. They will be front-and-center in our report to the department. Our subcommittee's proposed reform will seek to implement these values more fully. Our subcommittee is currently working on a draft report which will explain this in detail, but I am happy to meet with you to discuss details, explain our work, and hear your suggestions. I will be in Berlin and Dresden to deliver a keynote and conduct research most of this week. Would you like to meet early next week?

I personally value your suggestions, but I hope you will avoid combative accusations that are based, as below, on very partial information. I will happily share the details of our subcommittee efforts, our goals, our proposal, and our values. We can all work together in good faith and agree on the most important things, I believe.

As I suggested, please let me know when you would like to meet early next week for a collegial discussion about our subcommittee's work. Please feel free to invite anyone else you wish. I am cc'ing our entire subcommittee — you only copied a partial list of the subcommittee.

Thanks again.

Yours,
Jeremi


On Apr 22, 2019, at 4:45 AM, Canizares, Jorge Canizares-Esguerra <canizares-esguerra@austin.utexas.edu> wrote:

> Dear Colleagues
> I am concerned about the new alternative of  Committee on Committees (or Nominations) along with triads of applicants for every position (one of whom will be chosen by the chair) as a solution to departmental inequities in governance. The solution appears as extremely cumbersome instead of the straightforward system of rotation. How we'll guarantee that the nominating committee and the chair won't simply select candidates from the same pool of individuals who are not now considered "reliable"?  Example: Alberto had never been chair of anything until last April. Alberto temporarily became the chair of the equity committee .He directed reforms on equity merit pay and the climate survey and gathered data. Suddenly, the equity committee was dissolved into subcommittees and power devolved to the same pool of people, the grownups, who have been running things in the department.  Clearly, Alberto cannot be trusted with positions of leadership. Would he ever be chosen out any triad presented to Jackie to be, say, director of the IHS or Graduate Director?  The new proposed solution will most likely make things worse as those not chosen will feel even more disenfranchised. Or they simply don't ever apply not to be humiliated. How do make sure that those  of us who want to occupy positions of leadership in the department but who are considered by the "grownups"  illegible or incapable won't be, again, left out?  We embarked

a year ago on a pattern of analysis and reform. Let's make sure we offer realistic alternatives of inclusion and equity.

Best

Jorge



Jorge Cañizares-Esguerra

Alice Drysdale Sheffield Professor of History

University of Texas-Austin

https://utexas.academia.edu/JorgeCanizaresEsguerra

Re: the way forward this spring                    Exhibit 29

Alberto A. Martinez

Mon 2/18/2019 12:42 AM

Sent Items

To: Jones, Jacqueline <jjones@austin.utexas.edu>;

Cc: Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan
<meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>;
Suri, Jeremi <suri@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Deans-Smith, Susan
<sdsmith@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>;


Hi Jackie,

thank you for writing;
and to Susan, Madeline, and Jeremi — welcome to the Equity Committee.

Thank you for sending these draft statements of the subcommittees' charges, Jackie. I do have a some
suggestions.

Looking at our initial emails last May and the agenda from the very first meeting of the Equity
Committee, I want to echo some of that language. Our objective was to review equity broadly, to better
include "minorities, gender, and any colleagues who feel disenfranchised," in order "to ensure an
equitable distribution of resources and influence among various groups and all individuals."  So how
about this:


**Governance:**
This subcommittee is tasked with reviewing our department's structures of governance-- including the
Executive Committee, committee assignments, and administrative positions (such as Associate Chair,
Graduate Adviser, and Assessment Director)-- to make recommendations to ensure an equitable
distribution of resources and influence among various groups and all individuals. This subcommittee will
work to ensure that our governance is inclusive (especially in terms of diversity and gender), efficient,
transparent, and responsive to the needs of faculty and students.

[original draft] Governance:
This subcommittee is tasked with reviewing the department's structures of governance-- including the
Executive Committee, standing committee assignments, and administrative positions (such as Associate
Chair, Graduate Adviser, and Assessment Director)—and with making recommendations as needed to
insure that those structures are efficient, transparent, inclusive, and responsive to the needs of the
department.


Next, regarding promotions, the draft seems to emphasize promotion to full professor ("special
attention") whereas originally when the Equity Committee was created the main focus was promotion to
tenure. To be sure, multiple colleagues didn't get tenure in our department, and also, several others have
been Associates for a while, so I suggest editing the wording in order to work on both areas equally.
Also, I think we should prioritize helping faculty in the promotions processes. So how about this:

**Promotions:**

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent (understanding that the University and the College impose rules and guidelines that also govern our procedures). This subcommittee will analyze both promotion to full professor and promotion to tenure (including the Third Year Review, peer observations of classes, mentoring, etc.), to help faculty advance in rank.

[original draft] Promotions:
This subcommittee is tasked with reviewing the department's promotion policies to insure that they are fair, transparent, and comprehensive (understanding that the University and the College impose certain rules and guidelines that must govern our own procedures). Members should pay special attention to procedures related to promotion to full professor, but also policies that affect junior faculty--including the Third Year Review, peer observations of classes, and mentoring—as means of preparing those faculty for the tenure review.


Finally, about Scheduling and Curriculum, I think the draft is fine, except that we should well add a robust discussion about how the new requirements for the History major may affect enrollments in terms of diversity. Basically, I share Abena's serious concern that by eliminating the old requirement of 2 courses in AAME&LAH, while adding the new requirement of 2 pre-1800 courses, our department risks funneling more students to white faculty (especially in European history) and reducing enrollments in African History courses in particular. I worry that a net effect might be: teaching less ethnocultural diversity to some of our majors and inadvertently luring fewer students into AAME. Hence I suggest adding one goal/sentence, at the end:

**Scheduling and Curriculum:**
This subcommittee is tasked with ensuring the fair and transparent participation of faculty members in assessment assignments and in the distribution of teaching assignments (especially required courses for History undergraduate majors and graduate students) as well as continuing to ensure that MWF/TTh schedules are rotated among the faculty in an equitable way. This subcommittee will also discuss how the new requirements in the History major can affect enrollments in geographic area courses in order to elucidate how to counter any inadvertent effects on teaching diversity.

[original draft]  Scheduling and Curriculum:
This subcommittee is tasked with insuring the fair and transparent participation of faculty members in assessment assignments and in the distribution of teaching assignments (especially required courses for History undergraduate majors and graduate students) as well as continuing to insure that MWF/TTh schedules are rotated among the faculty in an equitable way.


Finally, the dates for the open meetings and final reports seem fine to me.

Thank you all --

Al

---

**From:** Jones, Jacqueline
**Sent:** Sunday, February 17, 2019 1:12:50 PM
**To:** Alberto A. Martinez
**Cc:** Joseph, Peniel E; Lawrence, Mark A; Raby, Megan; Walker, Juliet E K; Zamora, Emilio; Suri, Jeremi; Hsu, Madeline Y; Deans-Smith, Susan; Flores, Arturo R; Llado, Jacquelin
**Subject:** RE: the way forward this spring

Dear Members of the Equity Committee:

Re: Clarification on no change to original charge of Curriculum and Scheduling Committee

Exhibit 30

Alberto A. Martinez

Mon 2/18/2019 2:39 PM

Sent Items

To:Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>;

Cc:Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>;

📎 1 attachments (43 KB)

Equity Agenda 1.pdf;

hi Jackie,

thank you for writing.
The exact phrase I used last night: "ensure an equitable distribution of resources and influence among various groups and all individuals" was the main charge verbatim that you fairly gave to our Equity Committee on May 11, 2018 in the initial email you wrote to us (me, Joan, Emilio, Leonard, Megan, Peniel, Mark, Juliet; and cc'd to Alan). I've pasted it below. Naturally, I agreed right then and quoted this same phrase verbatim in an email to the committee later that same day, which I cc'd to you, and also in the printed Agenda of the very first meeting of the Equity Committee on May 22, which I also emailed to you and the committee on May 29, and attached here.

Since we had all agreed on this charge, I think it is still part of our goal. Obviously it doesn't imply a necessarily equal distribution of resources among everyone, but equity: inclusion in governance, access to leadership, opportunities, resources, etc.

But you now ask: "Who are these various groups?"
As you originally wrote, there are indeed various groups in our department. Certainly there are differences by rank, areas of expertise, friendships, etc., but more specifically I'm referring also to minorities. The original Public Statement on Governance circulated by Hispanic faculty in our department was precisely that we felt excluded for years from our department's governance for various reasons that we listed.

Such experiences and sentiments affect other faculty individuals too, for example, in 15 years (fall 2003 to spring 2018) some individuals such as Bill Brands and Erika had been in the Executive Committee 7 or 8 years, whereas others, such as Juliet, Emilio, Huaiyin, had been in the EC exactly 0 years. Similar things happen with departmental resources, such as organizing conferences or holding fellowships at the IHS. For example, my friend Erika has been an IHS Fellow 3 times whereas some others have never had an IHS fellowship. Or we can consider it by "groups," whereas 13 white colleagues have held 2 or more IHS fellowships, no minorities have been fellows twice, not yet, and some minorities have never had an IHS fellowship even once, such as Juliet, Toyin, Leonard, Lina, Indrani. I experienced this point personally when I first applied for an IHS fellowship, with a research topic that perfectly matched that year's topic, but instead my friend Mark Metzler received his 2nd IHS fellowship. He told me it was

because "they sort of owe it to me, because I've done lot for them; but don't worry, I'm sure you'll get it next year."

As for the word "influence," which again, I just quoted from your email about our Committee's main charge last May, I basically mean that individuals or groups who have been disenfranchised from our governance have lacked the influence in steering our department, contributing to promotions decisions, feeling included, etc.

You write: "The general concerns that you are expressing here are, I think, implicit in the charge."  Still, I prefer much prefer my explicit version, echoing your words from May, just because it includes and highlights these words: "equitable," "influence," "groups and all individuals," "inclusive," "diversity and gender," and "faculty," whereas your revised version deletes all of them.

I prefer my draft because it makes explicit issues of equity, but you're welcome to send the version you prefer -- at least you see those issues as implicit.

I see that you've added the word "democratic," which always sounds good, but is part of the issue at stake, I think: Does unconscious bias step in when we vote? Does majority rule overlook the participation of some minorities and individuals? I like democracy, but there are other ways also to assign positions and opportunities, such as rotation and volunteering.

Btw, I spoke with Martha Newman and Lina recently and Martha emphasized and insisted that really a department is not a democracy but a "consultative dictatorship," which I disagree with.

As for your revised charge for the Promotions Subcommittee, it looks good to me.

Next, about Scheduling and Curriculum, you write:  "your revised charge presupposes all sorts of things we do not know to be true."

I wrote:  "Eliminating the old requirement of 2 courses in AAME & LAH"
You say that it wasn't eliminated.
But it appears exactly as I described it in the 2016-18 Course Catalog:
"6 hours African, Asian, Latin American or Middle Eastern history"
which is, as I wrote: "2 courses in AAME & LAH"

You write that it was replaced with this requirement:
"students must take at least 3 and could take all 4 geographical range requirements in AAME & LAH."
This is incorrect, I think: the new requirement is instead that students must take 3 courses in these areas: Africa, Asia, Europe, Latin America, Middle East, Transnational"
https://liberalarts.utexas.edu/history/undergraduate/degree-info.php
which adds Europe and Transnational to what used to be AAME&LAH.

Let me illustrate the difference with an example: Previously there were 6 course requirements in the major (aside from in-residence and upper division). To complete 30 credits (10 courses), a student might take, for example, 2 US History + 2 EUR + 2 e.g. African History courses (to fulfill the Requirement of 2 in AAME&LAH), + 1 Required 350L (e.g., in African History) + 3 HIS courses (e.g., in African History). In this scenario, a student could complete a 30 credit major including 6 courses in African History.

However, in the new major, this same student (seeking to maximize African history courses), would take 2 US History + 3 African History (among the required geographic areas) + 1 TLAH + 1 capstone, + 2 Pre-1800 (unlikely that the student finds two that are Afr) + 1 History elective, say, in Afr. History. Thus it's unlikely that this student can pull off 6 courses in Afr. History with the new requirements whereas it's far more plausible to take 1 or 2 courses in pre-1800 in EUR history. Thus, since most pre 1800 courses

are in EUR history (in addition to US courses), the net effect is to pull more students to those EUR courses.

Last night, before I wrote, I looked at the HIS list of spring courses:
https://liberalarts.utexas.edu/history/courses/index.php
I counted at least 13 courses in EUR that seem to be mostly pre-1800 (including cross-listings from other departments offered as HIS). Meanwhile, I only saw 2 courses by Cynthia and Jorge pre-1800, + 1 course by Indrani is partly pre-1800, and 2 courses by Abena and Toyin have 1/4th or less pre-1800 material (I don't know if 1/4th counts as pre-1800).

The lack of pre-1800 AAME&LAH courses is clear.

As you write, the old requirement of taking two courses in EUR was "eliminated," but then again, this requirement was, or as you say, replaced with EUR being among the geographic areas that can fulfill a geographic requirement, and also, many pre-1800 courses are in EUR.

Still, as you write, some students might well complete the new major without any EUR courses. But will it happen? Or will more students enroll in courses taught by EUR professors? We'll see.

I was at the Department meeting many months ago when Abena tried to present to our department the numerical data that she had painstakingly complied with Jerry Larson about pre-1800 courses. She told me after the meeting that Julie abruptly did not allow her to present that data, and I saw that Abena therefore felt exasperated and disenfranchised. Later Julie or Nancy Sutherland sent everyone a cursory email saying that there was no potential problem with enrollments if we do the pre-1800 requirement, but giving no numerical data.

I'm sure and I trust that Julie, Nancy, and several colleagues have worked earnestly to conscientiously try to improve the History major. Personally, I haven't had the time to engage these conversations much, so hopefully indeed there are no inadvertent problems in enrollments or diversity in teaching. However, I'm just not so sure, and thus last night I suggested that this be part of the Sch. & Curriculum discussions. But again, these are just my honest opinions, and you and Susan are welcome to set the charge of the committee as you see fit, without this.

Finally, regarding the Proposal for Evaluating the History Major, I had already given you my feedback in person when we met in your office on Jan. 25 with Art Flores. That was one of the items you had sent me to discuss that day. According to my notes, what I said right then was that on the whole the document looks good to me, but that my only substantive suggestion was, verbatim, that tracking demographic data about our students is valuable but that instead of only doing so by year "it would be good to track what percentage of minorities take intro courses (for the major) and what percentage of minorities are in the capstone. In other words, are we losing or gaining buy-in from minority students? I've received some anecdotal info about the former, in the History Honors program." You then replied that the History Honors program is going very well and that the info about minorities over time can be tracked from the Dean's office data.

Also, I see that the version you sent now is a bit different from the version you sent me in January. The new version seems fine too, and I'm glad that it includes questions about whether students have any suggestions for improving the major.

Sincerely,

Al


From: Jones, Jacqueline

# RE: the way forward this spring

Exhibit 31

## Jones, Jacqueline

Mon 2/18/2019 10:20 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Cc: Joseph, Peniel E <Peniel.Joseph@austin.utexas.edu>; Lawrence, Mark A <malawrence@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>; Walker, Juliet E K <jekwalker@austin.utexas.edu>; Zamora, Emilio <e.zamora@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>; Flores, Arturo R <arturo.flores@austin.utexas.edu>; Llado, Jacquelin <jllado@austin.utexas.edu>;

📎 2 attachments (81 KB)

EC LIST 2011-2018.pdf; PROPOSAL FOR EVALUATING THE HISTORY MAJOR revised.docx;

Hi Al and Committee members:

Some comments on the charges and proposed changes:

Your suggestions for revised charge, Governance:
This subcommittee is tasked with reviewing our department's structures of governance-- including the Executive Committee, committee assignments, and administrative positions (such as Associate Chair, Graduate Adviser, and Assessment Director)-- to make recommendations to ensure an equitable distribution of resources and influence among various groups and all individuals. This subcommittee will work to ensure that our governance is inclusive (especially in terms of diversity and gender), efficient, transparent, and responsive to the needs of faculty and students.

My comments:
"equitable distribution of resources and influence among various groups and individuals":  I believe this wording is vague and unnecessary.  Who are these "various groups"?  Are you suggesting we define colleagues by sexual preference, marital status, religion, age, immigrant status?  We do not define our department or mission that way.  And what is "influence"?  The general concerns that you are expressing here are, I think, implicit in the charge.
Your revisions presuppose that the EC is not already diverse in terms of minority faculty and women.  Please see the attached document, which lists all EC members over the last 7-8 years.

Revised charge, Governance:
This subcommittee is tasked with reviewing the department's structures of governance-- including the Executive Committee, standing committee assignments, and administrative positions (such as Associate Chair, Graduate Adviser, and Assessment Director)—and with making recommendations as needed to insure that those structures are efficient, democratic, transparent, inclusive, and responsive to the needs of the department and our students.

Please note that you and all other members of the subcommittee are free to express any and all concerns during deliberations. A charge is best when it is succinct and when it does not make unwarranted assumptions about the issue under review.

Revised charge, Promotions:

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent (understanding that the University and the College impose rules and guidelines that also govern our procedures). This subcommittee will analyze policies and procedures related to both promotion to full professor and promotion to associate professor with tenure. Factors to be considered (but are not limited to) the Third Year Review, peer observations of classes, mentoring, and service obligations, with the goal of helping faculty to advance in rank.

Finally, about Scheduling and Curriculum, You write, "I think the draft is fine, except that we should well add a robust discussion about how the new requirements for the History major may affect enrollments in terms of diversity. Basically, I share Abena's serious concern that by eliminating the old requirement of 2 courses in AAME&LAH, while adding the new requirement of 2 pre-1800 courses, our department risks funneling more students to white faculty (especially in European history) and reducing enrollments in African History courses in particular. I worry that a net effect might be: teaching less ethnocultural diversity to some of our majors and inadvertently luring fewer students into AAME. Hence I suggest adding one goal/sentence, at the end:"

**Scheduling and Curriculum:**

This subcommittee is tasked with ensuring the fair and transparent participation of faculty members in assessment assignments and in the distribution of teaching assignments (especially required courses for History undergraduate majors and graduate students) as well as continuing to ensure that MWF/TTh schedules are rotated among the faculty in an equitable way. This subcommittee will also discuss how the new requirements in the History major can affect enrollments in geographic area courses in order to elucidate how to counter any inadvertent effects on teaching diversity.

[original draft]   Scheduling and Curriculum:

This subcommittee is tasked with insuring the fair and transparent participation of faculty members in assessment assignments and in the distribution of teaching assignments (especially required courses for History undergraduate majors and graduate students) as well as continuing to insure that MWF/TTh schedules are rotated among the faculty in an equitable way.

Please note that there seems to be a great deal of misinformation floating around about the new major. First, see the attached draft proposal from the committee tasked with developing metrics to assess the new major. Over the last few weeks I have twice asked for Equity Committee input, but received replies from only two individuals. Again, your revised charge presupposes all sorts of things we do not know to be true. It will take some time to gather the statistics and feedback from both faculty and students before we can address these concerns with any certainty.

More generally on this issue:

Your revisions contain errors: "Eliminating the old requirement of 2 courses in AAME & LAH" - that requirement has **not** been eliminated, rather it has been replaced by an expanded requirement for geographical diversity that means students **must take** at least 3 and could take all 4 geographical range requirements in AAME & LAH. What **has been eliminated** is the old requirement of 2 courses in European history.

The old requirement was 2-2-2  that is, 2 courses in US, 2 in Europe and 2 in any other; the new one is at least two course in US (one in residence) plus four courses out of five geographic areas - Africa, Asia, Europe, Latin American, Middle East or transnational.  Students can fulfill the new requirement without any European history and many no doubt will.

By the way, this information is readily accessible:

https://liberalarts.utexas.edu/history/undergraduate/degree-info.php

Adding the new requirement of 2 pre-1800 courses:  This was done because almost everyone agrees History is a discipline about chronological depth and this requirement is common in recently redesigned majors nationwide.   How is that working in practice --- is it "funneling more students to white faculty in European history"?  According to those keeping track of these things, No, it isn't.  We have almost no pre-1800 courses on the schedule in the Eur area for next year as we only have three pre1800 faculty, all of whom have various load reductions and other teaching responsibilities.  Apparently there are plenty of pre-1800 courses scheduled in other areas.

Please note that the new major represents the extensive consultation and collaboration of our department colleagues and the collective wisdom of members of the AHA, including Univ of OK professor Anne Hyde, who has led the Tuning Project that has shaped new configurations of majors nationwide in the last decade plus.  We'll make changes as we go forward no doubt, as that's what good curriculum practice looks like. Along those lines, please offer comments on the attached proposal to assess the major, which recommends the collection of both anecdotal and statistical data.

In sum, I am confident that the three subcommittees, plus the committee to assess the new major, will address forthrightly any and all concerns of your committee and of the department as a whole. I think it is time to begin those conversations.

Best,
Jackie

# Re: good seeing you !

Exhibit 32

### Chatterjee, Indrani

Thu 2/21/2019 1:11 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Al, I seriously cannot fathom how you have the energy to keep going. Thanks for sharing the entire correspondence- and re Mark Metzler I had the identical experience. He TOLD me not to apply to the IHS - and I figured he was major favorite of the department and so I kept out. The next year Sumit marched into the same IHS fellowship. And I never even tried!
Let us go and hang out next Thursday evening- Trudy is good. I love their food. This weekend I am in Pittsburgh giving a talk. And I have to shut the phone now on flight.
Big 🤗 .

Indrani Chatterjee,
Professor of History

http://www.utexas.edu/cola/depts/history/faculty/ic2396#home

---

**From:** Alberto A. Martinez
**Sent:** Thursday, February 21, 2019 4:38:07 PM
**To:** Chatterjee, Indrani
**Subject:** good seeing you !

hi Indrani,

we live in different hallways, and probably different class schedules too, so it was good running into u yesterday! Anyhow, here's a sample of the kind of behind the scenes wrangling that I do around here; see the emails below. It's exasperating, but I'm making progress despite the needless constant interventions.

Btw, I might do a happy hour tomorrow, maybe at 5-ish, if so I'll send the place. Maybe Trudy's or Julio's...

Al

Jones, Jacqueline
Thu 2/14/2019 8:01 AM
Alberto A. Martinez
Joseph, Peniel E; Lawrence, Mark A;
Raby, Megan; Walker, Juliet E K;
Zamora, Emilio; Suri, Jeremi;
Hsu, Madeline Y; Deans-Smith, Susan;
Flores, Arturo R; Llado, Jacquelin
Inbox

Dear Members of the Equity Committee:

Exhibit 33

**DEPARTMENT OF HISTORY**
The University of Texas at Austin

128 Inner Campus Drive · B7000 · Austin, Texas 78712-1739 · 512 471 3261 · FAX 512 475 7222

<u>MEMO</u> Feb. 25, 2019.

①

I met w. S.J. Flores was there, taking notes. weird.

JJ shows me a printout of a FP, my email, asks me "Do you see anything wrong with this?" I say no, not at all. She asks "Why are you saying that Julie is racist towards Abena?" (!) But that's not what I wrote at all! Just wrote that A felt disenfranchised when Hardwick didn't let her present data to the dept.! I say I would've written the same thing if it had been about Joshua Frens-String." But Jones takes H's side, says what I wrote implies that H is racist, asks me How do you know that's what happened? <u>because I was there</u> — I saw that Abena had handouts and she <u>told me</u>, upset, that JH didn't let her distribute it to faculty. Jones defends JH, says "Julie has done a lot of work for our Department" shouldn't be criticized. Says my emails aren't private, that "some people" have them, are "talking about reporting you to <u>H.R.</u>" (Who? JH? over what??) Says if I'm going to name someone I should include that person in the email. or not put that in. Says my email was "hurtful and divisive" — but I explained I was just noting Abena as an example of someone who felt excluded, disent from our governance (because she has been) I said it's a big Dept so sometimes indiv. might be offended, as I <u>myself</u> was offended by Jones meddling in Eq. C, or Abena was offended by Julie.

