UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| ALBERTO MARTINEZ,<br>　　　Plaintiff | § § § | |
| v. | § § § | CIVIL ACTION NO.: 1:20-cv-01175-LY |
| | § § | |
| UNIVERSITY OF TEXAS AT AUSTIN,<br>　　　Defendant. | § § | |

---

**PLAINTIFF'S RESPONSE OPPOSING DEFENDANT'S MOTION TO DISMISS**

---

TO THE HONORABLE UNITED STATES DISTRICT JUDGE LEE YEAKEL:

**NOW COMES**, Plaintiff, Alberto Martinez, by and through his attorney of record, and files this Response opposing Defendant's Motion to Dismiss. In support thereof, Plaintiff would respectfully show the Court the following:

**<u>INTRODUCTION</u>**

Plaintiff Alberto Martinez filed suit against his employer, The University of Texas at Austin ("UT"), for retaliation after his supervisor engaged in a pattern of conduct aimed to dissuade Dr. Martinez, and any other reasonable, similarly situated employee, from further pursuing his study on inequities amongst faculty in UT's History Department. Dr. Martinez's initial notification to his supervisor, the History Department Chair, of "discrimination" and "marginalization" of Hispanic employees in their Department was generally well received and incited the formation of an Equity Committee under Dr. Martinez's leadership to address those issues. However, Dr. Martinez's preliminary conclusions were later met with significant hostility and opposition.

More than mere petty or minor grievances as UT suggests in its Motion to Dismiss, Dr. Martinez's supervisor carried out actions to restrict Dr. Martinez's work and leadership within the Equity Committee and further denigrate Dr. Martinez's professional reputation by spreading gossip throughout the Department by filing two demonstrably false discrimination complaints against him. UT insists Dr. Martinez's supervisor was legally obligated to file the complaints against him, yet that supervisor's pattern of false allegations indicates that a more malicious, retaliatory motive was at play. UT argues that the six-month gap between Dr. Martinez's notice of discrimination and the filing of false complaints is insufficient to establish causation via temporal proximity. However, UT's argument in this regard ignores the additional facts and evidence supporting Dr. Martinez's retaliation claim, which includes explicit statements made by the supervisor indicating her desire to prevent Dr. Martinez from further engaging in a protected activity. Dr. Martinez's First Amended Complaint cites to far more than simply the six-month timeframe to conclude he suffered discrimination and retaliation by his employer.[1] For these and other reasons discussed below, UT's Motion to Dismiss should be denied.

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is appropriate only if the plaintiff has not provided fair notice of its claims and factual allegations that – when accepted as true – are plausible and rise above mere speculation.[2] Such a motion tests the legal sufficiency of the complaint, which requires "a short and plain statement of the claim showing that the

---

[1] Plaintiff does not address the national origin pay discrimination claim referenced in UT's Motion because he intends to voluntarily dismiss that claim and will seek leave to amend his complaint accordingly.
[2] *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

pleader is entitled to relief."[3] A complaint does not require detailed factual allegations; it simply must plead "enough facts to state a claim to relief that is plausible on its face."[4]

Although detailed factual allegations are not required, a complaint may be dismissed when (1) it does not show a right to relief beyond mere speculation or (2) it sets forth a claim for relief from which no more than a mere possibility of misconduct can be inferred.[5] "A claim has facial plausibility when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged."[6] When there are nonconclusory factual allegations, the court must assume that they are true and then determine whether they plausibly give rise to an entitlement to relief.[7] The court must indulge all reasonable inferences in favor of the plaintiff.[8] If the factual allegations are plausible, the court must assume all plausible facts in the complaint are true and cannot decide disputed fact issues.[9]

Motions to dismiss under Rule 12(b)(6) are traditionally viewed with disfavor by the courts.[10] Indeed, "[a] well-pleaded complaint may proceed even if it appears 'that a recovery is

---

[3] Fed. R. Civ. P. 8(a).