(Doesn't (Does that not matter? What about *our* feelings?)
But J brought up HR again. (Over what? that I defend a
black woman?) So I say she or anyone are perfectly welcome to
report me to HR or send them any of my emails because
I really haven't done anything wrong. And I know emails are
Public, I tell her they can all go on the cover of any newspaper.
Jackie says I shouldn't write names in emails, only maybe allude
to incidents indirectly, generally. Said some Eg. C. members
said names in some meetings (Who? Said what? gives no evidence
of course; absurd) Asked if I asked Julie for her own account. No,
my point is JJ had denied or sort of denied that any individuals
are disenfranchised, not true, so I gave an example. Had I said I'm
attentive to (Whomever is out of the loop, like J. Brown, he's white
but I argued his salary was way too low; said it in the Eg. C.
and in emails to JJ. He agreed, didn't even know it.

Jones asked for an apology — For what?? Asked me to mediate
⅍ Abena and Julie, so I said she should do it, she's the chair.
"You think I should meet with them?" she says. "Certainly, Yes."

I brought up the new major, said I talked w. Susan Somers,
who told me they had no clear data on enrollments, on how
the new major affected them, but that maybe not affecting
enrollments in African History or LAH because students fulfill a
pre-1800 req with US AP courses. But JJ admitted that the new major





**DEPARTMENT OF HISTORY**
The University of Texas at Austin

128 Inner Campus Drive · B7000 · Austin, Texas 78712-1739 · 512 471 3261 · FAX 512 475 7222

doesn't allow as many courses in one area as before. I insist that faculty should discuss this but I won't have it. J switches again to censorship of names in emails, saying privacy, I said not a private incident, and that I certainly DO already spend plenty of effort "biting my tongue." So what about her? I explain that it was wrong and shocking of her to appoint subcommittee chairs without even consulting the EqC. or me. She gets tense, but I say it was disappointing, and that I had already been appointed for that. Told her it shows a lack of trust, totally unwarranted.

She goes back to email issue, names, that I should be like Art Flores, (and so I'm thinking, what about all the problems staff have with Art?!?) Bite my tongue. I reiterate, did nothing wrong, no confidential info, nothing false, etc. I tell her about kept rumors, people bad mouthed behind their back, like Sally Clarke, that some said she was "crazy," but I was in a committee once with her and she was totally fair and straightforward forthright and rational, especially on not bending any rules. They did the same to J. Walker, as if she were "crazy," when she isn't. I say I don't like this culture of whispers.

Ending, Jackie says "by the way" I can't use the title John E Green Regents Professorship, that I'm only a "Fellow of the" title, that there's a difference, honorary. I thought



I was given the title with the research funds, I say
Brian Levack had it for years and he told me he
heard it they gave it to me, and that I should
ask for more money because they were giving me less than
him, that the Dean keeps some of it. I tell Jackie
that's fine.

Strangest meeting in my time at UT.
exasperating, absurd.

AM.

request

# Exhibit 34

### Jones, Jacqueline

Sun 3/10/2019 1:41 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>; Suri, Jeremi <suri@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Deans-Smith, Susan <sdsmith@austin.utexas.edu>;

Dear Al, Susan, Madeline, and Jeremi,

Some of the email correspondence surrounding our Equity initiatives this semester contain pointed references to individual colleagues (coincidentally, mostly women) in a way that apparently seeks to embarrass or denigrate them.  Often these colleagues are not even on the email thread in question, giving them no opportunity to weigh in on the topic or set the record straight. However, in some cases they do learn about these comments second-hand. I have heard from a couple of these colleagues, and they are understandably upset.

I think we can all agree that it is possible to make larger points about departmental policies and procedures without naming individual colleagues in the process. The Equity initiative is meant to bring us together as a department, not divide us. I would like to request that, should this problem persist, you encourage correspondents within your own (sub)committee to make their arguments without referencing specific colleagues.

Finally, this request does not apply to *my* name, as of course suggestions for the Chair are always welcome, as long as they are based on accurate information and proposed in a spirit of cooperation and collegiality.

Jackie

confirmation/summary of meeting

Exhibit 35

Jones, Jacqueline

Wed 3/20/2019 7:08 AM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>;

Cc: Flores, Arturo R <arturo.flores@austin.utexas.edu>;

Dear Al,
This is to note that you and I met on the afternoon of Monday, Feb. 25. (Art was there and took notes.)  I discussed what I felt were inappropriate references to specific colleagues in some of the emails you have sent as Chair of the Equity Committee.  Disparaging colleagues in emails to the committee list-serv is divisive and inappropriate, especially when at least some of the claims are misleading or false.  Certainly we can discuss departmental policy and procedures without denigrating individuals.
Too, I would like to take this opportunity to ask you to refrain from forwarding emails I send you to members of the History department staff; I always cc them on any correspondence I want to share with them.
Best,
Jackie

# Re: confirmation/summary of meeting

Exhibit 36

Alberto A. Martinez

Thu 3/21/2019 12:46 AM

Sent Items

To: Jones, Jacqueline <jjones@austin.utexas.edu>;

Cc: Flores, Arturo R <arturo.flores@austin.utexas.edu>;

Bcc: Alberto Martinez <almartinez1905@gmail.com>; wagonmail@yahoo.com <wagonmail@yahoo.com>; wendigo00979@yahoo.com <wendigo00979@yahoo.com>; francesyrivera@yahoo.com <francesyrivera@yahoo.com>;


Hi Jackie,

I received your brief summary of our meeting on Feb. 25th.
However, your account is much too incomplete and doesn't fairly capture my statements. For example, I did not denigrate anyone. Therefore, I here send you my own memo of our meeting:

As requested, I came to your office and saw that Art Flores was there too. I noticed that he had a small yellow notepad and was taking notes on pencil; this seemed odd because he's not usually in your office when we've met before.

After our greetings, you showed me a printout of one paragraph from a group email I wrote on February 18th in which I mentioned that Abena felt bad that Julie didn't let her present certain data to the department. This is the paragraph:

"I was at the Department meeting many months ago when Abena tried to present to our department the numerical data that she had painstakingly compiled with Jerry Larson about pre-1800 courses. She told me after the meeting that Julie abruptly did not allow her to present that data, and I saw that Abena therefore felt exasperated and disenfranchised. Later Julie or Nancy Sutherland sent everyone a cursory email saying that there was no potential problem with enrollments if we do the pre-1800 requirement, but giving no numerical data."

You asked me if I saw anything improper in that paragraph; so I read it and said no, there's nothing wrong there. But then you asked me: "Why did you say that Julie is racist toward Abena?" I replied that that's not what my sentence says or what I wrote. But you said that it implies it. And I replied that I would have written the same thing if it had happened to a white man, like Joshua Frens-String instead of Abena. I said that my point was that although faculty present at a meeting had voted in favor of changes to our History major, faculty had not been able to listen to the data that Abena had painstakingly compiled with Jerry Larson, because Julie didn't let her distribute the handouts. You asked me how do I know that's what really happened, and I replied "Because I was there," at the faculty meeting and right then Abena showed me the handouts that she had prepared and told me that Julie didn't let her distribute them at the meeting. So I saw that Abena was upset and frustrated, and I felt sorry that her input just wasn't heard in our faculty meeting. At the time, Abena was still an Assistant Professor whereas Julie was a full Professor, so naturally I was concerned about the importance of empowering and entrusting our junior faculty to have their input heard in our department governance.

Still, you replied by defending Julie and said that "she has done a lot of work for our department" and therefore should not be criticized. You asked me if I realized that there might be another account of what happened. I said sure, such as Julie's account, but that I was just stating what I knew, what I saw. You

then said that university emails are not private, and that hence "some people" had forwarded my group email to others who, you said, were upset by what I had written and that "they're talking about reporting you [me] to H.R." That seemed weird to me. But you said that it was an unfair critique of Julie because I hadn't included her in the email and said that I could have instead brought it up in some other way. You also said that my email was "hurtful and divisive," about which I disagreed because it wasn't a critique of Julie but an example of how Abena felt excluded and disenfranchised from our department governance. I also explained that certainly in a department as big as ours (60+ faculty) sometimes individuals might feel offended by what others say, whether it's Abena offended by Julie, or Julie offended by my email, or me offended by you (especially by how you've intervened in the Equity Committee that I chair). I said that by mentioning an incident in which Abena felt upset and disenfranchised I was precisely responding to something that felt "hurtful and divisive" to her.

You brought up Human Resources again, and I said that it's perfectly fine if anyone who griped to you or you yourself want to show my email to Human Resources especially because there's nothing wrong or unfair in my email, because I'm just standing up for a colleague who felt disenfranchised, and also because my email can well be printed on the cover of any newspaper, just as we are well-informed about our university email accounts.

You said that emails should better not include names of persons who are not copied in the correspondence. This was news to me, and I've never heard of any department or UT unit requiring that no names be mentioned in emails unless any mentioned persons are copied. You asked me if I can agree that I should not have stated Julie's and Abena's names in my email. I replied that it's sometimes possible to allude to incidents without stating names but that it's also common to use names, since otherwise it may be unclear what one is actually saying. (For example, I know that you've said or written things about me and other faculty without sending us copies of such emails, or telling us about such conversations.)

Still, you also said that you've heard that in some meetings of the Equity Committee some members of the committee have actually mentioned names of other faculty in a critical way. Since you did not give any specific example, I tried to think of one, to see what such a comment might refer to, but you said that it wasn't necessary to bring up any example now.

You asked me if I had asked Julie Hardwick for her own account of the incident. I said no, but that I'm well available to talk to both of them, as Chair of the Equity Committee. I had mentioned this incident in my group email to illustrate how sometimes input from individual faculty isn't taken into account. In the previous email to me and the committee, you had seemed to deny that any "groups" or "individuals" in our department feel disenfranchised, so I was therefore giving specific examples of how some individuals who are minorities are indeed disenfranchised to some extent. And I said that I also do the same for individuals who are white and disenfranchised, as I did when I pointed out that Jonathan Brown was the most underpaid professor in our department.

Still, you asked whether I wanted to apologize for what I wrote, but I replied that I can't apologize because I did nothing wrong, but only mentioned a problem, among others, as someone concerned about issues of equity and inclusion, as Chair of the Equity Committee. You then asked why didn't I try to just resolve the matter directly between Abena and Julie, and I replied that you're welcome to do that, since I was just bringing up this problem as an example of a junior faculty member, Abena, feeling disenfranchised.

You asked me if I don't think that this incident was already resolved, and I replied that obviously it was not resolved. You asked me whether I think that You should meet with Julie and Abena together, and I said: "Certainly, yes." (Accordingly, I wrote to Abena that same day to let her know that you might therefore ask to meet with her and Julie.)

As you know, Abena was very worried that the new requirements in the History major (especially the requirement of 6 credits in pre 1800s courses) might reduce enrollments in certain geographical areas that have fewer pre-1800 courses, such as in her area, African History; in favor of courses in European History, which have many pre-1800 offerings. I agreed, as do multiple other faculty members. Hence my group email to the Equity Committee raised this issue, since you had asked us to provide suggestions for possible charges for the Equity Committee's subcommittee on Curriculum and Scheduling, among others; so my suggestion was that that subcommittee could well include --a discussion-- of how the new major may affect enrollments in certain areas such as African history.

But you disagreed and excluded my suggestion that there be any such discussion in the subcommittee. Hence in our meeting with Art, you didn't want to discuss the technicalities of how the new major might affect enrollments. I then said that I had already spoken about this with our new Academic Advising Coordinator, Susan Somers, and that she kindly confirmed to me that the department just doesn't have compiled statistics of how enrollments were usually distributed among courses or how they will now be, with the new major, but that the very limited data so far shows that the requirement of two pre-1800 courses doesn't seem to be reducing enrollments in courses such as AAME and Latin American History, mainly because many History majors are fulfilling one of their pre-1800 requirements with an advanced placement course in US History. Still, Susan said that the new major indeed doesn't let students potentially specialize with as many courses as before in a single geographical area, such as African history, because there is one more requirement than previously, but she added that maybe few students previously took so many courses in any one geographical area anyhow.

But I said that we can well "bracket aside" the issue of whether the new requirements will affect any enrollments. And I said that even if it's true that no enrollments will be affected, that still I think it could be fruitful to have a constructive open discussion about this issue, since it has been brought up by faculty such as Abena, Indrani, Tracie, myself, and others. So, you said that we could indeed set aside the question of the new major but that still, the point of the present meeting is for me to realize that certain sensitive issues need not arise in emails, especially if one is mentioning the names of persons who are not copied in the correspondence. I noted that certainly one should not write emails that reveal confidential information, but that the email in question was just a description of a minor incident, and that already I do spend plenty of time in the department knowing when to "bite my tongue" about not saying things that may be embarrassing to some colleagues. This meant that, like other faculty, I certainly do my part in terms of not writing certain things about our colleagues.

Also, I then said that I was shocked and very upset when you decided to appoint the chairs of every subcommittee of my committee without even consulting me or the members of the committee. Since the Equity Committee was created mainly to deal with questions of Diversity and Inclusion in our department governance, and since you and the department faculty selected and approved me to chair the Equity Committee in an open faculty meeting, it was very disappointing to me that months later you appointed someone else to chair the discussions on governance. It shows an unwarranted lack of trust. Still, as I said, I can shrug it off since I do want to continue being part of the present process of improving equity in our department governance.

(On May 2, 2018, as a minority, after 13 years in our department, it was very significant for me to finally be appointed Chair of one of the more than fifteen standing or ad hoc committees that annually exist in our department. Other faculty get appointed to chair committees multiple times, year after year, and therefore, my Hispanic colleagues and I pointed out on May 2, 2018 that we were frustrated that we were never or nearly never appointed to chair committees.)

Again, you returned to the issue of using individuals' names in emails. You suggested that I might well emulate the managerial approach of Art Flores, sitting right there, who sometimes criticizes things done by staff without actually naming them in group emails. He too briefly said something to that effect. So I bit my tongue and I said that, to be fair, there are different managerial styles, and that I believe in

forthright honesty and transparency, so long as confidential or personal information is not being revealed, of course.

I explained that one of the problems in our department is an unfortunate habit whereby some individuals are badmouthed behind their back in conversations and innuendos. I gave the example of a former faculty member who I had been told was "crazy," but who I didn't personally know. Then finally I was once in a hiring committee that included her and I was surprised to see that she was actually, really, the one person there who was most focused on following proper procedures; it was impressive to see. Thus I frankly state my concerns rather than whispering about colleagues.

At the end of our meeting you raised a separate issue from the topics above. You said that sometimes I've written "John E. Green Regents Professorship" under my name as a title, but that actually when I was allocated research funds from that Professorship, I had not been awarded the Professorship title per se, but that I instead was really just "a Fellow" of the Professorship. I replied that I didn't realize there was a difference, and that the former holder of the title, Brian Levack, had even congratulated me for having received it, so I thought you had appointed me to the title not just the research funds. I quoted also that Brian had asked me how much funds I was allotted, so I replied $7500, and he then commented that that was very low, that apparently the Dean had held back some funds because Brian used to receive much more, and that I should therefore request more. Anyhow, you then clarified at our meeting that any honorary Professorship is awarded through a process and that I was only a fellow of those funds. I asked if anyone else is presently a fellow of the same Professorship too, and you said no, and I said that certainly I was glad to have a title, I thought, but that if the title was not awarded to me I can well write instead "Fellow of the John E. Green Regents Professorship."

That was the end of our meeting, I then thanked you both for meeting with me.

To end this long email, I have to frankly ask and advise you, as the Minority Liaison Officer of our Department, to please spend more effort on extending trust to individuals such as myself, and to please encourage, welcome, and incorporate more individual faculty input in our governance. This is a concern that other faculty have repeatedly voiced, as Abena herself stressfully and critically requested in our recent department meeting on governance.

As I've said before, in writing, I do disagree with one of our colleagues who frankly claimed that our department is "a consultative dictatorship," and advised me to accept that.

Sincerely,

Al

---

**From:** Jones, Jacqueline
**Sent:** Wednesday, March 20, 2019 7:08 AM
**To:** Alberto A. Martinez
**Cc:** Flores, Arturo R
**Subject:** confirmation/summary of meeting

Dear Al,
This is to note that you and I met on the afternoon of Monday, Feb. 25. (Art was there and took notes.)  I discussed what I felt were inappropriate references to specific colleagues in some of the emails you have sent as Chair of the Equity Committee.  Disparaging colleagues in emails to the committee list-serv



Exhibit 37



hi ▮ still in PR, I'll try to call today, but I'm not worried, Jorge said that apparently JJ wants to claim that I did something "inappropriate" which is absurd. I think she's annoyed at the Eq. Committee or me, since she sent me an unwarranted email days ago saying I was "disparaging" profs which is false.

03/24/2019, 10:31 AM

Well I want to talk to you about it because i have no interest in getting wrapped up in this

03/24/2019, 10:34 AM

Exhibit 38

Handbook of Operating Procedures 3-1022

# Protection from Retaliation for Suspected Misconduct Reporting (Whistleblower)

**Effective September 30, 2015**

Executive Sponsor: Vice President for Diversity and Policy Owner: Associate Vice President, Diversity Community Engagement                    and Community Engagement

## I. Policy Statement

The University of Texas at Austin ("University") is committed to the ethical stewardship of University resources in compliance with laws and the rules, policies, and procedures of The University of Texas System ("UT System") and the University. To this end, it is the policy of the University to:

- foster a University environment that promotes employees, students, and other University community members to report suspected misconduct of a material nature taking place at the University.

- prohibit retribution or retaliation against any individual who, in good faith, reports such concerns or participates in an investigation pertaining to these reports.

Links to University policies related to misconduct in research and academic misconduct may be found in Sec. X below.

## II. Reason for Policy

To set forth responsibilities and steps for good faith reporting of material violations of law or University policies in the employment setting and to aid in the protection of individuals from retaliation for such reporting.

## III. Scope & Audience

This policy applies to reports of misconduct in the employment setting and applies to University employees, students, affiliates, and visitors.

## IV. Definitions (specific to this policy)

**Misconduct:**
An individual's action that is unlawful or unethical including but not limited to: illegal or fraudulent activity; financial misstatements, accounting or auditing irregularities; conflicts of interest or commitment; violation of laws, regulations, rules, or policies. Examples of misconduct may be found in the Office for Inclusion and Equity's Procedure and Practice Guide (http://www.utexas.edu/equity/policies/procedure-and-practice-guide).

**Retaliation:**
Any action that adversely affects the employment or institutional status of an individual who, in good faith, advances a report of misconduct to University officials or participates in an investigation of such report.

**University Community Member:**
Refers to any University employee, student, affiliate, or an individual external to the University who conducts business with the University.

**University Policy:**

This collectively refers to The University of Texas System ("UT System")  Board of Regents' *Rules and Regulations* (http://www.utsystem.edu/board-of-regents/rules), UT System policies (http://www.utsystem.edu/board-of-regents/policy-library), as well as the University's own policies.

**Whistleblower:**
An individual who raises a concern about suspected violation of law or University policy.

## *V. Website (for policy)*

https://policies.utexas.edu/policies/hop/3-1022

## *VI. Contacts*

| CONTACT | DETAILS | WEB |
|---|---|---|
| Office for Inclusion and Equity | **Phone:** 512-471-1849 | **Website:** http://www.utexas.edu/equity (http://www.utexas.edu/equity) <br> **Email:** equity@austin.utexas.edu (mailto:equity@austin.utexas.edu) |
| University Compliance Services Hotline | **Phone:** English:1-877-507-7321 <br> Español:1-800-216-1288 | **Website:** http://utexas.edu/hotline (http://utexas.edu/hotline) <br> **Email:** compliance@austin.utexas.edu (mailto:compliance@austin.utexas.edu) |

## *VII. Responsibilities & Procedures*

A. **General Overview**

1. The University expects its employees to perform their duties and responsibilities in accordance with applicable laws and to follow University policies and procedures.

2. The University provides mechanisms to assist individuals in coming forward to report misconduct without fear of reprisal or retaliation.

3. Any individual who retaliates against a University employee or student because of a good faith report of actual or suspected misconduct is subject to disciplinary action by the University, up to and including dismissal.

4. The Procedure and Practice Guide (http://www.utexas.edu/equity/policies/procedure-and-practice-guide) provides information regarding reporting avenues, individual and supervisory responsibilities, and other details clarifying the implementation of this policy.

B. **Whistleblower Reporting**

1. A University community member who in good faith suspects or has knowledge of a material violation of law or University policy has a professional obligation and is expected to report suspected violations. A University community member who reports in good faith actual or suspected violations of law or University policy will be protected from retaliation.

   a. Reports may cover suspected or actual misconduct, regardless of whether the individual is personally involved in the matter.

b. The individual should make such report as soon as reasonably possible, preferably within ninety (90) days from the time he or she becomes aware of the suspected misconduct.

c. An individual may amend his or her report upon learning of new information relevant to the report.

2. Reporting guidelines specific to a particular issue may be found in the Procedure and Practice Guide (http://www.utexas.edu/equity/policies/procedure-and-practice-guide). Reports to the University, however, may be directed through any of these channels:

a. employee's supervisor/manager, dean/director, or Human Resources contact

b. the Office for Inclusion and Equity via
   - (512) 471-1849

   - email: equity@austin.utexas.edu (mailto:equity@austin.utexas.edu)

   - www.utexas.edu/equity (http://www.utexas.edu/equity)

c. University Compliance Services Hotline (available 24 hours a day, 365 days per year) via
   - Phone:  English 1-877-507-7321 or Español 1-800-216-1288

   - Email: hotline@compliance.utexas.edu (mailto:hotline@compliance.utexas.edu)

   - Web: utexas.edu/hotline (http://utexas.edu/hotline)

The supervisor/manager, dean, director, or other University official receiving such report must assure the report is further brought to the attention of the University designee handling such reports. Refer to the Procedure and Practice Guide. (http://www.utexas.edu/equity/policies/procedure-and-practice-guide)

3. Reports made through the University Compliance Services Hotline (https://utexas.edu/hotline) may be submitted anonymously and will be routed to appropriate University officials for investigation.

4. Reports made in accordance with this policy may not be construed as having made a report to a law enforcement authority.

5. Processing of such report will follow procedural steps outlined in the Procedure and Practice Guide. (http://www.utexas.edu/equity/policies/procedure-and-practice-guide)

6. An individual who has a question about the propriety of any practice under University policies should seek guidance from his or her supervisor/manager or the University official who has responsibility for overseeing compliance with the particular policy.

7. Examples of violations of University policies and illegal behavior may be found in the Procedure and Practice Guide. (http://www.utexas.edu/equity/policies/procedure-and-practice-guide)

8. The individual who suspects a violation has occurred should not accuse or confront the individual directly or attempt to investigate the matter personally.

## C. Retaliation Reporting

1. An employee who comes forward in good faith to report actual or suspected misconduct in violation of federal or state law or regulations or University policy will not be subject to retaliation, reprisal, or disciplinary action by the University. This protection does not extend to self-reported violations.

2. An employee or other University community member must not take any disciplinary or retaliatory action against any individual for good faith reporting, or causing to be reported suspected misconduct, or for assisting in an authorized investigation associated with the report.