[4] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[5] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). *See also Official Cmte. Of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, L.L.P.,* 322 F.3d 147, 158 (2d Cir. 2003) (internal citations omitted) ("A court's task in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.").

[6] *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

[7] *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief[]").

[8] *See, e.g., Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).

[9] *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

[10] *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)) ("[A] motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted[]'").

very remote and unlikely[,]"[11] and "[a] complaint must not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support his claim which would entitle him to relief.'"[12] "[I]f a complaint is vulnerable to [a] 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile. That rule applies 'even if the plaintiff does not seek leave to amend."[13] Appellate courts review a district court's dismissal of claims under Rule 12(b)(6) de novo.[14]

## BACKGROUND

Dr. Martinez is a full professor in UT's Department of History and has taught UT students for the last 15 years. Martinez consistently received excellent evaluations and had no disciplinary record at UT prior to 2019, after Martinez first voiced concerns about inequities in Department governance and faculty salaries.[15] On April 19 and May 2, 2018, Dr. Martinez notified his supervisor (the History Department Chair), Jacqueline Jones, that there was "discrimination" and "marginalization" of Hispanic employees within UT's History Department. In response, Dr. Martinez was appointed to serve as Chair of a new Committee on Equity, reviewing governance, salaries, and promotions in the Department. Said Committee would analyze 15 years of data and disseminate draft reports summarizing the Committee's findings and recommendations.

---

[11] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

[12] *Yusuf v. Vassar Coll.,* 35 F.3d 709, 713 (2d Cir. 1994) (citing *Conley v. Gibson*, 344 U.S. 41, 45-46 (1957)).

[13] *Travelers Indem. Co. v. Dammann & Co.*, 594 F.3d 238, 256 n.14 (3d Cir. 2010) (internal citations omitted).

[14] *See, e.g., Causey v. Swell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *Doe on behalf of Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998).

[15] *See* Plaintiff's First Amended Complaint at ¶ 23, ECF 4.

Dr. Martinez first sent the Committee's draft report, titled "Report: Equity in Salaries and Raises," on October 15, 2018.[16] This draft was designed "to discuss 'compression,' that is, inequities in salaries, and to make proposals for how to improve the Guidelines of the Salary Committee."[17] An ultimate conclusion from this report noted that "[i]nequities presently exist in faculty salaries."[18] While most of the report's recipients agreed with this broad, underlying conclusion, some faculty, including the Department Chair Jacqueline Jones, reacted rather defensively and took issue with certain charts and tables in the report's appendices that analyzed yearly salary alongside the number of yearly publications issued by individual faculty members.[19]

Several days after disseminating the draft report, Department Chair Jones attended a meeting of the Department's Executive Committee and voiced her intent to disband the Equity Committee.[20] After Jones's attempt to disband the Committee failed, she instead created subcommittees of the Equity Committee, personally appointed the chairs for those subcommittees, and effectively removed and reallocated many of Dr. Martinez's Committee responsibilities to the new subcommittee chairs.[21] By so doing, Jones ceased communicating

---

[16] Am. Complaint (ECF 4), ¶ 30. *See also* Ex. 4 to Am. Complaint, ECF 4-1, 29.

[17] ECF 4-1, 29.

[18] *Id.*

[19] *See, e.g.,* ECF 4-1, 118-120 (Hardwick: "The report is offensive[.] . . . I am happy to send you my cv (although this also is easily available on my faculty page) and a time sheet so you can see I'm not underpaid and overcompensated for service."); ECF 4-1, 129-131 (Jones: "[T]his section seems to denigrate the industrial-strength administrative work that some of our colleagues do. And this section suggests that this kind of work is a boondoggle. Not true!"). *Compare to* ECF 4-1, 99 (Garrard: "I so appreciate the hard work and startling evidence you came up with in the report. It offers quite a remarkable snapshot of our department…and not a particularly pretty one, at that. . . . [I]t definitely shines light in a lot of dark corners.").