3. Any employee or other University community member who believes he or she is experiencing retaliatory action by another individual as a result of any of the following activities is strongly encouraged to report this to the Office for Inclusion and Equity at http://www.utexas.edu/equity (http://www.utexas.edu/equity) or by calling 512-471-1849:

   - Good faith reporting of misconduct of another individual reported to a person designated by the University to receive such disclosure.

   - Participation in an investigation involving misconduct of another person.

   - Filing a complaint alleging prohibited discrimination or harassment with the Office for Inclusion and Equity.

4. Procedures for filing a complaint may be found in the Practice and Procedure Guide. (http://www.utexas.edu/equity/policies/procedure-and-practice-guide)

5. Further resources and information for addressing concerns of retaliation in the workplace or academic environment may be obtained by contacting the Office for Inclusion and Equity or visiting its website (http://www.utexas.edu/equity).

D. **False Information**

Related to this policy, an employee will be subject to disciplinary action, up to and including dismissal, for any of these actions:

- making a false report of retaliation, actual misconduct, or suspected misconduct.

- knowingly providing false answers or information in response to an ongoing investigation.

# VIII. Forms & Tools
**Office for Inclusion and Equity Procedure and Practice Guide**
(http://www.utexas.edu/equity/policies/procedure-and-practice-guide)

# IX. Frequently Asked Questions
None

# X. Related Information
**University Compliance Services Reporting Hotline** (https://utexas.edu/hotline)

UT System Policy **UTS131** (http://www.utsystem.edu/board-of-regents/policy-library/policies/uts131-protection-retaliation-reporting-suspect-wrongdoing) - Protection from Retaliation for Reporting Suspected Wrongdoing

**HOP 3-1021** (http://www.policies.utexas.edu/policies/suspected-dishonest-or-fraudulent-activities) - Suspected Dishonest or Fraudulent Activities

**HOP 7-1230** (http://www.policies.utexas.edu/policies/misconduct-science-and-other-scholarly-activities) – Misconduct in Science and Other Scholarly Activities

Applicable state and federal laws: Titles VI and VII of the Civil Rights Act of 1964, as amended; Age Discrimination in Employment Act of 1967; Age Discrimination Act of 1975; Americans with Disabilities Act of 1990; Americans with Disabilities Amendment Act of 2008; Equal Pay Act of 1963; Veterans Readjustment Act of 1974; Executive Order of 11246; Sections 503 and 504 of the Rehabilitation Act of 1973; Title IX of the Education Amendments of 1972; Texas Labor Code; Chapter 21

## XI. History

Last review date: September 30, 2015
    Editorial changes made February 18, 2016

Next scheduled review date: October 2017

**Office for Inclusion and Equity - Please Contact**                    Exhibit 39

Eagle Bull, Galen <galen.eaglebull@austin.utexas.edu>
Fri 5/17/2019 7:42 AM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>

Professor Martinez:

My name is Galen Eagle Bull, and I am an Associate Director in the Office for Inclusion and Equity (OIE). We received an anonymous concern regarding your relationship with a female graduate student, and I would like to discuss that with you. This is not a formal investigation.

Please contact me at the number below to arrange a time to come to OIE and discuss the matter in-person. I will do my best to accommodate your schedule.

Thank you in advance for your cooperation. I look forward to hearing from you.


Galen Eagle Bull, JD
Associate Director
Office for Inclusion and Equity
The University of Texas at Austin
512-471-1849


*It is the policy of The University of Texas at Austin ("University") to provide an educational and working environment that provides equal opportunity to all members of the University community. In accordance with federal and state law, the University prohibits unlawful discrimination, including harassment, on the basis of race, color, religion, national origin, sex, pregnancy, age, disability, citizenship, veteran status and genetic information. The University also prohibits discrimination on the basis of, sexual orientation, gender identity, and gender expression.*

# Exhibit 40

**Re: Office for Inclusion and Equity - Please Contact**

## Alberto A. Martinez <almartinez@austin.utexas.edu>

Sat 5/18/2019 11:43 AM

**To:** Eagle Bull, Galen <galen.eaglebull@austin.utexas.edu>; katie@sergilaw.com <katie@sergilaw.com>
**Bcc:** Alberto Martinez <almartinez1905@gmail.com>; wagonmail@yahoo.com <wagonmail@yahoo.com>

Dear Mr. Galen Eagle Bull,

thank you for writing. However, I'm not in Austin right now; I flew to Puerto Rico on Thursday and will return on June 5th. (I'm the primary caretaker for my mother, who is disabled in Puerto Rico.) If it works, we can meet on the afternoon of Friday June 7 or Monday June 10.

By the way, I've been waiting to hear from someone for weeks. In March a colleague told me that I was being "investigated" about an alleged "inappropriate relationship" with ██████████. I had no relationship and no inappropriate relationship with her. Last June she frankly asked me ███████████████████████████████ and told her anyhow that it was impossible. She told me right then that she had "a boyfriend" anyhow (who actually was not quite that). Still, we became friends by working in the same coffee shops. And, I set boundaries such as not inviting her to any restaurants, rejecting all invitations to go to her house, not telling her where I live, and not even accepting her friend request on facebook. Even though she agreed that we'd just be friends, I later eventually got the impression that she liked me again so I told her that "I'm worried that you're crushing on me," but she categorically denied it, and repeatedly showed me photos of the guys she was dating and meeting, to reassure me. Finally on October 18 she texted me frustrated saying that "I fell in love with you" and I replied that I just didn't know that at all since she had denied having any crush on me. She replied that she hadn't told me that because she couldn't admit it and still be friends so she had acted to "play it cool" especially by dating other people because I had rejected her. She then explained that she would not talk to me anymore, because, she wrote, when one person likes another but it's not reciprocal then the two should not speak. Regardless, she did reach out to me subsequently several times.

Since someone first told me in March that there was some sort of ongoing investigation about me, I asked for advice and a colleague told me to just wait for OIE or some other office to contact me. ████████████ told me in March that she had to meet with the Chair of my department, and she told me that the Chair Jackie Jones told her that an anonymous complaint against me was submitted last semester, even though ████████████ has no such claims or complaints against me. By now, six months or more have passed and therefore in the meantime several faculty members have either been interviewed or have heard some version of the story that I'm being investigated for an "inappropriate relationship," which is exasperating for me, because (A) I had no such relationship, and (B) I'm waiting for when is the right time for me to respond to such false rumors publicly.

I understand that your job presently might well be to investigate only the present allegation, but for the record, I've been at UT 15 years, and suddenly in March I've had to tolerate a series of false allegations against me: (1) that I said or wrote disparaging and denigrating things about female faculty in my department (totally false), (2) that I had some sort of inappropriate relationship with a graduate student (totally false), and (3) that I said false and divisive things about Jewish faculty (totally false).

Therefore, in order to defend myself against a pattern of smears and false allegations, I had to retain a lawyer. We met with Donna Reddix recently to discuss allegation (3) above. And as I explained to Ms. Reddix and UT's lawyer Chris, I am upset that allegations based on no facts

have gained currency in my department and feel like retaliation. The Chair of my department has been involved in gifting credence to all of these allegations without consulting me at all, and I worry that she is retaliating because she disliked the findings of the Equity Committee that I chair in the department. (We found substantive inequities in salaries, and lack of inclusion of minorities and especially Hispanic faculty in positions of departmental governance during all 15 years reviewed; and moreover, I stood up for an African American female professor who was disrespected—and who is now being accused too.)

Since you write that the concern about a graduate student "is not a formal investigation," I don't know yet whether I'll bring my lawyer. But I've cc'd her to discuss it and I've written the present email without consulting her or anyone. I understand that if I bring a lawyer to our meeting you may have to bring a UT lawyer too, so if I will indeed bring a lawyer I will let you know in advance.

Lastly, I respectfully understand that it's your job to investigate allegations, and I look forward to assisting you in the process. Let me know if we can meet on June 7 or 10.

Sincerely,

Dr. Alberto A. Martínez
Professor, Department of History


University of Texas at Austin
128 Inner Campus Dr., Stop B7000
Austin, TX  78712-0220
tel. 512-517-2755, fax 512-475-7222
almartinez@austin.utexas.edu
http://liberalarts.utexas.edu/history/faculty/aam829
http://www.martinezwritings.com/m/About.html
http://liberalarts.utexas.edu/hps/
http://sites.utexas.edu/puertorico/

---

**From:** Eagle Bull, Galen
**Sent:** Friday, May 17, 2019 5:42:54 AM
**To:** Alberto A. Martinez
**Subject:** Office for Inclusion and Equity - Please Contact

Professor Martinez:

My name is Galen Eagle Bull, and I am an Associate Director in the Office for Inclusion and Equity (OIE). We received an anonymous concern regarding your relationship with a female graduate student, and I would like to discuss that with you. This is not a formal investigation.

Please contact me at the number below to arrange a time to come to OIE and discuss the matter in-person. I will do my best to accommodate your schedule.

Thank you in advance for your cooperation. I look forward to hearing from you.


Galen Eagle Bull, JD

Exhibit 41



**DIVISION OF DIVERSITY & COMMUNITY ENGAGEMENT**
Office for Inclusion and Equity

*100 West Dean Keeton Street, SSB, 3.212 • Austin, Texas 78712-1541 • 512-471-1849*
*FAX 512-512-471-8180 • www.equity.utexas.edu • oie@austin.utexas.edu*

## PRIVATE & CONFIDENTIAL

August 20, 2019

| | |
|---|---|
| To: | Alberto Martinez, PhD |
| | Department of History |
| From: | Galen Eagle Bull, J.D., Associate Director |
| | Office for Inclusion and Equity ("OIE") |
| RE: | Closure Memorandum |

In January of this year, OIE received an anonymous third-party report that you were dating a current graduate student in violation of the University's Consensual Relationship policy. The graduate student was subsequently identified ▮▮▮▮▮▮▮▮▮▮. OIE conducted an extensive due diligence inquiry into the allegation, speaking with ▮▮▮▮▮▮▮▮ and select faculty within the Department of History. OIE determined that the evidence did not substantiate a policy violation.

You met with OIE on June 6, 2019. You reiterated that you never dated ▮▮▮▮▮▮▮▮▮ never had a physical relationship with her, or anything beyond a friendship. You said that you were not on ▮▮▮▮▮▮ dissertation committee, and that you never supervised her or evaluated her work in any way. You added that you never read one chapter of her dissertation.

You said that in June 2018, you received a ▮▮▮▮▮▮▮▮▮▮ text message. It was a ▮▮▮▮▮▮▮▮▮▮▮▮ text message saying that she was, "Pre-emptively hitting on," you, that it led to a discussion between the two of you about your friendship, and that it was not a dating relationship. Afterward, you said that you received a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ text message, ▮▮▮▮▮▮▮▮▮▮" You said you ▮▮▮▮▮▮▮▮▮ to anyone.

Based on the information you provided and information from other sources, OIE will take no further action and considers this matter closed. OIE reserves the right to re-open this complaint should additional information arise.



DIVISION OF DIVERSITY & COMMUNITY ENGAGEMENT **Exhibit 42**
Office for Inclusion and Equity

*100 West Dean Keeton Street, SSB, 3.212 • Austin, Texas 78712-1541*
*PHONE 512-471-1849 • FAX 512-471-8180*
*www.equity.utexas.edu • oie@austin.utexas.edu*

**PRIVATE & CONFIDENTIAL**

April 22, 2019

To:        Alberto Martinez, PhD
           Professor
           Department of History

From:     Donna Davis Reddix, JD
           Associate Director
           Office for Inclusion and Equity

CC:        Janet Dukerich, PhD
           Senior Vice Provost for Faculty Affairs and Professor
           Office of the Executive Vice President and Provost

           Carmen L. Shockley
           Assistant Vice President for Faculty Affairs
           Office of the Executive Vice President and Provost

           Randy L. Diehl, PhD
           Dean, College of Liberal Arts and Professor

RE:        Notice of Race and Religious Discrimination Complaint & Investigation

---

      The University of Texas at Austin has empowered the Office for Inclusion and Equity (OIE) to investigate and resolve concerns of discrimination, harassment (including sexual harassment) on the bases of race, color, religion, national origin, age, disability, citizenship, veteran status, sexual orientation, gender identity or gender expression, and genetic information, as well as allegations involving sexual misconduct, inappropriate consensual relationships, and retaliation. [1]

---

[1] *Applicable OIE policies can be found at https://equity.utexas.edu/policies/*

This memo is notification that OIE has received an official complaint against you by Jacqueline Jones, PhD, Professor and Chair of the Department of History.  The allegation(s) against you are as follows:

1. Allegation #1: You have charged that the Complainant shows favoritism towards other Jewish colleagues through departmental appointments of administrative influence and power.
2. Allegation #2: Your statements have caused a toxic environment in the Department of History between Jewish and non-Jewish colleagues.

**Statement of Allegations**

1. On April 2, 2019, the Complainant initiated a formal investigation against you alleging race discrimination.
2. The Complainant alleges that you have stated within the Department of History that she only promotes Jewish colleagues to senior leadership roles.

Pursuant to University Policy, you are provided an opportunity to submit a written response to the allegations presented within ten (10) working days. The ten day period commences the day after the date of this letter.  If you chose to submit a written response, please submit the response to OIE. Upon conclusion of the investigation, you will receive a report on the investigation along with any findings.

To ensure the integrity of the investigation, we ask that you maintain confidentiality and not discuss the allegations with any individual who does not have a legitimate need to know. Additionally, you must retain and preserve all records, including but not limited to documents and electronic communications that may be relevant to the subject of this notice.

As a reminder, University policy strictly prohibits retaliation towards any person who has brought a complaint or participated in an investigation. OIE appreciates your cooperation in this process. If you have any questions regarding University policies and/or OIE's process, please do not hesitate to contact OIE.

Re: Notice of Investigation

# Exhibit 43

Alberto A. Martinez

Tue 4/23/2019 9:58 AM

Sent Items

To: Reddix, Donna D <Donna.Reddix@austin.utexas.edu>;

Bcc: Alberto Martinez <almartinez1905@gmail.com>; wendigo00979@yahoo.com <wendigo00979@yahoo.com>;

📎  1 attachments (8 MB)

Equity emails.pdf;

Dear Donna Davis Reddix,

thank you for duly writing.
I'm stunned to read these allegations, which are completely false, and also absurd and nonsensical. I certainly do Not believe these claims that have been ascribed to me, and I've said no such things in person or in writing. Either someone has lied to Prof. Jones, or she herself is misrepresenting me.

This is especially exasperating to me, since in the past few weeks I've already patiently endured a series of other arbitrary and false allegations about me. First (1), Prof. Jones told me that some faculty were thinking of "reporting me to Human Resources," which was absurd. Next, (2) I received emails from Prof. Jones, falsely stating that I had "disparaged" or "denigrated" certain female faculty in emails, which is false, and which I immediately denied in meticulous detail. Then, (3) I also heard from several colleagues that there is some sort of ongoing investigation about me about an anonymous allegation of an "inappropriate relationship" or something like that with a graduate student, which likewise is completely false. And now, (4) I receive this official notice about an investigation about Jewish faculty. It's incredible.

Yet I've said no such things at all, so I want to know who has initiated such smears about me. I do understand and fully respect that OIE must fairly and professionally investigate this matter and I'll gladly cooperate in any ways that I can. This is certainly an offensive allegation that deserves close attention, even though it's false. I am entirely interested in investigating this allegation. Alarmingly, this claim and the series of incidents I list above, and others, jointly show a pattern that feels like retaliation against me. But why?

On April 2018, the tenured Hispanic professors (myself and two others) in our History department publicly raised the problem that we were effectively if inadvertently marginalized and excluded from our History department's governance for many years. This complaint led to the creation of an "Equity Committee" of which I am the Chair. My committee and I have painstakingly worked on important and delicate issues of equity and diversity for a year. I've consistently expressed myself professionally and respectfully. Still, the inordinately defensive, paranoid, and accusatory ways in which Prof. Jones has recently acted, make me think that she worries about the direction of my committee or imagines that I might speak ill of her.

To promptly help you with your investigation, I have spent many hours today and yesterday gathering various emails that should clearly convey to you two things: that the allegations about me are false and absurd, and that I have been subjected to an unwarranted treatment. I've highlighted multiple passages to bring to your attention. I have multiple other emails, do let me know if you need more. In the Equity

Committee, and as Minority Liaison Officer, and as a minority myself, my concern all throughout has been about how to be more inclusive in our faculty governance (as all my emails plainly show), not to invent absurd reasons as to why others have been included.

You ask when we may meet; how about Friday May 3 at 1:00pm?
Or, if you prefer sooner, how about Thursday May 2 at 3:45pm?
I'd like to bring a lawyer to our meeting, since I too want to formally investigate these allegations, not just defend myself, so I have to find one soon.

Sincerely,

Dr. Alberto A. Martínez
Professor, Department of History

University of Texas at Austin
128 Inner Campus Dr., Stop B7000
Austin, TX  78712-0220
tel. 512-517-2755, fax 512-475-7222
almartinez@austin.utexas.edu
http://liberalarts.utexas.edu/history/faculty/aam829
http://www.martinezwritings.com/m/About.html
http://liberalarts.utexas.edu/hps/
http://sites.utexas.edu/puertorico/

---

**From:** Reddix, Donna D
**Sent:** Monday, April 22, 2019 10:49:10 AM
**To:** Alberto A. Martinez
**Subject:** Notice of Investigation

Dear Professor Martinez,

My name is Donna Davis Reddix, and I am an Associate Director for the Office for Inclusion and Equity (OIE). The University of Texas at Austin has empowered OIE to investigate and resolve certain allegations, including claims of discrimination, harassment, and retaliation.  A matter has been brought to our attention that I need to discuss with you.  We are currently investigating a race and religious discrimination allegation made against you by Dr. Jacqueline Jones, Professor and Chair of the Department of History.

Attached is the official Notice of Investigation memorandum, which contains a more detailed account of the allegations against you.   As with all investigations, we caution against discussing the nature of the investigation or disseminating information discovered during the course of the process to anyone.  We would also like to send a reminder not to engage in any action that can be reasonably interpreted as retaliation against anyone who participated in or who you believe may have participated in this investigation.

Please contact our office or respond via email to schedule a meeting to discuss the allegations.  This meeting will provide you with an opportunity to respond to the allegations. Pursuant to University policy, you have the right to

be accompanied by an advisor in any meetings with OIE.  Please provide me with days when you are available for a meeting. I will do my best to accommodate your scheduling needs.

OIE can be reached at 512.471.1849. Additional information about OIE and its services is available at https://www.equity.utexas.edu.

Thank you in advance for your time and attention to this matter.

Best regards,

**Donna Davis Reddix, JD**
Associate Director, Office for Inclusion and Equity
The University of Texas at Austin
T:  512-471-1849
F:  512-471-8180
www.equity.utexas.edu
(Pronouns: she/her/hers)



It is the policy of The University of Texas at Austin ("University") to provide an educational and working environment that provides equal opportunity to all members of the University community. In accordance with federal and state law, the University prohibits unlawful discrimination, including harassment, on the basis of race, color, religion, national origin, sex, pregnancy, age, disability, citizenship, veteran status and genetic information. The University also prohibits discrimination on the basis of sexual orientation, gender identity, and gender expression.

RE: Notice of Investigation

# Exhibit 44

Reddix, Donna D <Donna.Reddix@austin.utexas.edu>

Fri 5/3/2019 3:12 PM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>
**Cc:** katie@sergilaw.com <katie@sergilaw.com>

Professor Martinez,

The alleged statement was provided by an anonymous third party on or about March 27, 2019, who claims you have charged openly that Professor Jacqueline Jones shows favoritism towards Jewish colleagues, and appoints them to positions of administrative influence in the Department of History.

We will discuss the allegations in greater detail during our meeting on Monday.  I look forward to meeting you.

Best regards,

**Donna Davis Reddix, JD**
Associate Director, Office for Inclusion and Equity
The University of Texas at Austin
T:  512-471-1849
F:  512-471-8180
www.equity.utexas.edu
(Pronouns: she/her/hers)



*It is the policy of The University of Texas at Austin ("University") to provide an educational and working environment that provides equal opportunity to all members of the University community. In accordance with federal and state law, the University prohibits unlawful discrimination, including harassment, on the basis of race, color, religion, national origin, sex, pregnancy, age, disability, citizenship, veteran status and genetic information. The University also prohibits discrimination on the basis of sexual orientation, gender identity, and gender expression.*

---

**From:** Alberto A. Martinez <almartinez@austin.utexas.edu>
**Sent:** Thursday, May 2, 2019 9:44 AM
**To:** Reddix, Donna D <Donna.Reddix@austin.utexas.edu>
**Cc:** katie@sergilaw.com
**Subject:** Re: Notice of Investigation

Dear Ms. Reddix,

to assist our meeting on Monday, I have a request: can you please email me any alleged facts on which the allegations by Dr. Jones are based?  My lawyer pointed out that according to OIE's Procedure and Practice Guide (p. 16, item D.2.), the OIE should provide "the facts surrounding the allegations."

In particular, I'm wondering what Dr. Jones specifically meant by claiming that I've said things "within the Department." Simply put, exactly (1) who claims that I said (2) what to (3) whom, (4)

where, and (5) when?

Also, please let me know if you have any questions or need any additional information from me based on your review of the email correspondence that I sent you.

Thank you,

Alberto Martinez

---

**From:** Reddix, Donna D
**Sent:** Tuesday, April 30, 2019 8:28:37 AM
**To:** Alberto A. Martinez
**Subject:** RE: Notice of Investigation

Great.  Thank you for confirming.

**Donna Davis Reddix, JD**
Associate Director, Office for Inclusion and Equity
The University of Texas at Austin
T:  512-471-1849
F:  512-471-8180
www.equity.utexas.edu
(Pronouns: she/her/hers)



*It is the policy of The University of Texas at Austin ("University") to provide an educational and working environment that provides equal opportunity to all members of the University community. In accordance with federal and state law, the University prohibits unlawful discrimination, including harassment, on the basis of race, color, religion, national origin, sex, pregnancy, age, disability, citizenship, veteran status and genetic information. The University also prohibits discrimination on the basis of sexual orientation, gender identity, and gender expression.*

**From:** Alberto A. Martinez <almartinez@austin.utexas.edu>
**Sent:** Monday, April 29, 2019 7:02 PM
**To:** Reddix, Donna D <Donna.Reddix@austin.utexas.edu>
**Subject:** Re: Notice of Investigation

hi Ms. Reddix,

good, let's meet on Monday May 6 at 2:30pm in SSB Suite 3.212; my lawyer too confirmed that that time works.

Thank you, see you then,

Alberto Martinez



DIVISION OF DIVERSITY & COMMUNITY ENGAGEMENT **Exhibit 45**
Office for Inclusion and Equity

*100 West Dean Keeton Street, SSB, 3.212 • Austin, Texas 78712-1541*
*PHONE 512-471-1849 • FAX 512-471-8180 • www.equity.utexas.edu • oie@austin.utexas.edu*

## PRIVATE & CONFIDENTIAL

September 12, 2019

TO:   Maurie McInnis, PhD
     Executive Vice President and Provost

FROM:  Donna Davis Reddix, JD
     Associate Director
     Office for Inclusion and Equity

RE:   Formal Investigation Report
     Jacqueline Jones, PhD, Department Chair & Professor, History (Complainant)
     Alberto Martinez, PhD, Professor, History (Respondent)

CC:   Janet Dukerich, PhD
     Vice Provost for Advocacy and Dispute Resolution
     Office of the Executive Vice President and Provost

     Carmen L. Shockley
     Assistant Vice President for Faculty Affairs
     Office of the Executive Vice President and Provost

     Michelle George
     Assistant Director
     Faculty Affairs

## Introduction:

On March 27, 2019, the Office for Inclusion and Equity ("OIE") received a complaint reporting allegations of race and religious discrimination against Alberto Martinez, PhD, Professor, Department of History, College of Liberal Arts ("Respondent"). The Complainant is Jacqueline Jones, PhD, Department Chair & Professor, Department of History, College of Liberal Arts ("Complainant") who claims Respondent made alleged anti-Semitic statements to a graduate student that she shows favoritism towards Jewish colleagues, and appoints them to positions of administrative influence and power in the department because of their race and/or religion.