[20] ECF 4, ¶ 38; ECF 4-1, 133-135.

[21] ECF 4, ¶¶ 42, 45-58.

directly with Martinez, although he was still technically Chair, and largely failed to include him in the ongoing work that originally was his protected activity.[22]

In late February 2019, Jones held a meeting with Dr. Martinez reprimanding him for statements that he never made, as she somehow conflated Martinez's description of one person feeling "disenfranchised," with accusing another person of being "racist."[23] Jones then warned Martinez that members of the Department faculty were considering reporting him to Human Resources.[24] Jones sent Martinez an email purporting to summarize their conversation approximately one month later, writing that "[d]isparaging colleagues in emails to the committee list-serv is divisive and inappropriate, especially when at least some of the claims are misleading or false."[25] Initially unbeknownst to Martinez, Jones also submitted multiple accusations against Martinez to UT's Office for Equity and Inclusion ("OIE").[26] The sham investigations that followed spanned many months all while malicious gossip amongst Jones and other faculty in the Department concerning Martinez continued to spread.[27]

Jones first accused Martinez of having an inappropriate relationship with a graduate student. In her complaint to OIE, Jones wrote, "[REDACTED] told me that [REDACTED] had informed [REDACTED] that a current faculty member of the department had engaged in inappropriate conduct with graduate students in the past, and was dating a graduate student now. [REDACTED] said [REDACTED] were concerned about the well-being of the graduate

---

[22] *Id.*
[23] ECF 4, ¶ 59. *Compare to* ECF 4-1, 156 ("I saw that [she] therefore felt exasperated and disenfranchised.").
[24] ECF 4, ¶ 59.
[25] ECF 4, ¶ 61; ECF 4-1, 166.
[26] ECF 4, ¶¶ 63-73.
[27] *Id.*

student(s)."[28] Jones categorized this as "Sexual Misconduct." Importantly, Martinez was not informed of the complaint until months later when OIE vaguely informed him that a formal investigation would not commence at that time.[29] UT's Motion to Dismiss mistakenly claims Jones had an obligation to file this complaint. However, the university rules, and state law on which the school rules are based, only require that reports be made concerning sexual harassment, sexual assault, dating violence, and stalking.[30] Jones's complaint alleged a consensual relationship ("dating") existed between Martinez and a graduate student that he did not supervise or teach. Even if such false allegations were true, they would not fall under the categories of sexual harassment, sexual assault, dating violence, or stalking.[31] And UT's investigators could not have been much too concerned with the merit of the complaint given that they: (1) never initiated a formal investigation; and (2) waited approximately four months before contacting Martinez to ask him about it.[32]

In March 2019, Jones filed her second complaint against Martinez, this time accusing Martinez of religious discrimination.[33] Jones alleged that a graduate student (perhaps the same

---

[28] ECF 4-1, 142.

[29] In fact, Martinez did not receive definitive confirmation that Jones filed this third-party complaint until receiving a copy of UT's response to his EEOC charge. Prior to this, Martinez was merely informed of "an anonymous concern[.]" *See* ECF 4-1, 177 & 180.

[30] *See* Tex. Educ. Code § 51.255. Importantly, this rule was not in effect until 2020 while Jones's complaint against Martinez was filed in 2019.

[31] Indeed, such an alleged relationship does not even constitute a violation of the university's consensual relationships policy.

[32] ECF 4-1, 177. *Compare to* ECF 9, 12 ("Martinez's own account of his relationship with Mary shows why the matter needed to be investigated.").