The allegations were based on information that could implicate the University's Nondiscrimination Policy (HOP 3-3020).[1]

Based on the evidence obtained during its investigation, as set forth below, there is INSUFFICIENT EVIDENCE to find the Respondent in violation of the University's HOP 3-3020 policy.

**Background:**

Complainant and Respondent are both tenured faculty members of the Department of History. Complainant serves as the Department Chair and states that a graduate student shared with her comments allegedly made by Respondent during a casual conversation. Specifically, that Respondent stated Complainant only promotes and appoints faculty colleagues who are Jewish. The graduate student has requested anonymity and OIE obliges this request.

**Allegations:**

In accordance with University policy, the OIE conducted an investigation to examine the following allegations submitted by Complainant:

1. Respondent made an anti-Semitic statement that Complainant shows favoritism towards other Jewish colleagues through departmental appointments of administrative influence and power.

2. The alleged statement has caused a toxic environment in the Department of History between Jewish and non-Jewish colleagues.

**Methodology:**

In addition to Respondent and Complainant, OIE contacted and interviewed both the anonymous graduate student ("Graduate Student"), and three current faculty members representing various social identities, including race and gender. The witnesses will not be individually identified in this investigation report to protect their privacy and confidentiality.

In its due diligence to conduct a thorough investigation, OIE notified Respondent and provided him with an opportunity to submit a written response to the allegations. Respondent submitted email correspondence and documents for review. Subsequently, OIE met with Respondent and his advisor Katie Frank, Attorney at Law, Sergi & Associates, P.C., Attorneys at Law ("Advisor") on May 6, 2019, to discuss the claims and provide an opportunity for a broader

---

[1] HOP 3-3020 can be viewed here: https://policies.utexas.edu/policies/nondiscrimination-policy

discussion. Attorney Chris Hutto from the University's Office of Legal Affairs was also present for Respondent's interview.

The allegations were analyzed under the University's Nondiscrimination Policy (HOP 3-3020). Specifically, the provisions pertaining to nondiscrimination[2] were examined. OIE's preponderance of the evidence standard reviews all evidence, including witness credibility, to determine whether it is more likely than not that the conduct occurred as alleged. If the conduct did occur as alleged, then an analysis is completed to determine whether the conduct violated University policy.

To establish a nondiscrimination violation, the investigation must find that the Respondent more likely than not engaged in 1) behavior or conduct; 2) directed at a specific individual or group of identifiable individuals; 3) that subjects the individual or group to treatment; 4) that adversely affects their employment or education; 5) because of their race or religion. This may include as provided by HOP 3-3020, verbal conduct that is not necessary to an argument for or against the substance of any political, religious, philosophical, ideological, or academic idea.

In determining whether conduct was discriminatory, the OIE seeks written guidance from various agencies and departments, including the Equal Employment Opportunity Commission (EEOC).  Accordingly, a "reasonable person" standard is applied to the basic determination of whether or not challenged conduct is discriminatory.[3]

**Investigation:**

OIE initially met with Complainant on April 2, 2019 to discuss the allegations. Complainant claims Graduate Student shared that Respondent made the alleged anti-Semitic statements during a private casual conversation in Respondent's office.  No further parties were in attendance or participated in the alleged discussion.  According to Complainant, Respondent's alleged comments have caused tension and discourse within the Department of History between Jewish and Non-Jewish faculty in that many believe Complainant considers race and/or religion in her administrator leadership appointment decisions.

Respondent and Graduate Student were the only individuals present when the alleged statements were made.  However, Complainant states that gossip within the Department about Respondent's alleged statement has caused tension among the faculty.

---

[2] OIE is tasked with determining whether a violation of University policy (ies) has occurred. OIE bases its determinations on the preponderance of the evidence, which refers to the deliberative process that OIE uses to determine which evidence in the case produces the stronger impression, has the greater weight, and is the more convincing.  An OIE determination that University policy (ies) was violated does not imply that a violation of state and/or federal law occurred.

[3] U.S. Equal Employment Opportunity Commission Enforcement Guidance, Number N-915-050.

Complainant states that Graduate Student claims Respondent asked, "Did you know that Jackie Jones is Jewish?" and showed her a list of faculty salaries while going through the names designating those that belonged to Jewish faculty. Complainant states that she was also told that Respondent made statements to Graduate Student that she is "Head of the Jewish Kabbalah" and there was a conspiracy against non-Jewish faculty in the Department of History.

OIE met with Graduate Student on April 12, 2019, and they asserted that Complainant spoke with them about comments Respondent allegedly made about her.  Graduate Student stated that Respondent told them "Did you know that Jackie Jones was Jewish?" in the context of being concerned about the number of Jewish leaders that currently hold senior leadership roles within the Department of History.  Graduate Student asserts they explained Respondent's concern was in his capacity as the Equity Committee Chairperson, and that he showed them salaries of other faculty as an illustration that Complainant is biased and favors Jewish faculty.  Graduate Student states that it is their understanding that the Equity Committee created a report that disclosed salary disparities to the Department of History faculty.

OIE met with Respondent and his Advisor to discuss the allegations further.  Respondent asserts that he never made the alleged statements, and offers that he does not know which colleagues are Jewish, Baptist, or any other religion.  Additionally, Respondent asserts that he identifies as an Agnostic, and is not Anti-Semitic.

As the Chairperson of the Equity Committee, Respondent states that he never looks directly for a pattern based on ethnicity. However, through his research he found a lack of Hispanic leadership within his department over a number of years.  The Equity Committee reviewed information regarding the fifteen standing committees, statement on governance, promotion to tenure, and salary.  The Equity Committee reviewed a 10-15 year period and asked, "Is the Department of History being equitable in promotion?"

The Equity Committee asked if the Department of History could institute a rotation that would allow more depth in the selection process and diversity of leaders.  Respondent states that he never personally mentioned Complainant specifically in any of the deliberations regarding equity, and the Equity Committee did not offer individual critiques of Complainant.  Respondent views the racial and ethnic disparities in leadership as part of a pattern that reflects systemic racism.

According to Respondent, the Equity Committee requested equitable salaries, but instead Complainant is obstructing the process, disrupting the narrative, and retaliating against the group who are attempting to increase leadership diversity with the Department of History.

OIE interviewed three current Department of History faculty.  The following accounts were offered by each witness.

- Witness 1 claims that they never heard Respondent say anything anti-Semitic or derogatory when referring to inequalities within the Department of History leadership. According to this witness, Respondent reviewed the collected data and shared the inequities with Complainant.  Respondent has been critical of Complainant's refusal to implement a process that would increase equality, and has often referenced unconscious bias as the basis of misunderstanding by Complainant.

- Witness 2 states that some Hispanic faculty have complained about the lack of inclusion in the appointment process, lower salaries, and that others in the department are selected repeatedly for leadership positions. According to this witness, Complainant has favorites within the faculty that represent various racial groups, including white and black.

  Witness 2 asserts that they reviewed the department's leadership roster and it appeared to be a large group of Jewish and older/senior staff who make more than the average salary within the department.  According to Witness 2, it is not clear whether all the Department's leaders are Jewish.  However, in this witness' opinion, Complainant is in a position to help and promote "her own" which this witness defines as the Department favorites.

  Witness 2 claims that they have never heard Respondent say anything against Complainant, and views his work on the Equity Committee as a request for Latinos to be treated with the same respect as White colleagues.

- Witness 3 asserts that the Equity Committee used tabular data over a 15 year period, and discovered disparities with the faculty salaries. Witness 3 offers that they never heard Respondent or anyone on the Committee make a derogatory statement about the Complainant's appointments being based upon ethnic or religious backgrounds. According to this witness, Complainant saw the momentum growing to support a salary equity review and adjustment, and she allegedly appointed Committee members to subcommittees which took away their power to effectuate change. Witness 3 states that the subcommittees then reported to faculty, not the Committee who initiated the discussion.

**<u>Findings:</u>**

OIE interviewed three faculty witnesses identified by the parties, representing different races and genders who have interacted directly with Respondent.  None of the witnesses indicated that they experienced individually or witnessed inappropriate comments by Respondent regarding Complainant.  Each witness responded that Respondent reported on Department of History faculty salary disparities in his capacity as the Equity Committee Chairperson, but none heard anti-Semitic or derogatory comments towards Complainant or Jewish faculty.  Further, OIE interviewed Graduate Student who also shared that Respondent's alleged comments were made within his capacity as the Committee's Chairperson.

Although Respondent admits identifying salary inequities and advocating for equal appointments of Hispanic men on faculty, he denies making Anti-Semitic comments about Complainant.

Based upon the evidence obtained and witness interviews, OIE does not find that Respondent more likely than not engaged in the alleged behavior.  OIE examined the credibility of each witness and was unable to find supporting information or documentation that supported Complainant's allegations of race or religious discrimination by Respondent.

While OIE does not discount the purported experience of Complainant, OIE was unable to independently corroborate Complainant's allegations.  The facts do not support a finding that Respondent exhibited behavior or conduct directed towards Complainant or Jewish individuals that subjects them to treatment or adversely affects their employment or education because of race or religion.  The standard of proof has not been satisfied.

**<u>Conclusion:</u>**

OIE finds that there is INSUFFICIENT EVIDENCE that Respondent violated the University's Nondiscrimination policy. Therefore, the allegations herein are unsubstantiated. OIE will take no further action and considers this matter closed. OIE reserves the right to re-open this complaint should we receive additional information.

# RE: Table of Associate to Full promotions?

Exhibit 46

## Hsu, Madeline Y

Fri 4/19/2019 12:59 PM

To: Raby, Megan <meganraby@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>;

Cc: Alberto A. Martinez <almartinez@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>;

📎 1 attachments (29 KB)

Evaluation section.docx;

Hi everyone,

Attached is my draft of the evaluation section.  Please note that the first two pages provide a general introduction for our subcommittee's work.  Can you take a look and let me know if you feel comfortable with the statements I have made about our findings and recommendations?

Best regards, Madeline

---

**From:** Raby, Megan <meganraby@austin.utexas.edu>
**Sent:** Friday, April 19, 2019 12:48 PM
**To:** Brower, Benjamin C <benbrower@utexas.edu>
**Cc:** Hsu, Madeline Y <myhsu@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>
**Subject:** Re: Table of Associate to Full promotions?

Yes, please, I think it would be really valuable to hear his experiences.

Megan Raby
Assistant Professor
Department of History
University of Texas at Austin

www.meganraby.com
New book: American Tropics: The Caribbean Roots of Biodiversity Science

On Apr 19, 2019, at 12:46 PM, Brower, Benjamin C <benbrower@utexas.edu> wrote:

Hello all, I just had a coffee with James and he said he'd be willing to share his experiences with Lina and Megan, writing the Assistant part of the report.  I add this because I remember that we had discussed the availability of "exit interviews"

Best, Ben

Benjamin Claude Brower
Associate Professor

**Department of History, Equity Committee, Promotions Procedures Subcommittee Report**

**Subcommittee members**: Madeline Hsu (chair), Ben Brower, Lina Del Castillo, Yoav Di-Capua, Al Martinez, Megan Raby

**Subcommittee charge:**

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent, with the caveat that the University and the College impose rules and guidelines that also govern departmental procedures. This subcommittee will analyze policies and procedures related to both promotion to full professor and promotion to associate professor with tenure. Factors to be considered (but are not limited to) the Third Year Review, peer observations of classes, mentoring, and service obligations, with the goal of helping faculty to advance in rank.

We have made our deliberations recognizing that equity may be defined and therefore evaluated in various ways.  The impetus for starting the Equity Committee stemmed from observations of inequality of outcomes between History faculty in areas such as salaries, graduate students admitted, endowed chairs, research funds, teaching awards, major service appointments, teaching schedules and loads, promotions rates and successes, election to the EC, and many other resources, markers of status, and departmental support.  Trying to evaluate equity issues directs attention as to why inequality of outcomes have been produced.  Are such differential outcomes related to inequality of access?  Are there measures that the department can undertake and wishes to undertake to address these inequities?  This subcommittee deliberated with the understanding that the department can primarily seek to accomplish equality of access to information, opportunities, and support but cannot guarantee equality of outcomes because of the complexity of factors attending individual faculty trajectories.

**General Findings:**

Overall, in the 27 cases of promotion processed by the History Department 2009-2019, this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender. 21 of the 27 cases were successful; all 12 cases of promotion from associate to full went through while only 9 of 15 cases of assistants seeking promotion and tenure went through.  Of the promoted faculty, 10 of 21 were women and 11 of 21 were persons of color.  The 6 faculty failing to receive

promotion and tenure, span the spectrum in terms of race, ethnicity, and gender.  Some of these candidates received positive or evenly split votes in the department, only to be turned down at the College and Presidential levels.  Please see the appendix at the end of this report for the full listing of these 27 cases.

Although this subcommittee did not find discernible patters of inequity in promotions outcomes, we did find considerable inconsistency and variation in individual trajectories to promotion that should be addressed by changes in departmental policy and practices. We also call attention to recent major changes in University policy which impose a limit of 12 years during which associate professors must seek promotion to full or face conversion to a 3-3 teaching load.  In a book field such as history, for which the primary requirement for promotion is a major project requiring years of work, this recent policy change has abruptly pulled the rug from under many colleagues who have been highly productive in many major areas of academic activity, including major leadership positions and institution building projects, whose publication output has ebbed as a consequence.  The narrow framing of academic work considered for promotion to full based on publications and research fails to acknowledged the breadth of important work that is required to operate a university of the first rank.  We discuss these findings and our recommended actions in the following sections concerning promotion from assistant to associate, promotion from associate to full, and evaluation processes.

**Department of History, Equity Committee, Promotions Procedures Subcommittee Report**

**Subcommittee members**: Madeline Hsu (chair), Ben Brower, Lina ~~dD~~el Castillo, Yoav Di-Capua, Al~~berto~~ Mart~~íi~~nez, Megan Raby

# Exhibit 47

**Subcommittee charge:**

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent, with the caveat that the University and the College impose rules and guidelines that also govern departmental procedures. This subcommittee will analyze policies and procedures related to both promotion to full professor and promotion to associate professor with tenure. Factors to be considered (but are not limited to) the Third Year Review, peer observations of classes, mentoring, and service obligations, with the goal of helping faculty to advance in rank.

We have made our deliberations recognizing that equity may be defined and therefore evaluated in various ways. The impetus for starting the Equity Committee stemmed from observations of inequality of outcomes between History faculty in areas such as salaries, graduate students admitted, endowed chairs, research funds, teaching awards, major service appointments, teaching schedules and loads, promotions rates and successes, election to the EC, and many other resources, markers of status, and departmental support. Trying to evaluate equity issues directs attention as to why inequality of outcomes have been produced. Are such differential outcomes related to inequality of access? Are there measures that the department can undertake and wishes to undertake to address these inequities? This subcommittee deliberated with the understanding that the department can primarily seek to accomplish equality of access to information, opportunities, and support but cannot guarantee equality of outcomes because of the complexity of factors attending individual faculty trajectories.

**General Findings:**

Since 2009 there have been 21 Assistant Professors who either earned tenure or departed without it. From 2009 until 2019 the History Department submitted 20 applications for tenure, and 11 of those have been successful: 55%. (Two Assistants were each denied tenure twice). Thus, ten Assistant Professors departed without tenure (7 were denied tenure, plus 3 resigned). Among these ten

departures, 50% were minorities and 60% were women. The three Assistants who resigned did not expect to receive tenure in our department.

The 7 faculty who failed to receive tenure, span the spectrum in terms of race, ethnicity, and gender.  Some of these candidates received positive or evenly split votes in the department, only to be turned down at the College and Presidential levels. A few candidates received mostly negative votes in the EC.

In the area of promotions to full professors, the Department submitted 14 cases to COLA from 2009 until 2019. There were 13 promotions to full Professor, and only 1 denial (a Hispanic professor who was subsequently promoted, making the thirteen promotions).

Adding together all the applications for promotions (to tenure or full professor) submitted to COLA in 2009-19, we find that there were 34 cases (including 3 men who each applied twice), and altogether, 24 cases (70%) were successful. Please see the appendix at the end of this report for the full listing of these 34 cases.

This subcommittee does not find patters of inequity in promotions outcomes, if we do not consider faculty who resigned before going up for tenure. However, if we do consider the latter, it seems unfortunate that our department lost 10 assistant professors in 10 years, mostly women and including 50% minorities.

Original:

Overall, in the 28 cases of promotion processed by the History Department 2009-2019, this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender. 21 of the 28 cases were successful; all 12 cases of promotion from associate to full went through while only 9 of 16 cases of assistants seeking promotion and tenure went through.  Of the promoted faculty, 10 of 21 were women and 11 of 21 were persons of color.  The 7 faculty failing to receive promotion and tenure, span the spectrum in terms of race, ethnicity, and gender.  Some of these candidates received positive or evenly split votes in the department, only to be turned down at the College and Presidential levels.  Please see the appendix at the end of this report for the full listing of these 27 cases.

Although this subcommittee did not find discernible patters of inequity in promotions outcomes,

In addition, we did find considerable inconsistency and variation in individual trajectories to promotion that should be addressed by changes in departmental policy and practices. We also call attention to recent major changes in University policy which impose a limit of 12 years during which associate professors must seek promotion to full or face conversion to a 3-3 teaching load.  In a book field such as history, for which the primary requirement for promotion is a major project monograph requiring years of work, this recent policy change has abruptly pulled the rug from under many colleagues who have been highly productive in many major areas of academic activity, including major leadership positions and institution building projects, whose publication output has ebbed varied as a consequence.  The narrow framing of academic work considered for promotion to full based on publications and research fails to acknowledged the breadth of important work that is required to operate a university of the first rank.  We discuss these findings and our recommended actions in the following sections concerning promotion from assistant to associate, promotion from associate to full, and evaluation processes.

## INTERIM EQUITY REPORT OF THE CHALLENGES
## OF PROMOTION TO FULL PROFESSOR

Many of the equity problems that present themselves in the promotion and tenure of Assistant Professors apply to the promotions of Associate.  However, Associates face some unique issues and this Report will focus on these.

From 2009 until 2019, there have been at least a dozen faculty who are or were Associates for 15 years or more. Since there are roughly sixty T-TT faculty in our department in a given year, then 15/60 = 25% of our faculty are or were Associates for 15 years or more. If Assistant professors are excluded from the denominator, then the percentage is higher.

Overall, including promotions to full that have not been yet completed, the average time from first year as an Associate at UT until first year as full Professor is:  more than 14 years. Or, if we exclude from the calculation those who haven't yet been promoted, then the average time from 1st year as Associate at UT until first year as full Professor is:  9 years. The quickest time to full professor has been 3 years.

The History Department currently has 21 Associate Professors, nearly 1/3 of our faculty, who will go through the process of promotion to Full Professors in the coming years.  Academic careers follow ~~many separate~~various paths, and within this group there is considerable variation in terms of time in ~~position~~ rank and, most critically, in terms of the overall professional profile and contribution to ~~the~~ our UT campus. By and large, this cohort ~~could~~ may be divided into two different groups. The first is comprised of Associate Professors who ~~will~~ start the promotion process to Full Professor no later than twelve years after their ~~last~~ promotion to the rank of Associate ~~Professor~~. The second group consists of colleagues who have been in the position of Associate Professors for more than twelve years. With the mandate of equity in mind, this report is mostly concerned with what the department can do in order to ~~guarantee~~ produce a successful and fair process ~~to~~ for this second group.

Why is this ~~is~~ an equity issue?

As ~~faculty members~~we ~~already~~ know, in the last few years both COLA and now also the Provost's Office, have introduced significant changes with regard to the necessary requirements for promotion to Full Professors. ~~Many of these~~Such changes are significant and some might constitute an actual contractual change. Although we are still in the process of trying to fully understand ~~the~~

~~specific nature of~~ these changes and receive an updated set of standards (especially from the Provost~~'s~~ Office and the Presidential Committee), it is clear that colleagues who have been in rank for more than twelve years ~~have become extremely vulnerable~~will be affected. At the heart of this vulnerability is the administrators' suspicion that such professors have "disengaged" from their work. ~~Even the most critical assessment of our colleagues does not reveal any~~ In actuality, however, our Associate Professor~~s~~ have not ~~who has~~ disengaged in our Department.  Instead, we find colleagues who have made a variety of contributions, ~~and experience shows that these will~~ yet we worry that they might not be measured equally.  In particular, service does not seem to carry much weight at the COLA level and beyond, even when such service is truly exceptional, making long-lasting contribution~~s~~ to our ~~the UT~~ campus, the academic field, and communities. Thus, the extraordinary contribution~~s~~ of faculty members risk being overlooked, even if they consume massive amounts of scholars' time. Associate Professors have~~who~~ directed programs, chaired other departments, units and schools and/or contributed in significant ways to campus life and to ~~the~~ develo~~p~~ping~~ment of~~ teaching pedagogy~~.~~, ~~risks being overlooked, even as it consumes massive amounts of a scholar's time.  Concomitantly,~~Therefore, the goal of this report is to ~~suggest~~ propose ways in which the History Department can ensure that it highlights these scholars' achievements and ensure that their promotion file correctly and accurately states their contribution.

**Publication rate and publication impact**

**Recommendations:**

A.  Retrieving Institutional Memory via a revamped Service Report: How to account for and ensure the recognition of *extraordinary service*?  We propose to significantly substantiate the process by which the EC's sub-committee on Service approaches preparing its report. By and large, the research profile and trajectory of each candidate attracts the most attention, and this is justified ~~in as much~~inasmuch as research is a primary consideration for promotion at all levels.  However, such outsized attention to research ~~risks overshadowing~~obscures other elements in a candidate's file, including the service of Associate Professors who have been in rank more than twelve years. Simply put, the Service report normally gets very little attention. The data which is required to compose it is retrieved simply from the candidate's service report and department's data. These sources are likely to fall short of accounting for extraordinary service and do not fully explain the work of colleagues who ran programs, departments, centers and academic units. Just as outside letters help unpack a candidate's research profile, highlighting contributions that might not easily reveal themselves to the uninformed eye, so too a more informed and dynamic analysis of service can reveal contributions that might otherwise go unseen.  To begin to close this gap and properly account for service achievements, we propose that in the relevant cases the sub-committee

on Service would actively interview members of the department and colleagues in other pertinent departments, as well as people who have worked with a candidate in ~~extra muros~~extramural service (including community service). It should also entertain the possibility of interviewing the candidate and anyone else that the candidate ~~would wish~~wishes to include in this process. [GD Service is only given so much weight in promotions considerations, and will not exceed that weight. Even if evidence is added and more service documented, it still will not be weighted more.  GD/AK did support idea of trying to get new Dean to give greater emphasis, but do not think it will happen at the Tower level.]

B.  <u>Teaching</u>: In some cases,  similar process is also relevant in the case of teaching and unique contributions to the development and dissemination of pedagogy.

C.  <u>Ad-Hoc Representation</u>: Buttressing the effort of reconstructing institutional memory, we propose that the candidate for promotion would nominate one individual that can best advocate for their case and have witnessed ~~first-hand~~firsthand and over many years, the ~~accumulative~~ cumulative impact of their labor (including teaching and leadership). This nominee would become part of the overall EC's evaluation process and would have full voting rights.