[33] ECF 4-1, 186 ("The alleged statement was provided by an anonymous third party[,] . . . who claims you have charged openly that Professor Jacqueline Jones shows favoritism towards Jewish colleagues, and appoints them to positions of administrative influence in the Department of History.").

one identified in the first complaint?)[34] told her that Martinez made anti-Semitic comments relating to Jones's appointment of certain faculty to positions with administrative influence and power. Jones complained that, as a result, Martinez "caused tension and discourse within the Department of History between Jewish and Non-Jewish faculty in that many believe [Jones] considers race and/or religion in her administrator leadership appointment decisions."[35] Jones further alleged that Martinez told a student Jones was "Head of the Jewish Kabbalah."[36] No one, including the graduate student, corroborated Jones's account, and Martinez was ultimately exonerated several months after first being questioned on the complaint.[37]

As detailed in Martinez's First Amended Complaint, Jones's conduct thwarted Martinez's work to complete and finalize the report on Department salaries.[38] While Martinez remains employed at UT and was not found to have violated University discrimination policies, his professional reputation remains tarnished as a result of the malicious gossip and rumors derived from Jones's allegations and OIE's investigations.[39]

---

[34] *See* ECF 4, ¶ 73 (Jones's meeting with the graduate student she believed to be dating Martinez took place on the same day Jones filed the religious discrimination complaint). *See also* ECF 4-1, 188.
[35] ECF 4-1, 190.
[36] ECF 4-1, 191.
[37] *See* Ex. 45 of Am. Complaint, ECF 4-1, 188-193; *Id*. at 193 ("The facts do not support a finding that Respondent exhibited behavior or conduct directed towards Complainant or Jewish individuals that subjects them to treatment or adversely affects their employment or education because of race or religion.").
[38] ECF 4, ¶ 77.
[39] ECF 4, ¶¶ 90-94. *See, e.g., id.* at ¶ 92 (following Martinez's nomination for UT's Civitatis Award for outstanding service, the Vice Provost for Diversity recounted receiving multiple emails and phone calls "with awful allegations about Martinez.").

## ARGUMENT & AUTHORITIES

I.   **Martinez Plausibly Pleaded Title VII Retaliation in His First Amended Complaint.**

UT's Motion to Dismiss should be denied because UT (1) ignores the facts and context surrounding Martinez's protected activities and the adverse actions taken by his supervisor, which, taken together, demonstrate a causal connection between the two; (2) argues that the absence of adverse findings against Martinez somehow negates or vitiates any material, adverse harms suffered by Martinez throughout the course of the investigations and thereafter; and (3) mistakenly identifies Martinez's initial email correspondence identifying inequities within UT's History Department to preemptively start the 300-day EEOC limitations period.[40] As can be plainly read in Martinez's First Amended Complaint, various comments and actions taken by Martinez's supervisor lead to the reasonable conclusion that his supervisor's conduct was retaliatory.[41] After taking great issue with Martinez's draft report on salaries, his supervisor made explicit her intent to disband further work on the issue. Thereafter, and once other faculty intervened and prevented the disbandment of the Equity Committee, Martinez's supervisor created various subcommittees, personally appointed leaders of those subcommittees, instead of Martinez, and excluded Martinez from performing much of the protected work he originally was tasked to undertake. Lastly, Martinez realized he was the target of retaliation in March of 2019

---

[40] UT's Motion to Dismiss includes various falsehoods that warrant brief mention here, such as that Jones awarded a raise to Martinez after his public statement of discrimination; when in fact, she recommended a raise for him on November 30, 2017; long before his protected statements of April 18, 2018, May 2, 2018, and October 15 2018. *See* ECF 4-1, 25 & 48. (Exhibit 2; Exhibit 4 of Am. Complaint), Likewise, UT's Motion states that, after Martinez reported discrimination, "In response, Jones: (1) "asked for a robust discussion" on the subject." ECF 9, 3. This too is false; Jones wrote that previously, in an email of April 13, 2018 (via her assistant, Arturo Flores). Martinez's statements of discrimination happened later, on April 18 and May 2, 2018.