D.  <u>Candidates with "split appointment"</u>: Colleagues who have "split appointments" are also vulnerable to the same process by which a sound institutional memory of their labor might be lost or misunderstood.

E.  <u>A Political Effort</u>: While the Department is very limited in terms of its ability to influence promotion criteria on the level of COLA and beyond, we recommend that the Chair would bring the situation of the second category of Associate Professors to the attention of the new dean. In particular, we are concerned about the application of  indices such as "publication rate" (it is rumored that the Provost~~'s~~ O~~o~~ffice is considering such new evaluation tools).

**Section: Evaluation Procedures**

**Faculty Input:**  Please note that some suggestions made by faculty conflicted with University policy or were not congruent with actual departmental practices.  These contradictions will be noted in comments in brackets.


-There was a general consensus that the CIS teaching evaluations are incapable of providing useful or insightful measures of teaching success and that they discriminate on the basis of gender, race and ethnicity, and age. [Jackie Llado: "There were some inaccuracies in terms of procedure and policy that were discussed during the open meeting. For example, one of the suggestions is focusing on the Teaching Portfolio to offset biases in CIS scores and student written comments. The Teaching Portfolio is not sent to the President's Committee as it's a COLA specific requirement [University requirement but doesn't get sent up to Tower AK]. Discrepancy in CIS scores and comments are explained in both the Chair's letter and the Scholarship Committee's letter on teaching. They can also be addressed in the candidate's Teaching Statement."

Jackie Jones: "CIS scores: In my Chair's letter I always address CIS scores that I think are unfair or unwarranted.  At times that means that I provide additional information related to a particular course—the challenges of teaching it, reasons why some students might have given less than favorable scores—and other times I consider where there might be a discrepancy between the peer observations (usually glowing) and the CIS scores (which might be ambiguous).  I also encourage candidates when they are writing their teaching philosophy statement to be candid about the challenges they face in the classroom, or have faced in a particular class.  Both the Dean's P&T Committee and the President's Committee are looking for evidence that the candidate has engaged in a measure of self-reflection when it comes to teaching; at times that means explaining (not explaining away) less than stellar CIS scores, in a specific class, or a specific section of the class, or overall.  // My point here is that no candidate for promotion is (or should be) at the total mercy of a particular number or score, as there are several places in the file where contextual evidence can be introduced. //In my letter I always include boilerplate language about the fact that we are a book discipline and so we do not consider citations as a measure of a colleague's work or prominence in the field.  (The social sciences and sciences use this metric.)  If your committee wanted to craft some language about the inherent unreliability of CIS scores, I would be glad to include that in any letter I write, though that might be a bit problematic for someone who has very  high scores across the board." ]

-Perhaps the most popular suggestion was that votes on promotion should extend beyond the EC to the entire department in order for more faculty to have input into the process and for greater transparency.  Without violating privacy requirements, files should be made available to the entire department and all faculty exert due diligence to cast informed votes.  Several colleagues also suggested that the department take votes by the EC and by the department and that both be sent up to the College and Tower for consideration.  [Several colleagues objected that the Department had used department wide voting under the Budget Council structure, and that participation had been low.  As nonvotes will be held against candidates, opening up voting in this way seems detrimental to faculty.  Jackie Llado:  "The EC vote was also discussed in the meeting. This is a University rule and the vote breakdown is included as the first page of the promotion dossier, including number of abstentions and illegible members (assistant profs cannot vote and associates cannot vote on promotions to full prof). I don't think that we can have the entire department vote on promotion cases because the University guidelines state that the department's governing body must vote on promotion. We also have to consider issues of privacy with regards to giving access to the full dossier to all faculty."]

-Some faculty advocated that membership on the EC should rotate more so that more faculty have opportunity to vote on promotion cases.  [This matter falls more under the brief of the Governance subcommittee.]

-Indrani Chatterjeei: Experience from other institution – in between device. All department members who were interested in a case have access to work and to the external letters. Kept in file with chair. Interest in voting and promotion and package go and sign names. A record we were reading. For that to be fruitful: we need a discussion on privacy. Also think about letters and read them how prior to vote. The whole intellectual thrust might not be intelligible, but at least sense for how experts talk about it. That could be a way of sharing information and gathering opinion and consensus. [Jackie Jones:  "…all members of the department have an opportunity to speak to the scholarship, teaching, and service of candidates up for promotion.  That meeting usually takes place very early in the fall semester, because departmental decisions are due in the Dean's office by September 15. Not many colleagues take advantage of that opportunity it seems to me; I'm not sure why that is the case.."]

-Several faculty [Erika Bsumek, Emilio ZamorraZamora, Martha NeumanNewman] urged that advocacy for faculty be strengthened by opening up membership on the Research Committee to interested friends of the faculty and/or colleagues with close areas of expertise.  [Madeline specified

that professional evaluations of colleagues should be handled on the basis of expertise, not friendships, which introduce inequitable considerations of popularity and personal networks into what should be workplace procedures.]  This sounds odd. I don't recall Erika, Martha, or Emilio saying that friends should be in the EC to vote. E.g., Emilio wasn't a friend of Anne, John, or Neil, his point was that he's an expert in Mexican American history and yet he was never involved in writing scholarship reports or voting.

-Faculty noted lack of clarity about how key terms such as "trajectory" and "time to tenure" are evaluated.

-Faculty noted that some colleagues with books on the table were denied promotion because their major publication was deemed "not important."  There should be greater clarity and standardization of how quality of publications are determined.

-From the Climate Survey: "Don't have mentors that write negative letters about their own candidates. I've seen this happen in our department at least twice. Please make the best case, not the worst. Please apply rules equally: if a year is "off the clock" write down what that means; e.g., it can't be used against the candidate at all. PLEASE let expert outside peer reviewers be used (it's not their fault if they're not in a peer university). PLEASE let experts be used who live in foreign countries. PLEASE change the system so that all tenured and full professors vote in all tenure cases."

**Recommendations:**

As noted in the other two sections, faculty should receive uniform information regarding processes and standards for promotion that is as updated as possible.  This information should be applied consistently in evaluation processes so that faculty will have a clear understanding of how each item will be weighed.  Of particular note are the following items:

-Evaluations of quality of scholarship are very uneven, and can be detrimental for faculty whose expertise is more specialized.  This committee recommends that the department ensure that the Research Committee includes colleagues with the closest fit in terms of expertise.  Furthermore, we recommend that the EC honor the evaluations made by external letter writers who are recruited because they are leading scholars in the faculty's research specialization, rather than setting them aside if members of the EC, who do have the ~~same levels of~~comparable expertise in the same area, disagree.

-How years ~~from~~ since the PhD to promotion will be weighed in terms of expected productivity varies from faculty to faculty.  There should be greater transparency and a consistent standard of

how years ~~from~~ in rank~~PhD~~ will be evaluated.  Factors complicating this include faculty who arrive from other positions, clock stoppages for fellowships, family leave, and illness.

-Outside letters be solicited from leading experts in the faculty's field of expertise, and that greater leeway be provided so that scholars from non-peer institutions, but who are leading experts, be included among outside reviewers.  If there is a strong mix of letters, at least one could be from a leading scholar from a nonpeer institution, with additional explanation of their centrality for that subfield.

Alberto Martínez's summary of promotions since 2009:

Since 2009 there have been 21 Assistant Professors who either earned tenure or departed without it. From 2009 until 2019 the Department has submitted 20 applications for tenure, and 11 of those have been successful.

11 Assistant Professors (out of 21) were promoted to tenure:

2019     (10) Lina del Castillo, (11) Megan Raby

2017     (9) Abena Osseo-Asare

2016     (8) Tatjana Lichtenstein

2012     (7) Ben Brower

2010     (6) Yoav di Capua

2009     (1) Tiffany Gill, (2) Frank Guridy, (3) Huaiyin Li, (4) Alberto Martinez, (5) Karl Miller

(Li had tenure at Missouri, but was hired as an Assistant at UT in 2006 and was promoted to Associate in 2009)

10 Assistant Professors departed without tenure:

2019     James Vaughn                              denied tenure

2017    Ruramisai Charumbira            denied tenure

2014    Anne Martinez                   denied tenure

2013    John McKiernan-Gonzalez     denied tenure twice: 2012 and 2013

2011    Susan Boettcher                 denied tenure

2011    Carolyn Eastman                 denied tenure

2011    Roger Hart                      denied tenure twice: 2010 and 2011

2011    Abigail Lustig                  resigned, expected not to get tenure

2009    Kim Alidio                      resigned, expected not to get tenure

2009    James Wilson                    resigned, expected not to get tenure

7 individuals were denied tenure; in 9 tenure denials, plus 3 resignations.

10 departures total without tenure (60% women), including 5 minorities (50%).


Promotions to full professors: 14 cases

13 Promotions to full Professor, and 1 denial (who was subsequently promoted)


2019    (14) Yoav Di-Capua

2018    (13) Daina Berry

2017    (12) Cynthia Talbot

2016    (11) Madeline Hsu

2015    (10) Alberto Martinez

2014    (8) Seth Garfield, and (9) Denise Spellberg

2013    (7) Mary Neuburger

2010    (4) Neil Foley, (5) Virginia Garrard, and (6) Leonard Moore

2009    (1) Julie Hardwick, and (2) Huaiyin Li    -- (3) Neil Foley was denied promotion


Jackie Jones summary of promotions since 2009-10:

To Full: Daina Berry (US), Yoav Di-Capua (AAME); Al Martinez (EUR); Cynthia Talbot (AAME); Madeline Hsu (US/AAME); Virginia Garrard (LAS); Leonard Moore (US); Neil Foley (US); Huaiyin Li (AAME); Mary Neuburger (EUR); Mark Metzler (AAME); Seth Garfield (LAS).

[No one who came up for full was denied promotion.] Neil Foley, denied 2009

To Associate: Karl Miller (US); Frank Guridy (LAS); Tiffany Gill (US); Yoav Di-Capua (AAME); Tatjana Lichtenstein (EUR); Abena Osseo-Asare (AAME); Megan Raby (EUR); Lina Del Castillo (LAS); Ben Brower (AAME/EUR).

Denied promotion to Associate: James Vaughn (EUR), Ruramisai Charumbira (AAME), Carolyn Eastman (US), John McKiernan-Gonzalez (US), Roger Hart (AAME), Anne Martinez (US), *Susan Boettcher (EUR)

*Not in Jackie Jones' summary, added by Bruce Hunt

Promotions to Full Professor compiled by Al Martinez:

| Faculty | First year at UT as Associate | First year as a Full | Years to promotion |
|---|---|---|---|
| George Forgie US | 1980 | | 39+ |
| Michael Stoff  US | 1986 | | 33+ |
| Bob Olwell  US | 1999 | | 30+ |
| Neil Kamil   US | 2000 | | 29+ |
| Susan Deans-Smith LAS | 1991 | | 28+ |
| Bruce Hunt  ST | 1992 | | 27+ |
| Charters Wynn  EUR | 1995 | | 24+ |
| Martha Newman  EUR | 1996 | | 23+ |
| Judy Coffin  EUR | 1997 | | 22+ |
| Alison Frazier  EUR | 2004 | | 15+ |
| Mark Lawrence  US | 2006? | | ~13? |
| Laurie Green  US | 2008 | | 11+ |
| Matthew Butler  LAS | 2008 | | 11+ |
| Erika Bsumek  US | 2009 | | 10+ |
| Tracie Matysik  EUR | 2009 | | 10+ |
| Ben Brower  AAME | 2012 | | 7+ |
| T. Lichtenstein  EUR | 2016 | | 3+ |
| <span style="color:red">A. Osseo-Asare   AAME</span> | 2017 | | 2+ |
| Aaron O'Connell  US | 2017 | | 2+ |
| ***Promotions to full professor, which have been completed*** | | | |
| Denise Spellberg   AAME | 1996 | 2014 | 18 |
| Cynthia Talbot  AAME | 2001 | 2017 | 16 |
| <span style="color:red">Neil Foley   US</span> | 1997 (denied 2009) | 2010 | 13 |
| Joan Neuberger  EUR | 1994 | 2007 | 13 |
| David Crew  EUR | 1987 | 1998 | 11 |
| Jonathan Brown  LAS | 1983 | 1993 | 10 |
| Seth Garfield  LAS | 2004 | 2014 | 10 |
| <span style="color:red">Madeline Hsu   AAME/US</span> | 2006 | 2016 | 10 |
| Yoav Di-Capua  AAME | 2010 | 2019 | 10 |
| Julie Hardwick  EUR | 2001 | 2009 | 8 |
| Mary Neuburger  EUR | 2006 | 2013 | 7 |
| <span style="color:red">Daina Berry  US</span> | 2012 | 2019 | 7 |
| Bob Abzug  US | 1984 | 1990 | 6 |
| <span style="color:red">Alberto Martinez  ST</span> | 2010 | 2015 | 5 |
| Virginia Garrard  LAS | 2006 | 2010 | 4 |
| <span style="color:red">Huaiyin Li    AAME</span> | 2009 | 2012 | 3 |
| <span style="color:red">Leonard Moore   US</span> | 2007 | 2010 | 3 |

Re: Reschedule portion of Promotions report to May 8?

# Exhibit 48

## Del Castillo, Lina M <delcastillo@austin.utexas.edu>

Sat 4/27/2019 3:31 PM

**To:** Raby, Megan <meganraby@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>
**Cc:** Brower, Benjamin C <benbrower@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Alberto A. Martinez <almartinez@austin.utexas.edu>

🖿 1 attachments (70 KB)
P&Treport_04_27 Lina additions.docx;

Dear All,
I did notice a few things missing from the version Megan sent. Madeline, please use this as our final version for the final report.

I can understand the frustration that comes from dealing with these issues over email (face to face is much better -- but this would require another meeting, aaak!)

I nevertheless do want to address a few points Madeline brought up. I especially want to clarify why I consider including information about ALL the people we hired for a tenure track position (including those who resigned prior to undergoing the process) matters as a question of equity. (This might be a bit long, but please bear with me).

First of all, I do appreciate how seriously we are all taking this issue; it is a sensitive one.

Madeline, you are right; I do not have the memory of what happened in the resignation cases. I did not have direct experiences with the people involved. From my point of view, my lack of knowledge about these cases is a reflection of the lack of institutional historical memory suffered by us as a department.

==Madeline, it is concerning to me that you do not agree that we should include statistical information on all the people hired as assistant professors.==

I am still not entirely clear on the reason why you do not think this is an equity issue. Are you familiar with the concept of PhD to Tenure Track pipeline (and leaks thereof?) I found a few articles from STEM, where most of this kind of research has been done:
https://www.nationalpostdoc.org/m/custom_page.asp?page=postdocket_04185m
https://www.jstor.org/stable/41328583?seq=1#metadata_info_tab_contents

Political Science also at least one study focused on Latinos and Latinas in particular:
http://web.apsanet.org/cswp/wp-content/uploads/sites/4/2017/01/leaky-pipeline.pdf

---

## web.apsanet.org

Title: Diagnosing the Leaky Pipeline: Continuing Barriers to the Retention of Latinas and Latinos in Political Science Created Date: 20170124185125Z

web.apsanet.org

---

Re: Quick recap of May 1 meeting

Exhibit 49

Raby, Megan <meganraby@austin.utexas.edu>
Tue 5/7/2019 12:07 PM

**To:** Hsu, Madeline Y <myhsu@austin.utexas.edu>
**Cc:** Alberto A. Martinez <almartinez@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>; Brower, Benjamin C <benbrower@utexas.edu>; Jones, Jacqueline <jjones@austin.utexas.edu>

Dear Madeline,

I'm disappointed that the version of the report that this subcommittee last saw is not the version that actually went out to the department. I was satisfied enough with the final version you sent to us where you noted "A majority of subcommittee members found it important to include the information that this rate falls to only 52%...," whereas "the dissenting subcommittee member" disagreed. The version you sent to the department without first showing us is not accurate in stating "Several subcommittee members" rather than the majority. Although you note that the report reflects a range of views, it should accurately report this range. I respectfully request that you correct this statement.

Thank you for agreeing to correct the tenure case success percent to 61%. I request that you also accept the other corrections to data (such as the inverted counts of minorities and women) and name spellings that Al has taken the time to make.

I also strongly request that you remove the citation of Ted Gordon who clearly does not agree with this characterization of his position. To dismiss it by saying he's not familiar with the specific cases is not relevant to his 1st point ("The 52% is certainly pertinent to discussions of the retention of diverse faculty members") and not tenable in relation to his 2nd point ("It is directly pertinent to the tenure rate if there is evidence that the three left because they were counseled out or otherwise were made to believe that they would not be promoted if they had stayed and gone up"). You have repeatly stated the latter was indeed the case with the individual cases you were familiar with. Please note, as I have stated from the beginning, this has *nothing* to do with us making a claim that any of these individuals indeed should have have gone up or should have been promoted—I have *never* argued that. What I and others on this subcommittee have been arguing is that this is data directly pertinent to the overall hiring-to-tenure-case trajectory examined by the subcommittee, and hence should be accurately stated in the introduction of this subcommittee's report. You suggest that instead of correcting these statements in the introduction, we should write a separate section on the resigned Assistants, but, first, this would not address these specific objections, and second, such a section is not possible given that we do not have necessary data (having not conducted exit surveys, as we discuss in the report).

I don't think it is correct that that this subcommittee "did not agree on many fundamental issues"— the matter of tenure and retention rates is the only fundamental issue we've been disagreeing about. In fact, I hope that none of this overshadows the fact that the subcommittee has been in complete agreement about the actual recommendations put forth in the report.

Thank you,
Megan

Megan Raby
Assistant Professor
Department of History
University of Texas at Austin

www.meganraby.com
New book: *American Tropics: The Caribbean Roots of Biodiversity Science*

On May 7, 2019, at 11:00 AM, Hsu, Madeline Y <myhsu@austin.utexas.edu> wrote:

Dear Al,

As noted in the chair's introduction, this subcommittee did not agree on many fundamental issues.  Nonetheless, the report as drafted reflects the range of views as well as those holding them.  Hence my decision to attribute primary authorship to each of the sections.

I will change the percentage from 66 to 61 but will not change other aspects of my chair's introduction.  Based on Ted's own decisions with faculty associated with AADS, I am surprised by his evaluation of the history department's history, but assume that it stems from his lack of knowledge of the situations.

If you and others wish to write up a section regarding the assistants who did not go up for tenure, please do so and it can be included in the report.

Best regards, Madeline

**From:** "Alberto A. Martinez" <almartinez@austin.utexas.edu>
**Date:** Tuesday, May 7, 2019 at 10:49 AM
**To:** Madeline Hsu <myhsu@austin.utexas.edu>, "Del Castillo, Lina M" <delcastillo@austin.utexas.edu>, "Raby, Megan" <meganraby@austin.utexas.edu>, "Di-Capua, Yoav" <ydi@austin.utexas.edu>, "Brower, Benjamin C" <benbrower@utexas.edu>
**Cc:** Jacqueline Jones <jjones@austin.utexas.edu>
**Subject:** Re: Quick recap of May 1 meeting

hi Madeline,

in your email you say again that our department's rate of promoting assistants who apply for tenure is 66%; please note again that it's actually 61% as I said in last week's meeting, and as your table at the end of your draft clearly shows. When revising, also please include the corrections I emailed on April 28th and again on the 29th, which as I wrote, include "three names were misspelled, some faculty counts are wrong, the counts of minorities and women were mistaken (inverted), as was a count of individual promotions, a few acronyms were undefined, three percentages were wrong," etc.  I attach it again as a pdf.

As for the other major significant figure, the 52% of assistants overall who were promoted (excluding 48% in resignations and tenure denials), you chose to move it to a footnote whereas we first had it in the main text. Please move it back to the main text since the info in that footnote is just inaccurate. As you fairly wrote in our original version "A majority of subcommittee members found it important to include the information that this rate falls to only 52% if all assistant professors who were hired and did not receive promotion are considered," whereas "the dissenting subcommittee member," yourself, disagreed. The footnote that you later added, however, without showing it to us before sending it to the department, pluralized: "dissenting subcommittee members," and downsized the actual majority to just "Several subcommittee members."

Regarding the other point you made, that the information about 52% "is noted but not included in the main report because Vice-Provost for Diversity, Edmund T. Gordon categorizes cases where faculty have not produced monographs as not involving issues of equity or diversity as individual faculty are responsible for meeting stipulated workplace standards," I ask that you please remove it because again it just isn't correct. It didn't make sense to me so I emailed Ted and asked him whether you consulted him about this and whether he agreed that the information should be excluded.

He replied, below, that he actually didn't say this, especially in the present context, and that "The 52% is certainly pertinent to discussions of the retention of diverse faculty members. It is directly pertinent to the tenure rate if there is evidence that the three left because they were counseled out or otherwise were made to believe that they would not be promoted if they had stayed and gone up."

Thus, for example, in the case of James Wilson, he was making good progress on his book manuscript, finished all chapters, but had had a bad Third Year Review, and a non-functional relationship with his mentor which made him conclude that he wouldn't get tenure here, so he left. Abigail too believed that she wouldn't be promoted if she stayed and went up, and Kim believed it so much that she stayed until the end but did not apply for promotion, having no book in hand, whereas others, such as Susan Boettcher, did apply for tenure, though having no book in hand or in production, no full manuscript. I also remember that Kim told me that if she had known that she'd get an extra year at UT by applying for promotion but being denied, she would have applied.

I certainly don't think our report should get into the specifics of any one case. The main point is just that the majority of members in our committee do agree that the 52% is an important aspect of the data that should be included in the main text of the report, not excluded in a footnote. So, please stet this.

Thanks,
Al

Alberto A. Martinez
To:  Gordon, Edmund T
Sent Items
Yesterday, 9:21 AM

hi Ted,

I hope you're very well; thank you for taking the time to kindly help our University provide a fair retention offer for Prof. Paul Bonin-Rodriguez, in Theatre and Dance -- I'm super glad that it enabled him to remain at UT.

On another topic, I have a quick question. In my History Department I'm in a subcommittee that analyzes our faculty promotions. We're finishing a Report, and there's a question of whether we can discuss in it the low rate with which Assistants in our department have managed to earn tenure. From 2009-2019, we had 11/21 = 52% of our Assistants get tenure, while the 10 who didn't consist of 7 who were

# meeting last week

Exhibit 50

Alberto A. Martinez

Sun 5/5/2019 10:31 PM

Sent Items

To: Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>;

hi Lina and Megan,

welcome back.  I meant to write and now I saw Madeline's email.
In the meeting last week, Susan presented and discussed info about the Curriculum and Scheduling subcommittee. Afterward, Madeline spoke and then we had a few faculty voice comments or questions. Near the end, I spoke and explained the following:

(1) some of the numerical data in the draft is mistaken/not final -- and as an example I noted that whereas p.1 and the last page of the report state that our promotion rate is 61% (11/18) the top of p.2 wrongly states 66% and compares it to 85%, a mistake that Madeline repeats below.

(2) I explained that if I were a 1st year Assistant Professor I'd like to know what are the chances that I will eventually be tenured, and to that end, therefore we should also count how many of our Assistant Professors left without tenure, including James Wilson, Kim Alidio, and Abigail Lustig. And so, I said that when we do that we find a troubling fact that only 52% of our Assistants were tenured while the rest left without it, and I said that our department should confront this fact.

(3) I also noted that it's concerning that HALF (5/10) of the faculty that left without tenure were minorities, given that roughly only 25% of all our faculty are minorities.