[41] Regardless, the Fifth Circuit "previously acknowledged that 'temporal proximity between protected activity and alleged retaliation is sometimes enough to establish causation *at the prima facie stage.*'" *Musser v. Paul Quinn Coll.*, 944 F.3d 557, 564 (5th Cir. 2019) (emphasis added) (internal citations omitted).

and filed his charge with the EEOC in September 2019, making all claims and matters at issue in his complaint timely. Therefore, Martinez respectfully requests the Court deny UT's Motion to Dismiss.

### A. Martinez's Complaint Does Not Exclusively Rely on the Six-Month Gap to Establish Causation Via Temporal Proximity.

The relatively short timeframe in which Jones filed complaints against Martinez, when considered alongside other statements made by Jones expressing a desire to deter Martinez from further engaging in a protected activity, is more than sufficient to plausibly allege a causal connection between the protected activity and the adverse acts he suffered. In his First Amended Complaint, Martinez details the various actions taken and statements made by his supervisor following his dissemination of a draft report on salaries that establish the requisite causation. Specifically, several days after receiving the draft report, Martinez's supervisor explicitly stated her intent to disband the Equity Committee. Such disbandment would clearly serve to halt Martinez's efforts to address discrimination in UT's History Department. [42] Thereafter, Martinez's supervisor formed subcommittees within the Equity Committee, she personally appointed allies to lead those subcommittees, removed many of Martinez's responsibilities originally assigned to him as Chair of the Equity Committee, and filed two false complaints against him ironically accusing him of discrimination. The various actions undertaken by Martinez's supervisor in this regard give rise to the plausible conclusion that they were retaliatory in nature.

UT's argument narrowly focuses on the six-month time period between when Martinez first wrote about discrimination and his supervisor's filings of various complaints against him to argue Martinez cannot plausibly establish causation via temporal proximity alone. However,

---

[42] *See* ECF 4, ¶ ¶ 4 & 7.

Martinez never sought to establish causation by mere temporal proximity. While this six-month timeframe may not be "close enough, without other evidence of retaliation, to establish the 'causal connection' element of a prima facie case of retaliation[,]" Martinez's Complaint outlines "other evidence of retaliation" supporting this conclusion that is more than sufficient to evade dismissal under Rule 12(b)(6).[43] Specifically, after distributing his draft report on salaries, Martinez alleges that his supervisor: (1) voiced her intent to disband the Equity Committee altogether; (2) subsequently limited, ignored, and/or excluded Martinez's work within the Equity Committee; (3) falsely accused Martinez of writing "denigrating" comments about female coworkers; and (4) filed two patently false discrimination complaints against him all while circulating malicious allegations about him to tarnish his professional reputation. All of the acts taken by Martinez's supervisor following his draft report on salaries lead to the reasonable conclusion that the supervisor was retaliating against him for engaging in a protected activity. In UT's own investigation, witnesses confirmed that Jones deterred Martinez's committee from effecting change.

The Fifth Circuit distinguished complaints relying exclusively on temporal proximity to establish causation from those providing additional evidence justifying such conclusion in outlining its prior decision in *Shirley v. Chrysler First, Inc.*[44] As the Court noted in *Strong v. Univ. Health Care Sys., L.L.C.*, "[t]he plaintiff in *Shirley* proved causation not by relying solely on temporal proximity, but by showing that she had no disciplinary history during her nine years of employment and quickly was fired for incidents for which no evidence existed. And importantly, her boss made disparaging comments about her EEOC complaint and 'harassed

---

[43] *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) (internal citations omitted).
[44] *See Strong v. Univ. Health Care Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) (distinguishing *Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir. 1992)).

[her] to death about it' before firing her."[45] Martinez's Complaint contains similar allegations to those described by the Fifth Circuit above. Prior to Martinez's work in the Equity Committee, Martinez had no disciplinary history, was employed by UT for more than 10 years, and was harassed by his supervisor in various ways as he sought to complete his work on the Committee's report on salaries. The facts as pleaded in Martinez's Complaint give rise to the reasonable conclusion that the adverse actions Martinez faced were the result of unlawful retaliation.