(4) Finally, I explained that there's a significant issue of gender that needs attention, which is that in all three categories: women, white women, and women of color, our female faculty have received tenure at a lower rates than males in our department, ranging at a greatest difference between 75% tenure rate for men of color and 50% of tenure rate for white women, as evinced in Madeline's table at the end. (I should've also said that the highest rate of tenure for our female faculty, 60%, is the Lowest for our male faculty 60%, again, in Madeline's table.)

Best,
Al

---

**From:** Hsu, Madeline Y
**Sent:** Sunday, May 5, 2019 5:01 PM
**To:** Del Castillo, Lina M; Raby, Megan
**Cc:** Di-Capua, Yoav; Brower, Benjamin C; Alberto A. Martinez; Jones, Jacqueline
**Subject:** Quick recap of May 1 meeting

Hi Megan and Lina,

So that you have some orientation for your discussion of the Promotions Procedures Subcommittee section on promotions for assistants to associate professors on May 8, I am sending you the summary of the general points and recommendations I presented on May 1.

1)      The subcommittee did not find patterns of inequity based on gender, race or ethnicity.  This is summarized in the tables at the end of the report.

2)      The subcommittee and faculty at large have differing views on many issues, including how to define equity.  We thought it important to include the range of opinions and views in fulfilment of the reporting aspects of our charge.

3)      History department rates of promoting and tenuring assistant professors is significantly lower than university rates (66% v. 85%)

4)      We anticipate a serious crisis with regard to associate professors seeking promotion to full, in light of the recent policy change and the 2018-2019 spate of turn-downs at the Tower level.

5)      I was not going to recommend a vote on any items, but that the Department should assign a senior faculty or a committee to be responsible for developing and enacting policies and practices in response to points 2 and 3.  The report contains many recommendations intended to facilitate these priorities which such a promotions czar or committee could act upon.

Jackie has allotted 15 minutes for your discussion, and the other 45 minutes to the governance subcommittee, which has not yet presented its findings.

Best regards, Madeline

RE: Reschedule portion of Promotions report to May 8? Exhibit 51

## Hsu, Madeline Y

Mon 4/29/2019 5:31 PM

To: Alberto A. Martinez <almartinez@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>;

Cc: Brower, Benjamin C <benbrower@utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>;

Hi everybody,

I will have limited email access until I return home later tonight and will send out the report draft then to meet the Tuesday deadline.

My work laptop does not track the changes made by Al's computer so I will not be using his version as it is not possible to check it before tomorrow.

In light of our concerted disputes regarding categorizing the resignations of 3 assistant professors as equity issues, I have decided to follow Vice Provost of Diversity Ted Gordon's categorical definition that faculty failing to publish a book in a book field in preparation for tenure are not equity or diversity cases.

The dispute is included in the report as a footnote.

Best regards, Madeline

---

**From:** Alberto A. Martinez <almartinez@austin.utexas.edu>
**Sent:** Monday, April 29, 2019 12:05 AM
**To:** Del Castillo, Lina M <delcastillo@austin.utexas.edu>; Hsu, Madeline Y <myhsu@austin.utexas.edu>; Raby, Megan <meganraby@austin.utexas.edu>
**Cc:** Brower, Benjamin C <benbrower@utexas.edu>; Di-Capua, Yoav <ydi@austin.utexas.edu>
**Subject:** Re: Reschedule portion of Promotions report to May 8?

hi all,

apologies for not replying more often this weekend, I was at a very time-consuming conference at Caltech.

Still, I've spent all day today on proofreading the latest version that Madeline sent. I have not added the edits that Lina sent this afternoon, so please add them.

Still, I've made multiple suggested edits and a few corrections; please consider them carefully -- attached.

Also, here are some comments:

The draft mentions "departmental bylaws" – I don't recall if I've ever seen them. If anyone has them, can you please email them to me?

**Department of History, Equity Committee, Promotions Procedures Subcommittee Report**

**Subcommittee members**: Madeline Hsu (chair), Ben Brower, Lina Del Castillo, Yoav Di-Capua, Al Martinez, Megan Raby

**Subcommittee charge:**

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent, with the caveat that the University and the College impose rules and guidelines that also govern departmental procedures. This subcommittee will analyze policies and procedures related to both promotion to full professor and promotion to associate professor with tenure. Factors to be considered (but are not limited to) the Third Year Review, peer observations of classes, mentoring, and service obligations, with the goal of helping faculty to advance in rank.

We have made our deliberations recognizing that equity may be defined and therefore evaluated in various ways. The impetus for starting the Equity Committee stemmed from observations of inequality of outcomes between History faculty in areas such as salaries, graduate students admitted, endowed chairs, research funds, teaching awards, major service appointments, teaching schedules and loads, promotions rates and successes, election to the EC, and many other resources, markers of status, and departmental support. Trying to evaluate equity issues directs attention as to why inequality of outcomes have been produced. Are such differential outcomes related to inequality of access? Are there measures that the department can undertake and wishes to undertake to address these inequities? This subcommittee deliberated with the understanding that the department can primarily seek to accomplish equality of access to information, opportunities, and support but cannot guarantee equality of outcomes because of the complexity of factors attending individual faculty trajectories.

**General Findings:**

Overall, in the 28 cases of promotion processed by the History Department 2009-2019, this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender. 21 of the 28 cases were successful; all 12 cases of promotion from associate to full went through (100%) while only 11 of 18 cases of assistants seeking promotion and tenure went through (61%). Of the promoted faculty, 10 of 21 were women and 11 of 21 were persons of color. The 7 faculty failing to receive promotion and tenure span the spectrum in terms of race, ethnicity, and gender. Some of these candidates received positive or evenly split votes in the department, only to be turned down at the College and Presidential levels. Please see the appendix at the end of this report for the full listing of these 28 cases.

When compared to University-wide rates of promotions for the past ten years (see https://provost.utexas.edu/promotion-tenure-data/ten-year/), the HIS rates differ. HIS is more successful in promotions from associate to full at 100% compared to the University average of

about 95%.  For promotions from assistant to associate with tenure, however, HIS averages about 66% compared to the University rate of about 85%.[1]

Although this subcommittee did not find discernible patters of inequity in promotions outcomes, we did find considerable inconsistency and variation in individual trajectories to promotion that should be addressed by changes in departmental policy and practices. As a book field, which requires long-term development of the key project, any changes in policy are inevitably inequitable as several years are needed to adjust to new requirements.  For example, we call attention to recent major changes in University policy which impose a limit of 12 years during which associate professors must seek promotion to full or face conversion to a 3-3 teaching load.  This policy change has abruptly pulled the rug from under many colleagues who have been highly productive in many major areas of academic activity, including major leadership positions and institution building projects, whose publication output has slowed as a consequence.  The narrow framing of academic work considered for promotion to full based on publications and research fails to acknowledged the breadth of important work that is required to operate a university of the first rank.  We discuss these findings, faculty input, and our recommended actions in the following sections concerning promotion from assistant to associate, promotion from associate to full, and evaluation processes.

Each section reports relevant information gathered from the climate survey, email and other communications from faculty, our meetings within the subcommittee and with the faculty at large, supplemental secondary materials, and consultation with staff such as Jackie Llado, Gail Davis, and Ann Kelble.  We have sought to include the range of perspectives and projections.  Please note that in at least two instances, statements made by some faculty have been directly contradicted by other faculty but that these cannot be presented here to avoid breaches of confidentiality.

The reports are followed by recommendations for future action by the department.  Many departmental colleagues have participated sincerely and earnestly, reflecting their deep commitments to this department.

---

[1]  Several subcommittee members thought it important to note that this rate falls to only 52% if all assistant professors who were hired and did not receive promotion are considered.  Inclusion of this information was disputed by dissenting subcommittee members, who questioned its relevance based on institutional memory of the cases.  This information is noted but not included in the main report because Vice-Provost for Diversity, Edmund T. Gordon categorizes cases where faculty have not produced monographs as not involving issues of equity or diversity as individual faculty are responsible for meeting stipulated workplace standards.

**quick question**                                                                  # Exhibit 52

## Alberto A. Martinez <almartinez@austin.utexas.edu>
Mon 5/6/2019 11:21 AM

**To:** Gordon, Edmund T <etgordon@austin.utexas.edu>

hi Ted,

I hope you're very well; thank you for taking the time to kindly help our University provide a fair retention offer for Prof. Paul Bonin-Rodriguez, in Theatre and Dance -- I'm super glad that it enabled him to remain at UT.

On another topic, I have a quick question. In my History Department I'm in a subcommittee that analyzes our faculty promotions. We're finishing a Report, and there's a question of whether we can discuss in it the low rate with which Assistants in our department have managed to earn tenure. From 2009-2019, we had 11/21 = 52% of our Assistants get tenure, while the 10 who didn't consist of 7 who were denied tenure, plus 3 who departed before the tenure application because they expected not to get tenure.

Five members in our committee think this information is significant, alongside the rate of 11/17 = 61% of applicants to tenure became tenured.

However, the one other member, our subcommittee chair, Madeline Hsu, prefers to exclude discussion of the 52%, and therefore, in the draft Report she includes your name in a footnote:

"Several subcommittee members thought it important to note that this rate falls to only 52% if all assistant professors who were hired and did not receive promotion are considered. Inclusion of this information was disputed by dissenting subcommittee members, who questioned its relevance based on institutional memory of the cases. This information is noted but not included in the main report because Vice-Provost for Diversity, Edmund T. Gordon categorizes cases where faculty have not produced monographs as not involving issues of equity or diversity as individual faculty are responsible for meeting stipulated workplace standards."

My question is:
For clarity, do you actually agree that such information should be excluded from our report, or is Madeline invoking your name without having actually asked you?

Thanks,

Al Martinez

Re: quick question

Exhibit 53

## Gordon, Edmund T <etgordon@austin.utexas.edu>

Mon 5/6/2019 1:45 PM

**To:** Alberto A. Martinez <almartinez@austin.utexas.edu>

Al

Thanks for letting me know about this. I do not remember ever saying anything like this. Certainly not in the context she places it. Where does she claim to have gotten it from? She has not talked to me about this issue as far as I can recall.

The 52% is certainly pertinent to discussions of the retention of diverse faculty members. It is directly pertinent to the tenure rate if there is evidence that the three left because they were counseled out or otherwise were made to believe that they would not be promoted if they had stayed and gone up.

Ted

---

**From:** "Alberto A. Martinez" <almartinez@austin.utexas.edu>
**Date:** Monday, May 6, 2019 at 11:21 AM
**To:** "Gordon, Edmund T" <etgordon@austin.utexas.edu>
**Subject:** quick question

hi Ted,

I hope you're very well; thank you for taking the time to kindly help our University provide a fair retention offer for Prof. Paul Bonin-Rodriguez, in Theatre and Dance -- I'm super glad that it enabled him to remain at UT.

On another topic, I have a quick question. In my History Department I'm in a subcommittee that analyzes our faculty promotions. We're finishing a Report, and there's a question of whether we can discuss in it the low rate with which Assistants in our department have managed to earn tenure. From 2009-2019, we had 11/21 = 52% of our Assistants get tenure, while the 10 who didn't consist of 7 who were denied tenure, plus 3 who departed before the tenure application because they expected not to get tenure.

Five members in our committee think this information is significant, alongside the rate of 11/17 = 61% of applicants to tenure became tenured.

However, the one other member, our subcommittee chair, Madeline Hsu, prefers to exclude discussion of the 52%, and therefore, in the draft Report she includes your name in a footnote:

"Several subcommittee members thought it important to note that this rate falls to only 52% if all assistant professors who were hired and did not receive promotion are considered.

the report

# Exhibit 54

Alberto A. Martinez

Sun 5/12/2019 11:57 PM

Sent Items

To: Raby, Megan <meganraby@austin.utexas.edu>; Del Castillo, Lina M <delcastillo@austin.utexas.edu>;

hey you two,

for the record, earlier today I did read the report that Madeline sent, but once I saw that she still strangely refused to fix the wrong numerical data in her section, such as the line about "Of the promoted faculty, 10 of 21 were women and 11 of 21 were persons of color," I decided that I can't keep arguing over this. I asked her directly 3 times by email to fix it and Megan firmly asked her too. It's so bizarre that I actually spent a while again today trying to figure out if there's any way in which Madeline's count is right, and I couldn't find any. Once again, I count:
24 promotions overall (including 3 individuals who are minorities, and two were promoted twice), 12 cases of promoted minorities (10 individuals who are minorities, and two were promoted twice). Thus, 24 - 3 = 21 individuals were promoted (including 12 women, and 10 minorities).

I wonder if Madeline counted Cynthia Talbot as a minority, since the university lists her as "two or more ethnicities," which could account for the 11 persons of color (whereas I don't count whites among persons of color), but still, the 10 women is plainly wrong, since the 12 are:
(12) Lina, (11) Megan, (10) Abena, (9) Tatjana, (8) Tiffany, (7) Daina, (6) Cynthia, (5) Madeline, (4) Denise, (3) Mary, (2) Ginny, (1) Julie.

I included that count way back in April 26 & 27, etc., so it was Madeline's choice not to read it. Anyhow, someday I'll ask her, one-on-one, why she refused to read my accounting or revise hers. It's awfully absurd and exasperating, even offensive. It's almost as if it begs for a public rebuke, but I won't do any such thing, and think we should just shrug it off, since it's important to in some ways "be the bigger person."

Still, it's alarming the degree to which one finds that the humanities is a non-mathematical culture. Abena has remarked on this too. There's some civility missing too. Anyhow, in light of such errors, naturally I just couldn't write anything such as "I approve" of what Madeline did, since I don't.

Anyhow, your section is good --- so thank you for working on it, despite the strange opposition that we've seen.

I'll be at the department meeting --

Best,
Al

**Department of History, Equity Committee, Promotions Procedures Subcommittee Report**

**Subcommittee members**: Madeline Hsu (chair), Ben Brower, Lina Del Castillo, Yoav Di-Capua, Al Martinez, Megan Raby

# Exhibit 55

**Chair's Introduction**

**Subcommittee charge:**

This subcommittee is tasked with reviewing our department's promotions procedures to ensure that they are helpful, inclusive, fair, and transparent, with the caveat that the University and the College impose rules and guidelines that also govern departmental procedures. This subcommittee will analyze policies and procedures related to both promotion to full professor and promotion to associate professor with tenure. Factors to be considered (but are not limited to) the Third Year Review, peer observations of classes, mentoring, and service obligations, with the goal of helping faculty to advance in rank.

We have made our deliberations recognizing that equity may be defined and therefore evaluated in various ways. The impetus for starting the Equity Committee stemmed from observations of inequality of outcomes between History faculty in areas such as salaries, graduate students admitted, endowed chairs, research funds, teaching awards, major service appointments, teaching schedules and loads, promotions rates and successes, election to the EC, and many other resources, markers of status, and departmental support. Trying to evaluate equity issues directs attention as to why inequality of outcomes have been produced. Are such differential outcomes related to inequality of access? Are there measures that the department can undertake and wishes to undertake to address these inequities? This subcommittee deliberated with the understanding that the department can primarily seek to accomplish equality of access to information, opportunities, and support but cannot guarantee equality of outcomes because of the complexity of factors attending individual faculty trajectories.

**General Findings:**

Overall, in the 28 cases of promotion processed by the History Department 2009-2019, this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender. 21 of the 28 cases were successful; all 12 cases of promotion from associate to full went through (100%) while only 11 of 18 cases of assistants seeking promotion and tenure went through (61%). Of the promoted faculty, 10 of 21 were women and 11 of 21 were persons of color. The 7 faculty failing to receive promotion and tenure span the spectrum in terms of race, ethnicity, and gender. Some of these candidates received positive or evenly split votes in the department, only to be turned down at the College and Presidential levels. Please see the appendix at the end of this report for the full listing of these 28 cases.

When compared to University-wide rates of promotions for the past ten years (see https://provost.utexas.edu/promotion-tenure-data/ten-year/), the HIS rates differ. HIS is more successful in promotions from associate to full at 100% compared to the University average of

about 95%.  For promotions from assistant to associate with tenure, however, HIS averages only about 61% compared to the University rate of about 85%.[1]

Although this subcommittee did not find discernible patterns of inequity in promotions outcomes, we did find considerable inconsistency and variation in individual trajectories to promotion that should be addressed by changes in departmental policy and practices. As a book field, which requires long-term development of the key project, any changes in policy are inevitably inequitable as several years are needed to adjust to new requirements.  For example, we call attention to recent major changes in University policy which impose a limit of 12 years during which associate professors must seek promotion to full or face conversion to a 3-3 teaching load.  This policy change has abruptly pulled the rug from under many colleagues who have been highly productive in many major areas of academic activity, including major leadership positions and institution building projects, whose publication output has slowed as a consequence.  The narrow framing of academic work considered for promotion to full based on publications and research fails to acknowledged the breadth of important work that is required to operate a university of the first rank.  We discuss these findings, faculty input, and our recommended actions in the following sections concerning promotion from assistant to associate, promotion from associate to full, and evaluation processes.

Each section reports relevant information gathered from the climate survey, email and other communications from faculty, our meetings within the subcommittee and with the faculty at large, supplemental secondary materials, and consultation with staff such as Jackie Llado, Gail Davis, and Ann Kelble.  We have sought to include the range of perspectives and projections.  On a number of issues, this subcommittee failed to come to agreement, hence the acknowledgement of primary authorship of different sections and tracking of data.

The reports are followed by recommendations for future action by the department.  Many departmental colleagues have participated sincerely and earnestly, reflecting their deep commitments to this department.

---

[1] Several subcommittee members thought it important to note that this rate falls to only 52% if all assistant professors who were hired and did not receive promotion are considered.  Inclusion of this information was disputed by dissenting subcommittee members, who questioned its relevance based on institutional memory of the cases

# INTERIM EQUITY REPORT ON PROMOTION FROM ASSISTANT TO ASSOCIATE PROFESSOR

# Exhibit 56

**Primary authors:** Lina del Castillo and Megan Raby

Over the past decade, the History Department's rate of successful tenure cases (61%, 11 out of 18 cases) has been significantly below the rate of the university as a whole (81%-85%).[2] Furthermore, 3 assistant Professors resigned before applying for tenure, making the percentage of assistants tenured out of the total hired 52% (11 out of 21 hires).[3] Among these overall departures without tenure, 50% were minorities and 60% were women. While this data on its own is not sufficient to conclude that there has been a lack of equity in the tenure process, it strongly suggests a need to consider what roadblocks may exist in the overall trajectory of junior faculty, from hiring to the tenure case.[4] It is also relevant that, of the 11 assistant professors who were promoted to Associate in the past 10 years, at least 3 were 'advanced' assistants in that they either already had a book published when they were hired, or had given up tenure at their original institution in order to come work at UT without tenure. The distinction between advanced and junior assistant professors is important when considering the kind of challenges junior assistants face versus those of their more advanced colleagues and it matters when it comes time to effectively mentor the diverse pool of assistants.

An assistant professor's success in promotion and tenure depends on the candidate's own efforts and abilities, in combination with the clarity and transparency of the criteria and procedures for promotion at the department level and above, the resources made available in support of research and teaching, mentorship, and department climate and inclusivity. While the department cannot expect to tenure one hundred percent of assistant professors hired, it is in the department's interest to do its utmost to put adequately prepared candidates up for tenure. This is not only in service of achieving a balance of ranks in the department—given the very low current number of junior faculty and low prospects of administrative approval to hire a significant number of faculty at the assistant level in the near future. It is also in service of equity.

Equitable outcomes depend on assistant professors receiving equitable access to information and consistent support from the time of hire through to completion of the tenure case. The department already supports assistant professors in many ways, such as having a mentorship process, opportunities for fellowships, and annual one-on-one meetings with the department chair. However, faculty input strongly suggests that a variety of roadblocks to equitable access to information and support have cropped up over the years, including inconsistencies in mentorship, delays or inconsistencies in the articulation of expectations, teaching duties, and provision of leave. There are many ways—some of them quite simple and straightforward—that we can do better.

---

[2] https://provost.utexas.edu/promotion-tenure-data/ten-year/
[3] See Appendix: "Alberto Martinez's summary of promotions since 2009."
[4] Thus the authors of this section of the report would like to append to the subcommittee chair's statement that "this subcommittee did not find patterns of discrimination based on vectors of race, ethnicity, or gender" the qualification that the data we currently have is ambiguous.