      **B.  The Adverse Actions Taken By Martinez's Supervisor Were More Than Mere Minor Grievances and Dissuaded Martinez, and Others, From Engaging in Further Protected Activity.**

      The various actions taken by Martinez's supervisor in this case were "'harmful to the point that [they] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"[46] In this particular case, Martinez's supervisor did successfully impede Martinez from performing further work in his report on salaries and also dissuaded another Committee member from performing certain work in the Equity Committee, and, ended all meetings of the Equity Committee per se.[47] While individual comments or actions taken by

---

[45] *Id.* ("The circumstances surrounding Strong's termination were very different and are considerably less compelling legally: Strong was not harassed at all about her gender discrimination complaint; Strong had worked for UHS for two years, not nine; Strong's disciplinary record was not completely clean prior to her complaint; and Strong's poor performance and improper conduct were not unsubstantiated when she was fired.").

[46] *Porter v. Houma Terrebonne Hous. Auth. Bd. of Comm'rs*, 810 F.3d 940, 945-46 (5th Cir. 2015) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57-69 (2006)).

[47] *See* ECF 4-1, 142 ("Jackie [Jones] has contacted me with objections about the survey, and I feel that I am stuck in an untenable position, forced to mediate between her and the committee.").

Martinez's supervisor may appear inconsequential or minor for purposes of Title VII retaliation, the cumulative effect was materially adverse and gives rise to a plausible retaliation claim.[48]

Alleged violations of sexual misconduct and discrimination, and investigations involving such allegations, can and did cause actionable harm in Martinez's case.[49] For Martinez, the false complaints filed by his supervisor resulted in months-long formal and informal investigations by OIE that began long before Martinez was given notice or an opportunity to respond. Throughout that time, Martinez was the subject of malicious rumors that spread throughout UT's History Department and beyond, alleging an inappropriate relationship with a graduate student that never took place among other baseless, unfounded claims. The fact that the investigations against Martinez did not result in termination of his employment is not dispositive here. As another district court previously acknowledged "an investigation can, under certain circumstances, constitute an adverse employment action."[50] Martinez's case involves such investigations because they were filed and pursued by his supervisor with the intent to dissuade or disrupt Martinez's work in achieving equity for employees in UT's History Department.[51]

---

[48] *See Porter v. Houma Terrebonne Hous. Auth. Bd of Comm'rs*, 810 F.3d 940, 947 (5th Cir. 2015) (citing *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 63-64, 67 (2006)) ("*Burlington Northern* requires us to consider the context of the alleged adverse employment actions, and emphasized that there are all manner of ways employers may retaliate against employees, some even unrelated to the employment.").

[49] *See, e.g., Doe v. Univ. of Tex. at Austin et al*, ECF Docket No. 31, No. 18-cv-85-RP, at *3 (W.D. Tex. Aug. 30, 2018) ("[B]eing investigated for violation of a university's sexual misconduct policy, which carries the threat of expulsion [or termination], constitutes a legally cognizable injury.").

[50] *Tingle v. Hebert*, 305 F. Supp. 3d 678, 691 (M.D. La. 2018) (internal citations omitted). *See also Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 436 (N.D.N.Y. 2009) ("Because being investigated by one's employer could likely deter a victim from complaining about discrimination, this qualifies as an adverse action.").

[51] *See Tingle v. Hebert*, 305 F. Supp. 3d 678, 690 (M.D. La. 2018) (citing *Williams v. Guilford Technical Community College Board of Trustees*, 117 F. Supp. 3d 708 (M.D.N.C. 2015)) ("[P]articularly harsh investigations that involve 'heightened scrutiny' can constitute an adverse employment action.").