# Exhibit 57

2003-2020
Executive Committee members, and Budget Council members (pre-2005)

*Draft, please send me any corrections: almartinez@austin.utexas.edu*

| | years in the EC or the BC | Total years | in 16 years incl. 2019-20 |
|---|---|---|---|
| Tully | years as Dept. Chair 2003-04, 2004-05, 2005-06, 2006-07, 2007-08, 2008-09, 2009-10, 2010-11, 2011-12, 2012-13 | 10 | 10 |
| Jones | 2009-10, 2010-11, + years as Dept. Chair: 2013-14, 2014-15, 2015-16, 2016-17, 2017-18, 2018-19, 2019-20 | 9 | 9 |
| Bsumek | 2007-08, 2011-12, 2012-13, 2016-17, 2017-18, BUT Bsumek's CV also says 2004-08, 2008-09, 2010-11 | 8? | 8 ? |
| Brands | 2006-07, 2007-08, 2008-09, 2009-10, 2010-11, 2015-16, 2016-17, | 7 | 7 |
| Matysik | 2005-06, 2009-10, 2010-11, spring 2014, 2015-16, 2018-19, 2019-20 | 6.5 | 6.5 |
| Levack | 2005-06, 2007-08, 2008-09, 2009-10, 2011-12, 2012-13 + years as Dept. Chair 1988-89, 1989-90, 1990-91, 1991-92, 1993-94, 1999-00, 2000-01 | 13 + prev. yrs.? | 6 |
| Crew | 2005-06, 2006-07, 2008-09, 2009-10, 2013-14, 2014-15, | 6 + prev. yrs.? | 6 |
| Joan Neuberger | 2008-09, 2009-10, 2012-13, 2013-14, 2018-19, 2019-20 | 6 + prev. yrs.? | 6 |
| Levine | 2010-11, 2011-12, 2015-16, 2016-17, 2018-19, 2019-20 | 6 | 6 |
| Lawrence | 2003-04, 2008-09, 2009-10, 2012-13, 2013-14, | 6 | 5 |
| Abzug | 2005-06, 2006-07, 2007-08, 2014-15, 2015-16, | 5 + prev. yrs.? | 5 |
| Metzler | 2005-06, 2007-08, 2008-09, 2014-15, 2015-16. | 5 + ? | 5 |
| Talbot | 2006-07, 2009-10, 2010-11, 2017-18, 2018-19, | 5 + prev. yrs.? | 5 |
| Di-Capua | 2008-09, 2011-12, 2014-15, 2015-16, 2019-20 | 5 | 5 |
| Berry | 2012-13, 2013-14, 2016-17, 2018-19, 2019-20 | 5 | 5 |
| Brower | 2010-11, 2012-13, 2013-14, 2018-19, 2019-20 | 5 | 5 |
| Hunt | 2009-10, 2010-11, 2016-17, 2017-18, | 8 | 4 |
| Kamil | 2006-07, 2007-08, 2014-15, 2015-16, | 4 + prev. yrs.? | 4 |
| Garrard (Burnett) | 2010-11, 2011-12, 2012-13, 2013-14, | 4 | 4 |
| Deans-Smith | 2007-08, 2008-09, 2014-15, 2015-16, | 4 + prev. yrs.? | 4 |
| Bodian | 2010-11, 2012-13, 2013-14, 2015-16, | 4 | 4 |
| Suri | 2012-13, 2013-14, 2016-17, 2017-18, | 4 | 4 |
| Lichtenstein | 2010-11, 2013-14, 2016-17, 2017-18, | 4 | 4 |
| Hardwick | 2005-06, 2006-07, 2007-08, 2019-20 | 4 + prev. yrs.? | 4 |
| Minault | 2005-06, 2007-08, 2008-09. | 3 + prev. yrs.? | 3 |
| Oshinsky | 2005-06, 2006-07, 2007-08. | 3 | 3 |
| Twinam | 2006-07, 2008-09, 2009-10, | 3 | 3 |
| Vaughn | 2012-13, 2014-15, 2015-16. | 3 | 3 |
| Butler | 2013-14, 2016-17, 2017-18, 2019-20 | 3 | 3 |
| Chatterjee | 2014-15, 2017-18, 2018-19, | 3 | 3 |
| Raby | 2014-15, 2016-17, 2018-19, | 3 | 3 |

| | | | |
|---|---|---|---|
| Cañizares-Esguerra | 2006-07, 2007-08*, 2011-12, 2012-13, <br> * doesn't appear in cv, he says he wasn't in EC then | 3 | 3 |
| Charumbira | 2009-10, 2011-12, 2013-14. | 3 | 3 |
| Garfield | 2005-06, 2018-19, 2019-20 | 3 | 3 |
| Wynn | 2003-04, 2014-15, 2015-16, | 3 + 2 prev. yrs. | 3 |
| Frazier | fall 2004, 2007-08, 2008-09, | 8.5 | 2.5 |
| Guridy | fall 2006, 2010-11, 2011-12. | 2.5 | 2.5 |
| Del Castillo | 2012-13, fall 2015, 2017-18, | 2.5 | 2.5 |
| Newman | 2003-04, 2019-20 | 2 + prev. yrs? | 2 |
| Stoff | 2005-06, 2006-07, 2018-19 (withdrew), | 2 + prev. yrs.? | 2 |
| Brown | 2016-17, 2017-18, | 2 + prev. yrs.? | 2 |
| Mary Neuburger | 2013-14, 2014-15, | 2 + prev. yrs.? | 2 |
| Olwell | 2008-09, 2009-10, | 2 + prev. yrs.? | 2 |
| Spellberg | 2005-06, 2006-07, | 2 | 2 |
| Gill | 2006-07, 2011-12. | 2 | 2 |
| Guha | 2014-15, 2015-16, | 2 | 2 |
| Hsu | 2016-17, 2017-18, | 2 | 2 |
| Joseph | 2016-17, 2017-18, | 2 | 2 |
| Anne Martínez | 2008-09, 2011-12. | 2 | 2 |
| Al Martínez | 2010-11, 2011-12, | 2 | 2 |
| Moore | 2010-11, 2011-12, | 2 | 2 |
| Osseo-Asare | 2017-18, 2018-19, | 2 | 2 |
| Zamora | 2018-19, 2019-20 | 2 | 2 |
| O'Connell | 2018-19, 2019-20 | 2 | 2 |
| Karl Miller | spring 2007, 2013-14. | 1.5 | 1.5 |
| Forgie | 2003-04, | 6 + prev. yrs.? | 1 |
| Coffin | 2012-13, | 1 + prev. yrs.? | 1 |
| Sidbury | 2005-06. | 1 + prev. yrs.? | 1 |
| Frens-String | 2017-18, 2018-19, | 1 + next yr. | 1 |
| Falola | 2005-06, at UT Austin since 1991 | 1 + prev. yrs.? | 1 |
| Foley | 2011-12 only.    23 years at UT | 1 | 1 |
| Farmer | 2019-20, | 1 | 1 |
| Mckiernan-González | 2009-10. | 1 | 1 |
| Vong | 2016-17, | 1 | 1 |
| Wilson | 2007-08. | 1 | 1 |
| Louis | at UT Austin since 1970 | 0 + prev. yrs.? | 0 |
| Walker | at UT Austin since 2002 | 0 | 0 |
| Green | at UT Austin since 2001 | 0 + prev. yr.? | 0? |
| Li | at UT Austin since 2006 | 0 | 0 |
| Mintz | at UT Austin since 2012 | 0 | 0 |

**Budget Council**
When there was a Budget Council, instead of an EC, all full Professors were automatically in the BC. There were also some Associate Professors (and sometimes some Assistants):  Frazier fall 2004, Deans-Smith 1984-85, 1988-89, 1991-92, 2000, 2001-05, Forgie 1977-78, 80-81, 89-90, 2001-04, Hunt 86-87, 87-88, 92-93, 2000-01, Lawrence 2000-01, 2003-04, Newman 1989-90, 97-98, 2000-01, Walker 2002-03, Wynn 1991-92, 2000-01, 2003-04.  Note:  I don't have the BC sheet for 2004-05, so the limited data I include for that year is from faculty CVs. Still, it raises the issue of: who to count? Were all full professors in the BC? Or was it an "Extended Budget Council"?  E.g., Frazier's CV shows membership in the BC in Fall 2004; Wynn's CV lists membership in the BC 2003-04.

Exhibit 58

**DRAFT -- TENTATIVE**
**Governance Subcommittee, UT Department of History**
**Report to the Department**

<u>Membership</u>: Falola; Joseph; Lawrence; Martínez; Neuburger, M.; Suri (chair); Twinam; Walker; Zamora.

<u>Committee Charge</u>: This subcommittee is tasked with reviewing the department's structures of governance-- including the Executive Committee, standing committee assignments, and administrative positions (such as Associate Chair, Graduate Adviser, and Assessment Director)—and with making recommendations as needed to ensure that those structures are efficient, democratic, transparent, inclusive, and responsive to the needs of the department and our students.

<u>Committee Meetings</u>: 8 March, 5 April, 19 April 2019.

<u>Narrative</u>: Our committee divided our deliberations into three categories related to the governance of the UT history department: Principles of Governance, Structures of Governance, and Procedures of Governance. We sequentially discussed each topic, with the purpose of suggesting practical steps that would improve overall department governance. Our discussions resulted in a clearer articulation of governing principles and a proposed reform, detailed below. These are first steps, designed to improve governance. They are not presented as "solutions," but possible first steps, designed to promote equity within governance structures and procedures.

<u>Principles of Governance</u>: Our committee believes that these principles must be emphasized and followed in all areas of department governance.

Transparency
Access
Representativeness
Equity
Diversity
Efficacy
Honesty
Citizenship
Trust
Credibility

We presume that there is a strong consensus on these principles within the department. There is room for improvement, however, in the implementation of these principles in our daily allocation of resources and duties. In particular, increased openness and accountability for decision-making, as well as broader participation, will allow for more confidence that such

principles are honored in governance appointments, structures, and procedures. This observation guides our proposed reform.

**Proposed Reform: Committee on Governance and Service (COGS)**

Goal: To increase transparency, representativeness, equity, and diversity in appointments to department committees and other positions of department responsibility.

Rationale: Many members of the department have expressed concerns about the allocation of resources and duties across the department. As the department has grown more complex, the department chair has made many of the necessary appointments. To assist the chair in making appointments that match with our principles, many members of the department would like to see a representative advisory body created to assist the chair on appointments, and engage our faculty in these decisions.

Responsibilities:
1. Track individual faculty departmental service to serve as a guideline for committee and position appointments.
2. Nominate colleagues for appointment to department committees and other positions of department responsibility with attention to equity and diversity.
3. Encourage wider department participation in committees and positions of responsibility.
4. Encourage more regular rotation of responsibilities, with continued attention to merit and efficacy.
5. Inform members of the department about these decisions, and thus build trust in the process.
6. Help the chair to fulfill his/her responsibilities in a timely and collegial manner.

Evaluation:
This proposed reform is a pilot. We recommend that the department implement COGS for three years and then evaluate if it, in combination with other possible reforms, serves the principles and responsibilities articulated above. We expect this new structure and its procedures to be adjusted by the department over time to improve our adherence to our principles and responsibilities.

**How will the Committee on Governance and Service (COGS) work?**

Membership: Each year our tenured and tenure-track faculty will elect three faculty members (one from each rank) to serve one-year terms. The elected full professor will serve as the COGS chair/facilitator. Faculty serving on the Executive Committee cannot serve on COGS. After service on COGS, a faculty member cannot serve again for four years. (Possible exceptions will be made for assistant professors, because presently they are fewer.)

The goal here is to create wide and frequent rotation, including new individuals each year to ensure that the department chair receives suggestions from different parts of the department, discouraging entrenched interests. The work of COGS will be advisory, and annual rotation will promote representativeness and shared burdens, the primary goals of this proposed reform.

Activities:
1. With departmental staff support, COGS will send an annual Qualtrics survey to department faculty, asking them to indicate their personal preferences for service in various available committee positions and other positions of departmental responsibility.
   a. The survey will also ask for information on faculty service outside the department, in order to document and take into consideration extensive responsibilities elsewhere on campus, and in the wider historical profession.
2. With department staff support, COGS will also maintain and update a historical listing (an updated Excel spreadsheet) of who has served in various positions during past years, with attention to possible unconscious biases in appointments.
3. Members of COGS will talk with members of the department, especially those less involved in service, encouraging them to consider participation in service roles.
4. After reviewing the above materials, COGS will send nominations to the chair for each open committee position or position of responsibility in the department. The expectation is that the chair will carefully consider each of these nominations, although final appointment power resides with the chair.
5. Upon request, COGS will share its nominations with members of the department, to ensure transparency.
6. We expect COGS to be in frequent communication with the chair, offering collegial advice and consultation on appointments.
7. We hope all members of the department will see COGS as an important avenue for participation in decision-making.

# Exhibit 59

COLLECTIVE NOMINATION OF PROFESSOR ALBERTO A. MARTÍNEZ TO THE 2019 CIVITATIS AWARD

Civitatis Award
Faculty Council Executive Committee
c/o Secretary of the General Faculty
WMB 2.102, F9500

Dear Members of the Selection Committee and President Fenves

We, the one hundred-and-thirty-eight (138) undersigned, senior vice chancellors, vice-presidents, vice provosts, associate provosts, deans, associate deans, chairs, directors, professors and students in over forty (40) departments, centers and schools, collectively nominate Professor Alberto A. Martínez for the 2019 *Civitatis Award*. We assert that Professor Martínez is a member of this institution whose "dedicated and meritorious service to the University" goes "above and beyond the regular expectations of teaching, research, and service." Professor Martínez is one of a handful of Puerto Ricans silently working on campus whose long years of labor on behalf of this institution deserve recognition. Since 1997, only one Hispanic has received this award.

Professor Alberto A. Martínez is a distinguished full professor in the History Department. Professor Martínez is also a devoted instructor, capable of enrapturing student audiences. His innovative courses on "Race, Science and Racism" and "History of Money and Corruption" have not just affected students but are also generating reflections on student admission policies and in the administrative life of this institution. Professor Martínez has dedicated more than a decade to identifying and solving inequities on campus. His knack for numbers and his capacious and inquisitive mind have shed a bright light on structural problems at UT Austin that demand our collective attention, particularly the Puerto Rican diaspora and the status of minorities on campus.

Before coming to UT Austin, Professor Martínez held a series of prestigious competitive fellowships at top institutions: M.I.T, Harvard, Boston University, Caltech, and The Smithsonian.

Professor Martínez has published five peer-reviewed scholarly books with top university presses: Princeton University Press, University of Pittsburgh Press, Johns Hopkins University Press, and Reaktion Books (UK) / University of Chicago Press. His latest publication on Giordano Bruno and Galileo is a profound, innovative study that revisits and challenges our well-known historiographies on the Inquisition trials of these two early-modern Italian cosmographers. It singlehandedly transforms our understandings of the Pythagorean-Lucretian-Epicurean Renaissance. It was recently reviewed as "quite possibly the most

important book of the year for the history of astronomy." His areas of expertise range from Albert Einstein to historical myths in sciences and mathematics. His books have received abundant scholarly praise, ranging from "laudable," to "painstakingly detailed," to "fascinating," to "an absolute *tour de force*." Two of his books have been national bestsellers in Mathematics, according to YPB Library Services.

He has published meticulous articles in various journals, from *American Journal of Physics*, to *The American Mathematical Monthly*, to *Archive for History of Exact Sciences*. Some of his writings have been translated into German, Japanese, Turkish, Spanish, and Italian. His ideas have been featured in *Scientific American*, and the Big Picture Science program of SETI (The Search for Extraterrestrial Intelligence Institute). This summer he was an invited expert in the Peabody Award winning investigative show Radiolab. In 2017, he gave the Annual Public Lecture for the Mathematics Department of Cornell University. He has been an invited speaker on history of astronomy and Catholicism at the University of Notre Dame. He has given invited talks about Einstein in Switzerland, France, the Netherlands, Puerto Rico, and Tenerife.

The *Civitatis Award* rewards service to the University. It is impressive, therefore, to see the breadth of Professor Martínez's public contributions to this institution.

At UT Austin, Professor Martínez contributes to the UTeach Natural Sciences program (praised by President Obama), and therefore the course he designed for math and science majors, "Perspectives on Science and Math," has been replicated in 45 universities nationwide. He gave the Keynote address, to the Annual Conference of Texas STEM Teachers in 2014. He was also featured in episodes of the Corporation for Public Broadcasting television series "Essential Science for Teachers: Physical Sciences," in 2003-04.

He mentored the Phi Alpha Theta History Honor Society at UT Austin for years, and he also mentored the League of United Latin American Citizens student group.

He teaches a course on "Race, Science and Racism." In 2018 he publicly complained that UT Austin has far too few African American students and he contended that "UT Austin should enroll more students who are economically disadvantaged." One year later, UT's Board of Regents created a $160 Million endowment to help disadvantaged students enroll in UT, to cover their tuition and fees. Likewise, Professor Martínez has contributed to various ongoing initiatives to help UT advance to become a Hispanic Serving Institution, meeting with other Hispanic faculty and officials from UT's Office of Admissions.

In the aftermath of Hurricane María, which devastated Puerto Rico, Professor Martínez went to the island multiple times to help in recovery efforts, and in Austin he carried out several initiatives: He publicly asked President Fenves for assistance for Puerto Ricans, he sought out and pulled together dozens of Puerto Ricans on campus, he created a coalition of Puerto Rican faculty for the first time at UT Austin, and created the website for it. Furthermore, Professor Martínez analyzed mortality rates caused by the hurricane, and he pointed out statistical

2

errors in the studies published by the government of Puerto Rico and Harvard University, as well as George Washington University. His critical analysis of mortality was featured on national news.

Professor Martínez has also been featured analyzing Puerto Rico's hurricane and economic crises on national television multiple times, in the TV program Full Measure, interviewed by the five-time Emmy Award winning investigative journalist, Sharyl Attkisson.

Professor Martínez also teaches an innovative course on "History of Money and Corruption." Accordingly, he has also pursued this topic in local and national venues. In particular, he has also worked to expose corruption in Puerto Rico at a national level. For example, in 2018 Professor Martínez accused Puerto Rico's Secretary of Education of corruption in government contracts, in the prominent Washington D.C. newspaper, _The Hill_. One year later, the Secretary of Education was arrested by the FBI, for corruption in government contracts.

At UT Austin too Professor Martínez has had the courage to publicly voice much needed critiques. He especially opposed the plan to eliminate and displace our staff. In late 2013, UT administrators announced their plan to establish "Shared Services" at UT Austin: to eliminate the jobs of 500 staff members plus remove another 300 staff out of UT Austin to a distant building, probably at the Pickle campus, to carry out duties for our departments at-a-distance. They said departments would work better with 800 fewer local and dedicated staff. They said UT would "save" $30 million a year. Yet Professor Martínez respectfully showed that such claims were numerically false, in Faculty Council, in campus events, in the _Austin American-Statesman_, _The Daily Texan_, and _The Austin Chronicle_. Professor Martínez found out that the plan was concocted by individuals associated with the firm Accenture, in _a conflict of interests_, which he exposed in Faculty Council and in _The Daily Texan_. Months later, the UT System's Audit Office confirmed that UT Austin did violate conflict of interest policies when it hired Accenture.

Professor Martínez criticized Shared Services in Faculty Council, the Graduate Student Assembly, the Texas State Employees Union, in petitions, in multiple student protests, and in newspapers. Gradually, administrators admitted that earnings projections were wrong, they decided staff would not be housed in a building outside UT, they decided to try a pilot program of Shared Services (instead of implementing it all at once). In Feb. 2015, the chief advocate of Shared Services, Kevin Hegarty, stepped down as Chief Financial Officer of UT Austin. The new CFO, Darrell Bazzell, arrived in April 2016. After just four months, the new CFO eliminated the centralized Shared Services, because, it "has not produced the savings and efficiencies initially anticipated when it was launched in 2014."

Moreover in 2013, Professor Martínez was the only faculty member to publicly object to the purchase and implementation of the immensely expensive administrative application Workday, in Faculty Council, and in _The Daily Texan_. Subsequently, the transition to Workday has caused

enormous expenses and difficulties, especially for UT's staff, yet Martínez had fairly anticipated that it should not be implemented.

In 2019, Professor Martínez has contributed to the Library Task Force to support our system of libraries. And in 2018, in *The Texas Tribune*, Professor Martínez rightly defended Academic Freedom against claims made by the Texas State Attorney General, who had formally denied that such a right belongs to professors. Presently, Martínez serves in UT's Committee and Counsel on Academic Freedom and Responsibility.

Yet Professor Martínez's most important and significant contribution is the advancement of Hispanic students and faculty on campus. He has spearheaded much-needed reform in his department and university to address issues of inclusion and fairness. Professor Martínez led for one year a new Equity Committee in the History Department that introduced policy reforms on the evaluation of merit salary raises and governance inequities. More important, Professor Martínez is the chair of the Independent Equity Committee of eight (8) distinguished Hispanic full professors in five (5) departments. Under the leadership of Professor Martínez, this committee has spent sixteenth months compiling a study akin in scope to the UT's Gender Equity Report. Without the tireless labors of Professor Martínez this recently completed study, the Hispanic Equity Report, would have never happened.

The significance of this report cannot be overestimated. It took hundreds of hours of Professor Martínez's painstaking research. It demonstrates in chilling numerical detail the subordinate status of Hispanic faculty throughout and the urgency to action to address inequities. Professor Martínez pored over University budgets and administrative paperwork held at the Perry-Castañeda Library, the Briscoe Center, and elsewhere. For the first time in the history of UT Austin and probably the history of all higher education in the State of Texas, Professor Martínez established reliable statistics on Hispanic faculty. The study includes staggering data on Hispanics on such diverse yet significant variables as numbers and distribution across departments, schools, and colleges; salary gaps in rank and gender; retention and tenure rates; gender inequities; ratios of teaching awards; access to campus-wide governance through elections and appointments; access to professorships and endowed chairs; share in positions of higher administration; correlations between merit and publications for 27% of all senior Hispanic Faculty and several departments on campus. This is a herculean task, a labor of care and devotion to the betterment of this institution. Professor Martínez has been a leader, tirelessly sharing data with the Vice Provost for Diversity, the Council for Racial and Ethnic Equity and Diversity, other local groups, and the in the pursuit of diversity and inclusion on campus.

The overall career of Professor Martínez clearly demonstrates that he has done "dedicated and meritorious service to the University, beyond the regular expectations of teaching, research, and service." Professor Martinez's fifteen-year trajectory on campus is one of distinction and courage

4

Cordially

On behalf of the Independent Equity Committee:

1. Prof. Jorge Cañizares-Esguerra. Alice Drysdale Sheffield Professor of History-UT-Austin. Distinguished Professor. Facultad Latinoamericana de Ciencias Sociales (FLACSO). Distinguished Luverhulme Visiting Professor-I.A.S of University of London. Nancy-Lyman-Roelker-Mentorship Awardee. American Historical Association

2. Prof. Francisco Gonzalez-Lima, George I. Sanchez Centennial Professor in Psychology, Psychiatry, Pharmacology & Toxicology. Director of the Texas Consortium in Behavioral Neuroscience. Distinguished Texas Scientist and Academic Director, Texas Academy of Science. Alexander von Humboldt Research Fellow, Germany

3. Prof. Gloria González-López, Professor of Sociology and Center for Women's and Gender Studies.

4. Prof. Martha Menchaca, Professor of Anthropology, Latin American Studies, Women and Gender Studies, and Mexican American & Latina/o Studies

5. Prof. John Morán González, Frank Dobie Regents Professor in American and English Literature

6. Prof. Fred Valdez, Jr. Professor of Anthropology; Director, Center for Archaeological and Tropical Studies

7. Prof. Emilio Zamora. Professor of History. Fellow of the George W. Littlefield Professorship in American History; and Fellow and President of the Texas State Historical Association

On behalf of diverse faculty university-administrators:

8. Prof. Sacha Kopp. Senior Vice Chancellor for Academic Affairs, University of Nebraska Omaha, former Dean of the College of Arts and Sciences, Stony Brook University; former Associate Dean for Undergraduate Education of the College of Natural Sciences, and Professor of Physics at the University of Texas at Austin

9. Prof. Leonard N. Moore, Vice President of the Division of Diversity and Community Engagement George Littlefield Professor of American History.

10. Prof. Ted Gordon. Vice Provost for Diversity.  Office of the Executive Vice President and Provost. Associate Professor in African and African Diaspora Studies Department.

11. Prof. James A. Wilson, Jr., Associate Provost for Academic Affairs and Director of Faculty Innovation and Enhancement (FIE) at Prairie View A&M University;  2019-2020 American Council on Education (ACE) Fellow at Rice University;  (Former Assistant Professor—UT History Department)

12. Prof. Luis Zayas. Dean. Steve Hicks School of Social Work. Professor of Social Work and the Del Medical School.

13. Prof. Anthony J. Petrosino.  Associate Dean for Research and Outreach. Simmons School of Education & Human Development. SMU. Former Associate Professor of STEM Education. College of Education (retired). UT-Austin

14. Prof. Richard Reddick. Associate Dean for Equity, Community Engagement, and Outreach, College of Education. Coordinator, Program in Higher Education Leadership. Assistant Director, Plan II Honors Program, College of Liberal Arts. Associate Professor of Higher Education Leadership and African and African Diaspora Studies

15. Prof. Mia Carter, Associate Dean. College of Liberal Arts. Associate Professor of English, University Distinguished Teaching Professor.

16. Prof. William E Forbath Associate Dean for Research. Law School. Lloyd M. Bentsen Chair in Law

17. Miguel V. Wasielewski.  Executive Director of Admissions. UT-Austin.

18. Dr. Suchitra V. Gururaj, Assistant Vice President for Community and Economic Engagement, Division of Diversity and Community Engagement

19. Prof. Karma R. Chávez, Chair and Associate professor, Department of Mexican American and Latina/o Studies

20. Prof. Jossianna Arroyo.. Chair Department of Spanish and Portuguese. Professor Spanish Language and Literature and the Department of African and African Diaspora Studies

21. Prof. Luis Urrieta, Jr., Associate Chair, Department of Curriculum & Instruction . Director of Student Programs, LLILAS-Benson. *Suzanne B. and John L. Adams Professor of Education*

6

22. Prof Virginia Garrard, Director LLILAS Benson Latin American Studies and Collections & Professor of History

23. Prof. Kevin Cokley, Ph.D. Director, Institute for Urban Policy Research & Analysis (IUPRA). *University and UT System Distinguished Teaching Professor.* Oscar and Anne Mauzy Regents Professorship for Educational Research and Development. Professor of Educational Psychology and African and African Diaspora Studies

24. Prof. Luis E. Cárcamo-Huechante, Director of the Program in Native American and Indigenous Studies (NAIS); Associate Professor at the Department of Spanish and Portuguese.