In his First Amended Complaint, Martinez details the harms he experienced as a result of his supervisor's retaliatory acts. Jones's discrimination complaints were designed to malign his professional reputation, resulting in an undetermined number of persons being contacted by OIE to discuss the allegations and leading to the further spread of gossip throughout the Department and university at large. Such gossip was allowed to fester and percolate for months given the extensive delays in OIE concluding their investigations. Regardless of those delays, any witnesses questioned would not have been entitled to nor received copies of the "Private and Confidential" reports ultimately exonerating Martinez. Following the conclusion of those investigations, Martinez was nominated for a service award only to learn that his nomination resulted in emails and calls to the Vice Provost of Diversity that accused Martinez of "awful" conduct for which OIE had already exonerated him. Those same accusations were later discussed after Martinez applied to serve as Department Chair.

The retaliatory acts taken by Martinez's supervisor represent far more than "[p]etty slights or minor annoyances that often take place at work and that all employees experience."[52] Indeed, Martinez himself had never experienced such circumstances as a UT employee prior to issuing his draft report on salaries in his new role as Chair of the Equity Committee. Other UT employees' subjective perceptions of the adversity faced by Martinez further evince that Martinez suffered a materially adverse harm in this case.[53] Partially in response to Martinez's

---

[52] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

[53] *See, e.g.,* ECF 4-1, 111 ("Defensive statements and injured sensibilities against the committee's preliminary report, however, were unfortunate. . . . But it is unfortunate that one or a few voices can unwittingly diminish the importance of demonstrable cases of inequity in our department."); ECF 4-1 132 ("[R]emove yourself from the center of all the unnecessary attacks (I was expecting disagreements but not at this sustained level of anger)[.] . . . [Y]ou cannot drive change if established and privileged vested interests are not ready for it."); ECF 4-1, 142 ("Jackie [Jones] has contacted me with objections about the survey, and I feel that I am stuck in an untenable position, forced to mediate between her and the committee."); ECF 4-1, 150-151

work on the draft report on salaries, Jones held a meeting with Martinez and warned him that unspecified other faculty members were considering filing reports to Human Resources.[54] That warning later surfaced in the form of Jones's own two discrimination complaints to OIE, which then resulted in months-long investigations. All of the circumstances surrounding these events support the plausibility of Martinez's retaliation claim in this case.[55] This Court should therefore deny UT's Motion to Dismiss Martinez's First Amended Complaint.

## CONCLUSION AND PRAYER

For the reasons stated in this Response, as well as those provided in Plaintiff's prior pleadings before this Court, Plaintiff respectfully prays this Court deny Defendant's Motion to Dismiss and for such other and further relief to which he may be justly entitled.

Respectfully submitted,

DAVID K. SERGI AND ASSOCIATES, P.C.
329 S. Guadalupe St.
San Marcos, TX 78666
Tel. (512) 392-5010
Fax. (512) 392-5042

/s/ Katherine Frank
KATHERINE FRANK
Texas Bar No. 24105630
Email: katie@sergilaw.com
COUNSEL FOR PLAINTIFF

---

("Alberto had never been chair of anything until last April. Alberto temporarily became the chair of the equity committee. He directed reforms on equity merit pay and the climate survey and gathered data. Suddenly, the equity committee was dissolved into subcommittees and power devolved to the same pool of people . . . who have been running things in the department. . . . How do we make sure that those of us who want to occupy positions of leadership in the department . . . won't be, again, left out?").
[54] ECF 4, ¶ 59.
[55] See Tingle v. Hebert, 305 F. Supp. 3d 678, 689 (M.D. La. 2018) (finding that an adverse employment action can be found where the "particular investigations involve instances where the Defendants specifically and unfairly targeted the Plaintiff in what amounted to sham investigations.").

[ 15 ]

## **CERTIFICATE OF SERVICE**

I certify that on February 25, 2021 a true and correct copy of the Plaintiff's Response to Defendant's Motion to Dismiss was served on Todd Dickerson, counsel for Defendant, electronically through the electronic filing manager.

/s/ *Katherine Frank*
Katherine Frank