25. Prof. Lourdes J Rodríguez. Director, Community-Driven Initiatives. Associate Professor Department of Population Health

26. Prof. Huaiyin Li. Director, Center for East Asian Studies Professor of History

27. Prof. Thomas Jesus Garza. Director, Texas Language Center. Associate Professor of Slavic and Eurasian Studies UT Regents' and University Distinguished Teaching

28. Prof. Minkah Makalani Director, John L. Warfield Center for African and African American Studies | Associate Professor, African and African Diaspora Studies

29. Prof. Ricardo Ainslie. Director, Mexico Center at LLILAS-Benson University of Texas at Austin. M.K. Hage Centennial Professor in Education

30. Prof. Arthur B Markman.  Executive Director of the IC2 Institute, and Founding Director of the Program in the Human Dimensions of Organizations Annabel Irion Worsham Centennial Professor, Psychology

31. Prof. Deborah Parra-Medina, Director of the Latino Research Institute, and Professor, Mexican American and Latina/o Studies

32. Prof. Douglas Biow. Director, Center for European Studies Director, France-UT Institute Superior Oil Company-Linward Shivers Centennial Professor

33. Prof. Lorraine Pangle Co-Director, Thomas Jefferson Center for the Study of Core Texts and Ideas Professor of Government

34. Prof. Benjamin Ibarra Sevilla. Program Director Master's Advanced Studies. Program Coordinator Masters of Science in Historic Preservation. Associate Professor of Architecture.

35. Prof. Michael Marder. Codirector of UTeach. Professor of Physics.

36. Prof. Wenhong Chen. Co-director, Media and Entertainment Industries Program | Moody College of Communication. Associate Professor of Media Studies and Sociology.

37. Dr. Kimberly Hughes, Director, UTeach Institute, University of Texas at Austin.

38. Dr. Paige Schilt. Director, Sanger Learning Center, School of Undergraduate Studies

39. Prof. Rebecca McInroy, Senior Host / Producer, KUT Radio

On behalf of general faculty:

40. Prof. Mark G. Raizen. Sid W. Richardson Foundation Regents Chair in Physics #2. Professor of Physics, Center for Nonlinear Dynamics Professor of Medicine, Dell Pediatric Research Institute

41. Prof. William Beckner. Paul V. Montgomery Centennial Memorial Professor in Mathematics

42. Prof. Toyin Falola. Jacob and Frances Sanger Mossiker Chair in the Humanities #2. Distinguished Teaching Professor. Department of History.

43. Prof. Henry William Brands Jr. Jack S. Blanton Sr. Chair in History at the University of Texas at Austin

44. Prof. Thomas L. Pangle Joe R. Long Endowed Chair in Democratic Studies. Department of Government

45. Prof. Neil Foley. Robert and Nancy Dedman Chair in History. Southern Methodist University. Former Associate Dean and Professor. UT.

46. Prof. Fernando Luiz Lara. Potter Rose Professorship in Urban Planning. School of Architecture

47. Prof. Juliet E. K. Walker. Professor of History and African and African Diaspora Studies. Fellow of George W. Littlefield Professorship in American History. Founder Director Center Black Business History, Entrepreneurship, Technology

48. Prof. Walter L. Buenger. Chief Historian, Texas State Historical Association Summerlee Foundation Chair in Texas History and Barbara Stuart Centennial Professor in Texas History Department of History.

49. Prof. Jeremi Suri. Mack Brown Distinguished Chair for Leadership in Global Affairs. Professor of History and Lindon Johnson School of Public Affairs.

50. Prof, Andrea C Gore, rofessor and Vacek Chair of Pharmacology; Division of Pharmacology and Toxicology, College of Pharmacy; Institute for Neuroscience; Institute for Cellular and Molecular Biology, and Department of Psychology

51. Prof. Peniel E. Joseph. Barbara Jordan Chair in Ethics and Political Values and Founding Director Center for the Study of Race and Democracy, LBJ School of Public Affairs. Professor of History.

52. Prof. Tom Palaima. Robert M. Armstrong Centennial Professor of Classics

53. Prof. Lisa L. Moore. Archibald A. Hill Professor in American and English Literature. Professor of Women's and Gender Studies. Director, LGBTQ Studies Program

54. Prof. Linda Dalrymple Henderson, David Bruton, Jr. Centennial Professor in Art History, University Distinguished Teaching Professor, Dept. of Art and Art History

55. Prof. Allan Tully Professor; Eugene C. Barker Centennial Professorship in American History

56. Prof. Jonathan C. Brown. Professor of History.

57. Prof. Robert Oppenheim, Professor of Asian Studies and Anthropology

58. Prof. Richard Fitzpatrick. Professor of Physics.

59. Prof. Joan Neuberger. Professor of History.

60. Prof. Robin Moore. Professor of Ethnomusicology, Butler School of Music

61. Prof. Cory F. Juhl.  Professor, Philosophy, Associate Chair, Philosophy

62. Prof. Jacqueline L. Angel, Professor of Sociology and Public Affairs. Sociology and LBJ School.

63. Prof. Paul B Woodruff.  Professor, Philosophy; Distinguished Teaching Professor

64. Prof. Daniel Bonevac Professor of Philosophy and Human Dimensions of Organizations

65. Prof. Angela Valenzuela, Professor, School of Education.

66. Prof. Cynthia Talbot. Professor of History

67. Prof. Richard Matzner. Professor of Physics

68. Prof. David Prindle. Professor of Government

69. Prof. Yoav Di-Capua. Professor of History.

70. Prof. Indrani Chatterjee. Professor of History and Asian Studies.

71. Prof. Juan Dominguez. Associate Professor of Psychology and Pharmacology. Fellow of the Alma Idell Carlson Chair.

72. Prof. Benjamin C. Brower. Associate Professor of History.

73. Prof. Alison K. Frazier Associate Professor of History & Religious Studies. Graduate Advisor, History.

74. Prof. Sam C. Vong. Assistant Professor of History. Curator of Asian Pacific American History, Smithsonian Institution

75. Prof. Abena Dove Osseo-Asare, Associate Professor of History

76. Prof. J. Brent Crosson. Assistant Professor, Religious Studies

77. Prof. Cesar A. Salgado. Associate Professor of Spanish and Portuguese

78. Prof. Megan Raby. Associate Professor of History.

79. Prof. Carlos E. Ramos-Scharrón. Associate Professor, Department of Geography & the Environment and LLILAS-Benson

80. Prof. Laurie Green. Associate Professor of History.

81. Prof. Katherine Dunlop. Associate Professor, Philosophy

82. Prof. C.J. Alvarez. Assistant Professor, Mexican American and Latina/o Studies

83. Dr. Megan Seaholm, Senior Lecturer. Department of History

84. Dr. Erik Dempsey, Assistant Director, Thomas Jefferson Center Lecturer, Department of Government and Thomas Jefferson Center;.

85. Dr. Rachel Ozzane. Lecturer. Department of History.

86. Prof. Lina del Castillo. Associate Professor of History.

87. Prof. Leticia Marteleto. Associate Professor of Sociology, Department of Sociology, Population Research Center.

88. Prof. Judith Coffin. Associate Professor of History.

89. Arturo De Lozanne, Ph.D. Associate Professor. Department of Molecular Biosciences. Provost's Teaching Fellow. University Distinguished Teaching Professor

90. Prof. Flavio Azevedo. Associate Professor. Department of Curriculum and Instruction.

91. Prof. Enrique Rodríguez-Alegría. Professor of Anthropology.

92. Prof. Paul Bonin Rodriguez. Associate Professor Department of Theatre and Dance.

93. Prof. Tracie Matysik. Associate Professor of History.

94. Prof Adam Clulow. Associate Professor of History.

95. Prof. Erika M. Bsumek. Associate Professor of History. Provost's Teaching Fellow

96. Prof. Joshua Frens-String. Assistant Professor of History.

97. Prof. Lorraine Leu, Associate Professor, LLILAS & Department of Spanish & Portuguese.

98. Prof. Steven Mintz. Professor of History.

99. Prof. Manuel Ramirez. Professor of Pyschology.

100. Prof. George Forgie. Associate Professor of History.

101. Prof. Snehal Shingavi, Associate Professor, English, and South Asia Institute, and Center for Asian American Studies

102. Prof. Alexander P. D. Mourelatos. Professor Emeritus of Philosophy and Classics

103. Prof. Lesley Dean-Jones. Associate Professor, Department of Classics.

104. Prof. Jennifer V Ebbeler. Associate Professor, Department of Classics

105. Dr. Joshua Roebke Author, Instructor, and Researcher Institute for Historical Studies & College of Natural Sciences

106. Dr. Jeffrey C. Leon. Lecturer, Philosophy

107. Dr. Dana L. Cloud. Independent Scholar. Former Professor, Department of Communication and Rhetorical Studies Syracuse University. Former Associate Professor, Department of Communication Studies, UT Austin

On behalf of former students and current students

108. Dr Kristie Patricia Flannery. Killam Postdoctoral Fellow, University of British Columbia. Former University of Texas at Austin Writing Fellow (2017-2018), and Department of History graduate student (2011-2019).

109. Prof. Cameron Strang. Assistant Professor of History. University of Nevada-Reno. Alumnus UT-History.

110. Prof. Ben Breen. Assistant Professor of History. US Santa Cruz. Alumnus UT-History (Professor Martinez's TA)

111. Prof. Paul Conrad. Assistant Professor of History. UT Arlington. Alumnus UT-History.

112. Prof. Francis Goicovich. Associate Professor of History. Universidad de Chile. Alumnus UT-History

113. Prof. Brad Dixon, Assistant Professor of History, University of Memphis. Former IHS Fellow (2018-2019) and Department of History graduate student (2013-2018).

114. Prof. Chloe Ireton, Lecturer in Iberian History and the History of the Iberian World 1500-1800, (Alumni of History graduate program, The University of Texas at Austin, 2011-2018)

115. Dr. Adrian Masters, German Research Foundation Fellow at the University of Tübingen, former UT Austin Institute for Historical Studies Fellow (2018-2019), UT University Writing Fellow (2017-2018), and Department of History graduate student (2011-2018)

116. Dr. Ran Segev. Postdoctoral Fellow. Minerva Humanities Center. Tel Aviv University History Department. UT-Austin. 2008- 2015

117. Dr. Dolph Briscoe IV, Lecturer of History at Texas A&M University-San Antonio. History Department UT 2014.

118. Dr. Angela Smith. Adjunct Professor St Edwards University. Alumnus History Department UT. Ph.D 2014.

119. Prof. Greg Cushman. Associate Professor of International Environmental History at University of Kansas. Alumnus History Department UT (Ph.D 2003).

120. Nicolás Alejandro González Quintero, Ph.D Candidate at the History Department at UT Austin; UT University Writing Fellow (2019-2020).

121. Diana Heredia-López, Graduate Student, Department of History

122. Stormie Koerner, currently a graduate student at the UT iSchool; BA in history and classics from UT Austin.

123. Sophia Grace Donnelly: graduated, December 2014 BA in Liberal Arts with Honors, History Major.

124. Alexander Chaparro-Silva. Graduate Student, Department of History

125. Gary Dunbar. Graduate Student, Department of History

126. Ernesto Mercado. Graduate Student. Department of History.

127. Stormie Koerner, currently a graduate student at the UT iSchool; BA in history and classics from UT Austin

128. Maria Aina Ongcheap, Undergraduate, BSA Neuroscience and BA History (History of Science)

129. Lauren Peña. Graduate Student and Assistant Instructor. Department of Spanish and Portuguese.

130. Gabriel J Rodriguez-Rivera. Scientist in Residence. Environmental Science Institute. Department of Chemical Engineering.

131. Allegra Geller.  M.S. University of Texas at Austin, Information Studies; B.A. 2013 History and European Studies; Phi Beta Kappa

132.  Michelle Morar. BS Biology 2009, M. Ed 2019. U-T Austin.

133.  Edgardo Irizarry Arroyo.  Graduate Student. School of Design and Creative Technologies

134.  Maxwell Anderson, J.D. Candidate at UT Law.

135.  Bethany Skeen. BA. University of Texas-Austin.

136.  Doreen Balbuena BA International Relations & Global Studies, 2013

Additional signatures
137. Prof. Liliana M. Garces, Associate Professor of Education, College of Education

138. Prof. Shaleiah Fox. Director External Relations Texas Development. Black Studies at UT Austin.

**about my case**

# Exhibit 60

Alberto A. Martinez <almartinez@austin.utexas.edu>

Thu 10/24/2019 5:50 PM

**To:** Gordon, Edmund T <etgordon@austin.utexas.edu>
**Bcc:** Alberto Martinez <almartinez1905@gmail.com>

📎 2 attachments (11 MB)

190927 Alberto Martinez Retaliation Complaint and Exhibits - full size.pdf; 190928 signed employment-discrimination-complaint-twc MARTINEZ.pdf;

Dear Ted,

I look forward to our group meeting with the Provost next week.
Still, when we last met I was stunned to hear that when you kindly signed Jorge's letter nominating me for an award, persons actually wrote and called you to say negative rumors about me, whatever they said. I've lived in the US for 27 years without winning any award, so it makes no big difference if I don't win one again. Still, it's not right that anyone should spread false rumors about me, because really I've done nothing wrong.

So, to reassure you that any such claims about me are grossly false, I here send you the formal complaint that my lawyers filed in the EEOC and Texas Workforce Commission last month, in regard to such allegations. Since you handle faculty and diversity issues, you should see it. It's 18 pages, the rest are exhibits.

Now of course, our meeting won't be about this, but in your office we mentioned how difficult it is to confront inequities "on the ground" that is, within departments. My case illustrates why we strongly hope that some structural institutional changes might be implemented in order to improve inclusion of minorities in faculty governance within departments.

Many thanks,
Alberto

EEOC Form 161 (11/16)

**U.S. Equal Employment Opportunity Commission**

# Exhibit 61

## Dismissal and Notice of Rights

| To: | Alberto Martinez<br>409 E. 38th St. #203<br>Austin, TX 78705<br>amartinez21905@gmail.com | From: | San Antonio Field Office<br>5410 Fredericksburg Rd<br>Suite 200<br>San Antonio, TX 78229 |
|---|---|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 36A-2020-00045 | Roy Roscoe,<br>EEOC, Federal Investigator | (210) 640-7562 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

| ☐ | The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC. |
|---|---|
| ☐ | Your allegations did not involve a disability as defined by the Americans With Disabilities Act. |
| ☐ | The Respondent employs less than the required number of employees or is not otherwise covered by the statutes. |
| ☐ | Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge |
| ☒ | The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge. |
| ☐ | The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge. |
| ☐ | Other (briefly state) |

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Jose Colon-Franqui   <span style="font-size:xx-small">Digitally signed by Jose Colon-Franqui<br>DN: cn=Jose Colon-Franqui, o=EEOC, ou=Equal Employment<br>Opportunity Commission, email=jose.colon.franqui@eeoc.gov, c=US<br>Date: 2020.08.27 08:44:32 -05'00'</span>   FOR

8/27/2020

Enclosures(s)

**Travis G. Hicks,**
**Director**

*(Date Mailed)*

cc:   **UNIVERISTY OF TEXAS AT AUSTIN**
Galen Eagle Bull
*Deputy Associate Vice President*
100 West Dean Keeton Street, SSB 3.212
Austin, TX 78712

Katie Frank
**DAVID K. SERGI & ASSOCIATES**
PO BOX 887
329 S. Guadalupe
San Marcos, TX 78667

Enclosure with EEOC
Form 161 (11/16)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice *and* within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

# Exhibit 62

## Differences in Salary by Race & Gender

controlling for Field & Experience (2009-2018)

**Campus-wide, Full Professors**



horizontal line =  White (non-Hispanic)

# Statesman

Exhibit 63

Opinion

# Editorial: UT must show Hispanic faculty are valued, needed

**By American-Statesman Editorial Board**

Posted Nov 3, 2019 at 6:01 AM

Some of the Hispanic faculty members at the University of Texas feel so disregarded that they have coined a term for the discrimination they face: Hispanopía.

The term covers all kinds of wrongs: The fact that UT's Hispanic professors earn thousands of dollars a year less than their white counterparts, even when accounting for seniority and area of study. The stunningly low numbers of Hispanics selected to serve as deans or department heads. The fact that very few Hispanics are honored with endowments and other teaching awards. The reports by some Hispanic faculty that some non-Hispanic colleagues fail to even acknowledge them in the hallway.

All too often, a recent report by UT's Independent Equity Committee found, Hispanic faculty feel invisible.

This cannot stand. We urge the university to take this report as a wake-up call and make clear, in words and deeds, that contributions by all faculty are welcome, valued and necessary to UT's success. That must start with providing Hispanic faculty members equal pay and equal opportunities for advancement.

The value of cultivating a diverse campus should not be a mystery to UT. The university has fought all the way to the U.S. Supreme Court to support diversity by including race with other considerations for student admissions.

UT-Austin President Gregory L. Fenves explained it best in 2015: "UT prepares tomorrow's leaders for a world that is increasingly global and interconnected. It's vital that our students have the opportunity to work with students from different backgrounds and experiences — and the freedom to learn from the myriad perspectives, viewpoints and ideas that should flourish on campus."

A diverse faculty is central to that mission.

Moreover, studies have found that minority students often perform better — earning higher grades and being less likely to drop out — when they have minority teachers who are supportive role models. This is especially important for students pursuing science, technology, engineering or math (STEM) degrees that can lead to high-demand, high-paying careers: A study coauthored by two UT professors found that Latino and African-American students in STEM programs are more likely to switch majors or drop out of college than white students. A stronger representation of minority faculty in those fields could reduce that trend.

Only 7% of the faculty at UT is Hispanic, the Independent Equity Committee report noted, even though Hispanics make up 21% of the students and 39% of the state's population. Clearly the university needs a robust effort to recruit a more diverse faculty.

It must also ensure proper pay and open pathways to advancement for Hispanic professors already at UT. Consider the fact that only 62.5% of Hispanic applicants received tenure from 2010-18, while nearly 85% of white applicants did. Among the Hispanic professors on a tenure track, only 4 out of 10 chose to stay at UT.

Hispanic academics are woefully under-represented in other groups at UT: Only 18 of the university's 541 chairs and professorships are held by Hispanic instructors. Only six of the university's 98 departments are chaired by Hispanics. Only eight of UT's 220 centers and institutes have Hispanic directors.

The university must examine its selection procedures for these leadership posts and academic honors to ensure minority contenders have a fair shot at them.

UT officials tell us they have directed the deans to look at their subordinates' salaries and address disparities. The university has also asked the deans to report back on their procedures for selecting leaders and recommend ways to make the process more open.

That's an encouraging start. But the university must follow through with a regular public accounting on the progress made with new hires, promotions and pay equity — and greater detail on the plans moving forward.

Being a renowned public institution comes with the obligation to serve the interests of all Texans. UT should have a faculty that reflects the diverse, vibrant people of Texas and gives everyone the opportunity to thrive.

HOUSTON ★ CHRONICLE

Subscribe | Sign In

OPINION // EDITORIALS

# Why can't UT-Austin hire, keep Latino faculty? [Editorial]

Exhibit 64

**The Editorial Board**

Jan. 22, 2020



The Torchbearers, a sculpture located south side of the Peter T. Flawn Academic Center at the University of Texas at Austin, is one of the iconic public art pieces of the educational

Limited-Time Offer    99¢ FOR 26 WEEKS

In a message posted on the University of Texas at Austin website, President Gregory Fenves touts the institution's commitment to diversity.

"Our history of exclusion and segregation gives us a responsibility to stand as champions of the educational benefits of diversity," the statement says.

It is a worthy goal — one backed by research showing that all students benefit from a diverse learning environment. Unfortunately, UT's pledge doesn't always translate into reality.

A recent 188-page "Hispanic Equity Report" found "gross disparities" and "discrimination" for Latino faculty at the state's flagship university.

History professor Alberto Martinez, chair of the committee that produced the report, described the inequities to the editorial board in three words: Flabbergasting. Demoralizing. Heartbreaking. We'll add another: Unacceptable.

Consider these findings:

Latino professors are paid less than their white peers, ranging from a difference of $10,000 for associate professors to $25,000 for full professors. The pay gap is even wider for Latinas.

Latinos are virtually shut out of leadership positions. Among the 130 dean positions, only 7.7 percent are Latino and none are held by a Hispanic female. In Texas, Latinas are 20 percent of the population

Limited-Time Offer          99¢ FOR 26 WEEKS

Some departments, such as the 130-year-old history department, have never been chaired by a person of color.

The Teresa Lozano Long Institute of Latin American Studies, named after an Hispanic alumna who endowed it with $15 million, has had no Latino directors since it was founded in 1940.

Only 62.5 percent of Latino applicants received tenure from 2010-18, compared with 85 percent of white applicants.

The report recounts the experience of a Latino professor who was denied tenure despite having a resume that includes three single-author books, two edited volumes, more than 30 scholarly articles and book chapters in print, and others in the works. "Very few candidates in the humanities have such extensive scholarly publications when they receive tenure," the report noted.

Denials despite professional achievement are common, Martinez says. Qualifications aren't the issue. The problem, he says, stems from a lack of Latino representation on committees that determine hiring, promotion and salaries.

UT-Austin has fought successfully at the U.S. Supreme Court to include race as part of its holistic student admission criteria, arguing that a diverse student body "brings with it educational benefits for all students."

That idea must extend to the university's faculty, as Fenves himself noted after the 2016 court ruling.

Limited-Time Offer        99¢ FOR 26 WEEKS

It's especially critical on a campus where 23 percent of undergraduate students are Latino, and in a state where nearly 45 percent of 18-to-24-year-olds are Latino. At UT, only 7 percent of tenure and tenure-track professors are Latino. Compare that with Texas A&M, where 22 percent of students and 16 percent of the faculty are Latino.

The disparity means that many Latino students never have a Latino professor during their time at UT, missing out on mentoring opportunities — or simply the connection to a faculty member who shares the same cultural background. Studies show that Latino and black students perform better with teachers of color who serve as role models.

The obstacles to advancement and inequities in pay lead to a high turnover rate and to frustration among those who stay, Martinez said. From 2013-2018, the report found, 60 percent of Latino assistant professors on tenure track left the school.

In a statement, UT officials said the university is working to address issues of faculty equity. Provost Maurie McInnis has "committed the university to understanding the source of the disparities. The provost has also asked the deans to review and report their processes and outcomes in leadership selection, to improve transparency into these processes, and [make sure] equity is considered in the selection of leadership."

That is encouraging. School officials should also follow recommendations outlined in the report, including hiring more Latino

**Limited-Time Offer**      99¢ FOR 26 WEEKS

staff to achieve equity with white faculty, and creating a rotation that allows all faculty to serve in leadership positions in university and departmental governance.

The university's promise to embrace "diversity in many forms" should include fair pay and opportunity for the Latino professors and other faculty responsible for educating our leaders of tomorrow.

## Sign up for the SaysHou newsletter

Get thought-provoking editorials, columns and letters from the opinion team.

| Enter your email | **SIGN UP** |

By subscribing, you agree to our Terms of use and acknowledge that your information will be used as described in our Privacy Policy.

**HOUSTON ★ CHRONICLE**

   

TOP ∧

### ABOUT

Our Company                           Interest Based Ads

Newspaper Delivery Safety Procedures  Terms of Use

Privacy Notice                        Advertising

Your California Privacy Rights        Careers

### CONTACT

Subscribe                             Customer Service

e-Edition                             Frequently Asked Questions

Archives                              Newsroom Contacts

**Limited-Time Offer**   99¢ FOR 26 WEEKS